FILED
17-0637
12/21/2017 3:18 PM
tex-21442581
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

NO. 17-0637

_____

# IN THE SUPREME COURT OF TEXAS

_____

## THE DALLAS MORNING NEWS, INC. AND KEVIN KRAUSE,

## PETITIONERS

## V.

## LEWIS HALL AND RICHARD HALL, INDIVIDUALLY AND ON BEHALF OF RXPRESS PHARMACIES AND XPRESS COMPOUNDING,

## RESPONDENTS

_____

## ON APPEAL FROM THE SECOND COURT OF APPEALS FORT WORTH, TEXAS
## NO. 02-16-00371-CV
## TRIAL COURT CAUSE NO. CV16-0309
## 43rd JUDICIAL DISTRICT COURT OF PARKER COUNTY, TEXAS

_____

## RESPONDENTS' RESPONSE TO PETITION FOR REVIEW

_____

Robert J. Myers
State Bar No. 14765380
rmyers@myerslawtexas.com
John J. Shaw
State Bar No. 24079312
jshaw@myerslawtexas.com

MYERS ✷ LAW
2525 Ridgmar Blvd., Ste. 150
Fort Worth, TX 76116
Tel: (817) 731-2500
Fax: (817) 731-2501

# TABLE OF CONTENTS

Table Of Contents .................................................................................. ii

Index Of Authorities ............................................................................ iii

Statement Of Facts ...............................................................................1

    A. Introduction..................................................................................1

    B. The Dallas Morning News Articles ............................................2

    C. The Aftermath of the Articles: The Lawsuit and Subsequent Search .............5

Summary Of The Argument ..................................................................6

Argument................................................................................................8

I. Response to Issue 1: The Court of Appeals Correctly Applied the Substantial Truth Test and the TCPA's Burden-Shifting  Framework ................8

    A. The Court of Appeals did not err in holding the first gist was not substantially true .........................................................................8

    B. The Court of Appeals correctly applied the TCPA's burden-shifting framework ..................................................................10

II. Response to Issue 2: The Court of Appeals Correctly Applied the "Ordinary Reader" Standard and the Substantial Truth Test ............................10

III. Review is not Warranted Based on a Bare Assertion that  Respondents' Evidence was "False" ......................................................13

Conclusion and Prayer ........................................................................18

Certificate Of Compliance ..................................................................20

Certificate Of Service..........................................................................21

Index to Appendix................................................................................22

# INDEX OF AUTHORITIES

**State Cases**

*AOL, Inc. v. Malouf*, 05-13-01637-CV,
2015 WL 1535669 (Tex. App.—Dallas Apr. 2, 2015, no pet.) ............................9

*Basic Capital Mgmt., Inc. v. Dow Jones & Co., Inc.*,
96 S.W.3d 475 (Tex. App.—Austin 2002, no pet.)................................................9

*D Magazine Partners, L.P. v. Rosenthal*,
529 S.W.3d 429 (Tex. 2017) .............................................................. 10, 11, 12

*Freedom Communications, Inc. v. Coronado*,
372 S.W.3d 621 (Tex. 2012) ...................................................................... 16, 17

*Guyton v. Monteau*,
332 S.W.3d 687 (Tex. App.—Houston [14th Dist.] 2011, no pet.) .....................17

*In re Lipsky*,
460 S.W.3d 579 (Tex. 2015) ...........................................................................9, 10

*In re Lowe's Home Centers, L.L.C.*, 13-16-00493-CV,
2017 WL 3205522 (Tex. App.—Corpus Christi July 28, 2017, no pet.).............16

*Inwood Forest Cmty. Improvement Ass'n v. Arce*,
485 S.W.3d 65 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ................14

*KBMT Operating Co., LLC v. Toledo*,
492 S.W.3d 710 (Tex. 2016) ...........................................................................9, 10

*Neely v. Wilson*,
418 S.W.3d 52 (Tex. 2013) ................................................................................12

*Office of Pub. Util. Counsel v. Pub. Util. Com'n of Texas*,
878 S.W.2d 598 (Tex. 1994) .............................................................................16

*SEI Bus. Sys., Inc. v. Bank One Texas, N.A.*,
803 S.W.2d 838 (Tex. App.—Dallas 1991, no writ) .........................................15

*Tran v. Fiorenza*,
934 S.W.2d 740 (Tex. App.—Houston [1st Dist.] 1996, no writ).......................17

*Turner v. KTRK Television, Inc.*,
   38 S.W.3d 103 (Tex. 2000) ................................................................12

**State Statutes**

Tex. Civ. Prac. & Rem. Code Ann. § 27.003 (West) ...............................................14

Tex. Civ. Prac. & Rem. Code Ann. § 27.005 (West) ...............................................10

Tex. Civ. Prac. & Rem. Code Ann. § 27.006 (West) ...............................................10

Tex. Civ. Prac. & Rem. Code Ann. § 27.008(a) (West).........................................14

Tex. Civ. Prac. & Rem. Code Ann. § 73.002(a); (b)(1)(A) (West).........................13

Tex. Civ. Prac. & Rem. Code Ann. § 73.005 (West) ...............................................12

**State Rules**

Tex. R. Evid. 201(b)..............................................................................16

Texas Rule of Appellate Procedure 9.4(i)(1)..........................................................20

Texas Rule of Appellate Procedure 9.4(i)(2)..........................................................20

## STATEMENT OF FACTS

### A. Introduction

Respondents are founders of RXpress Pharmacy ("RXpress"), a pharmaceutical compounding company with headquarters in Tarrant County, Texas. CR 566. Respondent Lewis Hall is a state-licensed pharmacist and has been practicing pharmacy for over 40 years. CR 566. Respondent Richard Hall has operated the business affairs of Lewis' pharmacy business over the years. CR 566.

In 2013, the Halls determined to enter into a partnership/joint venture with Scott Schuster and Dustin Rall. Both Schuster and Rall had experience in medical sales and marketing. CR 381–82. The initial concept and structure of the venture was straightforward, Rall and Schuster's role in the venture was to sell the compounded prescription product concept to doctors who would prescribe the medication for their patients. CR 381. The business plan was for the pharmacy, under Lewis's medical direction and Richard's management, to fill the prescriptions for patients, bill the insurance providers for the cost, and generate a profit, which all four venturers would share in equally. CR 381.

Following the formation of the venture, RXpress experienced a sustained period of successful operation and growth. Respondents became involved in a dispute with their business partners about business practices and the handling of fiscal matters. CR 569. Respondents sued the business partners in a public lawsuit.

1

Nothing in the lawsuit alleged or suggested that the Pharmacy was or is guilty of any crime or criminal activity. Rather, the allegations of wrongdoing were leveled at Respondents' business partners and companies that they owned. CR 569.

Even before Respondents' disputes with their partners had begun, the United States Department of Defense had begun to investigate and even "raid" certain unscrupulous pharmaceutical companies in Mississippi, Alabama and, eventually, Texas. These investigations and raids were prompted by suspicion or proof of said companies committing widespread fraud against the federal government. "TriCare," the effective benefits examiner arm of the federal government, was the instigator of investigations where fraud was suspected. Needless to say, revelations of "investigations," much less the "raids," were the death-knell of the targeted companies. CR 80–89.

## B. The Dallas Morning News Articles

From February through March 2016 *The News* published a series of articles, many of which were almost exclusively about RXpress.

### i. *The February 5th and 6th Articles*

The initial article was published on February 5, 2016 at 11:05 p.m. on the Dallas Morning News website. The article was titled, "North Texas pharmacy in federal probe is accused of paying kickbacks to doctors." The article was republished in the print version of the Dallas Morning News the following morning

on the front page under the title, "Drug kickbacks alleged; doctor-pharmacy ties' legality questioned in lawsuits, investigations." The continuation of the article on page 2A carried the title, "Compounder faces scrutiny." The articles continue to make various statements that Respondents have conducted their business in the same manner as others in the compounding industry that have been found to have committed criminal and civil wrongs. CR 80–89.

### ii.    The February 9th, 10th, and 11th Articles

The February 9th article[1] was published online in the "Crime" section, specifically as part of the "Crime Blog." The article primarily discusses a new Texas law that enables pharmacy regulators access to pharmacy financial records. The article makes one statement about RXpress: "RXpress Pharmacy of Fort Worth is currently being investigated for possible violations of federal law by the Department of Defense due to its use of Tricare money. Tricare is a health insurance program for the military, similar to Medicare." This particular online version contained a hyperlink to the February 5th article. The February 10th version[2] was featured in a different section online under a different title, but this article contained no hyperlink to the February 5th article. The February 11th version[3] was published in the print edition under yet another title.

---

[1] CR 98.
[2] CR 105.
[3] CR 112.

3

### iii. February 24th Article

The February 24th Article[4] was published on *The Dallas Morning News* Crime Blog. The article was entitled "Dallas firm that marketed compounded pain creams busted in massive health care fraud, kickback case." The article proceeded to describe the indictment and arrest of the principals of a pharmaceutical marketing company for a massive $65 million healthcare fraud scheme involving TriCare. After describing the individuals, their criminal actions, and two pharmacies implicated in the fraud, Petitioners included the following statement: "It is the first federal indictment in North Texas in connection with the government's largescale criminal investigation into compounding pharmacies and their marketing operations that have received Tricare money. *The Dallas Morning News* recently reported that a **Fort Worth compounding pharmacy is under investigation** in connection with similar allegations." The text in bold contained a hyperlink to the defamatory February 5th article.

### iv. The March 11th and 13th Articles

The March 11th article[5] was published on *The Dallas Morning News* Crime Blog. The article is titled, "North Texas compounding pharmacy under federal scrutiny was booted from private network over fraud concerns." That article was

---

[4] CR 115–122.
[5] CR 129–36.

republished on March 13th[6] at B1 of the print edition of *The Dallas Morning News* under the title "Pharmacies booted over fraud concerns; Audit reveals errors at compounders under federal scrutiny." The article generally mirrors the original February 5th and 6th articles, only this article adds statements regarding Respondent Xpress Compounding and its lawsuit involving a dispute with a pharmacy benefits manager.

**C. The Aftermath of the Articles: The Lawsuit and Subsequent Search**

Following the publication of the series of articles, RXpress's business declined rapidly. RXpress went from filling hundreds of prescriptions per day to only a few. CR 569. RXpress filed suit against *The News* on March 17, 2016. CR 6–21. *The News* filed a motion to dismiss under the Texas Citizens Participation Act ("TCPA"). The trial court denied the motion and the court of appeals affirmed.

On September 15, 2016, almost eight months after publication of the first article, the Defense Criminal Investigative Service of the Department of Defense searched Respondents' offices pursuant to a search warrant.[7] Respondents also discovered that Petitioner Krause's role in publishing the articles was less than passive. As the hearing on *The News*' motion had occurred, and without the ability

---

[6] CR 138–41.

[7] *The News* makes much about this event. However, no effort is made to cite any authority to support the suggestion that subsequent events somehow make the eight-month-old publications "true." By the time the subsequent search occurred, the damage to Respondents was done and the businesses effectively shut down. Moreover, this event happened at such a time after the hearing on the motion to dismiss. The record in this case was set and the only thing remaining was for the trial court to rule.

to conduct meaningful discovery, RXpress had only one choice but to notify the trial court of facts that had come to light implicating *The News*' role, along with Nathan Halsey, the primary source for the news reports, by filing an advisory to the court and parties. CR 979–1086. It became apparent that the stories were nothing more than a ruse to assist Halsey, with the help of a lawyer from a law firm that previously represented RXpress, in filing what he hoped would become a lucrative qui tam lawsuit involving RXpress.[8]

## SUMMARY OF THE ARGUMENT

This defamation case arises from a series of articles written by Dallas Morning News reporter Kevin Krause and published in both the online/electronic and print editions of the paper in February and March 2016. Petitioners have truly avoided what is and should be central to this Court's de novo review—what is the gist of the stories? Despite Petitioners' statements to the contrary, accurately reporting third-party allegations by weaving them together into a cloth that casts a substantially false and defamatory shadow over Respondents is still actionable.

---

[8] *The News* asserts that Respondents' "advisory" was bizarre and unsupported. Respondents have just discovered court records and testimony from a lawsuit initiated by a former K&L Gates lawyer, which directly supports the factual matters stated in Respondents' Advisory. Concurrent with this response, Respondents are filing a Conditional Motion for Judicial Notice of Court Records. The request is conditional upon this Court's ruling on the Motion for Judicial Notice filed by Petitioners. As explained more fully in Respondents' motion and response to the Petitioners' motion, consideration of these matters is not for this Court or the court of appeals, but rather the trial court in the normal course of this lawsuit. However, should the Court entertain the court records proffered by Petitioners, those proffered by Respondents should likewise be considered. Those records are also included here as Appendix Tabs A–E. For ease of reference, Tab E is simply excerpts of the most relevant portions of the rather voluminous records.

The series of DMN articles catapulted Respondents to the forefront of an alleged controversy in which they previously had no involvement. Overnight, Respondents found themselves falsely associated with pharmacies and drug companies that had been found culpable for producing unsafe prescriptions and accused of committing criminal healthcare fraud related to Tricare. The truth and reality, however, is that at the time of publication, Respondents' only fault was owning and operating a successful business in an industry that had recently come under scrutiny. There was absolutely no basis for Petitioners to drag Respondents into the spotlight and falsely paint them with the same brush as the "bad apples" of the industry actually found to have committed various criminal and civil violations primarily related to Tricare fraud. Neither the Texas or U. S. constitutions, nor Texas statutory law, shields Petitioners from cherry-picking "allegations" from unrelated civil lawsuits and juxtaposing those "facts" with unsupported allegations of criminal conduct and call it privileged or true.

The court of appeals applied the correct legal and evidentiary standards in its de novo review of the trial court's denial of *The News*' motion to dismiss. As there is not error, *The News'* petition should be denied and this case remanded back to the trial court to continue in the normal course.

## ARGUMENT

## I. RESPONSE TO ISSUE 1: THE COURT OF APPEALS CORRECTLY APPLIED THE SUBSTANTIAL TRUTH TEST AND THE TCPA'S BURDEN-SHIFTING FRAMEWORK

*The News* goes to great lengths to ignore the fact that the court of appeals set forth and applied the relevant legal standards applicable to this case. Op. at 7–10. *The News* further misconstrues the court of appeals' opinion regarding its analysis of the evidence on the issue of whether the first "gist" of the stories is substantially true. Pet. at 9–11. The court of appeals' analysis of the evidence properly considered and applied applicable precedent in reaching its conclusion that RXpress presented clear and specific evidence that the publications are not substantially true. Op. at 15–20.

### A. The Court of Appeals did not err in holding the first gist was not substantially true

*The News* argues that the February 2016 Search Warrant alone establishes the substantial truth that RXpress was under investigation.[9] As the court of appeals recognized, however, the inquiry does not end there. Op. at 16–20. A determination of whether the "gist" of a publication is substantially true is determined by an evidentiary analysis. *The News* argues that the media are accorded "breathing space" to report on official proceedings. Pet. at 8. While such a general statement may be true, the authorities *The News* cites in support are

---

[9] This is an about face from *The News*' consistent position in the courts below that the Search Warrant established the "literal" truth of the statement.

8

distinguishable. *KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710 (Tex. 2016), *AOL, Inc. v. Malouf*, 05-13-01637-CV, 2015 WL 1535669 (Tex. App.—Dallas Apr. 2, 2015, no pet.), and *Basic Capital Mgmt., Inc. v. Dow Jones & Co., Inc.*, 96 S.W.3d 475, 481–82 (Tex. App.—Austin 2002, no pet.) all involve fully developed judicial or official proceedings involving the government. In this case, at the time the articles were published, *The News* had only a picture of one substantive page of a sealed search warrant that referenced Respondents. There was no developed record. There were no direct or indirect allegations against anyone mentioned in the Search Warrant.

The February Search Warrant was the only piece of evidence *The News* relied upon to prove the "truth" of its reports. *The News* incorrectly argues that the court of appeals applied the "ordinary reader" test to the February Search Warrant. The court of appeals did no such thing. Recognizing the circumstantial nature of the evidence, the court of appeals applied an evidentiary analysis guided by this Court's holding in *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015), and determined that the February Search Warrant was some evidence of falsity. Op. at 16–17. When considered along with the evidence submitted by RXpress, the court held that the statement that RXpress was "under investigation" for healthcare fraud was not substantially true.

9

## B. The Court of Appeals correctly applied the TCPA's burden-shifting framework

*The News*' argument that the court of appeals misapplied the TCPA's burden-shifting framework is less than clear. Under the TCPA, the burden shifts to the nonmovant once the movant establishes that the TCPA applies to the legal action at issue. Tex. Civ. Prac. & Rem. Code Ann. § 27.005 (West). The court of appeals recognized that the parties did not dispute that the TCPA applies to this case. Thus, the burden shifted to RXpress at the outset requiring RXpress to present clear and specific evidence establishing a prima facie case for the elements of its defamation claim. *Id.* It is difficult to see how the court of appeals misapplied something that essentially occurred by operation of law. The court of appeals merely conducted an evidentiary analysis that considered "the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based" as required by the TCPA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.006 (West). The burden had already shifted and the court of appeals properly considered the matters required by the TCPA.

## II. RESPONSE TO ISSUE 2: THE COURT OF APPEALS CORRECTLY APPLIED THE "ORDINARY READER" STANDARD AND THE SUBSTANTIAL TRUTH TEST

*The News* hinges its argument on the assumption that this Court's opinion in *KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710 (Tex. 2016) established a new "ordinary reader" standard, while ignoring the more recent opinion in *D*

*Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429 (Tex. 2017), reh'g denied (Sept. 29, 2017), which the court of appeals applied. Moreover, *The News* takes the position that the judicial proceedings privilege and "third-party allegations" defense essentially operate as an absolute defense to a claim of defamation. Such an assertion is contrary to long-standing precedent that a publication can "convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory." *Neely v. Wilson*, 418 S.W.3d 52, 64 (Tex. 2013). Respondents have consistently maintained that that the "gist" of the publications was that Respondents were accused and guilty of violating criminal healthcare fraud laws. This is precisely what *The News*' selective juxtaposition of "facts" achieved.

## A. The Court of Appeals applied the correct "gist" standard

*The News*' argument that the court of appeals applied the wrong "ordinary reader" standard is based upon its assumption that *Toledo* established a bright-line standard applicable to all cases. However, this Court's opinion in *D Magazine Partners, L.P.* is contrary to *The News*' position.[10] *The News* attempts to circumvent the "gist" standard and focuses only on individual statements in

---

[10] This should have been obvious to at least *The News*' counsel given they filed an amici letter advocating the very position they advocate on behalf of *The News* in this case, i.e., that the *D Magazine* opinion is contrary to *Toledo*. This Court declined the opportunity to confirm *The News*' argument. Further, the amici on whose behalf counsel drafted the amici letter took a starkly different position in seeking clarification on the *Toledo* holding in their amici brief filed in the *Tatum* case referenced by *The News*. *See* Pet. at 14.

isolation rather than assessing the publication as a whole. In essence, to arrive at its conclusion, *The News* "does the very thing of which it accuses the court of appeals: it considers the article's statements individually instead of in context." *D Magazine Partners, L.P.*, 529 S.W.3d at 439. *The News* cannot simply tack on qualifiers such as "according to the lawsuit" or "as alleged" to escape liability. The standard for determining whether a publication is defamatory requires construing "the article as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000). At the motion to dismiss stage, a determination that at least one gist is capable of defamatory meaning is sufficient. *See D Magazine Partners, L.P.*, 529 S.W.3d at 439.

## B. The Court of Appeals correctly applied the substantial truth standard

The truth defense now applies to "an accurate reporting of allegations made by a third party regarding a matter of public concern" in actions brought against a newspaper. Tex. Civ. Prac. & Rem. Code Ann. § 73.005 (West). However, this rule does not dispense with the substantial truth doctrine in assessing the truth or falsity of a publication. A publication can "convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory." *Neely*, 418 S.W.3d at 64. Accurately reporting isolated statements does not shield Appellants from

12

liability where the publication as a whole is not substantially true. This was stated and applied by the court of appeals and was the central argument advanced by Respondents at all stages of this case. To accept *The News*' argument would be to grant media defendants literal immunity from defamation liability so long as they qualify a statement by attributing it to a third-party's allegation.

Further, *The News*' argument that "accuracy is the touchstone of the judicial proceedings privilege" is simply wrong. The standard for the judicial proceedings privilege requires that the report be a "fair, true, and impartial" account. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.002(a); (b)(1)(A) (West). The court of appeals correctly applied this provision in determining that by selectively reporting only allegations of healthcare fraud from lawsuits that had virtually nothing to do with healthcare fraud. The references to any healthcare fraud-like statements only appeared in isolation among single filings among the entirety of the cases. Thus, the accounts were not "fair, true, and impartial."

III. **REVIEW IS NOT WARRANTED BASED ON A BARE ASSERTION THAT RESPONDENTS' EVIDENCE WAS "FALSE"**

The matter before this court is an interlocutory appeal from an order denying a motion to dismiss under the TCPA. The TCPA sets forth a specific procedural framework for dismissal of unmeritorious claims to which the statute applies. That framework includes specific mandatory deadlines for filing a motion to dismiss, hearing the motion, and ruling on the motion. The TCPA also establishes what the

13

courts must consider when ruling on a motion to dismiss and suspends all discovery.

When a trial court permits limited discovery, as happened in this case, the hearing on the motion must occur no later than 120 days after the motion was filed. Tex. Civ. Prac. & Rem. Code Ann. § 27.003 (West). Petitioners' filed their motion to dismiss on May 23, 2017. CR 48. The trial court held the hearing on Petitioners' motion to dismiss 116 days later on September 15, 2016. CR 647. The statute requires the trial court rule on the motion no more than 30 days after the hearing, which, in this case, was Monday, October 17, 2016.

By law, the trial court could not have considered any additional evidence after October 17, 2016, even if wanted to. Nor could the trial court issue any kind of ruling relative to the motion to dismiss after October 17, 2016, whether or not it ruled on the motion. The 30-day deadline for the trial court to rule is mandatory and gives the trial court no discretion to grant extensions of time. *Inwood Forest Cmty. Improvement Ass'n v. Arce*, 485 S.W.3d 65, 70 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). The trial court's options are to rule to dismiss or to not dismiss the legal action. Id. If the trial court does not rule within 30 days, the TCPA mandates the motion is considered denied by operation of law. Tex. Civ. Prac. & Rem. Code Ann. § 27.008(a) (West).

Given the deadlines, the actual court records filed in a separate case five and seven months after the hearing deadline could not have been before the trial court. That the documents contain pleading allegations of an entity affiliated with Respondents that may raise a fact question as to the knowledge or belief of Respondents positions or arguments in this case makes no difference. This is not a case in which an unjust judgment has been entered. Respondents are quite certain that Petitioners will be free to explore these court records and the factual inferences they raise in the normal course of discovery and trial upon remand should they choose. But these matters are neither for this Court's consideration nor appropriate for remand to the trial court for a second bite at the TCPA apple. [11] *See SEI Bus. Sys., Inc. v. Bank One Texas, N.A.*, 803 S.W.2d 838, 841 (Tex. App.—Dallas 1991, no writ) (denying request for judicial notice of certified records of the Secretary of State that were not before the trial court, as doing so would essentially make the court of appeals a court of general, rather than appellate, jurisdiction). Had it not been for Respondents' request for discovery, which resulted in Petitioners acquiring an allegedly authenticated version of the entire search warrant, this hearing and ruling would have come well before September 15, 2016. It appears Petitioners will stop at nothing to avoid facing Respondents' meritorious claims on

[11] If Respondents' allegations regarding Petitioners' role in publishing the stories with knowledge that the initial search warrant was essentially false prove to be true after discovery, Respondents doubt they could claim that Petitioners withheld material information during the TCPA phase. Petitioners chose to utilize the TCPA and its discovery stay then vehemently opposed a request to depose Krause as was their right under the statute.

15

even playing field without the benefit of a statutory shield from discovery to hide behind.

*In re Lowe's Home Centers, L.L.C.*, 13-16-00493-CV, 2017 WL 3205522 (Tex. App.—Corpus Christi July 28, 2017, no pet.) for the proposition that false testimony was the extraordinary circumstance that was the basis for the court in that case to grant mandamus relief. First, the case is distinguishable in two obvious respects: it is a mandamus proceeding that is decided under specific standards and the case involves a venue challenge. Second, the basis for the court's decision was not the extraordinary circumstance of "false testimony." The "extraordinary circumstance" was a plaintiff non-suiting after a venue determination had been made in one county and refiling the suit in another county. Indeed, the word "false" appears only two times in the opinion.

"An appellate court may take judicial notice of a relevant fact that is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Freedom Communications, Inc. v. Coronado*, 372 S.W.3d 621, 623 (Tex. 2012) (citing Tex. R. Evid. 201(b) and *Office of Pub. Util. Counsel v. Pub. Util. Com'n of Texas*, 878 S.W.2d 598, 600 (Tex. 1994) (per curiam) (internal quotes omitted). "Under this standard, a court will take judicial notice of another court's records if a party provides proof of the records." *Freedom*

16

*Communications, Inc.*, 372 S.W.3d at 623. However, even where court records themselves are properly before a court under this rule, a court "may not take judicial notice of the *truth* of factual statements and allegations contained in the pleadings, affidavits, or other documents in the file." *Guyton v. Monteau*, 332 S.W.3d 687, 693 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *cf. In re C.S.,* 208 S.W.3d 77, 81 (Tex.App.-Fort Worth 2006, pet. denied) ("It is appropriate for a court to take judicial notice of a file in order to show that the documents in the file are a part of the court's files, that they were filed with the court on a certain date, and that they were before the court at the time of the hearing.").

Further, "appellate courts are reluctant to take judicial notice of evidence when the trial court was not afforded the opportunity to examine and take into consideration that evidence." *Tran v. Fiorenza*, 934 S.W.2d 740, 742 (Tex. App.—Houston [1st Dist.] 1996, no writ); *see also Sparkman v. Maxwell*, 519 S.W.2d 852, 855 (Tex. 1975) (declining to take judicial notice in part stating reluctance of appellate courts to take notice of matters when the trial court was not requested to do so and had no opportunity to examine the source material). Thus, "[a]s a general rule, appellate courts take judicial notice of facts outside the record only to determine jurisdiction over an appeal or to resolve matters ancillary to decisions which are mandated by law." *Freedom Communications, Inc.*, 372 S.W.3d at 623

(citing *SEI Business Systems, Inc.*, 803 S.W.2d at 841). No one has questioned this court's jurisdiction, and judicial notice for the reasons urged by Petitioners is not proper.

## CONCLUSION AND PRAYER

In this case, *The News* took a "shoot first and ask questions later" approach and the resulting casualty was the Respondents' business and nearly their livelihood. Both the trial court and the court of appeals analyzed the evidence and the law and determined that, at least at this early stage of the case, Respondents' claims are meritorious and deserve to proceed in the normal course. Both sides have uncovered evidence that was otherwise unavailable at the time of the hearing on *The News*' motion to dismiss. As two courts have determined that Respondents have carried their burden, Respondents should be permitted to test their case with the benefit of discovery to develop those matters which have only recently come to light. The court of appeals has not misconstrued or misapplied the law. Rather, the court of appeals applied all the precedent of this Court on the subject matter at hand.

Respondents pray that *The News*' petition be denied and that the case continue in the trial court. Respondents so pray and pray for general relief.

Respectfully submitted,

_____
Robert J. Myers, SBN 14765380
John J. Shaw, SBN 24079312
MYERS ✳ LAW
2525 Ridgmar Blvd., Ste. 150
Fort Worth, TX 76116
Tel: (817) 731-2500
Fax: (817) 731-2501
rmyers@myerslawtexas.com
jshaw@myerslawtexas.com

Counsel for Respondents

19

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Respondents' Response to Petition for Review complies with the type-volume limitation of Texas Rule of Appellate Procedure 9.4(i)(2) because it contains 4,449 words, excluding those parts exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

_____
John J. Shaw

**CERTIFICATE OF SERVICE**

I certify that on December 21, 2017, I used the Court's electronic case filing system to filed this Respondents' Response to Petition for Review and served this document on the following counsel in the manner stated below:

Thomas S. Leatherbury
Marc A. Fuller
Kimberly R. McCoy
Margaret D. Terwey
VINSON & ELKINS, LLP
2001 Ross Avenue, Ste. 3700
Dallas, TX  75201

_____
John J. Shaw

**INDEX TO APPENDIX**

Tab A – Plaintiff's Original Petition

Tab B – Plaintiff's Amended Petition

Tab C – Plaintiff's Motion to Compel

Tab D – Supplement to Plaintiff's Motion to Compel

Tab E – Excerpts from Supplement to Plaintiff's Motion to Compel

# TAB A

FILED
DALLAS COUNTY
9/29/2017 1:54 PM
FELICIA PITRE
DISTRICT CLERK

Marissa Pittman

NO. DC-17-13448

| | | |
|---|---|---|
| BNM, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| JOHN/JANE DOES 1-10, | § | |
| | § | |
| Defendants. | § | _____JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

**TO THE HONORABLE DISTRICT JUDGE OF SAID COURT:**

COMES NOW, Plaintiff BNM ("Plaintiff"), and files this, Plaintiff's Original Petition against Defendants JOHN/JANE DOES 1-10 ("Defendants") and, for cause, would respectfully show unto this Honorable Court as follows:

## NATURE OF THE ACTION

1. This suit is the vehicle through which the Plaintiff can recover against the outlandish, brazen acts of the Defendants, morally bankrupt individuals unlawfully tarnishing the reputation of a highly decorated former Assistant United States Attorney. The Plaintiff brings this claim for defamation and tortious interference with contract/prospective business advantage.

2. Plaintiff alleges that as a proximate result of the tortious and willful conduct of the Defendants, he has suffered financial damages. The Defendants have committed extraordinary acts of dishonesty and deceit towards Plaintiff. Therefore, the Plaintiff seeks all compensatory damages allowed under Texas law for the injuries caused by their tortious acts and omissions.

## DISCOVERY CONTROL PLAN

3. Discovery shall be conducted under Level 3 pursuant to Rule 190.03 of the TEXAS RULES OF CIVIL PROCEDURE.

## PARTIES

4. Plaintiff BNM can be served by and through his undersigned counsel of record.

5. Defendant JOHN/JANE DOES 1-10 are unknown at this time but the Plaintiff will supplement with the individual names of the Defendants.

6. This Honorable Court has jurisdiction over this matter, as the amount of the dispute is within the jurisdictional limits of this Honorable Court. Venue is proper in Dallas County, Texas, as it is a county in which a substantial part of the events or omissions giving rise to the claims described herein occurred. This case is not subject to removal.

7. At this time, the Plaintiff is seeking more than $1,000,000.00 in damages against the Defendants, jointly and severally, and an expedited trial by jury. This case is not subject to removal to federal court

## FACTUAL BACKGROUND

8. This action arises out of Defendant's blatant, egregious, and inequitable trespasses to, and violations of Plaintiff, Plaintiff's rights and interests, as well as numerous breaches of duties Defendants owed to Plaintiff. Defendants' fraud, negligence, and intentional torts against Plaintiff, includes the infliction of severe physical and emotional hardship upon the Plaintiff, and the intentional infliction of harm to Plaintiff. In addition, upon information and belief, Defendants knowingly, recklessly, or negligently pursued Plaintiff with tactics designed to deceive, coerce, harass, or force Plaintiff to engage in dealings with the Defendants.

9. The Defendants have knowingly, recklessly, and/or negligently engaged, or have allowed themselves to be engaged, in various deceptive techniques and trade practices designed to

mislead the Plaintiff. Defendants and/or their principals, agents, franchisors, and employees have knowingly, recklessly, and/or negligently misrepresented the true nature of their dealings with the Plaintiff and knowingly, recklessly, or negligently omitted the disadvantages of associating with the Defendants. In addition, upon information and belief, Defendants knowingly, recklessly, or negligently pursued Plaintiff with tactics designed to deceive, coerce, harass, or force Plaintiff to engage in dealings with the Defendants.

10.    Plaintiff brings this action to remedy the harm that Defendant has caused him: (1) by falsely and fraudulently inducing him to enter into and execute contracts; (2) by fraudulently inducing him to enter into and execute contracts under duress; (3) by committing numerous intentional torts against him including, but not limited to, numerous common law torts; (4) by inflicting severe and intentional emotional distress; (5) by stalking, harassing, and threatening Plaintiff; (6) by acting negligently toward Plaintiff; (7) by acting recklessly with wanton disregard to the rights of Plaintiff; (8) by making fraudulent and negligent misrepresentations to Plaintiff and others; (9) by failing to disclose material information to Plaintiff; and; (10) by breaching fiduciary duties to Plaintiff.

**CAUSES OF ACTION**

**TORTIOUS INTERFERENCE WITH CONTRACTS AND/OR PROSPECTIVE
BUSINESS RELATIONS**

11.    Plaintiff re-alleges each and every one of the foregoing paragraphs as though set forth fully herein.

12.    The Defendant acted with the intent to interfere with existing contracts as well as to prevent execution of prospective contracts. The Plaintiff has lost the opportunity to enter into several contracts as result of the interference by the Defendant. On information and belief, the

wrongful acts of the Defendant set forth in this Count were done maliciously, oppressively, and with the intent to harm the Plaintiff, and the Plaintiff is entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of the Defendant. Accordingly, the Plaintiff respectfully request that exemplary damages be awarded against the Defendant in a sum that is not less than three (3) times the amount of Plaintiff's actual damages.

## NEGLIGENCE AND GROSS NEGLIGENCE

13. Plaintiff re-alleges each and every one of the foregoing paragraphs as though set forth fully herein.

14. The Defendants owed and still owes duties to the Plaintiff. The Defendants breached these duties which proximately caused damages to the Plaintiff.

15. In addition, Plaintiff will show that the Defendants' acts and omissions, when viewed objectively from the Defendants' viewpoint, involved an extreme degree of risk, considering the magnitude and potential harm to the Plaintiff.

16. And, the Defendants had actual, subjective awareness of the risk, but still proceeded with their scheme with a conscious indifference to the rights, safety or welfare of the Plaintiff.

17. As a proximate result of the Defendants' negligence and gross negligence, the Plaintiff has been damaged and he seeks to recover all actual, consequential, incidental, and exemplary damages.

## DEFAMATION, SLANDER, AND LIBEL

18. Plaintiff re-alleges each and every one of the foregoing paragraphs as though set

forth fully herein.

19. The Defendants published false statements that negatively affected the Plaintiff. No privilege, absolute or conditional, attaches to these statements.

20. The Defendants made these statements to third parties without any legitimate interest in the information contained therein.

21. The Defendants' false statements and omissions caused damages to the Plaintiff.

22. These statements are unambiguous and defamatory or, alternatively, defamatory by innuendo or implication.

23. Each of the above-referenced acts and omissions, single or in combination with others, constituted defamation, libel, and slander as well as defamation, libel, and slander per se and caused the damages suffered by the Plaintiff.

24. As a result, the Plaintiff has been damaged and seeks to recover all actual, consequential, and incidental damages caused by the defamation/slander.

25. On information and belief, the wrongful acts of the Defendants set forth in this Count were done maliciously, oppressively, and with the intent to harm the Plaintiff, and the Plaintiff is entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of the Defendants. Accordingly, the Plaintiff respectfully requests that exemplary damages be awarded against the Defendants in a sum that is not less than three (3) times the amount of Plaintiff's actual damages.

## BUSINESS DISPARAGEMENT

26. Plaintiff incorporates each and every one of the foregoing paragraphs as though set

forth fully herein.

27. Defendants published disparaging words about Plaintiff's economic interests.

28. The words were false.

29. Defendants published the words with malice.

30. Defendants published the words without privilege.

31. The publication caused special damages.

32. As a result, Plaintiff has been damaged and seeks to recover all actual, consequential, and incidental damages caused by Defendants' conduct.

33. On information and belief, the wrongful acts of Defendants set forth in this Cause of Action were done maliciously, oppressively, and with the intent to harm Plaintiff, and Plaintiff is entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of Defendants. Accordingly, Plaintiff respectfully requests that exemplary damages be awarded against the Defendants in a sum that is not less than three (3) times the amount of Plaintiff's actual damages.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

34. Plaintiff incorporates each and every one of the foregoing paragraphs as though set forth fully herein.

35. The Defendants are fully aware of the facts that support this claim. The Defendants' conduct was extreme and outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, as to be regarded as atrocious, utterly intolerable, despicable, and the bottom of depravity in a civilized community.

36. The Defendants' conduct proximately caused Plaintiff damages in that it caused

Plaintiff to suffer severe emotional distress. In particular, the Defendants' conduct was the direct and proximate cause of Plaintiff's severe mental pain and anguish. In addition, the Plaintiff continues to suffer from the actions of the Defendants.

37. In addition to severe emotional distress, the Plaintiff has suffered and will continue to suffer, additional damages as a proximate result of the Defendants' conduct in that, in all reasonable probability, Plaintiff will continue to suffer this mental pain and anguish for a long time into the future – most likely the rest of his life. The conduct of the Defendants were maliciously negligent and/or grossly negligent, and fraudulent so as to entitle Plaintiff to recover exemplary damages. In this connection, Plaintiff will show that as a result of Defendants' conduct, Plaintiff has suffered losses of time and other expenses, including attorney's fees incurred in the investigation and prosecution of this action. Accordingly, Plaintiff asks that exemplary damages be awarded against the Defendants in a sum that is not less than three (3) times the amount of Plaintiff's actual damages.

## NEGLIGENT MISREPRESENTATION

38. The Plaintiff re-alleges each and every one of the foregoing paragraphs as though set fully herein.

39. By reason of the Plaintiff's reliance on the representations and fraudulent concealment of material facts by the Defendants, the Plaintiff has been damaged.

40. The Defendants employed a scheme and common course of conduct to defraud the Plaintiff. The misrepresentations and concealment of facts by Defendants were material.

41. On information and belief, the Defendants knew the misrepresentations and concealment of facts set forth herein were false.

42. Alternatively, the Defendants acted with reckless disregard whether the

representations made by Defendants were true. The Plaintiff relied upon the misrepresentations, lies, and the facts concealed by Defendants. The Plaintiff's reliance on these representations and concealment of facts was reasonable and justifiable.

43. The Plaintiff has suffered losses because of the wrongful conduct of the Defendants.

**CONSPIRACY TO COMMIT INTENTIONAL TORTS SET FORTH HEREINABOVE**

44. The Plaintiff re-alleges each and every one of the foregoing paragraphs as though set fully herein.

45. Each Defendant was a member of a combination of two or more persons.

46. The object of the combination was to accomplish an unlawful purpose or a lawful purpose by unlawful means.

47. The members had a meeting of the minds on the object or course of action.

48. One or more of the members committed an unlawful, overt act to further the object or course of action.

49. The plaintiff suffered injury as a proximate result of the wrongful act.

50. As a result, Plaintiff has been damaged and seeks to recover all actual, consequential, and incidental damages caused by Defendants' conduct.

51. On information and belief, the wrongful acts of Defendants set forth in this Cause of Action were done maliciously, oppressively, and with the intent to harm Plaintiff, and Plaintiff is entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of Defendants. Accordingly, Plaintiff respectfully requests that exemplary damages be awarded against the Defendants in a sum that is not less than three (3) times the amount of Plaintiff's actual damages.

52.     Plaintiff further respectfully requests that all members of the conspiracy be held jointly and severally liable for all acts done by any of them in furtherance of the combination. Such joint and several liability is respectfully requested to extend beyond the wrongdoer to include those who have merely planned, assisted, or encouraged the wrongdoer's acts.

## AIDING AND ABETTING THE COMMISSION
## OF INTENTIONAL TORTS SET FORTH HEREIN

53.     A primary actor committed a tort.

54.     Defendants had knowledge that the primary actor's conduct constituted a tort.

55.     Defendants had the intent to assist the primary actor in committing the tort.

56.     Defendants gave the primary actor assistance or encouragement.

57.     Defendants' assistance or encouragement was a substantial factor in causing the tort.

58.     As a result, Plaintiff has been damaged and seeks to recover all actual, consequential, and incidental damages caused by Defendants' conduct.

59.     Plaintiff further respectfully requests that the primary actor and all Defendants who had the intent to assist and who assisted or encouraged the primary actor be held jointly and severally liable for all acts done. Such joint and several liability is respectfully requested to extend beyond the wrongdoer to include those who have merely planned, assisted, or encouraged the wrongdoer's acts.

## ATTORNEYS FEES

60.     Plaintiff re-alleges each and every one of the foregoing paragraphs as though set forth fully herein. Request is made for all costs and reasonable and necessary attorneys' fees incurred by or on behalf of Plaintiff, and all fees necessary in the event of an appeal of this cause

to the Court of Appeals and the Supreme Court of Texas, as the Court deems equitable and just.

## CONDITIONS PRECEDENT

61. All conditions precedent to the Plaintiff's right of recovery have been performed, have occurred, or have been waived.

## NO WAIVER

62. By filing this lawsuit, Plaintiff does not waive or release any rights, claims, causes of action, or defenses, or make any election of remedies that they have, but expressly reserve such rights, claims, causes of action, and defenses.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that the Defendants be cited to appear and answer, as required by law, and that Plaintiff have the following relief:

- Judgment against the Defendants for pecuniary, economic, non-economic, special, general, consequential, and incidental damages in excess of $1,000,000.00;

- Actual damages in the amount determined to have been sustained by the Plaintiff;

- Compensatory damages;

- Pre- and Post-Judgment Interest;

- Costs of this lawsuit, including reasonable attorney's fees, experts' fees, and other disbursements; and

- Such other and further relief, at law or in equity, to which the Plaintiff may show himself to be justly entitled.

Dated, September 29, 2017

Respectfully submitted,

**JAMES S. BELL, PC**

/s/ James S. Bell

By:

_____

**James S. Bell**
**James S. Bell P.C.**
State Bar No. 24049314
james@jamesbellpc.com
2808 Cole Ave.
Dallas, TX 75204
(214) 698-9000 (Telephone)
**ATTORNEY PLAINTIFF**

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 1.06: RELATED CASES

On information and belief, this case probably requires transfer pursuant to Local Rule 1.06. The related case was filed under Cause No. DC-15-14415; BRADEN RICHARD POWER, *et al* vs. CRAIG PATRICK POWER, et al. in the 134th District Court of Dallas County, Texas.

**STATE OF TEXAS**
**COUNTY OF DALLAS**

I, FELICIA PITRE, Clerk of the District of Dallas County, Texas, do hereby certify that I have compared this Instrument to be a true and correct copy of the original as appears on record in my office.

GIVEN UNDER MY HAND AND SEAL of said Court, at office in Dallas, Texas, this _18TH_ day of _Dec_ A.D., _2017_.

FELICIA PITRE, DISTRICT CLERK
DALLAS COUNTY, TEXAS

By _Michael E. Clark_ Deputy

# TAB B

NO. DC-17-13448

| | | |
|---|---|---|
| BRANDON MCCARTHY, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| JOHN/JANE DOES 1-10, | § | |
| | § | |
| Defendants. | § | 134th JUDICIAL DISTRICT |

## PLAINTIFF'S FIRST AMENDED PETITION

### TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff BRANDON MCCARTHY ("Plaintiff"), and files this, Plaintiff's Original Petition against Defendants JOHN/JANE DOES 1-10 ("Defendants") and, for cause, would respectfully show unto this Honorable Court as follows:

### NATURE OF THE ACTION

1.     This suit is the vehicle through which the Plaintiff can recover against the outlandish, brazen acts of the Defendants, morally bankrupt individuals unlawfully tarnishing the reputation of a highly decorated former Assistant United States Attorney.  The Plaintiff brings this claim for defamation and tortious interference with contract/prospective business advantage.

2.     Plaintiff alleges that as a proximate result of the tortious and willful conduct of the Defendants, he has suffered financial damages.   The Defendants have committed extraordinary acts of dishonesty and deceit towards Plaintiff.   Therefore, the Plaintiff seeks all compensatory damages allowed under Texas law for the injuries caused by their tortious acts and omissions.

### DISCOVERY CONTROL PLAN

3.     Discovery shall be conducted under Level 3 pursuant to Rule 190.03 of the

TEXAS RULES OF CIVIL PROCEDURE.

## PARTIES

4.      Plaintiff BRANDON MCCARTHY can be served by and through his undersigned counsel of record.

5.      Defendant JOHN/JANE DOES 1-10 are unknown at this time but the Plaintiff will supplement with the individual names of the Defendants.

6.      This Honorable Court has jurisdiction over this matter, as the amount of the dispute is within the jurisdictional limits of this Honorable Court. Venue is proper in Dallas County, Texas, as it is a county in which a substantial part of the events or omissions giving rise to the claims described herein occurred. This case is not subject to removal.

7.      At this time, the Plaintiff is seeking more than $1,000,000.00 in damages against the Defendants, jointly and severally, and an expedited trial by jury. This case is not subject to removal to federal court

## FACTUAL BACKGROUND

8.      This action arises out of Defendant's blatant, egregious, and inequitable trespasses to, and violations of Plaintiff, Plaintiff's rights and interests, as well as numerous breaches of duties Defendants owed to Plaintiff. Defendants' fraud, negligence, and intentional torts against Plaintiff, includes the infliction of severe physical and emotional hardship upon the Plaintiff, and the intentional infliction of harm to Plaintiff. In addition, upon information and belief, Defendants knowingly, recklessly, or negligently pursued Plaintiff with tactics designed to deceive, coerce, harass, or force Plaintiff to engage in dealings with the Defendants.

9.      The Defendants have knowingly, recklessly, and/or negligently engaged, or have allowed themselves to be engaged, in various deceptive techniques and trade practices designed to

mislead the Plaintiff. Defendants and/or their principals, agents, franchisors, and employees have knowingly, recklessly, and/or negligently misrepresented the true nature of their dealings with the Plaintiff and knowingly, recklessly, or negligently omitted the disadvantages of associating with the Defendants. In addition, upon information and belief, Defendants knowingly, recklessly, or negligently pursued Plaintiff with tactics designed to deceive, coerce, harass, or force Plaintiff to engage in dealings with the Defendants.

10. Plaintiff brings this action to remedy the harm that Defendant has caused him: (1) by falsely and fraudulently inducing him to enter into and execute contracts; (2) by fraudulently inducing him to enter into and execute contracts under duress; (3) by committing numerous intentional torts against him including, but not limited to, numerous common law torts; (4) by inflicting severe and intentional emotional distress; (5) by stalking, harassing, and threatening Plaintiff; (6) by acting negligently toward Plaintiff; (7) by acting recklessly with wanton disregard to the rights of Plaintiff; (8) by making fraudulent and negligent misrepresentations to Plaintiff and others; (9) by failing to disclose material information to Plaintiff; and; (10) by breaching fiduciary duties to Plaintiff.

## CAUSES OF ACTION

### TORTIOUS INTERFERENCE WITH CONTRACTS AND/OR PROSPECTIVE BUSINESS RELATIONS

11. Plaintiff re-alleges each and every one of the foregoing paragraphs as though set forth fully herein.

12. The Defendant acted with the intent to interfere with existing contracts as well as to prevent execution of prospective contracts. The Plaintiff has lost the opportunity to enter into several contracts as result of the interference by the Defendant. On information and belief, the

wrongful acts of the Defendant set forth in this Count were done maliciously, oppressively, and with the intent to harm the Plaintiff, and the Plaintiff is entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of the Defendant. Accordingly, the Plaintiff respectfully request that exemplary damages be awarded against the Defendant in a sum that is not less than three (3) times the amount of Plaintiff's actual damages.

## NEGLIGENCE AND GROSS NEGLIGENCE

13. Plaintiff re-alleges each and every one of the foregoing paragraphs as though set forth fully herein.

14. The Defendants owed and still owes duties to the Plaintiff. The Defendants breached these duties which proximately caused damages to the Plaintiff.

15. In addition, Plaintiff will show that the Defendants' acts and omissions, when viewed objectively from the Defendants' viewpoint, involved an extreme degree of risk, considering the magnitude and potential harm to the Plaintiff.

16. And, the Defendants had actual, subjective awareness of the risk, but still proceeded with their scheme with a conscious indifference to the rights, safety or welfare of the Plaintiff.

17. As a proximate result of the Defendants' negligence and gross negligence, the Plaintiff has been damaged and he seeks to recover all actual, consequential, incidental, and exemplary damages.

## DEFAMATION, SLANDER, AND LIBEL

18. Plaintiff re-alleges each and every one of the foregoing paragraphs as though set forth fully herein.

19. The Defendants published false statements that negatively affected the Plaintiff. No privilege, absolute or conditional, attaches to these statements.

20. The Defendants made these statements to third parties without any legitimate interest in the information contained therein.

21. The Defendants' false statements and omissions caused damages to the Plaintiff.

22. These statements are unambiguous and defamatory or, alternatively, defamatory by innuendo or implication.

23. Each of the above-referenced acts and omissions, single or in combination with others, constituted defamation, libel, and slander as well as defamation, libel, and slander per se and caused the damages suffered by the Plaintiff.

24. As a result, the Plaintiff has been damaged and seeks to recover all actual, consequential, and incidental damages caused by the defamation/slander.

25. On information and belief, the wrongful acts of the Defendants set forth in this Count were done maliciously, oppressively, and with the intent to harm the Plaintiff, and the Plaintiff is entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of the Defendants. Accordingly, the Plaintiff respectfully requests that exemplary damages be awarded against the Defendants in a sum that is not less than three (3) times the amount of Plaintiff's actual damages.

## BUSINESS DISPARAGEMENT

26. Plaintiff incorporates each and every one of the foregoing paragraphs as though set forth fully herein.

27. Defendants published disparaging words about Plaintiff's economic interests.

28. The words were false.

29. Defendants published the words with malice.

30. Defendants published the words without privilege.

31. The publication caused special damages.

32. As a result, Plaintiff has been damaged and seeks to recover all actual, consequential, and incidental damages caused by Defendants' conduct.

33. On information and belief, the wrongful acts of Defendants set forth in this Cause of Action were done maliciously, oppressively, and with the intent to harm Plaintiff, and Plaintiff is entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of Defendants. Accordingly, Plaintiff respectfully requests that exemplary damages be awarded against the Defendants in a sum that is not less than three (3) times the amount of Plaintiff's actual damages.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

34. Plaintiff incorporates each and every one of the foregoing paragraphs as though set forth fully herein.

35. The Defendants are fully aware of the facts that support this claim. The Defendants' conduct was extreme and outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, as to be regarded as atrocious, utterly intolerable, despicable, and the bottom of depravity in a civilized community.

36. The Defendants' conduct proximately caused Plaintiff damages in that it caused Plaintiff to suffer severe emotional distress. In particular, the Defendants' conduct was the direct and proximate cause of Plaintiff's severe mental pain and anguish. In addition, the Plaintiff

continues to suffer from the actions of the Defendants.

37.     In addition to severe emotional distress, the Plaintiff has suffered and will continue to suffer, additional damages as a proximate result of the Defendants' conduct in that, in all reasonable probability, Plaintiff will continue to suffer this mental pain and anguish for a long time into the future – most likely the rest of his life.  The conduct of the Defendants were maliciously negligent and/or grossly negligent, and fraudulent so as to entitle Plaintiff to recover exemplary damages.  In this connection, Plaintiff will show that as a result of Defendants' conduct, Plaintiff has suffered losses of time and other expenses, including attorney's fees incurred in the investigation and prosecution of this action. Accordingly, Plaintiff asks that exemplary damages be awarded against the Defendants in a sum that is not less than three (3) times the amount of Plaintiff's actual damages.

## NEGLIGENT MISREPRESENTATION

38.     The Plaintiff re-alleges each and every one of the foregoing paragraphs as though set fully herein.

39.     By reason of the Plaintiff's reliance on the representations and fraudulent concealment of material facts by the Defendants, the Plaintiff has been damaged.

40.     The Defendants employed a scheme and common course of conduct to defraud the Plaintiff.  The misrepresentations and concealment of facts by Defendants were material.

41.     On information and belief, the Defendants knew the misrepresentations and concealment of facts set forth herein were false.

42.     Alternatively, the Defendants acted with reckless disregard whether the representations made by Defendants were true. The Plaintiff relied upon the misrepresentations, lies, and the facts concealed by Defendants. The Plaintiff's reliance on these representations and

concealment of facts was reasonable and justifiable.

43.     The Plaintiff has suffered losses because of the wrongful conduct of the Defendants.

**CONSPIRACY TO COMMIT INTENTIONAL TORTS SET FORTH HEREINABOVE**

44.     The Plaintiff re-alleges each and every one of the foregoing paragraphs as though set fully herein.

45.     Each Defendant was a member of a combination of two or more persons.

46.     The object of the combination was to accomplish an unlawful purpose or a lawful purpose by unlawful means.

47.     The members had a meeting of the minds on the object or course of action.

48.     One or more of the members committed an unlawful, overt act to further the object or course of action.

49.     The plaintiff suffered injury as a proximate result of the wrongful act.

50.     As a result, Plaintiff has been damaged and seeks to recover all actual, consequential, and incidental damages caused by Defendants' conduct.

51.     On information and belief, the wrongful acts of Defendants set forth in this Cause of Action were done maliciously, oppressively, and with the intent to harm Plaintiff, and Plaintiff is entitled to punitive and exemplary damages to be ascertained according to proof, which is appropriate to punish and set an example of Defendants.  Accordingly, Plaintiff respectfully requests that exemplary damages be awarded against the Defendants in a sum that is not less than three (3) times the amount of Plaintiff's actual damages.

52.     Plaintiff further respectfully requests that all members of the conspiracy be held jointly and severally liable for all acts done by any of them in furtherance of the combination.

Such joint and several liability is respectfully requested to extend beyond the wrongdoer to include those who have merely planned, assisted, or encouraged the wrongdoer's acts.

## AIDING AND ABETTING THE COMMISSION
## OF INTENTIONAL TORTS SET FORTH HEREIN

53. A primary actor committed a tort.

54. Defendants had knowledge that the primary actor's conduct constituted a tort.

55. Defendants had the intent to assist the primary actor in committing the tort.

56. Defendants gave the primary actor assistance or encouragement.

57. Defendants' assistance or encouragement was a substantial factor in causing the tort.

58. As a result, Plaintiff has been damaged and seeks to recover all actual, consequential, and incidental damages caused by Defendants' conduct.

59. Plaintiff further respectfully requests that the primary actor and all Defendants who had the intent to assist and who assisted or encouraged the primary actor be held jointly and severally liable for all acts done. Such joint and several liability is respectfully requested to extend beyond the wrongdoer to include those who have merely planned, assisted, or encouraged the wrongdoer's acts.

## ATTORNEYS FEES

60. Plaintiff re-alleges each and every one of the foregoing paragraphs as though set forth fully herein. Request is made for all costs and reasonable and necessary attorneys' fees incurred by or on behalf of Plaintiff, and all fees necessary in the event of an appeal of this cause to the Court of Appeals and the Supreme Court of Texas, as the Court deems equitable and just.

## CONDITIONS PRECEDENT

61. All conditions precedent to the Plaintiff's right of recovery have been performed, have occurred, or have been waived.

## NO WAIVER

62. By filing this lawsuit, Plaintiff does not waive or release any rights, claims, causes of action, or defenses, or make any election of remedies that they have, but expressly reserve such rights, claims, causes of action, and defenses.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that the Defendants be cited to appear and answer, as required by law, and that Plaintiff have the following relief:

- Judgment against the Defendants for pecuniary, economic, non-economic, special, general, consequential, and incidental damages in excess of $1,000,000.00;

- Actual damages in the amount determined to have been sustained by the Plaintiff;

- Compensatory damages;

- Pre- and Post-Judgment Interest;

- Costs of this lawsuit, including reasonable attorney's fees, experts' fees, and other disbursements; and

- Such other and further relief, at law or in equity, to which the Plaintiff may show himself to be justly entitled.

**Dated, October 26th, 2017**

Respectfully submitted,

**JAMES S. BELL, PC**

/s/ James S. Bell

By:

**James S. Bell**
**James S. Bell P.C.**
State Bar No. 24049314
james@jamesbellpc.com
2808 Cole Ave.
Dallas, TX 75204
(214) 698-9000 (Telephone)
**ATTORNEY FOR PLAINTIFF**

STATE OF TEXAS }
COUNTY OF DALLAS }

I, FELICIA PITRE, Clerk of the District of Dallas County,
Texas, do hereby certify that I have compared this Instrument
to be a true and correct copy of the original as appears on
record in my office.

GIVEN UNDER MY HAND AND SEAL of said Court, at office
In Dallas, Texas, this 13th day of December A.D. 2017

FELICIA PITRE, DISTRICT CLERK
DALLAS COUNTY, TEXAS

By _____ Deputy

# TAB C

CAUSE NO. DC-17-13448

| | | |
|---|---|---|
| **BRANDON MCCARTHY,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | **134TH JUDICIAL DISTRICT** |
| | § | |
| | § | |
| **JOHN/JANE DOES 1-10,** | § | |
| **Defendants.** | § | **DALLAS COUNTY, TEXAS** |

## PLAINTIFF'S MOTION TO COMPEL DEPOSITION TESTIMONY FROM WITNESS RYAN REYNOLDS

Plaintiff Brandon McCarthy ("Plaintiff" or "McCarthy") serves this Motion to Compel Deposition Testimony from Ryan Reynolds and would respectfully show the Court the following:

### SUM AND SUBSTANCE OF THIS MOTION

1.    Plaintiff respectfully seeks an order from this Court compelling Ryan Reynolds to appear again for his deposition and answer questions that he refused to answer at his deposition on November 10, 2017, because of baseless assertions of attorney-client privilege made by Reynolds' attorney at that deposition, David Bell.

2.    Plaintiff has attached as Exhibit 1 to this Motion a rough draft of the transcript of that deposition with the specific questions Plaintiff seeks to compel answers to highlighted in yellow.

3.    Those questions generally concern the following subject matter:

   a.   When Reynolds first retained David Bell as his counsel.

   b.   When Reynolds first met with David Bell as his counsel.

   c.   The general terms of David Bell's representation of Ryan Reynolds (i.e., rate, fees to be charged, scope of representation).

d. The identity of the person or persons who referred Ryan Reynolds to David Bell.

e. The start and end date of any alleged attorney-client relationship between Ryan Reynolds and Cameron Smith and/or James Rolfe and the scope of such representation(s).

f. The terms of any Cameron Smith's legal representation of Ryan Reynolds. (e.g., rate, fees to be charged, scope of representation).

g. The terms of James Rolfe's legal representation of Ryan Reynolds. (e.g., rate, fees to be charged, scope of representation).

h. The substance of communications between Ryan Reynolds and James Rolfe and/or Cameron Smith outside of the attorney-client relationship.

i. Whether Cameron Smith and/or James Rolfe have ever hired Ryan Reynolds to perform and work for them and the substance of that work and identity of any client for whom that work was performed.

4. The law in Texas is clear that the attorney-client privilege does not apply to these categories of questions. Reynolds' counsel's assertion of privilege as to these questions was baseless and has served to only delay the discovery process and increase Plaintiff's costs in seeking the truth. Plaintiff therefore requests that Reynolds and his counsel pay the fees and costs that Plaintiff has had to incur to bring this Motion.

## THE FACTS

**Unknown Defendants Are Engaging in an Illegal Smear Campaign Against Former United States Attorney Brandon McCarthy and Ryan Reynolds Likely Knows Who They Are**

5. Plaintiff McCarthy is former Assistant United States Attorney for the Northern District of Texas with a sterling reputation in the legal community. However, in the past year, one or more individuals have engaged in and continue to engage in a smear campaign against McCarthy by making intentionally false representations of purported fact to various people with the intent of harming his reputation and professional standing and painting him in a false light. Plaintiff has filed this lawsuit in order to determine who those people (named as Jane/John Does 1-10 in this suit) are and hold them legally accountable for their actions.

6. Ryan Reynolds ("Reynolds") is a convicted federal felon who has flouted the laws of this country and disobeyed Court orders. Indeed, the Honorable Judge Boyle of the United States District Court for the Northern District of Texas, Dallas Division, has previously found Reynolds in contempt of Court for failing to obey an asset-freeze order.

7. On information and belief, Reynolds has been used by a tool of these John/Jane Does to spread the false information about Defendant. For that reason, it is critical that Plaintiff depose Reynolds to learn if he has in fact been working for these John/Jane Does and to learn their identities.[1] Accordingly, Plaintiff's counsel issued and had served a subpoena requiring Reynolds to appear for his deposition on November 8.

---

[1] Because the person or persons engaging in this smear campaign are not yet known, they have been identified in this lawsuit as "John/Jane Does 1-10." On information and belief, this smear campaign may be related to a highly contentious case pending in the 134th District Court for which Plaintiff acts as counsel for one of the parties. For that reason, the case was transferred to the 134th after filing. Reynolds' allegation that such transfer was a "fraud on the court" is as baseless as it is outrageous.

**PLAINTIFF'S MOTION TO COMPEL DEPOSITION TESTIMONY FROM WITNESS RYAN REYNOLDS – Page 3**

### Reynolds and Others are Trying to Block Discovery of Relevant and Discoverable Information Concerning the Smear Campaign and the Identities of the John/Jane Doe Defendants

8. But Reynolds and/or whomever he is conspiring with to harm Brandon McCarthy continues to try to thwart Plaintiff's attempts to determine the identities of these John/Jane Does.

9. First, in response to Plaintiff's subpoena, Reynolds filed a document titled "Objections and Motion for Protective Order" regarding that subpoena, and Reynolds refused to appear for his deposition on November 8. Reynolds himself signed the Motion and represented that he was appearing "pro se."

10. After a hearing on November 8, this court ordered that Reynolds appear for his deposition on November 10.

11. At that deposition, it came to light through Reynolds testimony that the Objections and Motion for Protective Order (the "Motion") made material misrepresentations to this Court, including:

   a. The Motion falsely represented that Reynolds was appearing pro se. Reynolds testified at his deposition that an attorney had actually drafted that Motion for Protective Order and he identified that attorney as David Bell. (*See* Ex. 1 at page 46.)

   b. The Motion falsely represented that "Movant is a witness against the Plaintiff in another matter(s), and Plaintiff and his counsel are seeking to intimidate the witnesses against him in the other matter." Reynolds testified at his deposition that he had no knowledge of any "other matter" in which he is a witness against Plaintiff. (*Id.* at page 59, lines 20-23.)

12.     Plaintiff is filing a separate Motion for Sanctions against Reynolds' attorney David Bell for filing the baseless and intentionally misleading motion with the Court in attempt to block the Reynolds' deposition.

13.     However, this Motion deals with Reynolds and his counsel's obstructionism at the deposition itself.

## ARGUMENT AND AUTHORITIES

**Reynolds Cannot Refuse to Answer Questions Regarding His Communications with James Rolfe and Cameron Smith that
Without Establishing They Concern His Criminal Case or Custody Dispute**

14.     At Reynolds' deposition on November 10, Plaintiff's counsel asked Reynolds numerous questions regarding attorneys Cameron Smith and Jim Rolfe to determine if they might be the Jane/John Does that are the subject of this suit. However, Reynolds' counsel refused to let Reynolds answer any of these questions on grounds of attorney-client privilege because Smith and Rolfe are "attorneys." In fact, Reynolds' counsel stated that he would not let Reynolds answer any questions concerning any attorneys. (*See* Ex. 1, page 12.)

15.     Of course, as this court is well-aware, a communication is not privileged merely because it is with an attorney, even if it is a communication between an attorney and his/her client. *See Huie v. DeShazo*, 922 S.W.2d 920, 926 (Tex. 1996); *Borden, Inc. v. Valdez*, 773 S.W.2d 718, 720 (Tex. App.--Corpus Christi 1989, orig. proceeding) (not all communications between a client and an attorney are privileged, and the burden is on the party resisting discovery to show that the communication was, in fact, protected by the privilege).

16.     The elements of the attorney-client privilege under Texas law are: (1) a confidential communication; (2) made for the purpose of facilitating the rendition of professional legal services; (3) between or amongst the client, lawyer, and their representatives; and (4) the privilege has not

been waived. *See* TEX. R. EVID. 503(b)(1); *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 473 (N.D. Tex. 2004) (Kaplan, J.) (applying Texas law of privilege). These elements can be established by affidavit or live testimony. *Seibu Corp. v. KPMG LLP*, 2002 U.S. Dist. LEXIS 906, at *1 (N.D. Tex. Jan. 18, 2002) (applying Texas law of privilege).

17. The burden is on the party asserting the privilege to demonstrate how each document or communication satisfies these elements. *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. at 473 (citing *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985)) (applying Texas law of privilege). Courts generally construe the privilege narrowly because an assertion of privilege inhibits the search for truth. *Id.* A general allegation of privilege is insufficient to meet the burden. *Id.*

18. **Here, Reynolds testified that Smith had only acted as his attorney concerning a child custody dispute and Rolfe represented him concerning his criminal case, both of which have been resolved.** However, Reynolds did not establish that he has any ongoing attorney-client relationship with either Smith or Rolfe or that these communications occurred in the furtherance of providing legal services. Therefore, communications between Reynolds and Smith and/or Rolfe that do not concern their legal representation of him are not privileged and Reynolds and his attorney cannot assert that privilege as a basis for not answering questions regarding those communications.

19. Reynolds therefore respectfully requests that the Court order Reynolds to re-appear for his deposition and answer questions concerning the substance of communications between Ryan Reynolds and James Rolfe and/or Cameron Smith that do not concern the rendition of legal services in relation to Reynolds' custody dispute or criminal case, i.e., communications that fall outside of their alleged attorney-client relationship.

**Reynolds Cannot Refuse to Answer Questions Concerning the Factual Circumstances Surrounding His Attorney-Client Relationships with David Bell, Cameron Smith, and James Rolfe**

20. Reynolds' attorney instructed Reynolds not answer any questions regarding the factual circumstances of Reynolds' retention of himself (David Bell), Cameron Smith or James Rolfe as attorneys. Specifically, Reynolds' counsel David Bell would not let Reynolds answer when Reynolds had first consulted with and retained any of these attorneys, the fee arrangement with any of these attorneys, or who referred Reynolds to David Bell as counsel. David Bell's assertion of privilege as to these questions is baseless.

21. Texas law is clear that this information is not subject to the attorney-client privilege. As on Texas court stated:

> Under the great weight of authority, information concerning the factual circumstances surrounding the attorney-client relationship has no privilege, at least as long as disclosure does not threaten to reveal the substance of any confidential communications. Therefore, the attorney-client privilege does not encompass such nonconfidential matters as the terms and conditions of an attorney's employment, the purposes for which an attorney has been engaged, or any of the external trappings of the relationship between the parties.");

*See Duval County Ranch Co. v. Alamo Lumber Co.*, 663 S.W.2d 627, 634 (Tex. Ct. App.—Houston 1988); *see also* Goode, Wellborn and Sharlot, 2A Courtroom Handbook on Texas Evidence 456 (2012) ("Texas courts have followed the widely accepted common-law rule that the identity of the client and fee arrangements ordinarily are not shielded from disclosure.

22. Similarly, "by whom and when" a client was referred to a particular lawyer for representation is considered a factual circumstance surrounding the attorney-client relationship that is not protected from disclosure by privilege under Texas law. *See Alpert v. Riley*, 2009 U.S. Dist. LEXIS 36612 at *41 (S.D. Tex. Apr. 30, 2009) (holding the circumstances surrounding client's attorney-client relationship with law firm Scardino and Courtney, including by whom and

when client was referred to Scardino & Courtney, was discoverable and not privileged under Texas law).

23.     Reynolds therefore seeks an order from this Court compelling Reynolds to appear for deposition within the next 2 weeks at a mutually agreed date and time and to answer questions concerning:

  a.  When Reynolds first retained David Bell as his counsel.

  b.  When Reynolds first met with David Bell as his counsel.

  c.  The general terms of David Bell's representation of Ryan Reynolds (i.e., rate, fees to be charged, scope of representation).

  d.  The identity of the person or persons who referred Ryan Reynolds to David Bell.

  e.  The start and end date of any alleged attorney-client relationship between Ryan Reynolds and Cameron Smith and/or James Rolfe and the scope of such representation(s).

  f.  The terms of any Cameron Smith's legal representation of Ryan Reynolds. (e.g., rate, fees to be charged, scope of representation).

  g.  The terms of James Rolfe's legal representation of Ryan Reynolds. (e.g., rate, fees to be charged, scope of representation).

  h.  The substance of communications between Ryan Reynolds and James Rolfe and/or Cameron Smith outside of the attorney-client relationship.

  i.  Whether Cameron Smith and/or James Rolfe have ever hired Ryan Reynolds to perform and work for them and the substance of that work and identity of any client for whom that work was performed.

## CONCLUSION AND PRAYER

For the foregoing reasons, Plaintiff respectfully seeks an order from this Court granting the relief requested herein. Plaintiff further requests any other relief in law or equity to which he may be justly entitled.

Respectfully submitted,

JAMES S. BELL, P.C.
2808 Cole Avenue
Dallas, Texas 75204
Tel: (214) 668-9000

By:/s/ *James S. Bell*
James S. Bell
State Bar No. 24049314
james@jamesbellpc.com
Attorney for Petitioner

## Certificate of Service

I hereby certify that I have served a copy of this document on all counsel of record in compliance with the Texas Rules of Civil Procedure.

/s/ *James S. Bell*
James S. Bell

NO. DC-17-13448

| | | |
|---|---|---|
| BRANDON MCCARTHY | ) | IN THE DISTRICT COURT |
| VS. | ) | 134TH JUDICIAL DISTRICT |
| JOHN/JANE DOES 1-10 | ) | DALLAS COUNTY, TEXAS |

* * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF

**RYAN REYNOLDS**

NOVEMBER 10, 2017

Volume No.

* * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION of **RYAN REYNOLDS**, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 10th of November, 2017, from Time to Time, before Sherry Folchert, CSR, in and for the State of Texas, reported by machine shorthand, at the offices of David Bell, 8350 Meadow Road, Suite 186, Dallas, Texas, pursuant to the Texas Rules of Civil Procedure.

**EXHIBIT 1**

**A P P E A R A N C E S**

FOR THE PLAINTIFF:

James S. Bell
JAMES S. BELL, P.C.

FOR THE WITNESS:

David Bell

ALSO PRESENT:

Brandon McCarthy
Kelley Cash
Matt Segedy

**EXHIBIT 1**

# INDEX

| | PAGE |
|---|---|
| Appearances . . . . . . . . . . . . . . . . . . . . . . | 2 |
| Stipulations. . . . . . . . . . . . . . . . . . . . . . | 4 |
| **RYAN REYNOLDS**<br>Examination by Mr. James Bell. . . . . . . . . . | 5 |
| Signature and Changes . . . . . . . . . . . . . . . . . | Pg |
| Reporter's Certificate. . . . . . . . . . . . . . . . . | Pg |

# EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Fifth Amendment Invocation | |

**EXHIBIT 1**

**AGREEMENTS**

It is hereby agreed by and between the parties hereto, through their attorneys appearing herein, that any and all objections to any question or answer herein, except as to the form of the question and responsiveness of the answer, may be made upon the offering of this deposition in evidence upon the trial of this cause with the same force and effect as though the witness were present in person and testifying from the witness stand.

It is further agreed by and between the parties hereto, through their attorneys appearing herein, that this deposition may be signed before any notary public in and for the State of Texas, but if the original deposition has not been signed by the witness and returned by the time of the trial or any hearing in the case, the unsigned original or a copy thereof may be returned into Court and used with the same force and effect as though all requirements of the rules and statutes with reference to signature and return had been fully complied with.

**EXHIBIT 1**

P R O C E E D I N G S

RYAN REYNOLDS,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BELL:

Q. Sir, will you introduce yourself to the folks on the jury, as well as the Court?

MR. DAVID BELL: Excuse me, Counsel. First identify yourself and everybody that you've brought with you today.

MR. JAMES BELL: My name is James Bell. I have my client here and two folks that work for me. Matt Segedy and Kelley Cash.

MR. DAVID BELL: And your client is who?

MR. JAMES BELL: Brandon McCarthy.

MR. DAVID BELL: Okay. And Matt Segedy works for you, I believe, as of today, correct?

MR. JAMES BELL: I'm not here to answer your questions. I'm telling you he works for me.

MR. DAVID BELL: Well, I'm going to exclude -- ask that he be excluded because he's -- I anticipate he's going to be a witness in these proceedings. So if you insist on him staying here, I'm not waiving that objection. Just placing you on notice that we'll move to strike your use of this deposition if

**EXHIBIT 1**

he stays in this deposition.

Q.    (BY MR. JAMES BELL)  Sir, can you state your name for the -- strike that.

Can you introduce yourself to the folks on the jury as well as the Court?

MR. DAVID BELL:  Let the record show that you refuse to acknowledge my comment or to respond to my comment.  Please proceed at your own risk and peril.

THE WITNESS:  My name is Ryan Reynolds.

Q.    (BY MR. JAMES BELL)  Okay.  And, Mr. Reynolds, you're convicted a felony, true?

A.    I am.

Q.    And have you had your deposition taken before?

A.    Yes.

Q.    How many times?

A.    I don't remember.

Q.    Approximately how many times?

A.    I don't remember.

Q.    Is it more than once?

A.    Yes.

Q.    More than five times?

A.    I don't recall.

Q.    You don't recall whether or not you've been deposed more than five times?

A.    I do not.

**EXHIBIT 1**

Q. Okay. And you were served with a subpoena to appear for your deposition last Wednesday, correct?

A. Yes.

Q. You did not appear, correct?

A. Let me see when that was exactly. No, I was not at that deposition.

Q. Okay. When did David Bell become your lawyer?

MR. DAVID BELL: Object. I'm not going to allow you to answer any questions about my representation of you.

Q. (BY MR. JAMES BELL) Sir, I'm not asking you to get in communications with your lawyer. When did you retain Mr. Bell for services?

MR. DAVID BELL: I'm not going to allow him to answer any question that might invade the attorney/client privilege.

Q. (BY MR. JAMES BELL) So you're going to refuse to answer --

A. On the advice on my counsel.

Q. So you're going to refuse to answer my question about when you retained Mr. Bell to become your lawyer?

A. I'm going to object on the advice of my counsel.

Q. (BY MR. JAMES BELL) Are you going to refuse --

MR. JAMES BELL: Objection; nonresponsive.

**EXHIBIT 1**

Q. (BY MR. JAMES BELL) Are you going to refuse to answer my question about when you retained Mr. Bell as your lawyer?

MR. DAVID BELL: Counsel, you're asking for a legal conclusion. I'm not going to allow my client to answer that question.

Q. (BY MR. JAMES BELL) Sir, are you going to refuse to answer my question about when you retained Mr. Bell to become your lawyer?

MR. DAVID BELL: Again, you're asking for a legal conclusion. I'm not going to allow him to object (sic). Objection; form.

MR. JAMES BELL: So that's an objection form or are you just --

MR. DAVID BELL: Both.

Q. (BY MR. JAMES BELL) So are you going to refuse to answer my question about -- strike that.

When did you first meet Mr. Bell?

MR. DAVID BELL: I'm not going to allow him to answer questions about me or my representation of him. So ask any other question you want. Go ahead.

Q. (BY MR. JAMES BELL) So you're going to refuse -- just so that I have --

MR. JAMES BELL: Make sure you certify these.

**EXHIBIT 1**

Q.   (BY MR. JAMES BELL)  You're going to refuse to answer my question about when Mr. Bell became your lawyer.  Would that be a true statement?

MR. DAVID BELL:  I advise the client not to answer any questions about my representation.

MR. JAMES BELL:  I need to get a refusal on the -- on the --

THE WITNESS:  I'm going to object on advice of my counsel.

Q.   (BY MR. JAMES BELL)  I'm not asking you to object.  I need to get on the record, just so it's clear, you're going to refuse to answer my question based on the advice of your lawyer.  Is that a true statement?

A.   Correct.

Q.   Okay.  And you're going to refuse to answer my question based on the advice of your lawyer of when he became -- Mr. Bell became your lawyer, correct?

A.   Correct.

Q.   Okay.  And you're going to refuse to answer my questions surrounding the circumstances which led to Mr. Bell becoming your lawyer?  You're going to refuse to answer that question as well, true?

A.   Correct.

Q.   Okay.

**EXHIBIT 1**

MR. DAVID BELL:  Before you go further. Let's try not to overtalk each other.  And can I make a suggestion, Counsel?  Do you mind if we referred to as James and David.  It might make life easier for the reporter?

Q.  (BY MR. JAMES BELL)  And so you understand what the deposition is, correct?

MR. DAVID BELL:  Objection; form.  Asks for a legal conclusion.

MR. JAMES BELL:  You're only allowed to object to the form.  I didn't ask you for the basis.

MR. DAVID BELL:  You're asking him for a legal conclusion.

MR. JAMES BELL:  That's a form objection. So just object to form.  Let's -- let's follow rules.

MR. DAVID BELL:  Let's be civil.

MR. JAMES BELL:  Yeah, let's.

MR. DAVID BELL:  That's part of the Rule.

MR. JAMES BELL:  Let's.

MR. DAVID BELL:  Please proceed.

Q.  (BY MR. JAMES BELL)  So you understand what a deposition is, correct?

MR. DAVID BELL:  Asks for a legal conclusion.  Objection; form.

MR. JAMES BELL:  You can still answer.

**EXHIBIT 1**

THE WITNESS: I believe I do.

Q. (BY MR. JAMES BELL) Okay. And you understand what an oath is, correct?

A. I do.

Q. You're going to tell the truth, the whole truth, and nothing but the truth, correct?

A. Correct.

Q. You understand it's a felony in this state to lie under oath?

A. Correct.

Q. You understand that your testimony is being taken word for word by the court reporter here?

A. I do.

Q. Okay. And you understand that you're going to have an opportunity to review your deposition, correct?

A. Correct.

Q. Now, throughout this deposition, you've already hard it, there's going to be some objections by your lawyer as to form of the question and/or some instructions for you to not answer. Now, if he objects to form of the question, you still got to answer my question. Do you understand that?

A. I do.

Q. Okay. And if he instructs you not to answer, then you don't answer, right?

**EXHIBIT 1**

A. Right.

Q. Now --

MR. DAVID BELL: Let -- let me say one thing before you get started. I've instructed the client not to answer and I'm not going to allow him to -- as you can see answer, any questions about hiss communication with any lawyers. I'm not going to allow him to testify regarding any privilege shared with any lawyers. And I'm not going to allow him to testify about any matters not set out in the lawsuit you filed. I just want to be clear on that.

Q. (BY MR. JAMES BELL) And you understand the difference between direct knowledge and indirect knowledge, correct? Direct knowledge is something that you can see, touch, smell, you see for yourself, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Can you repeat that?

Q. (BY MR. JAMES BELL) Sure. You would agree direct -- there's a difference between direct knowledge and indirect knowledge? Direct knowledge is something you can see, hear, smell, touch yourself, right?

MR. DAVID BELL: Objection; form.

THE WITNESS: I do.

Q. (BY MR. JAMES BELL) Okay. And indirect

**EXHIBIT 1**

knowledge is what some -- something or somebody may tell you, correct?

A. Correct.

Q. Okay. And you understand the difference between a question that calls for yes-or-no answer versus one that calls for a narrative, right?

MR. DAVID BELL: Objection; form.

THE WITNESS: I do.

Q. (BY MR. JAMES BELL) Okay. When did you meet Brandon McCarthy?

A. I met him in a restaurant. I'm kind of bad with dates, but I would say five, six years ago.

Q. Do you know when you met Brandon McCarthy?

A. The exact date?

Q. Do you know what year you met Brandon McCarthy?

A. I really don't remember. It was '09 or '10.

Q. Did you meet Brandon while he was still an Assistant United States attorney?

A. I believe, yes.

Q. Okay. And how many times have you had in-person meetings with Brandon McCarthy?

MR. DAVID BELL: Objection; form.

THE WITNESS: By -- you mean where we were both physically present at those meetings? Is that what you mean by that?

**EXHIBIT 1**

Q. (BY MR. JAMES BELL) My question is: How many times have you been in the physical presence of Brandon McCarthy?

A. Many times.

Q. How many?

A. Four or five.

Q. Okay. So the first meeting you had with Brandon McCarthy was in either 2009 or 2010?

A. Well, it wasn't a meeting. I just -- that's when I met him.

Q. Okay. How many meeting have you had with Brandon McCarthy?

A. I believe two.

Q. When was the first meeting with Brandon McCarthy?

A. It was at K&L Gates.

Q. How long did that meeting last?

A. Approximately an hour maybe.

Q. Okay. And when was the first meeting -- strike that.

When did the first meeting at K&L Gates take place?

A. I don't remember the date, but it was right when -- it was pretty close to when he had started there.

**EXHIBIT 1**

Q. Okay. When was your second and final meeting with Brandon McCarthy?

MR. DAVID BELL: Objection; form.

THE WITNESS: It was at a hotel downtown with my -- with a friend of mine. And there was another gentleman there. I forget the name of the hotel.

MR. DAVID BELL: Just asked you when, I believe.

THE WITNESS: When, probably within -- within three or four months of the original meeting, the first one.

Q. (BY MR. JAMES BELL) Would you say around December 2015?

MR. DAVID BELL: Objection; form.

THE WITNESS: I don't know.

Q. (BY MR. JAMES BELL) Okay. And so you had two meetings with Brandon McCarthy. Just so the record is clear. One at K&L Gates and one at a hotel downtown. Would that be a true statement?

A. Yes.

Q. Okay. No other meetings that you can think of as you sit here right now?

A. Not that I can recall at this moment.

Q. And how long did the second meeting last?

A. Maybe an hour, hour and a half.

**EXHIBIT 1**

Q.   Okay.  And at the second meeting you had brought your friend, Ms. Sanchez; is that true?

A.   No.

Q.   What was the name of the friend that you brought to the meeting?

A.   Her first name is Brooke.

Q.   What's her last name?

A.   I don't recall.

Q.   You -- so she's -- she's a friend of yours, but you don't recall her last name?

A.   Well, there were four people there, total.  I can't recall her last name right now.

Q.   So you can't recall the name of the -- the last name of the friend that you brought to the meeting at the hotel; is that true?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I didn't know her very well. I mean I had just gotten to know her and -- and we met Brandon and another guy that was friends with Brandon, another attorney.  But I don't recall, no.

Q.   (BY MR. JAMES BELL)  Okay.  And at the second meeting you were there to discuss business involving Protect My ID?

A.   Yeah, I think it's protectmyid.org.

Q.   And so you --

**EXHIBIT 1**

MR. JAMES BELL: What is it?

MR. McCARTHY: It's keep My ID.

Q. (BY MR. JAMES BELL) And at the second meeting you talked about keepmyid.com and potentially doing a commercial or some social media for keepmyid.com; is that true?

A. It's keepmyid.org. But we discussed, you know, different marketing -- you know, how to market the business and how to get it out there and, you know, kind of like LifeLock does. But yes, pretty much marketing type stuff.

Q. So the purpose of the second meeting was to market -- discuss marketing and get out the business of keepmyid.org, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yeah, for the most part. I mean that was the -- that was the reason for the meeting, correct.

Q. (BY MR. JAMES BELL) Okay. Can you -- do you remember anything else being discussed at that meeting, at the second meeting?

A. Nothing that's relevant. Just, you know, what people talk about when they're having a drink or whatever. Just -- but, you know, nothing -- no other kind of business or anything.

**EXHIBIT 1**

Q. Okay. As you -- as you sit here right now, can you recall anything else you talked to Brandon McCarthy about at the second meeting at the hotel downtown --

A. No.

Q. -- where you --

Okay. Now, with respect the first meeting at K&L Gates that lasted approximately one hour, is that what you testified to?

A. Yes.

Q. Okay. You talked about a business you start -- started, White Collar Advisors; is that true?

MR. DAVID BELL: Objection; form.

THE WITNESS: We might have. But we talked about other things. That wasn't the point of the meeting.

Q. (BY MR. JAMES BELL) Did you discuss White Collar Advisors?

A. I mean I may have with him, I don't -- I don't remember that.

Q. Okay.

MR. DAVID BELL: Just tell him what you remember. Don't tell him what you may have remembered, please.

THE WITNESS: So can you repeat that?

Q. (BY MR. JAMES BELL) Sure. What all did you

**EXHIBIT 1**

say to Brandon at the first meeting at K&L Gates, the first meeting you had with him?

A. Well, it was Gus Hefler and myself and we talked about possibly doing a Qui Tam case against Dustin Raul and Scott Shuster and however many companies they have.

Q. And you discussed that with Brandon?

A. Yes.

Q. Okay. And what would be the basis for the alleged Qui Tam case?

A. Possible criminal acts that -- that they were, I guess, doing or conspiring to do.

Q. And you didn't have any personal knowledge of that, correct?

A. Of what?

Q. Of any criminal acts that Scott Shuster Dustin Raul were doing, true?

A. No, I didn't.

MR. DAVID BELL: Counsel, can we go off the record for a second?

MR. JAMES BELL: No.

MR. DAVID BELL: Okay. So on the record, I understand that represent Mr. Shuster and I'm perplexed as to why you would you ask questions about Mr. Shuster, if you do represent Mr. Shuster. I'd rather have this

**EXHIBIT 1**

discussion with you off the record.

Q. (BY MR. JAMES BELL) So just -- so just so that I'm aware, you -- you right now are on supervised release. Would that be a true statement?

A. Correct.

Q. Okay. And part of your supervised release standards are that you're not allowed to associate with persons engaged in criminal activity, correct?

A. Correct.

Q. And you're not allowed to associate with folks convicted of a felony, correct?

A. Correct.

Q. And you're not allowed to enter into any agreements to act as an informer or special agent of a law enforcement agency, correct?

A. Without permission, I'm not.

Q. That's right. Okay.

MR. DAVID BELL: Let me -- let me -- let interject an objection here. I told you earlier that I'm not going to allow the witness to testify about any matters that aren't set out in your pleadings and I don't see where any of these matters that you're asking him for comments about, his criminal conviction or anything else, are anywhere supported by anything in your pleadings.

**EXHIBIT 1**

MR. JAMES BELL:  Okay.

Q.  (BY MR. JAMES BELL)  Have you ever gotten special permission to act as an informer for the -- the government?

MR. DAVID BELL:  Objection.  I'm not going to allow him to testify about any matter that impedes the attorney/client privilege.  I'm not going to let him testify about any meetings he had with any lawyer.

Q.  (BY MR. JAMES BELL)  Are you going to refuse to answer that question?

A.  Yes.

MR. DAVID BELL:  And any other question similar to the --

Q.  (BY MR. JAMES BELL)  Do you -- do you understand what defamation is?

MR. DAVID BELL:  Objection.  Calls for a legal conclusion.  Objection; form.

THE WITNESS:  Defamation, no.

Q.  (BY MR. JAMES BELL)  What is your understanding of defamation?

A.  I don't have an understanding.

Q.  Okay.  Have you ever made any false statements about Brandon McCarthy?

A.  No.

Q.  Okay.  Do you have any direct evidence or

**EXHIBIT 1**

knowledge of facts that Brandon McCarthy has committed any illegal conduct?

A. No.

Q. Do you have any direct evidence knowledge or facts to support the position that Brandon McCarthy has engaged in unethical conduct?

MR. DAVID BELL: Calls for a legal conclusion. Objection; form.

THE WITNESS: Meaning from myself personally or people that I've spoken to on the phone or --

Q. (BY MR. JAMES BELL) I'm talking about direct knowledge, sir.

A. From -- from a person that I know that called me and told me what --

Q. I'm not asking your what a person called and told. Remember we talked about direct knowledge versus indirect?

A. Well, I don't have any direct knowledge, no. Personally.

Q. I'm talking about what your personal knowledge is. Okay. And that way we can keep -- we probably can shorten this deposition a bunch. Is much that fair?

A. Yeah. That's cool.

Q. All right. That way maybe you can get out of

**EXHIBIT 1**

here and your lawyer can get out of here.

So you don't have in direct evidence that Brandon McCarthy engaged any wrongful conduct, true?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Well, maybe I asked you a double negative. It would be a true statement to say that you don't have any direct knowledge that Brandon McCarthy engaged in any unlawful conduct. That would be a true statement, correct?

MR. DAVID BELL: Calls for a legal conclusion. Objection; form.

Q. (BY MR. JAMES BELL) Correct?

A. That would be correct.

Q. (BY MR. JAMES BELL) You don't have any direct knowledge or evidence that Brandon McCarthy engaged in any unethical conduct, correct?

MR. DAVID BELL: Calls for a legal conclusion. Objection; form.

Q. (BY MR. JAMES BELL) Correct?

A. Give me a second to think. No, I don't.

Q. You don't have any direct knowledge or facts to suggest that Brandon McCarthy engaged in any -- strike that.

**EXHIBIT 1**

You don't have any direct knowledge or evidence that Brandon McCarthy breached any duties to anybody, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: I do not.

Q. (BY MR. JAMES BELL) You don't have any direct evidence or knowledge to suggest that Brandon McCarthy defamed anybody, correct?

MR. DAVID BELL: Objection; form. Calls for a legal conclusion.

THE WITNESS: That's correct.

Q. (BY MR. JAMES BELL) You don't have any direct knowledge that Brandon McCarthy wasn't faithful to any of hiss clients, correct?

MR. DAVID BELL: Objection; calls for a legal conclusion. Form.

THE WITNESS: I do not.

Q. (BY MR. JAMES BELL) You don't have direct knowledge that Brandon McCarthy harmed any of his clients, correct?

A. I do not.

Q. You don't have direct evidence or knowledge that Brandon McCarthy was deceptive towards any of his client, correct?

MR. DAVID BELL: Objection; calls for a

**EXHIBIT 1**

legal conclusion. Objection; form.

THE WITNESS: I do not.

Q. (BY MR. JAMES BELL) You don't have direct knowledge that Brandon McCarthy cheated any of his clients, correct?

MR. DAVID BELL: Calls for a legal conclusion. Objection; form.

THE WITNESS: No.

MR. JAMES BELL: Do you want a running objection?

MR. DAVID BELL: No, I prefer to do it this way. Thank you.

Q. (BY MR. JAMES BELL) You don't have any direct evidence or knowledge that Brandon McCarthy defrauded anybody, including any of his clients, correct?

MR. DAVID BELL: Objection; form. Calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have direct knowledge that Brandon McCarthy betrayed any of his clients or anybody, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any

**EXHIBIT 1**

knowledge -- strike that.

You don't have any direct knowledge or evidence or facts to suggest that Brandon McCarthy wasn't loyal to anybody or any of clients, correct?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't direct knowledge that -- that or evidence that Brandon McCarthy didn't have act with the utmost good faith towards any of his clients, correct?

MR. DAVID BELL: Objection; form. Calls for a legal conclusion. Objection.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct knowledge and direct evidence that Brandon McCarthy didn't act with candor towards any of his clients, correct?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy engaged in any self-dealing of any kind towards any of his clients or anybody, correct?

**EXHIBIT 1**

MR. DAVID BELL: Objection; form. Calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct knowledge that Brandon McCarthy didn't act with integrity of the strictest kind towards any of any of his clients or anybody, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy wasn't fair to any of his clients, correct?

A. Correct.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy didn't act with the utmost honest in dealing with his clients or anybody else, correct?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy didn't fully disclose all of the facts to all of his clients or to anybody else,

**EXHIBIT 1**

correct?

MR. DAVID BELL:  Objection; form. Objection; calls for a legal conclusion.

THE WITNESS:  Correct.

Q.  (BY MR. JAMES BELL)  You don't have any direct evidence or knowledge or facts to suggest that Brandon McCarthy didn't act with fidelity towards his clients or anybody else, correct?

MR. DAVID BELL:  Objection; form. Objection; calls for a legal conclusion.

THE WITNESS:  Correct.

Q.  (BY MR. JAMES BELL)  You don't have any direct evidence that -- or facts to suggest that Brandon McCarthy didn't act with care when he help dealt with his clients or anybody else, correct?

MR. DAVID BELL:  Objection; form. Objection; calls for a legal conclusion.

THE WITNESS:  Correct.

Q.  (BY MR. JAMES BELL)  You don't have any direct evidence or facts to suggest that Brandon McCarthy wasn't fair and equitable in his dealings with any of his clients or anybody else, correct?

MR. DAVID BELL:  Objection; form. Objection; calls for a legal conclusion.

THE WITNESS:  Correct.

**EXHIBIT 1**

Q. (BY MR. JAMES BELL) You don't have any direct evidence -- strike that.

You don't have any direct evidence -- strike that.

You don't have any direct evidence or knowledge to suggest that Brandon McCarthy made any misrepresentations to any of his clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy engaged in any type of fraud, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy breached any fiduciary duties to any of his clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy damaged any of his

**EXHIBIT 1**

clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy acted with any ill will towards of any of his clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence or knowledge to suggest that Brandon McCarthy acted with any evil motive towards any of his clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy acted with any kind of malice towards any of his clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct

EXHIBIT 1

evidence or knowledge of any crimes Brandon McCarthy may have allegedly committed, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy was negligent in any way towards any of his clients or anybody else, correct?

A. Correct.

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

Q. (BY MR. JAMES BELL) You don't have any direct knowledge or evidence to suggest that Brandon McCarthy was grossly negligent towards any his clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy interfered with any contractual relationships with any of his clients or anybody else or any entities. That would be a true statement, correct?

MR. DAVID BELL: Objection; form. Calls for a legal conclusion. Objection.

**EXHIBIT 1**

THE WITNESS:  Correct.

Q.  (BY MR. JAMES BELL)  You don't have any direct evidence that Brandon McCarthy willfully committed any wrongful conduct, correct?

MR. DAVID BELL:  Objection; form. Objection; calls for a legal conclusion.

THE WITNESS:  Correct.

Q.  (BY MR. JAMES BELL)  So can we -- is your basic understanding of the word "defamation" it's a -- it's a statement, whether written or oral, that tends to damage somebody's reputation.  Would -- would you agree with that?

A.  I would in sense that if it's a lie, correct.

Q.  If it wasn't -- oh, I see.  I see what you're saying.  Okay.  Fair enough.

So it would be fair to say that you and I can have an agreement that when we use the word "defamation," it's -- it's a statement made by somebody that causes harm to one's reputation, but -- but it's not defamation it's if the truth?

A.  That's my understanding.

MR. DAVID BELL:  And I'm going to continue to object that you're asking him to give a legal opinion he's not qualified to make.

Q.  (BY MR. JAMES BELL)  Without giving a legal

**EXHIBIT 1**

opinion, what is your understanding --

MR. DAVID BELL: So I'm objecting to your question as to form.

MR. JAMES BELL: What is your understanding of defamation based on our discussions and -- and your living in world for -- I don't know how many years. Thirty-three years, 34 years.

THE WITNESS: I wish.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) You're what?

A. Forty-six.

Q. Wow.

MR. DAVID BELL: How many did you say.

MR. JAMES BELL: I thought he was 33.

THE WITNESS: Appreciate that. My -- yeah, my definition -- my definition would be, you know, to say something about somebody that wasn't true.

Q. (BY MR. JAMES BELL) And harms their reputation?

MR. DAVID BELL: Objection; form. Asks for a legal conclusion.

Q. (BY MR. JAMES BELL) Or just saying a lie about somebody?

A. Yeah. If -- if somebody says that -- you know, that Joe murdered somebody at the 7-Eleven last night

**EXHIBIT 1**

and he really didn't and they print it in the paper and -- and it was a lie, that to me is defamation. But yeah.

Q. Okay. Are you aware of any defamatory statements that Brandon McCarthy has made?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) You don't have any direct evidence of any misrepresentations Brandon McCarthy made to anybody or any clients, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) Do you have any direct evidence or knowledge that Brandon McCarthy breached any contract towards any clients, anybody or any entity?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Have you ever had Brandon McCarthy followed?

A. No.

Q. Have you ever had a private investigator on Brandon McCarthy?

A. Absolutely not.

**EXHIBIT 1**

Q. Are you aware of anybody that's had a private investigator on Brandon McCarthy?

MR. DAVID BELL: Objection to form.

THE WITNESS: No.

MR. JAMES BELL: Were you going to object instruct not to answer that?

MR. DAVID BELL: No. Just --

MR. JAMES BELL: Okay.

MR. DAVID BELL: You just don't have any time in your question. You're asking all these questions about what happened since the beginning of time so I've had to object as to form.

Q. (BY MR. JAMES BELL) So you're not aware of any private investigators that have investigated Brandon McCarthy?

A. Private investigators? You mean like that are privately hired in the public?

Q. Sure.

A. No.

Q. Are you aware Of any other kind of investigators?

A. Personally aware?

Q. Yes.

A. No.

Q. Okay. So you're not -- you're not aware of --

**EXHIBIT 1**

okay. Are you -- so it would be fair to say that you've never hired a private investigator to follow Brandon McCarthy. That would be true?

A. Absolutely not. That's true. Absolutely true. I've never hired anybody to do anything to Brandon whatsoever.

Q. Okay. And do you wish ill will on Brandon?

A. No.

Q. Have -- are you aware of anybody that has hired a private investigator on or did -- or somebody to investigate Brandon McCarthy?

A. I am not.

Q. Okay. Do you have secondhand knowledge of anybody privately investigating Brandon McCarthy or publicly investigating Brandon McCarthy?

MR. DAVID BELL: Objection; form.

THE WITNESS: I mean had I an incident at a restaurant where two guys walked up to me and told me that -- I was sitting there eating at Hillstone and this guy put his hand on my shoulder and I kind of looked around -- because it was kind of intimidating, you know, he was real close to me and I looked like that (indicating) and he said -- he said, Ryan, what's going on? And I didn't know this guy. But I didn't want to be rude because I thought maybe I do, you know, and he

**EXHIBIT 1**

said I want you to know that Brandon McCarthy has a connect at the IRS and this connect's going to get a guy and they're going to investigate you. And -- and he said don't worry, his own people are going to get him. Don't worry about it. And walked off. And there was another guy standing by the door and they both walked off together (indicating). That's the only thing. It was very strange.

Q. Did you get that person's name?

A. No.

Q. Okay. So -- just so that I understand the facts. Somebody approached you in Hillstone restaurant and said to you that Brandon McCarthy was having you investigated? That's --

A. They -- they -- specifically they said Brandon McCarthy has a friend at the IRS, the friend won't be doing the investigation, they're going to pass it to another person and they're going to try to get you fucked off. And he said don't worry about it because Brandon's own people are going to get him and he walked off. And I found -- I didn't know if he was trying to intimidate me or if he was -- it was a very bizarre conversation.

Because by the time I looked back to ask who he was or figure it out, he was gone. And there was

**EXHIBIT 1**

another guy standing by the door and they both walked out together.

Q. Okay. So are you -- are you aware of Brandon McCarthy trying to investigate you?

MR. DAVID BELL: Objection; form.

THE WITNESS: I mean I've heard from numerous people that --

Q. (BY MR. JAMES BELL) Let me say it a different way.

A. Okay.

Q. Do you have any personal knowledge that Brandon McCarthy is investigating you?

A. No.

Q. But you've heard from secondary sources that Brandon McCarthy has -- is trying to investigate you or is investigating you?

A. Yes.

Q. Who told you that?

A. A friend of mine named Carl Fleming called me and said, hey, man, do you know Rob Castle and I said no. And he said, well, he's my attorney. And he said he called me the other day and he was freaking out. And I said okay. And he said, man, I need you to meet me at this restaurant. I got to talk to you about Ryan Reynolds and Carl is like, man, can we do it another

**EXHIBIT 1**

time. He's like no, it's important. Right now.

So Carl said that he went down and met whoever Rob Castle is and said he -- he seemed nervous and seemed like this, you know, and he said, hey, man, what's Ryan doing? We need some shit on him. We're going to get him -- we're going to get him in trouble. You know, give me some dirt on him. What's he doing now? And Carl is like I have no idea.

And so I guess Rob worked -- I guess the way I understood it was Rob was Carl's attorney and then Carl said, well, can you help me with this matter -- because I guess it was -- Rob wanted to talk about me and he wanted to talk about some pending thing he had going on. And Rob said, man, no, I'm -- you're -- you're fired. I'm not your attorney anymore. And he goes, man, I just wanted to call you because that was one of the weirdest things that -- that I've ever had happened to me. And I say, man, I don't know. I don't know Rob Castle, you know. So he goes do you know what it and I -- and I told Carl, I said no.

Q. Are you -- strike that.

Do you have any direct evidence that Brandon McCarthy failed to disclose any material information or any information of any kind to any clients or anybody else?

**EXHIBIT 1**

MR. DAVID BELL: Objection; form. Objection; asks for a legal conclusion.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Have you ever said that Brandon McCarthy was a liar?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Have you ever said that Brandon McCarthy has engaged in any unethical conduct?

MR. DAVID BELL: Objection; form. Calls -- no predicate. Calls for a legal conclusion.

MR. JAMES BELL: Let me ask it a different way.

Q. (BY MR. JAMES BELL) Based on the fact that you have no personal knowledge that Brandon McCarthy engaged any unethical conduct, did you ever tell anybody that Brandon McCarthy engaged in any unethical conduct.

MR. DAVID BELL: Objection; form.

THE WITNESS: I mean I've heard, you know, what --

MR. JAMES BELL: Answer my question, please.

THE WITNESS: I don't know. I don't remember. I mean maybe when these people have come to me. I mean that's not the only story that I just told

**EXHIBIT 1**

you about Castle. There's many more. So what I'm saying is is I don't know if somebody comes to you and says, hey, man, Brandon has got this hookup at the IRS and be careful. You know, we heard this at a party from these other IRS agents that he's going to get you -- you know, try try to get you indicted. Could I have said something then? Possibly. Do I remember, no.

Q. (BY MR. JAMES BELL) Okay. So just so I understand -- and maybe deposition will be a lot shorter than I thought.

MR. JAMES BELL: I'll object to my side-bar. Do you want to sustain it?

MR. DAVID BELL: I don't have that power. I would like to though. Thank you though.

MR. JAMES BELL: And I'll stipulate to -- if you object to my side-bar.

Q. (BY MR. JAMES BELL) So would you agree with me, sir, that based on the fact -- strike that.

Based on the fact that you don't have any personal knowledge or evidence that Brandon McCarthy engage in any unethical or illegal conduct, you don't recall ever saying that he engaged in any illegal or unethical conduct. Would that be a fair statement?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

**EXHIBIT 1**

THE WITNESS: I don't know. I don't know if I ever said, you know, maybe to all these people that have been telling me these stories, I said, well -- well, I did to -- to Nathan Halsey.

Q. (BY MR. JAMES BELL) What did you -- what did you say to Nathan Halsey?

A. Well Nathan Halsey told me that Brandon sent him to the FBI and had him wired up. I said, man, you better be careful.

Q. Okay.

A. I said you can't -- I -- I don't know if Brandon did that or not. I'm not saying that he did. I'm telling you what I heard secondhand. And I may have said that's -- that -- you know, I may have said -- I don't know if I've ever said anything -- I may have said that's not right or whatever. But to be honest with you, I always like Brandon as person. You know, I mean I never -- I think he's a nice guy, you know. And so this -- you know, when this whole thing got rolling, whatever has been going on and -- and that thing, it just seem to get crazier and crazier. And, you know, I didn't -- you know -- but I don't know -- I don't recall ever saying anything like, you know, Brandon's a crook, criminal or anything like that. But I'm not saying I haven't said, well, I -- I mean that's -- if that's

**EXHIBIT 1**

true, that's not good.  But never anything that I recall.

MR. JAMES BELL:  Sorry.  I got to object as nonresponsive, but I appreciate your answer.

Q.  (BY MR. JAMES BELL)  Let me just -- so that I'm clear -- I can break this down.  You've always liked Brandon McCarthy, true?

A.  I have.

Q.  You always thought that Brandon McCarthy was a nice guy irrespective of what you've heard from other folks, at least based on your personal dealings with him, correct?

A.  Yes.

Q.  And as you sit here right now, you don't recall ever saying to somebody that Brandon committed any criminal acts, correct?

A.  No.

Q.  I may have -- I'm wrong or did I ask a bad question --

A.  No.

Q.  -- a double negative.  It could have been my fault.  And I apologize.

A.  Say it one more time.

Q.  Sure.  You don't -- as you sit here right now, you don't recall ever saying that Brandon engaged in any

**EXHIBIT 1**

criminal conduct, saying that to anybody?

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Correct?

A. I have -- no, I -- correct. You're correct.

Q. (BY MR. JAMES BELL) Okay. As you sit here right now, you don't recall ever telling anybody that Brandon has engaged in any unethical conduct based on your personal knowledge, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Not on my personal conduct, but I -- but I --

Q. (BY MR. JAMES BELL) Personal knowledge?

A. Well, just maybe secondhand knowledge. I said, well, if that's true, I know that you're -- you can't do that, you know, but not -- but I don't know from my personal knowledge that Brandon was doing that. I'm saying what these people told me -- if somebody said, well, Brandon did this or, you know, he knows this person at the IRS and he's trying to get you indicted, I said you can't -- you can't do that.

And -- but I -- but I don't know personally that Brandon has done this or -- but secondhand I may have said that -- that you can't do that. But I've never said that he's a crook or I think that's he's --

**EXHIBIT 1**

firsthand knowledge, I don't -- I don't know.

Q.   You just said that if -- if whatever the second or thirdhand people are saying to you is true, that whatever they said would be messed up?

A.   Right.  And -- and I don't know that they are true.  But I just said if they -- if that scenario is correct, then that's not right.

Q.   Did you ever think about picking up the phone and calling Brandon?

A.   Well, not at that point because I felt like, you know, I kind of felt like he was out to get me.  So I didn't want to -- you know, I just felt like I -- I didn't think that would be smart because I feel like he didn't like me or was mad at me for something he perceived that I did.  So no, I didn't.

Q.   What made you think that Brandon was out to get you?

A.   Well, mainly this -- you know, this supposed IRS person that -- that Brandon was personal friends with, supposedly was -- and I don't know this.  This is secondhand knowledge, but I heard -- I've heard this, you know, more than once.

Q.   Who did you hear it from?

A.   I've heard it from two attorneys.

MR. DAVID BELL:  Don't tell anything that

**EXHIBIT 1**

you've heard from any attorneys, please.

THE WITNESS: Okay. And let me think for a second. And just that strange conversation that I had at Hillstone with those -- with that guy.

Q. (BY MR. JAMES BELL) List for me all your attorneys since 2015.

MR. DAVID BELL: Objection. I'm not going let him answer any questions about who his attorneys are or were.

Q. (BY MR. JAMES BELL) You're going to refuse to answer my question regarding who your attorneys have been since 2015?

A. Based on advice of my counsel, yes.

Q. Okay. Who drafted your motion for protective order?

A. Mr. Bell (indicating).

Q. There were Two motions filed; one by Mr. Bell and one you filed pro se, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct. But -- well, he wrote it.

Q. (BY MR. JAMES BELL) So it's your sworn testimony that Mr. Bell wrote the motion for protective order that you signed pro se?

MR. DAVID BELL: I'm not going to allow him

**EXHIBIT 1**

to answer any questions about his attorney/client relationship.

Q. (BY MR. JAMES BELL) So you're going to refuse answer my question about who drafted your motion for protective order that you filed in this case?

A. Yes.

Q. And you're going to refuse to answer my question when you first met with Mr. Bell?

A. Yes.

Q. Did any other attorneys, other than Mr. Bell, have anything to do with the motion for protective order that you filed in this case?

MR. DAVID BELL: I'm not going to allow him to answer any questions about any relationship, meeting, or anything to do with any attorney.

Q. (BY MR. JAMES BELL) Sir, are you going to refuse to answer my question whether or not any other attorneys helped you draft the motion for protective order that you filed in this case prior to the motion that Mr. David Bell affixed his signature to?

A. To --

MR. DAVID BELL: I'm not going to allow to testify -- I'm sorry for interrupting.

MR. JAMES BELL: I just need to get -- let me get a refusal from him.

**EXHIBIT 1**

MR. DAVID BELL: I'm not going to allow him to answer any question that relates to any conversation, meeting, with any attorney.

MR. JAMES BELL: I don't want to know the sum and substance of your meetings.

Q. (BY MR. JAMES BELL) The question --

MR. DAVID BELL: James, I'm not --

MR. JAMES BELL: I'm sorry for speaking while you're interrupting me.

MR. DAVID BELL: That's fine. That's fine.

MR. JAMES BELL: Okay.

MR. DAVID BELL: I'm not going to allow him to answer any question dealing with any conversation, meeting, anything to deal with any attorneys he's consulted.

MR. JAMES BELL: Okay.

Q. (BY MR. JAMES BELL) I don't want to know the sum and substance of any meeting, conversation or anything you had with an attorney. What are the names of the attorneys that you have met with?

MR. DAVID BELL: I'm not going to allow him to answer that question for the same reasons, that those are all privileged communications.

MR. JAMES BELL: I'm not asking for the communications.

**EXHIBIT 1**

MR. DAVID BELL: I know that. He's not going to testify.

MR. JAMES BELL: So even though you know that I'm not asking for the -- the communications, you are still going to instruct the witness not to answer my question?

MR. DAVID BELL: I'll be instructing the witness not to answer any question relating to dealing with, naming, anything to do with any conversation you've had with my attorney, as those conversations are all privileged.

Now, if you can show me some law.

MR. JAMES BELL: You're -- you're missing the boat. I'm not asking --

MR. DAVID BELL: I know that. I know what you're asking. The record is clear what you're asking.

I'm just saying that if you've got some law that suggests that my understanding of the law is contrary to what the law is --

MR. JAMES BELL: It is. But that's -- that's --

MR. DAVID BELL: But I --

MR. JAMES BELL: -- we'll take it up --

MR. DAVID BELL: -- I'd be glad --

MR. JAMES BELL: We're going to --

**EXHIBIT 1**

MR. DAVID BELL: No problem.

MR. JAMES BELL: We're going to take it up. We'll take it up. We'll take it. That's all.

MR. DAVID BELL: Let me finish. Let me finish. I'll be glad to --

MR. JAMES BELL: I don't want to do the filibuster.

THE REPORTER: I need you to not talk at the same time, please.

MR. DAVID BELL: Yes. Don't talk at the same time.

Go ahead, please.

Q. (BY MR. JAMES BELL) Okay. You're going to refuse to answer my question about whether or not any attorney helped you draft the pro se motion for protective order you filed in this case?

MR. DAVID BELL: I'm --

Q. (BY MR. JAMES BELL) Are you going to refuse to answer that question?

MR. DAVID BELL: I'm --

THE WITNESS: Based on advice -- based on advice of my counsel, yes.

Q. (BY MR. JAMES BELL) Okay. And in that motion for protective order you asked for attorneys' fee, correct.

**EXHIBIT 1**

A. Correct.

Q. Okay. Whose attorney fees were you attempting to collect when you filed that motion for protective order?

A. Mr. Bell's.

Q. No other attorney?

A. Huh-uh, no.

Q. Even though you filed a motion pro se and asked for attorneys' fees at that point in time, it's your sworn testimony that the attorneys' fee you were asking for when you filed your pro se motion for protective order was the attorney's fee for Mr. Bell. Would that be a true statement?

A. Yes.

MR. DAVID BELL: You've gone almost an hour. In the next 10 or 15 minutes take a short break.

MR. JAMES BELL: Surely. Take five minutes.

(Break taken)

Q. (BY MR. JAMES BELL) Going back to the first meeting with Brandon McCarthy, tell me all the things that you had discussed?

MR. DAVID BELL: Objection; form.

THE WITNESS: Well, we -- what -- Mr. Kepler and I were there and what we were interested in

**EXHIBIT 1**

was possibly getting Brandon's help or knowledge on how to get a Qui Tam case going against Ronald Shuster, et cetera. From what I remember, Brandon said he had to do some background checks or, you know, where you have to see if their clients -- you know, run a -- whatever that's called.

Q.   (BY MR. JAMES BELL)  Brandon said he had the run a conflicts check?

A.   Yeah.

Q.   Do you remember what other names you gave to them that -- that day in terms of potential Qui Tams?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I don't.

Q.   (BY MR. JAMES BELL)  Do you remember the fact you did give him some additional names?  Like a Southwest.  Did you talk about Southwest?

Let me ask it a different way.

A.   Is Southwest a business or a name?

Q.   Do you recall discussing with Brandon McCarthy the names of other businesses where you would like to potentially pursue other Qui Tams?

A.   I may have mentioned Donson Brooks.  Maybe if you can refresh my memory, I can -- I just don't remember, you know, if -- if I mean I may have mentioned Donson.  He's -- he's a local guy that -- that I know

**EXHIBIT 1**

has ripped off millions of dollars in -- you know, I may have mentioned him because the dollar amount. But unless you can refresh my memory, I don't.

Q. Did you discuss Progen at that meeting?

A. It's possible.

Q. As you sit here right now, you don't recall discussing the name Progen at that meeting, correct?

A. I mean we discussed -- you know, I know that there's a lot of different names, but I don't recall Progen.

Q. So as you sit here right now, you don't recall discussing Progen at that the first meeting with Brando McCarthy?

A. Correct.

Q. You don't recall discussing Progen with Brandon McCarthy at the second meeting, correct?

A. Correct. I've never discussed Progen with Brandon McCarthy.

Q. So -- just so the record is clear. You've never discussed Progen with Brandon McCarthy, true?

A. True.

Q. And you were at the meeting trying to find out how Qui Tams work, correct?

A. Correct.

Q. And did you have any direct evidence of any

**EXHIBIT 1**

wrongdoing by anybody when you went to that first meeting with Brandon McCarthy?

MR. DAVID BELL:  Objection; form. Objection; calls for a legal conclusion.

THE WITNESS:  No.

Q.   (BY MR. JAMES BELL)  So when you showed up at the first meeting with Brandon McCarthy, you had no direct evidence, knowledge or facts to suggest that anybody had committed any criminal or wrongful acts, correct?

A.   Correct.

Q.   And the purpose of the meeting was to give the names of folks that you and Gus potentially thought might be engaging in criminal conduct, but y'all just didn't have any evidence, correct?

MR. DAVID BELL:  Objection; form. Objection; calls for a legal conclusion.

THE WITNESS:  Correct.

Q.   (BY MR. JAMES BELL)  And so at that meeting you didn't give Brandon McCarthy any evidence of any wrongdoing committed by Shuster, Raul, or anybody else at that meeting, correct?

A.   Correct.

Q.   You didn't give Brandon McCarthy at that first meeting, or any meeting for that matter, any evidence of

**EXHIBIT 1**

criminal conduct, illegal conduct, unethical conduct, or wrongful conduct of any kind,

MR. DAVID BELL: Objection; form. Calls for a legal conclusion.

THE WITNESS: Correct. Again, correct. None --

Q. (BY MR. JAMES BELL) That --

A. -- none whatsoever. We didn't -- no, correct. You're correct.

Q. We didn't -- you were going to say we didn't have -- you and Gus had no evidence, correct?

A. Correct.

Q. And at that meeting you didn't discuss any -- at that meeting you didn't discuss any facts or -- or evidence about any wrongful conduct any parties that -- that you -- that potentially would have been Qui Tam defendants, correct?

MR. DAVID BELL: Objection; form. Objection asks for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) At that time neither you nor Gus discussed any specifics with Brandon McCarthy about any alleged wrongful conduct by Schuster Raul or anybody or any other entities that you had brought up at that meeting, correct?

**EXHIBIT 1**

MR. DAVID BELL: Objection; asks for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) And Brandon told you he had to run a conflicts check, correct?

A. Correct.

Q. And before he told you -- he had to run a conflicts check before he could potentially or his firm could potentially take on any case against anybody, correct?

A. Correct.

Q. And you don't have any direct evidence that Brandon McCarthy brought a Qui Tam or helped shop a Qui Tam against Shuster Raul or any of those folks, correct?

MR. DAVID BELL: Objection; form. Objection; asks for a legal conclusion.

THE WITNESS: Not -- correct. Not to my knowledge.

Q. (BY MR. JAMES BELL) I want to make sure I got a clear record because I ask double negatives and I apologize.

A. That's all right.

Q. Okay. You don't have any direct evidence, knowledge or facts to suggest that Brandon McCarthy shopped any Qui Tams against anybody, including, but not

EXHIBIT 1

limited to Shuster Raul Express, R Express, Progen or anybody, correct?

A.   Correct.

MR. DAVID BELL:  Objection; form.

MR. JAMES BELL:  Pardon me?

THE WITNESS:  Correct.

MR. JAMES BELL:  Just give him --

MR. DAVID BELL:  Give me a little time delay.  One second.

THE WITNESS:  All right.

Q.   (BY MR. JAMES BELL)  Did you or Kepler show McCarthy any presentations at this meeting?

A.   No.

Q.   Did -- have you seen any -- actually, let me back up.  In your objections and motion for protective order you said that you're a witness against Brandon McCarthy in another matter.  What matter are you referring to?  Especially if you don't have any personal knowledge that he did anything wrong, what are you a witness against Brandon McCarthy for?

A.   Well --

Q.   If you don't know, you don't know.

A.   Yeah.  I don't know.

Q.   Okay.  So you don't know whether or not you're a witness against Brandon McCarthy.  True?

**EXHIBIT 1**

A. I don't, no.

Q. It would be fair to say you don't know whether or not you're a witness against Brandon McCarthy. True?

A. True.

Q. And when you said that, even though you said you were a witness against -- strike that.

Even though you said you're a witness -- strike that.

What did you mean when you said you were a witness against the plaintiff, meaning Brandon McCarthy, in another matter? Or is that just a mistake that you made in the pleading that you signed?

A. Well, I don't know of any -- you know, I don't know of any -- what it potentially would be. But like I said, a lot of it comes down to all of the stuff going on with what I've been hearing about the IR -- I mean I don't know. I guess I -- I don't know. So --

Q. The IRS?

A. Well, I mean as far as what I've been hearing that he's been trying to do to me. But as in a -- is in another case or whatever, I don't know anything -- no, I don't know that I'm a witness in any case against him.

Q. Okay. So you don't have any facts that he's -- well, let -- let me ask you this question.

Are you aware of the IRS investigating

**EXHIBIT 1**

Brandon McCarthy?

A. No.

Q. Okay. So are you aware of any case against Brandon McCarthy?

A. No.

Q. Are you aware of any investigation against Brandon McCarthy?

A. Directly?

Q. (Indicates.)

A. No.

Q. Do you have any indirect knowledge against any investigation against Brandon McCarthy, other than what you learned at Hillstone and from that other guy?

A. No. Basically what that guy told me.

Q. So --

A. I don't even know who the guy is. So it's just --

Q. Hearsay?

A. Yeah.

Q. So at -- as it stands right now -- you're not aware of being a witness against Brandon McCarthy in other matter, case, investigation. True?

A. True.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) You don't have any direct

**EXHIBIT 1**

evidence that Brandon McCarthy is trying to get you criminally prosecuted, correct?

A. Correct.

Q. Did you consider Brandon McCarthy your friend?

A. Yes.

Q. Do you think -- strike that.

Do you know whether or not Brandon McCarthy has been harmed?

A. I don't know --

MR. DAVID BELL: Calls for a legal conclusion. Objection; form.

THE WITNESS: I don't know because I don't know the facts of everything. Like I said, all I've -- the stuff I heard is all from, you know, Carl Fleming, the guy at Hillstone. Not directly.

Q. (BY MR. JAMES BELL) Well, he's no longer at K&L Gates, right?

A. Right.

Q. Okay.

A. From what I heard.

Q. Okay. And did you have any -- did you -- strike that.

Let me ask you this question.

Have you had any contact with K&L Gates?

A. Yes.

**EXHIBIT 1**

Q. Okay. And did you -- what did you tell K&L Gates about Brandon McCarthy?

A. What I heard from Nathan Halsey.

Q. And how many times have you met with K&L Gates?

A. I've never met with them. This was on the phone.

Q. Okay. How many times have you had a -- been on the telephone call with K&L Gates?

A. One time (indicating).

Q. Who did you speak to at K&L Gates?

A. I don't even remember.

Q. Who were you with on the phone call?

(Phone rang)

MR. DAVID BELL: I'm sorry.

(Pause in proceedings)

Q. (BY MR. JAMES BELL) Who was with you when you were on the phone call with K&L Gates or did they call you directly?

A. No, it was a set up call and two attorneys were with me.

Q. What are the names of those attorneys?

MR. DAVID BELL: Don't answer any questions about any attorneys that have represented you or given you legal advice.

THE WITNESS: On the advice of counsel I'm

**EXHIBIT 1**

going to --

Q.   (BY MR. JAMES BELL)  Are you going to refuse to answer the question about who you were on the call with to K&L Gates regarding K&L Gates' investigation of Brandon McCarthy?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  Yes.

Q.   (BY MR. JAMES BELL)  What did Nathan Halsey -- strike that.

What did -- what did you tell K&L Gates about what Nathan Halsey told you?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  Nathan told me that Brandon sent him -- that -- well, what was going on with Nathan was this, was that he had --

MR. DAVID BELL:  Just answer his question.

THE WITNESS:  Okay.

MR. JAMES BELL:  That's all right.  You can start wherever you want.

MR. DAVID BELL:  Just answer his question.

THE WITNESS:  Okay.  Repeat that one more time.

Q.   (BY MR. JAMES BELL)  Sure.  What did you tell K&L Gates -- strike that.

You didn't have any personal knowledge of

**EXHIBIT 1**

any wrongdoing to give to K&L Gates, correct?

A. Correct.

Q. And so you discussed what Nathan Halsey allegedly told you about Brandon McCarthy, right?

A. Correct.

Q. Okay. What did Nathan Halsey tell you about Brandon McCarthy?

A. That he sent him to the FBI to meet with an FBI agents -- or agent and that he had been sent out to get information on Shuster Raul, et cetera. And he said that the third time that he went down there to get the wire -- because they wanted more information that the agent -- Nathan was real worried because he said the agent was like we don't need you anymore, we don't have any wires down there. And I said that's not true. They got plenty of wires down there, Nathan.

And he, man, it's just weird because I was giving them all this good information and then all of a sudden they told me to go home. And I said -- I just told him I wouldn't be messing with those people. I said I don't know -- you know he was concerned about an SEC case that he had and he was concerned about it going criminal. And so, you know, I think he felt like he needed to do something.

But he told me that -- that Brandon had

**EXHIBIT 1**

directed him down there or maybe told him who to go to, I'm not sure. Do but that's basically what Nathan told me.

Q. It is possible that you could be confused about who Nathan Halsey was getting wired up for? Is that -- let me state it a different way.

Are you aware or not aware that Nathan Halsey was wired up, got a tape recording of Mr. Bob Miller from Trilogy Pharmacy? Are you aware of that?

A. Is he Asian? The -- an Asian guy?

MR. JAMES BELL: If I don't know if he's an Asian or not. Trilogy though.

THE WITNESS: Trilogy. I -- I don't remember exactly, you know, because -- like I said, those -- it all gets kind of convoluted to me. All -- there's so many different companies and people. So...

Q. (BY MR. JAMES BELL) I -- I get that there is and I'm -- here is the deal. I get a chance to take your depo, you're under oath, I just want to --

A. All right. Ask me one more time.

Q. If you don't know, it's cool.

A. Okay.

Q. I don't care and then I'm -- I'm moving on. All right.

Is it possible that Nathan Halsey when he

**EXHIBIT 1**

told you that he got wired up and was talking to the FBI and made a recording, it was for -- it was of a man named Mr. Bob Miller from Trilogy? Is that possible?

A. Absolutely.

MR. DAVID BELL: Objection; form.

MR. JAMES BELL: What's that?

THE WITNESS: Absolutely.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Okay. So if that's possible, it's also possible that Nathan didn't tell you that he was wired up for Shuster R Express, et cetera, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) Okay. And so you don't know whether or not Halsey was meeting with FBI regarding the Trilogy case, correct?

A. Correct.

Q. You don't have any direct evidence that Halsey was meeting with any law enforcement folks regarding Raul Shsuter or any of those folks, correct? You don't have direct knowledge of that, correct?

A. Well, I didn't -- the D.O.D. came to his house and took his phone, but I wasn't there.

Q. You don't have any direct knowledge that --

**EXHIBIT 1**

that Nathan Halsey was cooperating with law enforcement regarding Shuster Raul or any of those folks, correct?

A. Correct.

Q. Okay. And are you aware, sir, that the reason why the DOD came to his house and got his phone was for a recording that he had with Mr. Bob Miller from Trilogy Pharmacy? Were you aware of that?

A. No.

Q. Is that news to you?

A. Yes. He explained it differently to me. So that's news to me yes, if that's true.

Q. Okay. And -- well, let me ask you this question.

Is it possible that you remembered it differently?

A. No, he -- I mean Nathan told me that DOD called him he called Reid Prosper and said they wanted his phone and Reid said, well, let me look at it and I'll call you back. And he said the next morning at 5:00 a.m. they showed up and got his phone.

Q. With a search warrant?

A. Yes.

Q. And so --

MR. JAMES BELL: I don't know -- I'm bleeding right there.

**EXHIBIT 1**

MR. DAVID BELL: It's self-inflicted, let the record reflect.

Q. (BY MR. JAMES BELL) Okay. So -- so you're not -- you don't have any direct evidence that Halsey and Brandon were shopping a Qui Tam against Shuster Raul or any of those folks, correct?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) And at some in point in time Halsey -- are you aware of whether or not Halsey did file a Qui Tam case?

A. I'm not.

Q. Do you know whether or not Halsey filed a Qui Tam case against the Trilogy Pharmacy?

A. Not that I'm aware of.

Q. Is it possible that you mixed up Trilogy, Express, different pharmacies, just because there's a lot going on, like you said earlier?

A. It's possible. But Halsey's deal was not -- he was more worried about, you know, he showed me his complaint with the SEC and I told him that in my opinion this is a -- could possibly be referred to Department of Justice. But he was more concerned with all of that I mean than -- so the answer to your question is it's

**EXHIBIT 1**

possible, I don't know what he was looking at doing. But -- but from my perspective, he was more trying to get himself out of trouble than anything else that concerns any companies or any other individuals, including a Qui Tam case.

Q. So Halsey was more concerned about getting himself out of trouble with the SEC, right?

A. Well, and -- and not and -- and hoping that -- you know, not be referred to the Department of Justice. So both of those. I think -- so yes, correct, the SEC.

Q. And so -- and in terms of you repeating what Halsey says, you would agree with me that it gets fuzzy between the different -- the different names of different fuzzies in terms of your recollection, given the fact that it was over -- it was two years ago or over two years ago. Would that be fair?

MR. DAVID BELL: Objection -- objection; form.

THE WITNESS: Yes.

Q. (BY MR. JAMES BELL) Do you have any direct evidence that Brandon McCarthy has anything to do with the Dallas Morning News article?

MR. DAVID BELL: Objection; form. Objection.

THE WITNESS: Not direct, no.

EXHIBIT 1

Q.    (BY MR. JAMES BELL)  Do you have any -- so let me state it a different way.  Strike that.

It would be a fair statement to say you don't have any evidence, knowledge or facts to suggest that Brandon McCarthy had anything to do with any Dallas Morning News articles.  True?

A.    True.

Q.    It would also be true to say that you don't have any direct evidence, knowledge or facts to suggest that Brandon McCarthy has supplied Kevin Krouse with any information about any clients, potential clients, or any other folks for that matter.  True?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I don't have direct evidence, true.

MR. JAMES BELL:  Did I throw that back in there.  I can't remember.

(Pause in proceedings)

Q.    (BY MR. JAMES BELL)  So you -- were you -- you were convict of -- just by way of background, so that I understand, conspiracy to commit securities fraud.  And was it conspiracy to commit wire fraud and mail fraud or were -- did you get the actual charges?

MR. DAVID BELL:  Mr. Reynolds is not going to testify about anything -- though those things are

**EXHIBIT 1**

on -- .

MR. JAMES BELL: They're less than ten years old.

MR. DAVID BELL: Let me -- let me finish, please. Some of those things that you're inquiring about are part of the public record. He's just not going to testify about any matter regarding any of this line of questioning.

MR. JAMES BELL: Sure.

MR. DAVID BELL: He's not a party to this lawsuit and I'm not going to let him testify about anything. He answered your one question about he having previously been convicted. That's all he's going to talk about any of his prior criminal matters.

Q. (BY MR. JAMES BELL) You're going to refuse to answer my question about --

MR. DAVID BELL: And I'm advising him not to answer those questions.

Q. (BY MR. JAMES BELL) You're going to refuse to answer my question about being convicted of wire fraud, securities fraud and mail fraud, correct?

A. Correct.

Q. You've also been cited for contempt of court, correct?

A. Correct.

EXHIBIT 1

Q.   And tell Judge Tillery what was that for?

MR. DAVID BELL:   I'm going to object that. If it's public record, you can produce those documents for whomever.

Q.   (BY MR. JAMES BELL)  Are you going to refuse to answer my question about asking you to tell Judge Tillery why you were cited for contempt?

MR. DAVID BELL:   He's going to testify in front of Judge Tillery.  He's just not going to answer any questions as he is not a party to this lawsuit.  And you may present the public record to whomever.  But he's not going to answer any questions about any criminal matter.

Q.   (BY MR. JAMES BELL)  Are you going to refuse to answer my question why you were cited for criminal contempt -- strike that.

Are you going to refuse to answer my question about why you were cited for contempt?

MR. DAVID BELL:   Objection; form.  I don't think he can tell you why any of those things happened. If -- that's a matter that involves some -- court and some authority higher then him or you or I.

Q.   (BY MR. JAMES BELL)  Are you going to refuse to answer my question about why you were cited for contempt?

**EXHIBIT 1**

MR. DAVID BELL: I'm advising him to refuse to answer -- respectfully refuse to answer your questions.

MR. JAMES BELL: I need to get a refusal --

MR. DAVID BELL: He's going to -- he's going to --

MR. JAMES BELL: So go ahead.

THE WITNESS: Correct.

MR. JAMES BELL: No. No. I need to get a clean record.

MR. DAVID BELL: Sure.

Q. (BY MR. JAMES BELL) Are you going to refuse to answer my question about why you were cited for contempt?

A. Yes.

Q. Okay. Do you know Braden Power?

A. Who? Can you repeat that question?

Q. Sure. Do you know Braden Power?

A. No.

Q. Do you know Craig Power?

A. No.

MR. DAVID BELL: P-O-W-E-R, Counsel? Oh, is this the related case that you filed with the Court, said it was related? Is that the one? Oh, this is case -- Braden Richard Power and Craig Patrick Power.

**EXHIBIT 1**

Is that what you're asking about?  Do you know those people?

THE WITNESS:  No.

Q.    (BY MR. JAMES BELL)  Are you aware -- strike that.

Do you have any direct evidence, knowledge or facts to suggest that Brandon McCarthy breached or violated any of the Texas Disciplinary Rules of Professional Conduct?

MR. DAVID BELL:  Objection; calls for a legal conclusion.

THE WITNESS:  No.

MR. DAVID BELL:  Objection; form.

Q.    (BY MR. JAMES BELL) Do you have any direct evidence, knowledge or facts to suggest that Brian -- strike that.

Brandon McCarthy didn't provide competent and diligent representation to all of his clients?

MR. DAVID BELL:  Objection; calls for a legal conclusion.  Objection; form.

THE WITNESS:  No.

MR. DAVID BELL:  Are these all the same question you are asking again.  He will answer the same way.  And I would object the same way if you want to --

MR. JAMES BELL:  Just have a running

**EXHIBIT 1**

objection. Go ahead.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge or facts to suggest that Brandon McCarthy violated any conflicts of interests as it relates to any of his clients?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge or facts to suggest that Brandon McCarthy has been adversarial towards any of his clients?

MR. DAVID BELL: Calls for a legal conclusion. Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) All right. Are you taking any medications today that would affect your testimony?

A. No.

Q. Are you taking any medications?

A. Well, I have a prescription.

Q. For what?

A. Adderall.

Q. So you've taken Adderall today?

A. I haven't today.

Q. Are you under -- have you taken any pills

**EXHIBIT 1**

today?

A.   No.

Q.   Any drugs or anything?

A.   No.

Q.   Just have to ask.  Who is Cameron Smith?

A.   She is a lawyer that represented me in my case with my ex when I got out.  I guess child custody.  She represented me in the child custody case.

Q.   Has Cameron Smith represented you in any other matter?

MR. DAVID BELL:  I'm not going to let him testify about any relationship he has or had has with any lawyer.

Q.   (BY MR. JAMES BELL)  Do you refuse to answer my question about whether or not Cameron Smith has represented you in any other matter besides a child custody case?

MR. DAVID BELL:  I'm advising him not to --

THE WITNESS:  On the advice of my counsel, I'm not going to answer that.

Q.   (BY MR. JAMES BELL)  Have you ever worked for Cameron Smith?

A.   No.

Q.   Have you ever worked for Jim Rolf?

A.   No.

**EXHIBIT 1**

Q. Have you ever been paid by Cameron Smith?

A. No.

Q. Have you ever been paid by Jim Rolf?

A. No.

Q. What do you do for a living?

A. Right now I'm not doing much.

Q. What you doing for a living?

A. Nothing.

Q. How are you earning a living?

A. I'm really not at this point, unfortunately.

Q. Have you accepted any money in connection with any pharmacies?

A. No.

Q. Have you received any money in connection with -- accepted any money that could be related to Brandon McCarthy?

A. No.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Have you ever received any type of payments regarding any -- anything to do with any potential Qui Tams?

A. No.

Q. So you've never been paid to be witness?

A. No.

Q. And at some point you offered to pay Nathan

**EXHIBIT 1**

Halsey $2,000, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Not that I recall.

Q. (BY MR. JAMES BELL) And you don't recall offering Nathan Halsey $2,000 for a some kind of book?

A. No.

Q. Is it possible that you offered Nathan Halsey $2,000 for a book?

A. I don't believe so.

Q. Do you deny that you offered Nathan Halsey for any type of book, PowerPoint presentation, treaties, article, or otherwise?

MR. DAVID BELL: Objection; form.

THE WITNESS: Not that I recall.

Q. (BY MR. JAMES BELL) So you're denying that, true?

A. Yes.

Q. Did you ever tell Nathan Halsey that you needed an IRS guy, Rolf wants to call him because he heard there the -- through a friend of his in the IRS that Brandon and Nathan were trying to get investigation going on me so he wants to call him or, I guess, Gus Kepler?

MR. DAVID BELL: Objection; form.

THE WITNESS: Can you repeat that? I

**EXHIBIT 1**

don't -- I don't understand that.

Q.   (BY MR. JAMES BELL)  Sure.  Did you ever tell Gus Kepler or Nathan Halsey that you needed an IRS guy because Rolf wants to call him?

A.   About what?

MR. DAVID BELL:  He just asked you.

THE WITNESS:  No, I mean -- no.

Q.   (BY MR. JAMES BELL)  Are you still friends with Gus Kepler?

A.   I think so.

Q.   Have you traded any shares in the last couple of years?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  Traded shares, what do you mean?

Q.   (BY MR. JAMES BELL)  Stock shares?

A.   I'm going to plead the Fifth on that.  I'm not going to talk about any of my business or anything of that nature.

Q.   So you're taking the Fifth Amendment about whether or not you have sold, solicited related to your stock shares?

MR. DAVID BELL:  He's not going to testify about any matter involving --

THE WITNESS:  I am, yes.

**EXHIBIT 1**

Q. (BY MR. JAMES BELL) You're taking the Fifth Amendment?

A. Yes.

Q. (BY MR. JAMES BELL) Are you going to take the Fifth Amendment about whether or not you've attempted to sell shares to Brandon McCarthy?

A. I am. On the advice of counsel.

MR. DAVID BELL: Why don't you read that.

THE WITNESS: On advice of counsel, I respectfully decline to answer the question. I instead invoke my privilege against compelled self-incrimination secured by the Fifth and 14th Amendment to the U.S. Constitution and the Constitution of the State of Texas, even though invocation of the privilege is in no an admission or acknowledgement of criminal conduct as it is instead recognition that a response could simply supply a "link in the chain of evidence "which could be used against in criminal prosecution.

(Exhibit No. 1 was marked)

MR. DAVID BELL: Go ahead and state the authority that you're making that statement.

THE WITNESS: E.g. Hoffman v. United States, an individual may be (sic) compelled to provide testimony --

MR. DAVID BELL: May not.

**EXHIBIT 1**

THE WITNESS: May not be compelled to provide testimony which could supply "a link in chain of evidence" which could be use against him in criminal prosecution.

Q. (BY MR. JAMES BELL) Isn't it true --

MR. DAVID BELL: Let him finish, please.

THE COURT: Invocation of this privilege against compelled self-incrimination is not and should not be considered --

MR. DAVID BELL: Construed --

THE WITNESS: Construed as an admission of criminal conduct. One of the basic functions of the Fifth Amendment is to protect innocent men. Grunewald v. United States. Truthful responses of an innocent witness, as well those of a wrongdoer, may provide the government with incriminating evidence from the speaker's own mouth. Ohio v. Reiner.

Q. (BY MR. JAMES BELL) Isn't it true that you attempted and did, in fact, sell stock to Nathan Halsey and Gus Kepler?

MR. DAVID BELL: Objection. Go ahead an repeat -- can we have a --

If you'd mark that as an exhibit. Would you like him to read it again or just say --

MR. JAMES BELL: I just want him to say I

**EXHIBIT 1**

invoke the Fifth Amendment and -- and Exhibit 1.

MR. DAVID BELL: Just say --

MR. JAMES BELL: That's fine.

MR. DAVID BELL: And recite my invoking the Fifth Amendment and would repeat if you wish me to what I just read.

THE WITNESS: I invoke the Fifth Amendment and would repeat this if you would like me to.

Q. (BY MR. JAMES BELL) Just so I have a clean record. You're taking the -- did you sell or attempt to sell stock to Nathan Halsey and/ or Gus Kepler?

MR. DAVID BELL: Go ahead.

THE WITNESS: I'm going to plead the Fifth Amendment.

Q. (BY MR. JAMES BELL) And did you ever attempt to sell stock to Ryan Myer or Barrett Howe at K&L Gates

MR. DAVID BELL: Same objection. Would you repeat --

Q. (BY MR. JAMES BELL) Do you plead the Fifth?

A. Yeah.

MR. DAVID BELL: And --

THE WITNESS: And --

MR. DAVID BELL: -- you'll gladly read this back into the record.

THE WITNESS: I will gladly read this back

**EXHIBIT 1**

into the record.

MR. JAMES BELL: You can just say "I plead the Fifth Amendment plus Exhibit 1. Is that fair?

MR. DAVID BELL: Sure.

THE WITNESS: Yeah.

MR. DAVID BELL: And -- and let's say plus Exhibit 1 and I have asked if you prefer me to read it or just merely reference it.

MR. JAMES BELL: I'll just stipulate.

MR. DAVID BELL: Okay. That's fine. Thank you.

Q. (BY MR. JAMES BELL) Have you ever represented in the last year or two folks as a broker?

MR. DAVID BELL: Objection; form. Go ahead recite the --

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Are you under a restriction from being involved in the trading or selling of stock?

MR. DAVID BELL: Objection.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Did you ever -- did you -- strike that.

**EXHIBIT 1**

Isn't it true, sir, that you told Brandon McCarthy that he should invest in some stocks and that those stocks would go up in value?

MR. DAVID BELL: Objection.

THE WITNESS: I plead Fifth, Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true that you wanted Brandon McCarthy to invest $50,000 spread among several stocks?

A. I plead the Fifth, Exhibit 1.

Q. Isn't it true, sir, that you told Brandon McCarthy that -- strike that.

Isn't it true, sir, that the reason why you have a vendetta against Brandon McCarthy is because he refused to buy any stocks that you wanted to sell him?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth, Exhibit 1.

Q. (BY MR. JAMES BELL) Did you ever -- strike that --

You've texted Nathan Halsey and you said, just to clarify, my friend Cameron Smith, who represents Raul was hired by the SEC to prosecute a case against UDF. She doesn't represent UDF. Just wanted to make that clear so there wasn't a misunderstanding between us. Have a great weekend.

Do you remember writing that text?

**EXHIBIT 1**

MR. DAVID BELL: Repeat your objection.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Did you say that Cameron Smith was hired by the SEC to prosecute a case?

A. I plead the Fifth, see Exhibit 1.

Q. Do you ever say that Jim Raul was hired to prosecute cases, including one against Brandon McCarthy?

A. I plead the Fifth, Exhibit 1.

Q. Isn't it true, sir, that you threatened Nathan Halsey by saying that Prosecutor Bowie was going to go after him?

A. I plead the Fifth, Exhibit 1.

Q. Isn't it true, sir, that you said that you had influence and that Prosecutor Bowie was a friend of yours and that you could control his decision making; isn't that true, sir?

A. I plead the Fifth. Exhibit 1.

Q. Isn't it true that you have threaten Nathan Halsey with criminal prosecution?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true that you, along with Jim Rolf and Cameron Smith have threatened to

**EXHIBIT 1**

prosecute Brandon McCarthy?

MR. JAMES BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true that you Jim Rolf and Cameron Smith have threatened to try and prosecute Nathan Halsey?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true -- sir -- isn't it true, sir, that you Jim Rolf and Cameron Smith have made false statements about -- about Brandon McCarthy?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true that you, Jim Rolf and Cameron Smith have attempted to extort Brandon McCarthy?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true that you, Jim Rolf and Cameron Smith have conspired to extort and

**EXHIBIT 1**

damage Brandon McCarthy?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy sent Nathan Halsey to become an informant, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Not besides what Nathan told me, no.

MR. JAMES BELL: Objection; nonresponsive.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy sent Nathan Halsey out to become an informant, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Correct?

A. Correct.

Q. Do you remember talking about a book?

MR. DAVID BELL: The same book you asked about before?

MR. JAMES BELL: Yeah.

MR. DAVID BELL: Asked and answered.

Do your remember him asking you about a book before?

**EXHIBIT 1**

THE WITNESS: Him?

MR. DAVID BELL: Yeah, Mr. Bell.

THE WITNESS: Yes.

MR. DAVID BELL: Would you answer the same way?

THE WITNESS: Yeah. I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Okay. So you're going to take the Fifth Amendment about -- strike that.

You're now taking the Fifth Amendment about whether or not you offered to purchase a book from Gus Kepler for $2,000?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) When you offered to purchase a book from Gus Kepler, what book were you attempting to purchase?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true, sir, that you, Jim Rolf and Cameron Smith already had this alleged book that you refer to in your text with Nathan Halsey?

MR. DAVID BELL: Objection; form.

**EXHIBIT 1**

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true, sir, that the reason why you offered Nathan Halsey $2,000 for a book is because you, Cameron Smith and Jim Rolf already possessed that book?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) How were you going to pay $2,000 to get a book from Nathan Halsey?

MR. DAVID BELL: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Is it your sworn testimony, sir, under oath that Brandon McCarthy had that book that you reference in your text messages with Nathan Halsey?

A. Repeat that.

Q. Sure. Is it your sworn testimony that Brandon McCarthy had a copy of the book that you reference in your text messages with Nathan Halsey?

MR. DAVID BELL: Objection; form.

THE WITNESS: I have no idea.

Q. (BY MR. JAMES BELL) So, in other words, you have no direct evidence, knowledge, or facts to suggest

**EXHIBIT 1**

that Brandon McCarthy had or seen any -- any book that you reference in the text messages with Nathan Halsey, true?

MR. DAVID BELL: Objection; form.

THE WITNESS: I don't know anything about a book -- I -- I have no direct evidence about any kind of book that has to do with Brandon.

Q. (BY MR. JAMES BELL) Okay. So it would be fair to say that you're not aware -- strike that.

It would be fair to say that you don't have any direct evidence, knowledge or facts, to suggest that Brandon McCarthy has anything do with any book that you discussed with Nathan Halsey, true?

MR. DAVID BELL: Objection; form.

THE WITNESS: That's true.

Q. (BY MR. JAMES BELL) So what book were you referring to when you were text messaging Nathan Halsey?

A. I have no -- I have no idea.

Q. Did you remember seeing any kind of PowerPoint presentation?

A. No.

Q. Have you ever seen a PowerPoint presentation? I'll remind you you're under oath.

MR. DAVID BELL: Objection; form.

THE WITNESS: Well, in reference to what?

**EXHIBIT 1**

Q.   (BY MR. JAMES BELL)  Reference to anything that Brandon -- anything anybody says Brandon McCarthy had anything to do with?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  No.

Q.   (BY MR. JAMES BELL)  You haven't seen any PowerPoints?

A.   Not that I recall.

Q.   Did you see any bound -- did you ever see a bound book?

A.   No.

MR. DAVID BELL:  Objection; form.

Q.   (BY MR. JAMES BELL)  When you said to Nathan Halsey, would $2,000 help, cash, and he said for what, and you said copy of that.

When you said "copy of that, what were you referring to?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I plead the Fifth.  See Exhibit 1.

(Mr. McCarthy left the room)

Q.   (BY MR. JAMES BELL)  So you're going to plead the Fifth Amendment regarding asking Nathan -- strike that.

You're going to plead the Fifth Amendment

**EXHIBIT 1**

with respect to offering Nathan Halsey $2,000 cash for a copy of something that you reference in the text messages with him, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) So when you say you plead -- what did a "copy of that" refer to in your text messages with Nathan Halsey?

A. I plead the Fifth. See Exhibit 1.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) You're going to plead the Fifth as to what you meant -- strike that --

You're going to plead the Fifth Amendment or you are pleading the Fifth Amendment when you said you're willing to pay $2,000 for a copy of that?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) Can you tell Judge Tillery what, quote, a copy of that was?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Did you have a copy of a book, treatise, PowerPoint, prior to offering Nathan

**EXHIBIT 1**

Halsey $2,000?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Were you instructed by anybody to offer Nathan Halsey $2,000 for a copy of a book or PowerPoint?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true, sir, that Cameron Smith and Jim Rolf instructed you to offer Nathan Halsey $2,000 for a copy of a book?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Where did you, Jim Rolf and Cameron Smith get a copy of that book?

MR. DAVID BELL: Objection; form.

THE WITNESS: I don't have a copy of the book, nor I have I ever seen a copy of the book.

Q. (BY MR. JAMES BELL) You pled the Fifth Amendment with respect to a book. Do you know what book I'm talking about? Or are you going to plead the Fifth Amendment to that?

**EXHIBIT 1**

A.   I'm going to plead the Fifth on whatever book you're talking about.

MR. DAVID BELL:  Objection; form.

Q.   (BY MR. JAMES BELL) Have you seen a presentation -- strike that.

Isn't it true, sir, that you've seen a copy of a PowerPoint or a book in presence of Cameron Smith and Jim Rolf?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  No, that's not true.

(Brandon McCarthy entered the room)

Q.   (BY MR. JAMES BELL)  Are you aware -- who -- strike that.

Who told you to offer Nathan Halsey $2,000 for a copy of a book?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I plead the Fifth.  See Exhibit 1.

Q.   (BY MR. JAMES BELL)  Who gave you the money to potentially pay Nathan Halsey for a copy of the book that that you in reference your text messages with Nathan Halsey?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I plead the Fifth.  See Exhibit 1.

**EXHIBIT 1**

Q.    (BY MR. JAMES BELL)  Isn't it true that the book that you reference in your text messages with Nathan Halsey was what was going to be used to extort Brandon McCarthy?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I plead the Fifth.  See Exhibit 1.

Q.    (BY MR. JAMES BELL) Isn't it true that --

MR. DAVID BELL:  Excuse me.  Also calls for a legal conclusion.

Q.    (BY MR. JAMES BELL)  Isn't it true, sir, that the reason why you, Rolf, and Cameron Smith needed the book from Nathan Halsey is to fabricate and fraudulently make claims to extort Brandon McCarthy?  Isn't that true?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I plead the Fifth.  See Exhibit 1.

Q.    (BY MR. JAMES BELL)  Isn't the reason why you, Jim Rolf, and Cameron Smith tried to get a book from Nathan Halsey and offer him $2,000 to frame Brandon McCarthy for something he didn't do?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  Of course not.  Frame him for what?  I don't even understand where you're going with

**EXHIBIT 1**

this?

Q. (BY MR. JAMES BELL) You don't have any evidence that anybody's tried to frame Brandon McCarthy for anything?

A. Absolutely not.

Q. Do you have any evidence that -- that -- so then why are you refusing to talk about this book and pleading the Fifth?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) How -- does the -- the book fabricate and fraudulently attempt to -- to -- to implicate Brandon McCarthy in some kind of wrongful conduct?

A. I can't tell you about --

MR. DAVID BELL: Objection; form.

THE WITNESS: -- something I've never seen.

Q. (BY MR. JAMES BELL) Okay. Why were you offering money to Nathan Halsey for something -- $2,000 to Nathan Halsey for something you had never seen?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Why were you asking Nathan

**EXHIBIT 1**

Halsey for a copy of a book that you had never seen?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) How did you know that Nathan Halsey had a book if you had never seen it?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) How did you first learn about the book that you reference in your text messages with Nathan Halsey?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

I would like to go on the record and state that I've never heard anybody try to get Brandon, try to obtain evidence against Brandon, or ask me, hey, let's go get him, let's go find this. Never has one person ever said that about -- to me about Brandon, ever.

Q. (BY MR. JAMES BELL) But you're including attorneys, correct?

A. No. I'm talking about I've never had anybody.

Q. (BY MR. JAMES BELL) Okay. Here -- here --

A. Tell me let's go get him, let's figure

**EXHIBIT 1**

something out, let's conspire, let's find some stuff against him.  Not -- not one has ever come to me and tried to get Brandon -- come up with some way to get Brandon messed up, screwed up, what have you.

MR. DAVID BELL:  He's going to not talk to you about anything involving anything dealing with any attorney, period, end of report.

Is that correct?

THE WITNESS:  Correct.

Q.  (BY MR. JAMES BELL)  Okay.  So when you just answered that question, that excluded any comments from any attorneys, correct?

MR. DAVID BELL:  He's not going to answer that question.

THE WITNESS:  I plead the Fifth.  See Exhibit 1.

Q.  (BY MR. JAMES BELL)  You're going to refuse to answer my question about whether or not any attorney ever told you that they wanted to plant, fabricate or fraudulently make up information in order to implicate Brandon McCarthy in some sort of unethical conduct?

A.  I've never had --

MR. DAVID BELL:  Objection; form.

THE WITNESS:  -- I've never had anybody, including any attorneys that I know, ever ask or -- ask

**EXHIBIT 1**

me the participate in -- nor would I -- getting Brandon in any sort of trouble.

Q. (BY MR. JAMES BELL) Why are you offering $2,000 dollar for a book?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Who asked you to talk to K&L Gates?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) On the one hand, sir, you say to me that nobody has ever told you that they want any -- anything wrong to happen to Brandon McCarthy, correct?

A. That's absolutely correct.

Q. On the other hand, you're taking the Fifth Amendment as to who told you to contact K&L Gates, you're take the Fifth Amendment, correct?

A. I plead the Fifth. See Exhibit 1.

Q. And the reason that you spoke -- strike that.

Your understanding of the reason why you speaking to K&L Gates is to talk alleged misconduct of Brandon McCarthy?

**EXHIBIT 1**

A.  I plead the Fifth.  See Exhibit 1.

Q.  Can you tell Judge TIllery why you were tape -- telling Nathan Halsey that you were introducing Gus to the heads of IPOs for Stevens & Company?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I plead the Fifth.  See Exhibit 1.

Q.  (BY MR. JAMES BELL)  Have you ever been in health care business?

A.  I haven't been as of right now.  But I've been looking at different -- different businesses in there, but not -- I've never -- I guess you have to be more specific.  Made -- have I ever made money off of health care?

MR. DAVID BELL:  No. He just asked --

THE WITNESS:  No, I haven't.

MR. DAVID BELL:  -- if you've ever been in the health care business?

THE WITNESS:  No, I haven't.

Q.  (BY MR. JAMES BELL)  Are you personally aware of any criminal conduct committed by anybody in the health care business?

MR. DAVID BELL:  Objection; form.

Q.  (BY MR. JAMES BELL)  Direct evidence.

**EXHIBIT 1**

MR. DAVID BELL: Objection; form.

THE WITNESS: Direct evidence as in paperwork?

Q. (BY MR. JAMES BELL) Do you have any direct knowledge or direct evidence that anybody's committed any wrong -- criminal conduct in the health care business?

MR. DAVID BELL: Objection; form. In the whole wide world, counsel?

MR. JAMES BELL: I'm going to start there and then I'm going to narrow it down.

MR. DAVID BELL: Okay. Why don't you start with narrow.

THE WITNESS: No direct evidence.

Q. (BY MR. JAMES BELL) So as you sit here right you, you don't have any -- I don't need to narrow it down now. So you don't --

MR. JAMES BELL: And I'll object to my side-bar.

MR. DAVID BELL: No problem.

MR. JAMES BELL: I appreciate that. Sorry.

Q. (BY MR. JAMES BELL) It would be fair to say that you don't have any direct evidence or knowledge or facts to suggest that anybody has committed any criminal wrongdoing or criminal misconduct or unlawful conduct

**EXHIBIT 1**

who is in the health care space, true?

MR. DAVID BELL: Objection; form.

THE WITNESS: I've had people come to me and --

Q. (BY MR. JAMES BELL) I'm talking about your direct knowledge.

A. Direct knowledge from the person that's being investigated?

Q. No. It's about what you've witnessed, seen, touched, right? Remember we talked about that earlier?

A. Yeah.

MR. DAVID BELL: Objection; form.

THE WITNESS: No direct evidence.

Q. (BY MR. JAMES BELL) So is it fair to say that you don't have direct knowledge, facts or evidence to suggest that anybody's committed any criminal conduct in the health care space, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) Now, you've also said that you -- folk have come to you, correct?

A. Correct.

Q. Okay. About -- who -- who -- who came to you about whose committing alleged misconduct in the health care space?

**EXHIBIT 1**

MR. DAVID BELL: Objection; form.

THE WITNESS: I mean it's all the time. You know, people tell me things. You mean, Forrest Park? Who are you talking about?

MR. DAVID BELL: Let him ask you a question so you can answer it.

Q. (BY MR. JAMES BELL) Sir, can you tell -- tell us what black box is?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Are you on Instagram as "My stock buy"?

A. I plead the Fifth. See Exhibit 1.

Q. Do you put your brokerage account out on Instagram?

A. I plead the Fifth. See Exhibit 1.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Tell the folks about Bionolvis, Inc.

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true that you tried to get Brandon McCarthy stock in Bionolvis, Inc.?

**EXHIBIT 1**

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge or facts of anybody that's presented a false, fictitious or fraudulent claim to the -- to any department of United States?

MR. DAVID BELL: Objection; form. Asks for a legal conclusion.

THE WITNESS: Can you repeat that?

Q. (BY MR. JAMES BELL) Sure. Do you have any direct evidence, knowledge or facts to support the potion that someone you know has presented a false, fictitious or fraudulent claim to a department of the United States?

MR. DAVID BELL: Objection; form. Asking for a legal conclusion.

THE WITNESS: Just anybody anywhere, no.

Q. (BY MR. JAMES BELL) Who told you that Brandon McCarthy helped shop a Qui Tam against any of his clients?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) So you're going to plead

**EXHIBIT 1**

the Fifth Amendment with respect to who told you that Brandon McCarthy allegedly was shopping Qui Tams against some of his clients, correct?

A. Correct.

Q. And so you're taking the Fifth Amendment with respect to that issue?

A. Correct.

Q. You -- you got to make sure you say "I take the Fifth Amendment?

A. I take the Fifth Amendment.

Q. Yeah. I'm sorry. I -- I -- it's my fault because I didn't ask a proper question.

Who told you that Brandon McCarthy was allegedly shopping a Qui Tam against any of his clients, former clients, potential clients?

MR. DAVID BELL: Objection; form.

THE WITNESS: Can you repeat that?

Q. (BY MR. JAMES BELL) Sure. Who told you that Brandon McCarthy was bringing a Qui Tam against any clients, existing clients, former clients, or potential client or are you going to take the Fifth Amendment?

A. Yeah. I'm going to take the Fifth. See Exhibit 1.

Q. You're going to take the Fifth Amendment?

A. Please, yeah.

**EXHIBIT 1**

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) When you refer to the book in the text messages with Nathan Halsey, how were you going to get the $2,000 to pay for that book?

MR. DAVID BELL: Objection; form. Asked and answered.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Who came up with the idea to pay $2,000 -- strike that. Who came up the idea the offer Nathan Halsey $2,000 for a book?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Did you come up with the idea to pay or offer to pay Nathan Halsey $2,000 for a copy of a book?

A. I plead the Fifth. See Exhibit 1.

Q. Did Cameron Smith come up with the idea Nathan Halsey to pay $2,000 for the copy of a book?

A. I plead the Fifth. See Exhibit 1.

Q. Did Jim Rolf come up with the idea to offer Nathan Halsey -- have you off Nathan Halsey $2,000 for a copy of a book?

A. I plead the Fifth. See Exhibit 1.

**EXHIBIT 1**

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Has Jim Rolf ever been your lawyer?

A. Yes.

Q. When?

A. Jim Rolf and Joe Kendall were my attorneys when I was going through criminal matters.

Q. Okay. So --

A. So --

MR. DAVID BELL: That's a public record. He's not going to answer any other questions or about Mr. Rolf or Judge Kendall.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge, or facts to suggest that Brandon Brandon McCarthy was going to get some sort of kickback on a Qui Tam?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Did you ever get paid from any source or anybody for your communications or interactions with Nathan Halsey or Gus Kepler?

A. No.

MR. DAVID BELL: Objection; form. Objection; asked and answered. He answered no.

Q. (BY MR. JAMES BELL) Have you -- have you been

**EXHIBIT 1**

paid as consultant by anybody in the pharma -- strike that

Have you been paid as consultant by anybody in the health care space?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Have you been paid as a consultant by any lawyers?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

MR. DAVID BELL: Objection; asked and answered.

MR. JAMES BELL: Sorry about these books. Are you okay with space?

THE WITNESS: Yeah. Thanks.

Q. (BY MR. JAMES BELL) When's the last time you talked or interacted with Brandon McCarthy?

A. It's been a while. Gosh, maybe a couple of years.

Q. And you testified earlier that you are not aware of any cases or potential cases against Brandon McCarthy, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You're not aware of any

**EXHIBIT 1**

investigation personally against Brandon McCarthy, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) And you're aware of any proceedings, investigations, cases, or potential cases whereby you have personal knowledge of or any evidence you could provide to anybody against Brandon McCarthy, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) And so you would agree with me since no cases, no investigations exist, that -- and you're not aware of any proceedings, that Brandon McCarthy hadn't attempted to intimidate you a witness. Do you agree?

MR. DAVID BELL: Objection; form.

THE WITNESS: I don't know that no investigations exist.

Q. (BY MR. JAMES BELL) I understand you don't know that any investigations exist.

My question --

MR. JAMES BELL: Objection; nonresponsive.

Q. (BY MR. JAMES BELL) My question to you is: Since you don't know of any investigations or any

**EXHIBIT 1**

proceedings or potential proceedings whereby you would be a witness, you don't have any direct evidence that Brandon McCarthy is trying to intimidate you in any way as witness, correct?

MR. DAVID BELL:  Objection; form.

Q.   (BY MR. JAMES BELL) Correct?

A.   I've heard from numerous people.

Q.   You don't have any direct evidence that Brandon McCarthy is trying to intimidate you?

A.   Directly no.

Q.   Okay.  So you don't have any direct evidence that Brandon McCarthy is trying to intimidate you in any way, correct?

A.   That's correct.

Q.   Do you have any direct evidence that Brandon McCarthy has falsified any information?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  No.

Q.   (BY MR. JAMES BELL)  Do you have in direct evidence that Brandon McCarthy has covered up or engaged in any scheme, device, to defraud anybody or injure anybody?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  No.

Q.   (BY MR. JAMES BELL)  Are you aware -- strike

**EXHIBIT 1**

that.

Do you have any direct evidence, knowledge, or facts to suggest that Brandon McCarthy has engaged in a false, fictitious or fraudulent statements or representations or made such?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

(Pause in proceedings)

MR. JAMES BELL: Let's take a quick break.

MR. DAVID BELL: Yeah.

(Break taken)

(Matt Segedy not present after break)

Q. (BY MR. JAMES BELL) Sir, are you going to refuse to answer the question about the identity of any attorneys that you've met with in 2015 that can possibly have knowledge about the questions I've been asking you?

A. I am, yes.

Q. Are you going to refuse to identify the name of any attorneys in 2016 that possibly have any information regarding the questions I've been asking you?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes I am.

Q. (BY MR. JAMES BELL) Are you going to refuse to answer the question about -- strike that.

Are you going to refuse to identify the

**EXHIBIT 1**

names of any attorneys that you've consulted with, talked to, in 2017 regarding any of the questions I've asked?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes.

Q. (BY MR. JAMES BELL) Are you going to refuse to answer the question of the dates of initial consultations meetings with any attorneys you met with in 2015, '16 or 2017, regarding in subject matter of any of the questions I've been asking you about today?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes.

Q. (BY MR. JAMES BELL) Are you going to refuse to answer the question regarding the existence of any fee agreements with any attorneys regarding the subject matter that we've been talking about today in either 2015, 2016, or 2017?

A. What do you mean fee agreements?

Q. Do you have any free agreements with any attorneys?

A. No.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Do you have a fee agreement Mr. David Bell?

A. Well, I'm going to plead the Fifth. Exhibit 1.

**EXHIBIT 1**

Q. (BY MR. JAMES BELL) Do you have a fee agreement with David Bell? Are you taking the Fifth Amendment.

A. I'm going to plead the Fifth Amendment.

Q. Who referred you to David Bell?

MR. DAVID BELL: I'm not going to let him answer any questions about any lawyers.

THE WITNESS: Yeah, I'm going to plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Are you going to plead the Fifth Amendment who respect to the referral source was to David Bell?

MR. DAVID BELL: He's not going to answer any questions about any lawyers --

THE WITNESS: Yes, I am.

MR. DAVID BELL: -- he contacted or talked to or referred him to me.

Q. (BY MR. JAMES BELL) Are you going to refuse to answer the question and/or take the Fifth Amendment regarding any fees that have been charged by any attorneys regarding any of the subject matter we've discussed today in the years 2015, '16 and '17?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes.

Q. (BY MR. JAMES BELL) Are you going to refuse to

**EXHIBIT 1**

answer the question regarding the terms of any fee agreements with any lawyers regarding -- that -- that you've talked to regarding the subject matter that we've talked to -- talk to you about today?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes. Correct, yes.

Q. (BY MR. JAMES BELL) Are you going to refuse to answer the question regarding the general purpose of any work performed by any attorneys that relate to the subject matter of your testimony today?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes.

MR. JAMES BELL: I'm not going to allow him to testify about any communication way any attorney.

MR. JAMES BELL: I'm not asking about the communication. I'm asking about the identify of the attorney. Are you going to refuse to allow him to answer that question?

MR. DAVID BELL: Yes. Thank you.

MR. JAMES BELL: Are you also going to refuse FRUZ to allow your client to answer when the date of any initial consult or meeting was with any attorney?

MR. DAVID BELL: Yes. And that's also based upon his Fifth Amendment rights that he's asserting today.

**EXHIBIT 1**

MR. JAMES BELL: Well, I just --

MR. DAVID BELL: And actually his First Amendment rights that he should be asserting today.

MR. JAMES BELL: Well, I need to -- I -- Just based on the case law, I need to -- to make sure I get a direct answer.

Q. (BY MR. JAMES BELL) Are you -- are you going to refuse to answer the date of any initial consultations or meetings with any attorneys, whether they acted as your attorney or you talked with them outside the scope of an attorney/client relationship?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes.

Q. (BY MR. JAMES BELL) And you're going to refuse the identify the name of any attorneys that you've had a relationship with, whether attorney/client or otherwise, based on your Fifth Amendment privilege?

A. Yes.

Q. Are you going to take the Fifth Amendment with respect to your relationship with Cameron Smith?

A. Yes.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Are you going to take the Fifth Amendment -- strike that.

Are you taking the Fifth Amendment with

**EXHIBIT 1**

respect to your relationship with Jim Rolf?

A. Yes.

MR. DAVID BELL: Objection; form again.

Q. (BY MR. JAMES BELL) How much have you paid David Bell or are you taking the Fifth Amendment?

MR. DAVID BELL: He's not going to testify about his relationship with his attorney.

THE WITNESS: I'm not going to testify about any attorneys. I'm going to plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) And you're pleading the Fifth to as who your referral source was as to getting to David Bell?

MR. DAVID BELL: He's not going to testify about that any conversations with -- or communications with any attorney. Objection; form.

Q. (BY MR. JAMES BELL) Okay. I'm -- I'm not asking -- was -- did a nonattorney refer you to David Bell?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Okay. So you're going to refuse to answer the question about who -- which attorney was the referral source to David Bell or are you taking the Fifth Amendment?

**EXHIBIT 1**

A. I am, yes.

Q. You're taking --

A. I'm -- I'm pleading the Fifth Amendment. See Exhibit 1.

Q. On September 8th meeting that you had -- strike that.

On the -- do you remember on your August 13, 2015, meeting pitching Brandon McCarthy to use your Prisoner Entry Program that you had started?

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Is that possible?

A. It's possible.

Q. And did you -- do you remember talking about Forrest Park and Dr. Rumloui at that first meeting on August 2013, 2015?

A. At K&L Gates?

Q. Yes, sir.

A. I don't recall it, but I'll not saying it's not possible.

Q. Sure. Is it -- is it possible that you spent time talking about your Prisoner Entry Program at K&L Gates at your first meeting with Brandon McCarthy? Yes or no?

A. Yes.

Q. Is it -- it's also possible that you spent time

**EXHIBIT 1**

talking about Forest Park Medical Center with Brandon McCarthy at your first meeting at K&L Gates, correct?

A. Is the question is it possible?

Q. Yes.

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes.

Q. (BY MR. JAMES BELL) And it's possible that you also spoke about Dr. Rumloui with Brandon McCarthy at the first meeting at K&L Gates on or about August 13, 2015, correct?

A. It's possible. I don't recall.

Q. It's also possible that you talked about --

MR. JAMES BELL: I can move this over. I'm sorry.

Q. (BY MR. JAMES BELL) It's also possible that you spoke to Brandon McCarthy about a man -- a gentleman by the name Joe Garza? Do you recall that on that August 2013, 2015, meeting?

A. It's possible.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) When you went to that September 13th meeting, did you understand how Qui Tams worked, or no?

A. No. August.

Q. I'm sorry. When you showed up to the August

**EXHIBIT 1**

13, 2015, meeting did you understand how Qui Tams worked?

A. No. That's why we went there, to primarily see if we could began Brandon's knowledge.

Q. On how -- on how a Qui Tam works?

A. Correct.

Q. You didn't have any information on any compounding pharmacies, doctors, hospitals, correct, at that August meeting?

A. Correct.

Q. You had some information regarding stock schemes and possibly Dr. Rumloui, correct, at that first meeting?

A. Possibly.

Q. At that first meeting?

A. Possibly, yes.

Q. You would agree with me that nothing substantive was discussed at that first meeting with Brandon McCarthy in August of 2015, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Nothing substantive, but speaking on Rumloui, now that I recollect, it -- it strikes me as Brandon also thought he was a crook. I mean that all our -- talking about him. Because I did too and he -- he pretty much thought the same. But

**EXHIBIT 1**

there was no specifics talked about as far as what exactly he's done or anything.

Q. (BY MR. JAMES BELL) Okay. So you-all -- you recall you remember talking about Dr. Rumloui --

A. Yes.

Q. -- at that first meeting?

A. I -- I don't know when it was actually was, but I know I've talked to Brandon about Rumloui.

Q. And it probably would have been at the first meeting?

A. I guess, you know, I --

MR. DAVID BELL: Don't guess, please.

THE WITNESS: Okay. Possibly.

Q. (BY MR. JAMES BELL) Okay. And then you would agree with me that nothing substantive was discussed about any pharmacy, hospital, or doctor that you're aware of at that first meeting, correct?

A. Correct.

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) Do you remember the name of -- strike that.

Do you know whether or not Gus gave Brandon the name of -- the proper name of any compounding pharmacies or was he just listing them off? Do you

**EXHIBIT 1**

remember?

A. I don't recall.

Q. So you don't recall which pharmacies Gus talked to Brandon about, correct?

A. Correct.

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) And whatever pharmacies were mentioned, you don't remember any criminal conduct or willful conduct that was discussed at that meeting, because you said nothing substantive was discussed, correct?

A. Correct.

Q. And Brandon McCarthy told you he needed to run a conflict checks, correct?

A. Correct.

Q. Before he could proceed, correct?

A. Correct.

Q. Because that was the standard procedure and he wanted to make sure that -- this is his third day at a big tall building law firm -- that he doesn't get in any trouble, right?

MR. DAVID BELL: Objection; form.

THE WITNESS: Absolutely.

Q. (BY MR. JAMES BELL) That was the impression

**EXHIBIT 1**

that you got?

A.   Absolutely.

Q.   Did Brandon at that first meeting appear to be careful and cautious about what clients or Qui Tams he could or couldn't take and -- and the conflict procedures?  Did he seem to be aware of those and cognizant and --

A.   Yes.

MR. DAVID BELL:  Objection; form, please.

Q.   (BY MR. JAMES BELL)  Go ahead.  What's the answer?

A.   Well, he -- he was -- he -- we just discussed the basics of how a Qui Tam worked.  It wasn't -- there was no specifics.  It was -- you know, and then he said he had to, you know, see if there's any conflicts.  There wasn't any intimate details about any case or person or anything like that.

Q.   So no intimate details were talked to about any case or person, correct, at the first meeting?

A.   Correct.

Q.   There was -- it was just basically an overview of how Qui Tam work, correct?

A.   Correct.

Q.   And the names -- there were some names that were given to Brandon McCarthy, correct?

**EXHIBIT 1**

A. Correct.

Q. You don't remember the name of those pharmacies because they were all --

A. There's so many of them and it was names and companies and no, I don't -- I don't recall, you know, all the names and companies that were talked about.

Q. And Brandon McCarthy told you and Gus that he needed to run a conflict checks, correct?

A. Correct.

Q. And before he could even take a look at it or talk about any of these pharmacies because they could potentially be clients of K&L Gates, correct?

A. Correct. He made no comments whatsoever regarding any person or any company while we were there.

Q. Okay. So Brandon seemed completely professional in his dealings with you and Gus, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct. Correct.

Q. (BY MR. JAMES BELL) You've been around enough attorneys to know whether or not a lawyer is professional or not, right?

A. Yes.

Q. And Brandon seemed and -- seemed prepared and professional in terms of abiding by, based on your observations, abiding by his legal duties and ethical

**EXHIBIT 1**

obligations to clients, and former clients, and/or existing clients of K&L Gates, correct?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  Correct.  There was no -- like I said, there was -- he didn't make any substantive comments.  He listened to us.  And the then at the end he said, well, you know, before I can advise you or do anything, I have to do a conflict check.  And so yes, correct.

Q.  (BY MR. JAMES BELL)  Okay.  So Brandon told you before he could do anything or advise, he had to run a conflicts check, correct?

A.  Correct.

Q.  And that seemed like the right thing to do, correct?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  Based on my, you know, limited knowledge of law, yes.

Q.  (BY MR. JAMES BELL)  And based on Brandon's professionalism that's why you continued to stay in contact with him?  It's one of the reasons why, correct?

A.  Correct.

Q.  That he seemed to maintain confidentiality and he didn't seem like a shady lawyer to you, correct?

A.  Correct.

**EXHIBIT 1**

Q. He seemed like he was honest, ethical in his dealings with the two of you, at least in your limited interaction with him, correct?

A. Correct.

Q. He didn't give you or Gus any legal advice, correct?

A. Correct.

Q. Brandon just -- in that first meeting, just listened to the two of you, correct?

A. Correct.

Q. And as you sit here right now, there's nothing you can say that Brandon did wrong in that first meeting with you in August of 2015, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct. Correct.

Q. (BY MR. JAMES BELL) And in terms of the second meeting that happened, I believe at the hotel, there's nothing Brandon said that was inappropriate or wrong or unethical in your opinion, correct?

A. Correct.

Q. The book that you reference in your text message with Nathan Halsey where you offer to pay him $1000, does that refer to a copy of a PowerPoint presentation?

MR. DAVID BELL: Objection; form.

**EXHIBIT 1**

THE WITNESS: On advice of my counsel, I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Have you seen a PowerPoint presentation related to any alleged health care schemes?

MR. DAVID BELL: Objection; asked and answered. Objection; form.

THE WITNESS: Plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Do you remember a name called Trilogy coming up in the fall of 2015?

A. I mean I've heard the name.

Q. Do you know anything about the pharmacy called Trilogy?

A. No.

Q. Do you have any evidence that Brandon McCarthy brought or attempted to bring a Qui Tam lawsuit against a company called Progen?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any evidence that Brandon put his personal well-being above any of his clients, former clients, or alleged clients?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any evidence

**EXHIBIT 1**

that Brandon McCarthy has tried to drum up any federal criminal conviction into any of his former clients, clients or existing clients?

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Or prospective clients.

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct evidence knowledge or facts to suggest that Brandon McCarthy helped published slanderous news articles against clients, former clients, existing clients or other folks?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct evidence that Brandon McCarthy's ever exploited a client -- a confidential relationship with any of his clients, former clients, or existing clients?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

MR. DAVID BELL: Okay. When you got to a stopping point.

MR. JAMES BELL: Okay. Give me five minutes. Is that all right?

MR. DAVID BELL: Yeah. I was just going

**EXHIBIT 1**

to --

MR. JAMES BELL: If you want to bring pizza in here --

MR. DAVID BELL: No, just --

(Pause in proceedings)

Q. (BY MR. JAMES BELL) At -- based on your, previous testimony that Brandon McCarthy didn't say much he didn't -- at the first meeting Brandon McCarthy didn't tell you that he wanted to be in charge of bringing a Qui Tam against anybody at that point in time, correct?

A. Correct.

Q. It was more -- at the first meeting it was more Brandon McCarthy trying to give you information about what a Qui Tam was and the law behind a Qui Tam, correct?

A. Correct.

Q. Just a basic overview what a Qui Tam was?

A. We were just there -- I mean -- I like Brandon. I mean I would consider him my friend so I just said -- I told Gus, I said, let's go there and he can explain it. I don't know what it is and it's very confusing to me. So I said he can explain it to us. And, you know, we can see if there's a possibility or not on whatever, you know, everybody was thinking about trying to make

**EXHIBIT 1**

some money any off a Qui Tam case. Because I was too. We were all, you know, trying to figure out how we can make some money off of this deal. So we just went there and -- and Brandon just kind of outlined the basics of how they worked. But not as far as any particular person or company or anything like that.

Q. Did you bring the concept of the Qui Tam against Progen and its principals to Brandon McCarthy?

A. No.

Q. Was there ever a plan for you to be a plaintiff in Qui Tam lawsuit against Progen that you're aware of?

A. No.

Q. Did you discuss the name Progen in the August 2015 meeting?

A. Not that I recall. I don't -- I mean they were rattling...

Q. As you sit here right now, can you remember the name --

A. No, I cannot.

Q. As you -- I just got to get a clean record.

A. Okay.

Q. As you sit here right now, do you remember the name Progen even coming up in your August 2015 meeting with Brandon McCarthy?

A. No.

**EXHIBIT 1**

Q. Was -- strike that.

Brandon McCarthy never solicited you to be a plaintiff in the Qui Tam action, correct?

A. Correct.

(Pause in proceedings)

Q. (BY MR. JAMES BELL) Since you didn't know the name Progen, would you agree with me that you were never adverse to Progen?

MR. DAVID BELL: Objection; form.

THE WITNESS: I would agree with that.

Q. (BY MR. JAMES BELL) Did Brandon McCarthy conspire with you to move forwards with a Qui Tam?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Did Brandon McCarthy strategize and/or conspire with you to move forward regarding a Qui Tam?

A. No.

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Did Brandon McCarthy make a deal with you regarding any Qui Tam?

A. No.

Q. Did Brandon McCarthy ever make any illegal deals with you?

**EXHIBIT 1**

A. No.

Q. Did Brandon McCarthy ever say that he would personally receive a portion of any recovery of a Qui Tam to you?

A. No.

Q. Did McCarthy say that he would take on a -- a Qui Tam without supporting evidence?

A. No.

Q. Did Brandon McCarthy ever talk to you about any referral fee or fee for him?

A. No.

Q. Did you see a PowerPoint presentation by Brandon McCarthy in or around Brandon McCarthy or that Brandon McCarthy had anything to do with?

A. No.

Q. Do you have any evidence, facts, or knowledge that Brandon McCarthy was looking into Progen to sue them?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge, or facts that McCarthy was looking in to Shuster Raul or any of those folks to sue them or harm them?

A. No.

**EXHIBIT 1**

Q.   Do you have any evidence, facts, or knowledge to suggest that Brandon McCarthy tried to get any former clients, existing clients or prospective clients criminally prosecuted?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  No.

(Pause in proceedings)

Q.   (BY MR. JAMES BELL)  Did you ever hear Brandon McCarthy bring up the name Progen to the best of your recollection?

A.   No.

Q.   (BY MR. JAMES BELL)  Do you remember Brandon McCarthy in any -- you don't remember Brandon McCarthy bringing up the name Shuster Raul or Express Pharmacy in your meetings, correct?

A.   Correct.  He didn't comment on anything.  He just listened and then told us that he had to do a check.  That's it.

Q.   Do you have any direct evidence, knowledge, or facts that Brandon McCarthy -- that Brandon McCarthy helped Nathan Halsey obtain information or records about Progen and/or are R Express?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  No.

Q.   (BY MR. JAMES BELL)  Or any of its principals?

**EXHIBIT 1**

A. No.

Q. Do you have any direct evidence, knowledge, or facts that suggest that Brandon McCarthy attempted to persuade the U.S. Department of Homeland Security to investigate Progen or RExpress Rolf or Shuster, any of those folks?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge, or facts that -- that Brandon McCarthy had something to do with presenting allegations regarding Progen or any of the companies I've mentioned to the U.S. attorney's office?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge, or facts that Brandon McCarthy worked with Halsey Kepler or you to publish defamatory news articles and television segments?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct evidence that Brandon McCarthy had anything to do with a CBS news article?

A. No.

**EXHIBIT 1**

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Do you have any direct evidence that Brandon McCarthy spurred the issuance of the warrant on Halsey's phone?

A. No.

Q. Based solely on your dealings with Brandon McCarthy, you would agree with me, he was honest in his dealing with you, true?

A. Yes.

Q. Based on your dealings with Brandon McCarthy, you would agree with me that he seemed ethical in his dealings with you, true?

A. Yes.

Q. You would agree with me that Brandon McCarthy in his dealings with you was upfront, honest, had integrity, correct?

A. I would.

Q. You'd say that Brandon McCarthy, in his dealings with you, presented himself as a loyal -- an attorney that acted with loyalty and integrity of the strictest kind? Would you agree with that?

A. Yes. I mean, like I said, we were friends. I was helping him with the Keep My ID thing. So I would -- yeah. The answer is yes. I mean...

Q. You're not aware of any false or inaccurate

**EXHIBIT 1**

statements that Brandon McCarthy made, correct?

A. No.

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) I asked a double negative. I'm sorry.

A. Oh, okay.

Q. Would you agree with me that you're not aware of false or inaccurate statements that Brandon McCarthy has made about any clients, former clients, existing clients, future clients, or anybody to your knowledge. Do you --

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) -- agree with that statement?

A. Yes.

Q. Do you have the direct evidence, knowledge, or facts to suggest that Brandon McCarthy urged CBS to run any kind of story regarding any of his clients, former clients, or existing clients?

A. No.

MR. DAVID BELL: This is yours.

MR. JAMES BELL: Thank you.

(Pause in proceedings)

Q. (BY MR. JAMES BELL) When you told Brandon

**EXHIBIT 1**

McCarthy that you've got a huge case out of Fort Worth in the hundreds of millions health care, you didn't have any facts or evidence at that time, you just possible -- you were just searching for a potential Qui Tam case, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) How is your daughter, by the way?

A. Fine. Thank you.

Q. Good.

A. Fourteen. She's still sweet. Hopefully she stays that way.

MR. JAMES BELL: The name of the gal at the second meeting was Brooke Chavez Taylor.

THE WITNESS: Taylor. Brooke Taylor.

MR. DAVID BELL: Hey, can I have that?

MR. JAMES BELL: No.

MR. DAVID BELL: Let me see her again. Cute.

THE WITNESS: Yes, she's cute. What do you think, Brandon?

MR. McCARTHY: She went to Harvard.

MR. DAVID BELL: Do what?

MR. McCARTHY: Harvard. Smart girl.

**EXHIBIT 1**

Harvard. Harvard.

MR. DAVID BELL: Harvard, Massachusetts?

THE WITNESS: Yeah.

MR. JAMES BELL: Yes.

MR. DAVID BELL: Sure it wasn't Howard?

MR. JAMES BELL: Yeah. Positive.

(Pause in proceedings)

THE WITNESS: She's in law school, I think. I heard she maybe went to law school.

Q. (BY MR. JAMES BELL) Where are you currently living in case I have to subpoena you at another point in time?

A. 5608 Matalee, but I don't know how long. I'll update you if I change my address.

MR. JAMES BELL: Well, you've got to go through your attorney.

THE WITNESS: Or I'll update him to let you know.

That's another coincidence that came up, I guess, I can't -- I'm not allowed to live there because of my --

MR. DAVID BELL: Don't go into any of that stuff, please.

THE WITNESS: Okay. So...

Q. (BY MR. JAMES BELL) You would agree in your

**EXHIBIT 1**

dealings with Brandon McCarthy it appeared that he adhered to his ethical legal duties, correct?

MR. DAVID BELL: Form; asked and answered.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) McCarthy seemed -- strike that.

Based on your observations, McCarthy seemed faithful to his clients, correct?

MR. DAVID BELL: Form; asked and answered.

MR. JAMES BELL: I didn't ask that before, by the way. I haven't asked any of these.

MR. DAVID BELL: Asked and answered.

THE WITNESS: I mean, yeah, correct.

Q. (BY MR. JAMES BELL) McCarthy appeared -- strike that.

McCarthy was forthright, correct?

A. Correct.

Q. McCarthy was frank with you guys?

A. Correct.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) McCarthy seemed like he had a conscience, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) Honorable?

**EXHIBIT 1**

A. Correct.

Q. Just?

A. Correct.

Q. Moral?

A. Correct.

Q. Principled?

A. Correct.

Q. Conscientious?

A. Correct.

Q. Fair?

A. Correct.

Q. Equitable?

A. Correct.

Q. Upright?

A. Correct.

Q. Honorable?

A. Correct.

Q. Trustworthy?

A. Correct.

Q. Impartial?

A. Correct.

Q. Unbiased?

A. Correct.

Q. Unprejudiced?

A. Correct.

**EXHIBIT 1**

Q. Neutral?

A. Correct.

Q. Lawful?

A. Correct.

Q. Legal?

A. Correct.

Q. Legitimate?

A. Correct.

MR. DAVID BELL: Objection; form. I don't know what that means.

Q. (BY MR. JAMES BELL) Did McCarthy reveal, disclose or divulge any information about any of his clients to you?

A. No.

Q. Did McCarthy leak, unmask, expose any information about any of his clients, prospective clients to you?

A. No.

MR. JAMES BELL: Let's take a quick pizza break and maybe I can shore this up.

MR. DAVID BELL: Yeah.

MR. JAMES BELL: Is that cool?

MR. DAVID BELL: Sure.

MR. JAMES BELL: Okay.

(Break taken)

**EXHIBIT 1**

Q.   (BY MR. JAMES BELL)  All right.  Just -- is there anything I can say or do to change your mind about the questions I've asked regarding the Fifth Amendment? Change -- are you going to continue to maintain the Fifth Amendment with respect to the questions I asked you?

MR. DAVID BELL:  I'm better suited to answer that question than he is.  So we've talked about meeting.  Let's meet and then we'll revisit all that.

MR. JAMES BELL:  I know.  I just need to get on the record.

MR. DAVID BELL:  Okay.  That's fine.

MR. JAMES BELL:  Okay.

THE WITNESS:  Yeah.  I would like to stick with my answers.

MR. JAMES BELL:  I just -- let me ask it again, just so I have a clean record.

Q.   (BY MR. JAMES BELL)  Is there anything I can say or do to change your mind with regard to withdrawing your assertion of the Fifth Amendment privilege regarding any of the questions I've asked you thus far?

A.   No.

MR. JAMES BELL:  Okay.  Now, just -- I think it will take ten minutes in terms of a timeline. Well --

**EXHIBIT 1**

Q. (BY MR. JAMES BELL) You're going to assert the Fifth Amendment privilege with respect to any dealings with Cameron Smith, correct?

A. Well, any attorneys is what I'm going assert the Fifth Amendment with.

Q. Okay.

MR. DAVID BELL: And any and all.

THE WITNESS: Yeah.

Q. (BY MR. JAMES BELL) You're going to assert the Fifth Amendment privilege with respect to Cameron Smith, correct?

A. Correct.

Q. Jim Rolf, correct?

A. Correct.

Q. Joe Kendall, correct?

A. Correct.

Q. Okay. Now, you're aware of circumstances whereby folks were -- or have tried to implicate -- or her of implicating Brandon -- Brandon McCarthy in some kind of nefarious or wrongful conduct, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Well, I mean -- hearsay. I've heard at lot of stuff, you know.

Q. (BY MR. JAMES BELL) Secondhand?

A. Yeah. About everybody and everything. I mean

**EXHIBIT 1**

as far as this case is kind -- or this deal, whatever you want to call it, has kind taken of taken on a life of its own. So I've heard all kinds of stuff about all different people.

Q. So what have you heard about any alleged wrongdoing by Brandon McCarthy, even though it's secondhand. Now I'm asking for indirect knowledge or indirect facts.

A. I mean the thing -- I guess, you know, the whole thing with -- with Nathan and getting wired up by the FBI. That -- I -- I really get confused as far as the companies or whatever that maybe -- that as far as Kevin Krouse is concerned that -- that for -- that Kevin Krouse would not run Nathan's SEC complaint in the newspaper if -- if he was given the information on whomever, Scoot Shuster, Dustin, et cetera. But I don't -- I don't know who that deal was made with, if there ever was a deal. I just had heard that from Nathan.

Because Nathan had told me that if that article runs in Dallas -- all his investors are in Dallas -- and he's basically screwed.

Q. My question is: What have you heard that Brandon McCarthy has done wrong? Or has everything you learned about Brandon McCarthy come from attorneys?

**EXHIBIT 1**

A.    No, I mean a lot of it came from Halsey.  But I don't -- you know, I mean I guess the -- that I heard that he sent Nathan to the FBI office to get wired up to go get information against whomever.  I don't know who exactly who they were, but...

That.

You know and, like I said, about me, I've heard, you know, numerous times that he had somebody at the IRS and that he was going to put on me.

Q.    Who did you hear that from again?

A.    Well, I heard it from the guy that Carl, who was a client of what's his name that I mentioned earlier?  I don't know.  It's some -- some attorney.  Carl Fleming is his name.  The guy at Hillstone.  I know that there's a guy whose name is Hoi that has, you know, been calling people.  And I had a girl -- an ex-girlfriend that said he called her and was asking about my investments and did I beat her up.  And then she said eight months later he called and said, well, does Ryan sell drugs?  And I'm going, what's going on here?

I've heard -- well, you're talking about Brandon.  I'm trying to think.  I mean, that -- that he was representing somebody and getting evidence against them when they were his client -- when they were his firm's client.

**EXHIBIT 1**

Q. Who did you hear that from, that allegation?

A. I don't know. It's like all so convoluted. I don't really remember. I'm just telling you things I remember that I've heard. You know...

Q. Did you hear that allegations from any attorneys?

A. I don't recall. But I mean I guess the main thing is the FBI thing. Because -- that -- that's -- you know, when Nathan told me that was -- that he was doing that, that -- that scared me. And I don't know who, what or -- had anything to do with that. But I didn't -- that's when I was -- that made me nervous. You know, especially in my situation. I just felt that was careless of him to be doing. But I know he wanted to get off that case, that SEC case.

I heard that -- that Brandon called the SEC attorney that was handling Nathan's case and maybe tried to trade -- you know, try to get Nathan -- help Nathan out. And I don't know if that's improper or not. I mean but I heard that. And that the SEC attorney told Nathan that if Barack Obama calls me, I wouldn't drop this case. I'm not -- I'm not -- I don't know if that's wrong or not. I don't know if Brandon had anything to do with it. I'm just telling you things I've heard. I'm -- I'm not saying they're right, wrong, or

**EXHIBIT 1**

indifferent. I don't know.

But mainly the FBI thing and, you know, from Nathan what said I -- I didn't -- you know, that he went to Krouse. I don't know who all met with Kevin Krouse. But, you know, it was told to me that there -- it was a trade where they would get Kevin the information on Shuster Raul, et cetera, and all the companies if he wouldn't run that story.

Basically that's, you know, what I can remember.

Q. With regard to your assertion of the Fifth Amendment regarding the book that we were talking about earlier. Do you remember that?

A. Yes.

Q. Okay. When did you first hear of a book or a PowerPoint? Are you going to take the Fifth Amendment?

A. Well, I've never heard of a PowerPoint.

Q. Okay. You've heard of a book?

A. I've heard of a book, but I don't -- I've never seen a book. I don't -- it's my -- it's my belief that the book -- that the way that it was described by Gus and Nathan -- had nothing do to with Brandon.

Q. Your under --

A. I --

Q. Your understanding is the book had nothing to

**EXHIBIT 1**

do with Brandon?

A. No. It wasn't -- it wasn't a --

Q. Well, I just -- I asked you a double negative.

It was your understanding -- would it be a fair statement to say that your understanding was the book that you were talking about earlier with Gus and Nathan had nothing to do with Brandon. That would be a true statement, correct?

A. Abso-- yes.

Q. Okay. Now, tell me what else do you --

A. Well, the -- the -- from my understanding was it was about Shuster and Raul. I don't even -- it was never -- I never have heard -- that's what struck me as funny when you said was there a book that was trying to -- that people were trying to get to hurt him. It was -- it had nothing to do with him. I think you're -- you're -- there's something that you're missing as far as that's concerned.

I think that whatever this book was had to do with the evidence that Nathan obtained on whoever he was recording and text messaging and things of that nature.

Q. That's your guess?

A. That's what I was told.

Q. Who were was told that by?

**EXHIBIT 1**

A. Nathan and Gus.

Q. Okay. But as far as you know, you don't -- you don't think Brandon had anything to do with this book, correct?

A. No.

Q. Correct?

A. Correct.

Q. Okay. So yeah, I asked you a double negative. Just to be clear.

As far as you knew Brandon McCarthy had nothing to do with this book that Nathan and/or Gus -- Nathan Halsey, Gus Kepler had made, correct?

A. Correct.

Q. Now, at some point request you were trying to obtain this book from either Gus or Nathan, right?

MR. DAVID BELL: Objection; form.

THE WITNESS: That, I'm going to plead the Fifth on -- on anything that has to do with me trying to obtain this book. I'm just telling you --

MR. DAVID BELL: Just let -- let him --

THE WITNESS: Yeah.

Q. (BY MR. JAMES BELL) What is the reasoning behind -- how would talking about the book incriminate you?

MR. DAVID BELL: You don't need to answer

**EXHIBIT 1**

that. You're asking him for a legal conclusion. Just --

THE WITNESS: I'm just going to plead the Fifth.

Q. (BY MR. JAMES BELL) Okay. When -- well, why did you want to obtain a copy of the book?

MR. DAVID BELL: Objection; form.

THE WITNESS: I'm going to plead the Fifth on that.

MR. DAVID BELL: Tell him go back to Exhibit --

THE WITNESS: Yeah.

(Pause in proceeding)

THE WITNESS: I mean what I'm telling you is --

MR. DAVID BELL: Just leave it.

THE WITNESS: Okay.

Q. (BY MR. JAMES BELL) If you were me sitting here right now, what question should I ask you that wouldn't call for your invocation of the Fifth Amendment privilege?

MR. DAVID BELL: Objection; form.

Why don't you and I talk, like we discussed earlier.

MR. JAMES BELL: I'm happy to talk to you

**EXHIBIT 1**

afterwards. I'm -- I'm just -- I want --

MR. DAVID BELL: I'm not going to let him answer those questions. I'm not going to let him waive, knowingly or inadvertently, his First or Fifth Amendment or any other right he has.

Q. (BY MR. JAMES BELL) So are you pleading the Fifth Amendment with respect to why you wanted to obtain a copy of the, quote, unquote, book?

MR. DAVID BELL: He's doing what he's testified on the record.

MR. JAMES BELL: I know. I just got to get a record.

MR. DAVID BELL: That's all that he's -- just -- just --

THE WITNESS: I'm pleading the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Okay. And was it your intent to purchase the book and then sell the book?

A. I plead the Fifth. See Exhibit 1.

Q. Who all was involved in -- strike that.

Was it more than you involved in attempting to purchase the book?

A. I plead the Fifth. See Exhibit 1.

Q. Did you try and get the book from Gus Kepler?

A. I plead the Fifth. See Exhibit 1.

**EXHIBIT 1**

Q. Did you try and get the book from Nathan Halsey?

A. I plead the Fifth. See Exhibit 1.

Q. Why were you train -- trying to obtain a book that you had never seen?

A. I have to plead the Fifth again. See Exhibit 1.

Q. Did somebody instruct you to obtain the book?

A. I plead the Fifth. See Exhibit 1.

Q. Why did anybody else want to have a copy of the book?

A. I plead the Fifth. See Exhibit 1.

Q. How was the book going to help you?

A. I plead the Fifth. See Exhibit 1.

Q. Were you going to benefit -- benefit by obtaining the book?

A. I plead the Fifth. See Exhibit 1.

Q. Were you ever given the book?

A. I plead the Fifth. See Exhibit 1.

Q. Did you have a copy of the book and just not look at it?

A. I plead the Fifth. See Exhibit 1.

Q. Have you ever held any type -- have you ever held this book in your hand?

A. Plead the Fifth. See Exhibit 1.

**EXHIBIT 1**

Q.   And when I say "the book," this is the book that was allegedly created by Halsey and -- and Gus, correct?

A.   I mean I don't know.

Q.   Is that your understanding of the book that we're talking about?

A.   No.

Q.   What is your understanding of the book?

A.   Because you're telling me there was a book that had something to do with McCarthy.

Q.   I'm talking the book regarding Halsey and -- and -- and -- and Kepler.  That's the only book that's out there.

A.   That I'm aware of.

Q.   I'm talking about the -- the book --

MR. DAVID BELL:  Excuse me.  Objection; form.

MR. JAMES BELL:  Sure.

Q.   (BY MR. JAMES BELL)  I'm talking about the book that you're referring to in the text messages between you and Kepler and you and Halsey.  Do you understand that?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I'm going to plead.  And see Exhibit 1 on that.

**EXHIBIT 1**

But you inferred earlier that it was some kind of book to use against McCarthy (indicating).

Q.   (BY MR. JAMES BELL)  The implication is if Brandon McCarthy had something to do with creating that book, he would have been creating against some of his own clients.  And that would be wrongful.  Don't you agree?

MR. DAVID BELL:  Objection; form.  Asked for a legal -- asks -- asks for a legal conclusion.

THE WITNESS:  I've -- I've never heard that.  That -- that Brandon had anything do with that book, if we're talking about the same book.

Q.   (BY MR. JAMES BELL)  I'm talking about the book that you're talking about in your text messages to Halsey and Gus.

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I plead the Fifth.  See Exhibit 1.

I just didn't know -- you inferred earlier that there was some book out there that was trying to do harm to McCarthy.

Q.   (BY MR. JAMES BELL)   It's the same book I'm talking about.

A.   Okay.  I've never thought that Brandon had anything to do with that book or produced it or went

**EXHIBIT 1**

out -- from -- from my understanding that was Nathan.  I don't -- I never -- so when you say that it's supposedly going to be just against him, I don't -- I have no knowledge of that.

Q.  Well, do you understand the allegation against Brandon?

A.  No, apparently not.

Q.  The -- the allegation is that he somehow has -- had seen the book or produced the book, created the book, help author the book with Nathan Halsey and -- and Gus to turn against former clients.  Do you understand that that's one -- one of the allegations --

A.  No.

Q.  -- his firm is making against -- no?

A.  No.

Q.  Okay.  Do you understand why I -- now I'm trying to ask about the -- the same book?  Why -- why we're talking about the same book?  Do you understand now?  Does that give you a better kind of --

A.  Yeah, I -- see, I didn't -- I didn't realize all that.

Q.  Okay.

A.  This is -- if -- if -- if this is this book that's out there that has information on whomever, the common knowledge out on the street is is that Nathan

**EXHIBIT 1**

Halsey created this book. And so when you were saying that about using it against Brandon or something, I -- I thought you were talking about something different. Because I -- that doesn't make any sense to me.

Q. Well, it makes sense to you now, right?

A. I --

Q. If Nathan Halsey created a book against clients of Brandon McCarthy's and Brandon McCarthy knew about it to -- and -- and handed it over -- to pursue a Qui Tam lawsuit against his own clients, you could understand that -- if that allegation was made, you can understand why Brian -- why Brandon McCarthy wants to know who, what, when, where, how about this alleged book because he had nothing to do with it. You can understand that, right?

A. Yeah. I never -- that didn't even cross my mind that he would have. I'm telling you Nathan -- that Halsey -- if this is this so-called book, Halsey created this book, went out and got the information and it was -- and from my understanding, this book was created because Halsey was trying to obtain evidence to get himself -- see, the Qui Tam was second nature. That -- that was down the line. I mean there's other -- there's -- Halsey thought he was in a pickle. I mean, Halsey's been through this before, you know. Reid

**EXHIBIT 1**

Prosper got him off a prior -- he almost got indicted and Reid got him off a prior deal he was involved in. So Halsey was worried that this SEC case could be referred to the DOJ. And that -- if we're talking about this book, that's what I understood the book to be.

I didn't even -- never related McCarthy to this book whatsoever. It was for Halsey to get out of whatever deal he was in.

Q. Did Halsey ever say to you that Brandon McCarthy had anything do with this book?

A. No.

Q. Did Gus Kepler ever tell you that Brandon McCarthy anything to do with this book?

A. No.

Q. Then why were you trying to obtain a copy of the book from Nathan Halsey?

MR. DAVID BELL: Objection; form.

THE WITNESS: I'm going to plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) If it has nothing to do with Brandon McCarthy, why are you pleading the Fifth Amendment as it relates to this book?

MR. DAVID BELL: Objection; form. I think the law is clear. He doesn't have to explain that to you, Counsel.

**EXHIBIT 1**

Q. (BY MR. JAMES BELL) Are you taking the Fifth Amendment?

A. Yeah. I'm pleading the Fifth. Exhibit 1.

Q. Did Nathan Halsey ever give you a copy of the book?

A. No.

Q. Are you aware of any copies that exists out there of the book?

A. No.

Q. Did Gus Kepler have a copy of the book?

A. Not that I'm aware of.

Q. Were you trying to get the book to pursue a Qui Tam?

A. Plead the Fifth. See Exhibit 1.

Q. When you were offering $2,000 to Nathan Halsey to get a copy of this book is it because you wanted to pursue a Qui Tam case?

MR. DAVID BELL: Objection -- objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Did Jim Rolf or Cameron Smith instruct you to offer $2,000 for the book so that they could serriptiously help you prosecute a Qui Tam?

A. I plead the Fifth. Exhibit 1.

**EXHIBIT 1**

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) So you're pleading the Fifth Amendment with respect to a book you've never seen, right?

A. Yes. Correct.

Q. You're pleading the Fifth Amendment with respect to a book you tried to obtain a copy -- how did you -- strike that.

How did you know that a book even existed?

A. I think Halsey kind of prided himself on making these presentations and, you know, I'm -- I'm friends with Reid Prosper and he, at one point, told me that --

MR. DAVID BELL: Don't tell him any conversations with any lawyer that's ever represented you.

THE WITNESS: Oh, okay.

Supposedly, Halsey was -- was good at presentations and he made this to help himself.

Q. (BY MR. JAMES BELL) Did Reid Prosper ever represent you?

A. Yes.

Q. And are you aware of any other presentations, other than the book that we're talking about, that Halsey made?

A. Not in relation to this case.

**EXHIBIT 1**

Q.   Are -- are you aware of any other Qui Tam -- alleged Qui Tam presentations made by Halsey?

A.   No.

Q.   Are you aware of any other books or presentations made by Halsey?

A.   No.  Halsey told me that when -- when he was going to get indicted that he made some presentations to show the government that he didn't do this.  He kind of pride -- like I said, he kind of prided himself on these presentations and, hey, this is how I got out of this deal, I went in there with these, you know, graphs and stuff and showed that I wasn't the one that did it.  I was conned into doing this.  And he -- he told me that that's how he got off this indictment.

Q.   Okay.  But with respect to presentations or books, other than about him and his case, are you only aware of one book or one presentation where he was attempting to pursue or throw other folks under the bus?

A.   Yes.  That's the only one I've heard about.

Q.   And that's the book that we've been talking about today, correct?

A.   I assume.

Q.   Okay.  And how would somebody other than you benefit from having the book?

MR. DAVID BELL:  Objection; form.

**EXHIBIT 1**

THE WITNESS: The only other people I think would benefit would be people that were representing the people that maybe were in the book that wanted to see what evidence was out there against them. I don't know.

Q. (BY MR. JAMES BELL) And then turn around and blame Brandon McCarthy?

A. That -- no, that doesn't -- that doesn't come into my mind whatsoever.

Q. Have -- have you ever heard of those attorneys saying that about Brandon McCarthy?

A. Never.

Q. Have you ever heard of Brandon McCarthy having anything to do with putting together, stapling, being involved with, touching this alleged book?

A. Never.

MR. JAMES BELL: Give me two minutes and then I -- I'm sorry. I know I've said it a couple of times and cried wolf, but...

Let me just talk to my client.

(Break taken)

MR. JAMES BELL: I'm going to suspend the deposition at this time.

(Proceedings concluded)

**EXHIBIT 1**

STATE OF TEXAS   }
COUNTY OF DALLAS  }

I, FELICIA PITRE, Clerk of the District of Dallas County,
Texas, do hereby certify that I have compared this Instrument
to be a true and correct copy of the original as appears on
record in my office.

GIVEN UNDER MY HAND AND SEAL of said Court, at office
In Dallas, Texas, this 13th day of December A.D. 2017

FELICIA PITRE, DISTRICT CLERK
DALLAS COUNTY, TEXAS

By _Benny Joly_ Deputy

# TAB D

CAUSE NO. DC-17-13448

| | | |
|---|---|---|
| BRANDON MCCARTHY,<br>Plaintiff, | §<br>§<br>§ | IN THE DISTRICT COURT |
| | §<br>§ | |
| v. | §<br>§ | 134TH JUDICIAL DISTRICT |
| | §<br>§ | |
| JOHN/JANE DOES 1-10,<br>Defendants. | §<br>§ | DALLAS COUNTY, TEXAS |

## SUPPLEMENT TO PLAINTIFF'S MOTION TO COMPEL DEPOSITION TESTIMONY FROM WITNESS RYAN REYNOLDS

Plaintiff Brandon McCarthy ("Plaintiff") serves this Supplement to Plaintiff's Motion to Compel Deposition Testimony from Ryan Reynolds and would respectfully show the Court the following:

1.      On November 20, 2017, Plaintiff filed his Motion to Compel Deposition Testimony from Ryan Reynolds concerning various questions that witness Ryan Reynolds refused to answer at his deposition due to baseless assertions of privilege made by his attorney David Bell. At the time of the filing of that deposition, only the rough draft of the deposition transcript was available. Plaintiff stated in that Motion he would supplement with the certified transcript once available.

2.      The Court reporter provided the certified transcript on November 22, 2017. Plaintiff is therefore supplementing his Motion with that certified copy.

3.      With this Supplement, Plaintiff hereby supplements his Motion to Compel with the certified transcript of Mr. Reynold's deposition attached hereto as Exhibit 1 and it is incorporated by reference.

Respectfully submitted,

JAMES S. BELL, P.C.
2808 Cole Avenue
Dallas, Texas 75204
Tel: (214) 668-9000

By:/s/ *James S. Bell*
    James S. Bell
    State Bar No. 24049314
    james@jamesbellpc.com
    Attorney for Petitioner

## Certificate of Service

I hereby certify that a true and correct copy of this document was served on all counsel of record in compliance with the Texas Rules of Civil Procedure.

By:/s/ *James S. Bell*
    James S. Bell

NO. DC-17-13448

BRANDON MCCARTHY ) IN THE DISTRICT COURT
)
VS. ) 134TH JUDICIAL DISTRICT
)
)
JOHN/JANE DOES 1-10 ) DALLAS COUNTY, TEXAS

* * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF

RYAN REYNOLDS

NOVEMBER 10, 2017

Volume No. 1

* * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION of RYAN REYNOLDS, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 10th of November, 2017, from 10:12 a.m. to 2:51 p.m., before Sherry Folchert, CSR, in and for the State of Texas, reported by machine shorthand, at the offices of David Bell, 8350 Meadow Road, Suite 186, Dallas, Texas, pursuant to the Texas Rules of Civil Procedure.

CERTIFIED
TRANSCRIPT

hg

EXHIBIT 1

A P P E A R A N C E S

FOR THE PLAINTIFF:

James S. Bell
JAMES S. BELL, P.C.
2808 Cole Avenue
Dallas, Texas  75204
214-668-9000

FOR THE WITNESS:

David Bell
DAVID BELL, P.C.
8350 Meadow Road, Suite 186
Dallas, Texas  75231
214-368-3191

ALSO PRESENT:

Brandon McCarthy
Kelley Cash
Matt Segedy

EXHIBIT 1

INDEX

| | PAGE |
|---|---|
| Appearances . . . . . . . . . . . . . . . . . . . | 2 |
| Stipulations. . . . . . . . . . . . . . . . . . . | 4 |
| RYAN REYNOLDS<br>   Examination by Mr. James S. Bell . . . . . . . . | 5 |
| Signature and Changes . . . . . . . . . . . . . . | 161 |
| Reporter's Certificate. . . . . . . . . . . . . . | 163 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Fifth Amendment Invocation | 79 |

CERTIFIED QUESTIONS

| 1 | When did David Bell become your lawyer? | 7/7 |
|---|---|---|
| 2 | When did you retain Mr. Bell for services? | 7/12 |
| 3 | So you're going to refuse to answer my question about when you retained Mr. Bell to become your lawyer? | 7/20 |
| 4 | Are you going to refuse to answer my question about when you retained Mr. Bell as your lawyer? | 8/1 |
| 5 | Sir, are you going to refuse to answer my question about when you retained Mr. Bell to become your lawyer? | 8/7 |
| 6 | You're going to refuse to answer my question about when Mr. Bell became your lawyer. | 9/1 |

hg

EXHIBIT 1

AGREEMENTS

It is hereby agreed by and between the parties hereto, through their attorneys appearing herein, that any and all objections to any question or answer herein, except as to the form of the question and responsiveness of the answer, may be made upon the offering of this deposition in evidence upon the trial of this cause with the same force and effect as though the witness were present in person and testifying from the witness stand.

It is further agreed by and between the parties hereto, through their attorneys appearing herein, that this deposition may be signed before any notary public in and for the State of Texas, but if the original deposition has not been signed by the witness and returned by the time of the trial or any hearing in the case, the unsigned original or a copy thereof may be returned into Court and used with the same force and effect as though all requirements of the rules and statutes with reference to signature and return had been fully complied with.



EXHIBIT 1

P R O C E E D I N G S

RYAN REYNOLDS,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BELL:

Q. Sir, will you introduce yourself to the folks on the jury, as well as the Court?

MR. DAVID BELL: Excuse me, Counsel. First identify yourself and everybody that you've brought with you today.

MR. JAMES BELL: My name is James Bell. I have my client here and two folks that work for me. Matt Segedy and Kelley Cash.

MR. DAVID BELL: And your client is who?

MR. JAMES BELL: Brandon McCarthy.

MR. DAVID BELL: Okay. And Matt Segedy works for you, I believe, as of today, correct?

MR. JAMES BELL: I'm not here to answer your questions. I'm telling you he works for me.

MR. DAVID BELL: Well, I'm going to exclude -- ask that he be excluded because he's -- I anticipate he's going to be a witness in these proceedings. So if you insist on him staying here, I'm not waiving that objection. Just placing you on notice that we'll move to strike your use of this deposition if

he stays in this deposition.

Q. (BY MR. JAMES BELL) Sir, can you state your name for the -- strike that.

Can you introduce yourself to the folks on the jury as well as the Court?

MR. DAVID BELL: Let the record show that you refuse to acknowledge my comment or to respond to my comment. Please proceed at your own risk and peril.

THE WITNESS: My name is Ryan Reynolds.

Q. (BY MR. JAMES BELL) Okay. And, Mr. Reynolds, you're a convicted felon, true?

A. I am.

Q. And have you had your deposition taken before?

A. Yes.

Q. How many times?

A. I don't remember.

Q. Approximately how many times?

A. I don't remember.

Q. Is it more than once?

A. Yes.

Q. More than five times?

A. I don't recall.

Q. You don't recall whether or not you've been deposed more than five times?

A. I do not.

Q. Okay. And you were served with a subpoena to appear for your deposition last Wednesday, correct?

A. Yes.

Q. You did not appear, correct?

A. Let me see when that was exactly. No, I was not at that deposition.

Q. Okay. When did David Bell become your lawyer?

MR. DAVID BELL: Object. I'm not going to allow you to answer any questions about my representation of you.

Q. (BY MR. JAMES BELL) Sir, I'm not asking you to get in communications with your lawyer. When did you retain Mr. Bell for services?

MR. DAVID BELL: I'm not going to allow him to answer any question that might invade the attorney/client privilege.

Q. (BY MR. JAMES BELL) So you're going to refuse to answer --

A. On the advice on my counsel.

Q. So you're going to refuse to answer my question about when you retained Mr. Bell to become your lawyer?

A. I'm going to object on the advice of my counsel.

Q. (BY MR. JAMES BELL) Are you going to refuse --

MR. JAMES BELL: Objection; nonresponsive.

hg

EXHIBIT 1

Q.  (BY MR. JAMES BELL)  Are you going to refuse to answer my question about when you retained Mr. Bell as your lawyer?

MR. DAVID BELL:  Counsel, you're asking for a legal conclusion.  I'm not going to allow my client to answer that question.

Q.  (BY MR. JAMES BELL)  Sir, are you going to refuse to answer my question about when you retained Mr. Bell to become your lawyer?

MR. DAVID BELL:  Again, you're asking for a legal conclusion.  I'm not going to allow him to object (sic).  Objection; form.

MR. JAMES BELL:  So that's an objection form or are you just --

MR. DAVID BELL:  Both.

Q.  (BY MR. JAMES BELL)  So are you going to refuse to answer my question about -- strike that.

When did you first meet Mr. Bell?

MR. DAVID BELL:  I'm not going to allow him to answer questions about me or my representation of him.  So ask any other question you want.  Go ahead.

Q.  (BY MR. JAMES BELL)  So you're going to refuse -- just so that I have --

MR. JAMES BELL:  Make sure you certify these.

EXHIBIT 1

Q. (BY MR. JAMES BELL) You're going to refuse to answer my question about when Mr. Bell became your lawyer. Would that be a true statement?

MR. DAVID BELL: I advise the client not to answer any questions about my representation.

MR. JAMES BELL: I need to get a refusal on the -- on the --

THE WITNESS: I'm going to object on advice of my counsel.

Q. (BY MR. JAMES BELL) I'm not asking you to object. I need to get on the record, just so it's clear, you're going to refuse to answer my question based on the advice of your lawyer. Is that a true statement?

A. Correct.

Q. Okay. And you're going to refuse to answer my question based on the advice of your lawyer of when he became -- Mr. Bell became your lawyer, correct?

A. Correct.

Q. Okay. And you're going to refuse to answer my questions surrounding the circumstances which led to Mr. Bell becoming your lawyer? You're going to refuse to answer that question as well, true?

A. Correct.

Q. Okay.

hg
EXHIBIT 1

MR. DAVID BELL: Before you go further. Let's try not to overtalk each other. And can I make a suggestion, Counsel? Do you mind if we're referred to as James and David? It might make life easier for the reporter?

Q. (BY MR. JAMES BELL) And so you understand what a deposition is, correct?

MR. DAVID BELL: Objection; form. Asks for a legal conclusion.

MR. JAMES BELL: You're only allowed to object to the form. I didn't ask you for the basis.

MR. DAVID BELL: You're asking him for a legal conclusion.

MR. JAMES BELL: That's a form objection. So just object to form. Let's -- let's follow rules.

MR. DAVID BELL: Let's be civil.

MR. JAMES BELL: Yeah, let's.

MR. DAVID BELL: That's part of the Rule.

MR. JAMES BELL: Let's.

MR. DAVID BELL: Please proceed.

Q. (BY MR. JAMES BELL) So you understand what a deposition is, correct?

MR. DAVID BELL: Asks for a legal conclusion. Objection; form.

MR. JAMES BELL: You can still answer.

EXHIBIT 1

THE WITNESS: I believe I do.

Q. (BY MR. JAMES BELL) Okay. And you understand what an oath is, correct?

A. I do.

Q. You're going to tell the truth, the whole truth, and nothing but the truth, correct?

A. Correct.

Q. You understand it's a felony in this state to lie under oath?

A. Correct.

Q. You understand that your testimony is being taken word for word by the court reporter here?

A. I do.

Q. Okay. And you understand that you're going to have an opportunity to review your deposition, correct?

A. Correct.

Q. Now, throughout this deposition, you've already heard it, there's going to be some objections by your lawyer as to form of the question and/or some instructions for you to not answer. Now, if he objects to form of the question, you still got to answer my question. Do you understand that?

A. I do.

Q. Okay. And if he instructs you not to answer, then you don't answer, right?

EXHIBIT 1

A.   Right.

Q.   Now --

MR. DAVID BELL:  Let -- let me say one thing before you get started.  I've instructed the client not to answer and I'm not going to allow him to -- as you can see -- answer any questions about his communication with any lawyers.  I'm not going to allow him to testify regarding any privilege shared with any lawyers.  And I'm not going to allow him to testify about any matters not set out in the lawsuit you filed. I just want to be clear on that.

Q.   (BY MR. JAMES BELL)  And you understand the difference between direct knowledge and indirect knowledge, correct?  Direct knowledge is something that you can see, touch, smell, you see for yourself, correct?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  Can you repeat that?

Q.   (BY MR. JAMES BELL)  Sure.  You would agree direct -- there's a difference between direct knowledge and indirect knowledge?  Direct knowledge is something you can see, hear, smell, touch yourself, right?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I do.

Q.   (BY MR. JAMES BELL)  Okay.  And indirect



EXHIBIT 1

knowledge is what some -- something or somebody may tell you, correct?

A. Correct.

Q. Okay. And you understand the difference between a question that calls for yes-or-no answer versus one that calls for a narrative, right?

MR. DAVID BELL: Objection; form.

THE WITNESS: I do.

Q. (BY MR. JAMES BELL) Okay. When did you meet Brandon McCarthy?

A. I met him in a restaurant. I'm kind of bad with dates, but I would say five, six years ago.

Q. Do you know when you met Brandon McCarthy?

A. The exact date?

Q. Do you know what year you met Brandon McCarthy?

A. I really don't remember. It was '09 or '10.

Q. Did you meet Brandon while he was still an Assistant United States attorney?

A. I believe, yes.

Q. Okay. And how many times have you had in-person meetings with Brandon McCarthy?

MR. DAVID BELL: Objection; form.

THE WITNESS: By -- you mean where we were both physically present at those meetings? Is that what you mean by that?

Q. (BY MR. JAMES BELL) My question is: How many times have you been in the physical presence of Brandon McCarthy?

A. Many times.

Q. How many?

A. Four or five.

Q. Okay. So the first meeting you had with Brandon McCarthy was in either 2009 or 2010?

A. Well, it wasn't a meeting. I just -- that's when I met him.

Q. Okay. How many meetings have you had with Brandon McCarthy?

A. I believe two.

Q. When was the first meeting with Brandon McCarthy?

A. It was at K&L Gates.

Q. How long did that meeting last?

A. Approximately an hour maybe.

Q. Okay. And when was the first meeting -- strike that.

When did the first meeting at K&L Gates take place?

A. I don't remember the date, but it was right when -- it was pretty close to when he had started there.

Q. Okay. When was your second and final meeting with Brandon McCarthy?

MR. DAVID BELL: Objection; form.

THE WITNESS: It was at a hotel downtown with my -- with a friend of mine. And there was another gentleman there. I forget the name of the hotel.

MR. DAVID BELL: Just asked you when, I believe.

THE WITNESS: When, probably within -- within three or four months of the original meeting, the first one.

Q. (BY MR. JAMES BELL) Would you say around December 2015?

MR. DAVID BELL: Objection; form.

THE WITNESS: I don't know.

Q. (BY MR. JAMES BELL) Okay. And so you had two meetings with Brandon McCarthy. Just so the record is clear. One at K&L Gates and one at a hotel downtown. Would that be a true statement?

A. Yes.

Q. Okay. No other meetings that you can think of as you sit here right now?

A. Not that I can recall at this moment.

Q. And how long did the second meeting last?

A. Maybe an hour, hour and a half.

Q. Okay. And at the second meeting you had brought your friend, Ms. Sanchez; is that true?

A. No.

Q. What was the name of the friend that you brought to the meeting?

A. Her first name is Brooke.

Q. What's her last name?

A. I don't recall.

Q. You -- so she's -- she's a friend of yours, but you don't recall her last name?

A. Well, there were four people there, total. I can't recall her last name right now.

Q. So you can't recall the name of the -- the last name of the friend that you brought to the meeting at the hotel; is that true?

MR. DAVID BELL: Objection; form.

THE WITNESS: I didn't know her very well. I mean I had just gotten to know her and -- and we met Brandon and another guy that was friends with Brandon, another attorney. But I don't recall, no.

Q. (BY MR. JAMES BELL) Okay. And at the second meeting you were there to discuss business involving Protect My ID?

A. Yeah, I think it's protectmyid.org.

Q. And so you --

EXHIBIT 1

MR. JAMES BELL: What is it?

MR. McCARTHY: It's Keep My ID.

Q. (BY MR. JAMES BELL) And at the second meeting you talked about keepmyid.com and potentially doing a commercial or some social media for keepmyid.com; is that true?

A. It's keepmyid.org. But we discussed, you know, different marketing -- you know, how to market the business and how to get it out there and, you know, kind of like LifeLock does. But yes, pretty much marketing type stuff.

Q. So the purpose of the second meeting was to market -- discuss marketing and get out the business of keepmyid.org, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yeah, for the most part. I mean that was the -- that was the reason for the meeting, correct.

Q. (BY MR. JAMES BELL) Okay. Can you -- do you remember anything else being discussed at that meeting, at the second meeting?

A. Nothing that's relevant. Just, you know, what people talk about when they're having a drink or whatever. Just -- but, you know, nothing -- no other kind of business or anything.

Q. Okay. As you -- as you sit here right now, can you recall anything else you talked to Brandon McCarthy about at the second meeting at the hotel downtown --

A. No.

Q. -- where you --

Okay. Now, with respect the first meeting at K&L Gates that lasted approximately one hour, is that what you testified to?

A. Yes.

Q. Okay. You talked about a business you start -- started, White Collar Advisors; is that true?

MR. DAVID BELL: Objection; form.

THE WITNESS: We might have. But we talked about other things. That wasn't the point of the meeting.

Q. (BY MR. JAMES BELL) Did you discuss White Collar Advisors?

A. I mean I may have with him, I don't -- I don't remember that.

Q. Okay.

MR. DAVID BELL: Just tell him what you remember. Don't tell him what you may have remembered, please.

THE WITNESS: So can you repeat that?

Q. (BY MR. JAMES BELL) Sure. What all did you

say to Brandon at the first meeting at K&L Gates, the first meeting you had with him?

A. Well, it was Gus Kepler and myself and we talked about possibly doing a Qui Tam case against Dustin Rall and Scott Schuster and however many companies they have.

Q. And you discussed that with Brandon?

A. Yes.

Q. Okay. And what would be the basis for the alleged Qui Tam case?

A. Possible criminal acts that -- that they were, I guess, doing or conspiring to do.

Q. And you didn't have any personal knowledge of that, correct?

A. Of what?

Q. Of any criminal acts that Scott Schuster and Dustin Rall were doing, true?

A. No, I didn't.

MR. DAVID BELL: Counsel, can we go off the record for a second?

MR. JAMES BELL: No.

MR. DAVID BELL: Okay. So on the record, I understand that represent Mr. Schuster and I'm perplexed as to why you would you ask questions about Mr. Schuster, if you do represent Mr. Schuster. I'd rather

EXHIBIT 1

have this discussion with you off the record.

Q. (BY MR. JAMES BELL) So just -- so just so that I'm aware, you -- you right now are on supervised release. Would that be a true statement?

A. Correct.

Q. Okay. And part of your supervised release standards are that you're not allowed to associate with persons engaged in criminal activity, correct?

A. Correct.

Q. And you're not allowed to associate with folks convicted of a felony, correct?

A. Correct.

Q. And you're not allowed to enter into any agreements to act as an informer or special agent of a law enforcement agency, correct?

A. Without permission, I'm not.

Q. That's right. Okay.

MR. DAVID BELL: Let me -- let me -- let interject an objection here. I told you earlier that I'm not going to allow the witness to testify about any matters that aren't set out in your pleadings and I don't see where any of these matters that you're asking him for comments about, his criminal conviction or anything else, are anywhere supported by anything in your pleadings.

MR. JAMES BELL: Okay.

Q. (BY MR. JAMES BELL) Have you ever gotten special permission to act as an informer for the -- the government?

MR. DAVID BELL: Objection. I'm not going to allow him to testify about any matter that impedes the attorney/client privilege. I'm not going to let him testify about any meetings he had with any lawyer.

Q. (BY MR. JAMES BELL) Are you going to refuse to answer that question?

A. Yes.

MR. DAVID BELL: And any other question similar to the --

Q. (BY MR. JAMES BELL) Do you -- do you understand what defamation is?

MR. DAVID BELL: Objection. Calls for a legal conclusion. Objection; form.

THE WITNESS: Defamation, no.

Q. (BY MR. JAMES BELL) What is your understanding of defamation?

A. I don't have an understanding.

Q. Okay. Have you ever made any false statements about Brandon McCarthy?

A. No.

Q. Okay. Do you have any direct evidence or

EXHIBIT 1

knowledge, or facts that Brandon McCarthy has committed any illegal conduct?

A. No.

Q. Do you have any direct evidence, knowledge, or facts to support the position that Brandon McCarthy has engaged in unethical conduct?

MR. DAVID BELL: Calls for a legal conclusion. Objection; form.

THE WITNESS: Meaning from myself personally or people that I've spoken to on the phone or --

Q. (BY MR. JAMES BELL) I'm talking about direct knowledge, sir.

A. From -- from a person that I know that called me and told me what --

Q. I'm not asking you what a person called and told. Remember we talked about direct knowledge versus indirect?

A. Well, I don't have any direct knowledge, no. Personally.

Q. I'm talking about what your personal knowledge is. Okay. And that way we can keep -- we probably can shorten this deposition a bunch. Is that fair?

A. Yeah. That's cool.

Q. All right. That way maybe you can get out of

here and your lawyer can get out of here.

So you don't have any direct evidence that Brandon McCarthy engaged any wrongful conduct, true?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Well, maybe I asked you a double negative. It would be a true statement to say that you don't have any direct knowledge that Brandon McCarthy engaged in any unlawful conduct. That would be a true statement, correct?

MR. DAVID BELL: Calls for a legal conclusion. Objection; form.

Q. (BY MR. JAMES BELL) Correct?

A. That would be correct.

Q. You don't have any direct knowledge or evidence that Brandon McCarthy engaged in any unethical conduct, correct?

MR. DAVID BELL: Calls for a legal conclusion. Objection; form.

Q. (BY MR. JAMES BELL) Correct?

A. Give me a second to think. No, I don't.

Q. You don't have any direct knowledge or facts to suggest that Brandon McCarthy engaged in any -- strike that.

**EXHIBIT 1**

You don't have any direct knowledge or evidence that Brandon McCarthy breached any duties to anybody, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: I do not.

Q. (BY MR. JAMES BELL) You don't have any direct evidence or knowledge to suggest that Brandon McCarthy defamed anybody, correct?

MR. DAVID BELL: Objection; form. Calls for a legal conclusion.

THE WITNESS: That's correct.

Q. (BY MR. JAMES BELL) You don't have any direct knowledge that Brandon McCarthy wasn't faithful to any of his clients, correct?

MR. DAVID BELL: Objection; calls for a legal conclusion. Form.

THE WITNESS: I do not.

Q. (BY MR. JAMES BELL) You don't have direct knowledge that Brandon McCarthy harmed any of his clients, correct?

A. I do not.

Q. You don't have direct evidence or knowledge that Brandon McCarthy was deceptive towards any of his clients, correct?

MR. DAVID BELL: Objection; calls for a

legal conclusion. Objection; form.

THE WITNESS: I do not.

Q. (BY MR. JAMES BELL) You don't have direct knowledge that Brandon McCarthy cheated any of his clients, correct?

MR. DAVID BELL: Calls for a legal conclusion. Objection; form.

THE WITNESS: No.

MR. JAMES BELL: Do you want a running objection?

MR. DAVID BELL: No, I prefer to do it this way. Thank you.

Q. (BY MR. JAMES BELL) You don't have any direct evidence or knowledge that Brandon McCarthy defrauded anybody, including any of his clients, correct?

MR. DAVID BELL: Objection; form. Calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have direct knowledge that Brandon McCarthy betrayed any of his clients or anybody, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any

knowledge -- strike that.

You don't have any direct knowledge or evidence or facts to suggest that Brandon McCarthy wasn't loyal to anybody or any of clients, correct?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have direct knowledge that -- that or evidence that Brandon McCarthy didn't act with the utmost good faith towards any of his clients, correct?

MR. DAVID BELL: Objection; form. Calls for a legal conclusion. Objection.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct knowledge and direct evidence that Brandon McCarthy didn't act with candor towards any of his clients, correct?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy engaged in any self-dealing of any kind towards any of his clients or anybody, correct?

MR. DAVID BELL: Objection; form. Calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct knowledge that Brandon McCarthy didn't act with integrity of the strictest kind towards any of -- any of his clients or anybody, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy wasn't fair to any of his clients, correct?

A. Correct.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy didn't act with the utmost honesty in dealing with his clients or anybody else, correct?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy didn't fully disclose all of the facts to all of his clients or to anybody else,

EXHIBIT 1

correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence or knowledge or facts to suggest that Brandon McCarthy didn't act with fidelity towards his clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that -- or facts to suggest that Brandon McCarthy didn't act with care when he dealt with his clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence or facts to suggest that Brandon McCarthy wasn't fair and equitable in his dealings with any of his clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

hg
EXHIBIT 1

Q.   (BY MR. JAMES BELL)   You don't have any direct evidence -- strike that.

You don't have any direct evidence -- strike that.

You don't have any direct evidence or knowledge to suggest that Brandon McCarthy made any misrepresentations to any of his clients or anybody else, correct?

MR. DAVID BELL:  Objection; form. Objection; calls for a legal conclusion.

THE WITNESS:  Correct.

Q.   (BY MR. JAMES BELL)   You don't have any direct evidence that Brandon McCarthy engaged in any type of fraud, correct?

MR. DAVID BELL:  Objection; form. Objection; calls for a legal conclusion.

THE WITNESS:  Correct.

Q.   (BY MR. JAMES BELL)   You don't have any direct evidence that Brandon McCarthy breached any fiduciary duties to any of his clients or anybody else, correct?

MR. DAVID BELL:  Objection; form. Objection; calls for legal conclusion.

THE WITNESS:  Correct.

Q.   (BY MR. JAMES BELL)   You don't have any direct evidence that Brandon McCarthy damaged any of his

clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy acted with any ill will towards of any of his clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence or knowledge to suggest that Brandon McCarthy acted with any evil motive towards any of his clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy acted with any kind of malice towards any of his clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct

evidence or knowledge of any crimes Brandon McCarthy may have allegedly committed, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy was negligent in any way towards any of his clients or anybody else, correct?

A. Correct.

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

Q. (BY MR. JAMES BELL) You don't have any direct knowledge or evidence to suggest that Brandon McCarthy was grossly negligent towards any of his clients or anybody else, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy interfered with any contractual relationships with any of his clients or anybody else or any entities. That would be a true statement, correct?

MR. DAVID BELL: Objection; form. Calls for a legal conclusion. Objection.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy willfully committed any wrongful conduct, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) So can we -- is your basic understanding of the word "defamation" it's a -- it's a statement, whether written or oral, that tends to damage somebody's reputation. Would -- would you agree with that?

A. I would in the sense that if it's a lie, correct.

Q. If it wasn't -- oh, I see. I see what you're saying. Okay. Fair enough.

So it would be fair to say that you and I can have an agreement that when we use the word "defamation," it's -- it's a statement made by somebody that causes harm to one's reputation, but -- but it's not defamation it's if the truth?

A. That's my understanding.

MR. DAVID BELL: And I'm going to continue to object that you're asking him to give a legal opinion he's not qualified to make.

Q. (BY MR. JAMES BELL) Without giving a legal opinion, what is your understanding --

MR. DAVID BELL: So I'm objecting to your question as to form.

MR. JAMES BELL: What is your understanding of defamation based on our discussions and -- and your living in the world for -- I don't know how many years. Thirty-three years, 34 years.

THE WITNESS: I wish.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) You're what?

A. Forty-six.

Q. Wow.

MR. DAVID BELL: How many did you say?

MR. JAMES BELL: I thought he was 33.

THE WITNESS: Appreciate that. My -- yeah, my definition -- my definition would be, you know, to say something about somebody that wasn't true.

Q. (BY MR. JAMES BELL) And harms their reputation?

MR. DAVID BELL: Objection; form. Asks for a legal conclusion.

Q. (BY MR. JAMES BELL) Or just saying a lie about somebody?

A. Yeah. If -- if somebody says that -- you know,

EXHIBIT 1

that Joe murdered somebody at the 7-Eleven last night and he really didn't and they print it in the paper and -- and it was a lie, that to me is defamation. But yeah.

Q. Okay. Are you aware of any defamatory statements that Brandon McCarthy has made?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) You don't have any direct evidence of any misrepresentations Brandon McCarthy made to anybody or any clients, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) Do you have any direct evidence or knowledge that Brandon McCarthy breached any contract towards any clients, anybody or any entity?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Have you ever had Brandon McCarthy followed?

A. No.

Q. Have you ever had a private investigator on Brandon McCarthy?

A.   Absolutely not.

Q.   Are you aware of anybody that's had a private investigator on Brandon McCarthy?

MR. DAVID BELL:   Objection to form.

THE WITNESS:   No.

MR. JAMES BELL:   Were you going to object and instruct not to answer that?

MR. DAVID BELL:   No.   Just --

MR. JAMES BELL:   Okay.

MR. DAVID BELL:   You just don't have any time in your question.   You're asking all these questions about what happened since the beginning of time so I've had to object as to form.

Q.   (BY MR. JAMES BELL)   So you're not aware of any private investigators that have investigated Brandon McCarthy?

A.   Private investigators?   You mean like that are privately hired in the public?

Q.   Sure.

A.   No.

Q.   Are you aware of any other kind of investigators?

A.   Personally aware?

Q.   Yes.

A.   No.

EXHIBIT 1

Q. Okay. So you're not -- you're not aware of -- okay. Are you -- so it would be fair to say that you've never hired a private investigator to follow Brandon McCarthy. That would be true?

A. Absolutely not. That's true. Absolutely true. I've never hired anybody to do anything to Brandon whatsoever.

Q. Okay. And do you wish ill will on Brandon?

A. No.

Q. Have -- are you aware of anybody that has hired a private investigator on or did -- or somebody to investigate Brandon McCarthy?

A. I am not.

Q. Okay. Do you have secondhand knowledge of anybody privately investigating Brandon McCarthy or publicly investigating Brandon McCarthy?

MR. DAVID BELL: Objection; form.

THE WITNESS: I mean I had an incident at a restaurant where two guys walked up to me and told me that -- I was sitting there eating at Hillstone and this guy put his hand on my shoulder and I kind of looked around -- because it was kind of intimidating, you know, he was real close to me and I looked like that (indicating) and he said -- he said, Ryan, what's going on? And I didn't know this guy. But I didn't want to

be rude because I thought maybe I do, you know, and he said I want you to know that Brandon McCarthy has a connect at the IRS and this connect's going to get a guy and they're going to investigate you. And -- and he said don't worry, his own people are going to get him. Don't worry about it. And walked off. And there was another guy standing by the door and they both walked off together (indicating). That's the only thing. It was very strange.

Q. Did you get that person's name?

A. No.

Q. Okay. So -- just so that I understand the facts. Somebody approached you in Hillstone restaurant and said to you that Brandon McCarthy was having you investigated? That's --

A. They -- they -- specifically they said Brandon McCarthy has a friend at the IRS, the friend won't be doing the investigation, they're going to pass it to another person and they're going to try to get you fucked off. And he said don't worry about it because Brandon's own people are going to get him and he walked off. And I found -- I didn't know if he was trying to intimidate me or if he was -- it was a very bizarre conversation.

Because by the time I looked back to ask



EXHIBIT 1

who he was or figure it out, he was gone. And there was another guy standing by the door and they both walked out together.

Q. Okay. So are you -- are you aware of Brandon McCarthy trying to investigate you?

MR. DAVID BELL: Objection; form.

THE WITNESS: I mean I've heard from numerous people that --

Q. (BY MR. JAMES BELL) Let me say it a different way.

A. Okay.

Q. Do you have any personal knowledge that Brandon McCarthy is investigating you?

A. No.

Q. But you've heard from secondary sources that Brandon McCarthy has -- is trying to investigate you or is investigating you?

A. Yes.

Q. Who told you that?

A. A friend of mine named Carl Fleming called me and said, hey, man, do you know Rob Castle and I said no. And he said, well, he's my attorney. And he said he called me the other day and he was freaking out. And I said okay. And he said, man, I need you to meet me at this restaurant. I got to talk to you about Ryan

Reynolds and Carl is like, man, can we do it another time. He's like no, it's important. Right now.

So Carl said that he went down and met whoever Rob Castle is and said he -- he seemed nervous and seemed like this, you know, and he said, hey, man, what's Ryan doing? We need some shit on him. We're going to get him -- we're going to get him in trouble. You know, give me some dirt on him. What's he doing now? And Carl is like I have no idea.

And so I guess Rob worked -- I guess the way I understood it was Rob was Carl's attorney and then Carl said, well, can you help me with this matter -- because I guess it was -- Rob wanted to talk about me and he wanted to talk about some pending thing he had going on. And Rob said, man, no, I'm -- you're -- you're fired. I'm not your attorney anymore. And he goes, man, I just wanted to call you because that was one of the weirdest things that -- that I've ever had happen to me. And I say, man, I don't know. I don't know Rob Castle, you know. So he goes do you know what it and I -- and I told Carl, I said no.

Q. Are you -- strike that.

Do you have any direct evidence that Brandon McCarthy failed to disclose any material information or any information of any kind to any

EXHIBIT 1

clients or anybody else?

MR. DAVID BELL: Objection; form. Objection; asks for a legal conclusion.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Have you ever said that Brandon McCarthy was a liar?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Have you ever said that Brandon McCarthy has engaged in any unethical conduct?

MR. DAVID BELL: Objection; form. Calls -- no predicate. Calls for a legal conclusion.

MR. JAMES BELL: Let me ask it a different way.

Q. (BY MR. JAMES BELL) Based on the fact that you have no personal knowledge that Brandon McCarthy engaged any unethical conduct, did you ever tell anybody that Brandon McCarthy engaged in any unethical conduct?

MR. DAVID BELL: Objection; form.

THE WITNESS: I mean I've heard, you know, what --

MR. JAMES BELL: Answer my question, please.

THE WITNESS: I don't know. I don't remember. I mean maybe when these people have come to

me. I mean that's not the only story that I just told you about Castle. There's many more. So what I'm saying is is I don't know if somebody comes to you and says, hey, man, Brandon has got this hookup at the IRS and be careful. You know, we heard this at a party from these other IRS agents that he's going to get you -- you know, try -- try to get you indicted. Could I have said something then? Possibly. Do I remember, no.

Q. (BY MR. JAMES BELL) Okay. So just so I understand -- and maybe the deposition will be a lot shorter than I thought.

MR. JAMES BELL: I'll object to my side-bar. Do you want to sustain it?

MR. DAVID BELL: I don't have that power. I would like to though. Thank you though.

MR. JAMES BELL: And I'll stipulate to -- if you object to my side-bar.

Q. (BY MR. JAMES BELL) So would you agree with me, sir, that based on the fact -- strike that.

Based on the fact that you don't have any personal knowledge or evidence that Brandon McCarthy engaged in any unethical or illegal conduct, you don't recall ever saying that he engaged in any illegal or unethical conduct. Would that be a fair statement?

MR. DAVID BELL: Objection; form.

Objection; calls for a legal conclusion.

THE WITNESS: I don't know. I don't know if I ever said, you know, maybe to all these people that have been telling me these stories, I said, well -- well, I did to -- to Nathan Halsey.

Q. (BY MR. JAMES BELL) What did you -- what did you say to Nathan Halsey?

A. Well, Nathan Halsey told me that Brandon sent him to the FBI and had him wired up. I said, man, you better be careful.

Q. Okay.

A. I said you can't -- I -- I don't know if Brandon did that or not. I'm not saying that he did. I'm telling you what I heard secondhand. And I may have said that's -- that -- you know, I may have said -- I don't know if I've ever said anything -- I may have said that's not right or whatever. But to be honest with you, I always like Brandon as a person. You know, I mean I never -- I think he's a nice guy, you know. And so this -- you know, when this whole thing got rolling, whatever has been going on and -- and that thing, it just seems to get crazier and crazier. And, you know, I didn't -- you know -- but I don't know -- I don't recall ever saying anything like, you know, Brandon's a crook, criminal or anything like that. But I'm not saying I

haven't said, well, I -- I mean that's -- if that's true, that's not good. But never anything that I recall.

MR. JAMES BELL: Sorry. I got to object as nonresponsive, but I appreciate your answer.

Q. (BY MR. JAMES BELL) Let me just -- so that I'm clear -- I can break this down. You've always liked Brandon McCarthy, true?

A. I have.

Q. You always thought that Brandon McCarthy was a nice guy irrespective of what you've heard from other folks, at least based on your personal dealings with him, correct?

A. Yes.

Q. And as you sit here right now, you don't recall ever saying to somebody that Brandon committed any criminal acts, correct?

A. No.

Q. I may have -- I'm wrong or did I ask a bad question --

A. No.

Q. -- a double negative. It could have been my fault. And I apologize.

A. Say it one more time.

Q. Sure. You don't -- as you sit here right now,

you don't recall ever saying that Brandon engaged in any criminal conduct, saying that to anybody?

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Correct?

A. I have -- no, I -- correct. You're correct.

Q. (BY MR. JAMES BELL) Okay. As you sit here right now, you don't recall ever telling anybody that Brandon has engaged in any unethical conduct based on your personal knowledge, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Not on my personal conduct, but I -- but I --

Q. (BY MR. JAMES BELL) Personal knowledge?

A. Well, just maybe secondhand knowledge. I said, well, if that's true, I know that you're -- you can't do that, you know, but not -- but I don't know from my personal knowledge that Brandon was doing that. I'm saying what these people told me -- if somebody said, well, Brandon did this or, you know, he knows this person at the IRS and he's trying to get you indicted, I said you can't -- you can't do that.

And -- but I -- but I don't know personally that Brandon has done this or -- but secondhand I may have said that -- that you can't do that. But I've

never said that he's a crook or I think that he's -- firsthand knowledge, I don't -- I don't know.

Q. You just said that if -- if whatever the second or thirdhand people are saying to you is true, that whatever they said would be messed up?

A. Right. And -- and I don't know that they are true. But I just said if they -- if that scenario is correct, then that's not right.

Q. Did you ever think about picking up the phone and calling Brandon?

A. Well, not at that point because I felt like, you know, I kind of felt like he was out to get me. So I didn't want to -- you know, I just felt like I -- I didn't think that would be smart because I feel like he didn't like me or was mad at me for something he perceived that I did. So no, I didn't.

Q. What made you think that Brandon was out to get you?

A. Well, mainly this -- you know, this supposed IRS person that -- that Brandon was personal friends with, supposedly was -- and I don't know this. This is secondhand knowledge, but I heard -- I've heard this, you know, more than once.

Q. Who did you hear it from?

A. I've heard it from two attorneys.

MR. DAVID BELL: Don't tell anything that you've heard from any attorneys, please.

THE WITNESS: Okay. And let me think for a second. And just that strange conversation that I had at Hillstone with those -- with that guy.

Q. (BY MR. JAMES BELL) List for me all your attorneys since 2015.

MR. DAVID BELL: Objection. I'm not going to let him answer any questions about who his attorneys are or were.

Q. (BY MR. JAMES BELL) You're going to refuse to answer my question regarding who your attorneys have been since 2015?

A. Based on advice of my counsel, yes.

Q. Okay. Who drafted your motion for protective order?

A. Mr. Bell (indicating).

Q. There were two motions filed; one by Mr. Bell and one you filed pro se, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct. But -- well, he wrote it.

Q. (BY MR. JAMES BELL) So it's your sworn testimony that Mr. Bell wrote the motion for protective order that you signed pro se?

EXHIBIT 1

MR. DAVID BELL: I'm not going to allow him to answer any questions about his attorney/client relationship.

Q. (BY MR. JAMES BELL) So you're going to refuse to answer my question about who drafted your motion for protective order that you filed in this case?

A. Yes.

Q. And you're going to refuse to answer my question when you first met with Mr. Bell?

A. Yes.

Q. Did any other attorneys, other than Mr. Bell, have anything to do with the motion for protective order that you filed in this case?

MR. DAVID BELL: I'm not going to allow him to answer any questions about any relationship, meeting, or anything to do with any attorney.

Q. (BY MR. JAMES BELL) Sir, are you going to refuse to answer my question whether or not any other attorneys helped you draft the motion for protective order that you filed in this case prior to the motion that Mr. David Bell affixed his signature to?

A. To --

MR. DAVID BELL: I'm not going to allow him to testify -- I'm sorry for interrupting.

MR. JAMES BELL: I just need to get -- let

EXHIBIT 1

me get a refusal from him.

MR. DAVID BELL: I'm not going to allow him to answer any question that relates to any conversation, meeting, with any attorney.

MR. JAMES BELL: I don't want to know the sum and substance of your meetings.

Q. (BY MR. JAMES BELL) The question --

MR. DAVID BELL: James, I'm not --

MR. JAMES BELL: I'm sorry for speaking while you're interrupting me.

MR. DAVID BELL: That's fine. That's fine.

MR. JAMES BELL: Okay.

MR. DAVID BELL: I'm not going to allow him to answer any question dealing with any conversation, meeting, anything to deal with any attorneys he's consulted.

MR. JAMES BELL: Okay.

Q. (BY MR. JAMES BELL) I don't want to know the sum and substance of any meeting, conversation or anything you had with an attorney. What are the names of the attorneys that you have met with?

MR. DAVID BELL: I'm not going to allow him to answer that question for the same reasons, that those are all privileged communications.

MR. JAMES BELL: I'm not asking for the

communications.

MR. DAVID BELL: I know that. He's not going to testify.

MR. JAMES BELL: So even though you know that I'm not asking for the -- the communications, you are still going to instruct the witness not to answer my question?

MR. DAVID BELL: I'll be instructing the witness not to answer any question relating to dealing with, naming, anything to do with any conversation you've had with any attorney, as those conversations are all privileged.

Now, if you can show me some law.

MR. JAMES BELL: You're -- you're missing the boat. I'm not asking --

MR. DAVID BELL: I know that. I know what you're asking. The record is clear what you're asking.

I'm just saying that if you've got some law that suggests that my understanding of the law is contrary to what the law is --

MR. JAMES BELL: It is. But that's -- that's --

MR. DAVID BELL: But I --

MR. JAMES BELL: -- we'll take it up --

MR. DAVID BELL: -- I'd be glad --

EXHIBIT 1

MR. JAMES BELL: We're going to --

MR. DAVID BELL: No problem.

MR. JAMES BELL: We're going to take it up. We'll take it up. We'll take it. That's all.

MR. DAVID BELL: Let me finish. Let me finish. I'll be glad to --

MR. JAMES BELL: I don't want to do the filibuster.

THE REPORTER: I need you to not talk at the same time, please.

MR. DAVID BELL: Yes. Don't talk at the same time.

Go ahead, please.

Q. (BY MR. JAMES BELL) Okay. You're going to refuse to answer my question about whether or not any attorney helped you draft the pro se motion for protective order you filed in this case?

MR. DAVID BELL: I'm --

Q. (BY MR. JAMES BELL) Are you going to refuse to answer that question?

MR. DAVID BELL: I'm --

THE WITNESS: Based on advice -- based on advice of my counsel, yes.

Q. (BY MR. JAMES BELL) Okay. And in that motion for protective order you asked for attorneys' fee,

correct?

A. Correct.

Q. Okay. Whose attorney fees were you attempting to collect when you filed that motion for protective order?

A. Mr. Bell's.

Q. No other attorney?

A. Huh-uh, no.

Q. Even though you filed a motion pro se and asked for attorneys' fees at that point in time, it's your sworn testimony that the attorneys' fee you were asking for when you filed your pro se motion for protective order was the attorney's fee for Mr. Bell. Would that be a true statement?

A. Yes.

MR. DAVID BELL: You've gone almost an hour. In the next 10 or 15 minutes take a short break.

MR. JAMES BELL: Surely. Take five minutes.

(Break taken)

Q. (BY MR. JAMES BELL) Going back to the first meeting with Brandon McCarthy, tell me all the things that you had discussed.

MR. DAVID BELL: Objection; form.

THE WITNESS: Well, we -- what --

Mr. Kepler and I were there and what we were interested in was possibly getting Brandon's help or knowledge on how to get a Qui Tam case going against Ronald Schuster, et cetera. From what I remember, Brandon said he had to do some background checks or, you know, where you have to see if their clients -- you know, run a -- whatever that's called.

Q. (BY MR. JAMES BELL) Brandon said he had to run a conflicts check?

A. Yeah.

Q. Do you remember what other names you gave to them that -- that day in terms of potential Qui Tams?

MR. DAVID BELL: Objection; form.

THE WITNESS: I don't.

Q. (BY MR. JAMES BELL) Do you remember the fact you did give him some additional names? Like a Southwest. Did you talk about Southwest?

Let me ask it a different way.

A. Is Southwest a business or a name?

Q. Do you recall discussing with Brandon McCarthy the names of other businesses where you would like to potentially pursue other Qui Tams?

A. I may have mentioned Donson Brooks. Maybe if you can refresh my memory, I can -- I just don't remember, you know, if -- if -- I mean I may have

EXHIBIT 1

mentioned Donson. He's -- he's a local guy that -- that I know has ripped off millions of dollars in -- you know, I may have mentioned him because the dollar amount. But unless you can refresh my memory, I don't.

Q. Did you discuss ProGen at that meeting?

A. It's possible.

Q. As you sit here right now, you don't recall discussing the name ProGen at that meeting, correct?

A. I mean we discussed -- you know, I know that there's a lot of different names, but I don't recall ProGen.

Q. So as you sit here right now, you don't recall discussing ProGen at that the first meeting with Brando McCarthy?

A. Correct.

Q. You don't recall discussing ProGen with Brandon McCarthy at the second meeting, correct?

A. Correct. I've never discussed ProGen with Brandon McCarthy.

Q. So -- just so the record is clear. You've never discussed ProGen with Brandon McCarthy, true?

A. True.

Q. And you were at the meeting trying to find out how Qui Tams work, correct?

A. Correct.

EXHIBIT 1

Q. And did you have any direct evidence of any wrongdoing by anybody when you went to that first meeting with Brandon McCarthy?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) So when you showed up at the first meeting with Brandon McCarthy, you had no direct evidence, knowledge or facts to suggest that anybody had committed any criminal or wrongful acts, correct?

A. Correct.

Q. And the purpose of the meeting was to give the names of folks that you and Gus potentially thought might be engaging in criminal conduct, but y'all just didn't have any evidence, correct?

MR. DAVID BELL: Objection; form. Objection; calls for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) And so at that meeting you didn't give Brandon McCarthy any evidence of any wrongdoing committed by Schuster, Rall, or anybody else at that meeting, correct?

A. Correct.

Q. You didn't give Brandon McCarthy at that first

meeting, or any meeting for that matter, any evidence of criminal conduct, illegal conduct, unethical conduct, or wrongful conduct of any kind?

MR. DAVID BELL: Objection; form. Calls for a legal conclusion.

THE WITNESS: Correct. Again, correct. None --

Q. (BY MR. JAMES BELL) That --

A. -- none whatsoever. We didn't -- no, correct. You're correct.

Q. We didn't -- you were going to say we didn't have -- you and Gus had no evidence, correct?

A. Correct.

Q. And at that meeting you didn't discuss any -- at that meeting you didn't discuss any facts or -- or evidence about any wrongful conduct any parties that -- that you -- that potentially would have been Qui Tam defendants, correct?

MR. DAVID BELL: Objection; form. Objection asks for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) At that time neither you nor Gus discussed any specifics with Brandon McCarthy about any alleged wrongful conduct by Schuster, Rall or anybody or any other entities that you had brought up at

that meeting, correct?

MR. DAVID BELL: Objection; asks for a legal conclusion.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) And Brandon told you he had to run a conflicts check, correct?

A. Correct.

Q. And before he told you -- he had to run a conflicts check before he could potentially or his firm could potentially take on any case against anybody, correct?

A. Correct.

Q. And you don't have any direct evidence that Brandon McCarthy brought a Qui Tam or helped shop a Qui Tam against Schuster, Rall, or any of those folks, correct?

MR. DAVID BELL: Objection; form. Objection; asks for a legal conclusion.

THE WITNESS: Not -- correct. Not to my knowledge.

Q. (BY MR. JAMES BELL) I want to make sure I got a clear record because I ask double negatives and I apologize.

A. That's all right.

Q. Okay. You don't have any direct evidence,

knowledge, or facts to suggest that Brandon McCarthy shopped any Qui Tams against anybody, including, but not limited to Schuster, Rall Xpress, RXpress, ProGen or anybody, correct?

A.   Correct.

MR. DAVID BELL:   Objection; form.

MR. JAMES BELL:   Pardon me?

THE WITNESS:   Correct.

MR. JAMES BELL:   Just give him --

MR. DAVID BELL:   Give me a little time delay.  One second.

THE WITNESS:   All right.

Q.   (BY MR. JAMES BELL)   Did you or Kepler show McCarthy any presentations at this meeting?

A.   No.

Q.   Did -- have you seen any -- actually, let me back up.  In your objections and motion for protective order you said that you're a witness against Brandon McCarthy in another matter.  What matter are you referring to?  Especially if you don't have any personal knowledge that he did anything wrong, what are you a witness against Brandon McCarthy for?

A.   Well --

Q.   If you don't know, you don't know.

A.   Yeah.  I don't know.

EXHIBIT 1

Q. Okay. So you don't know whether or not you're a witness against Brandon McCarthy. True?

A. I don't, no.

Q. It would be fair to say you don't know whether or not you're a witness against Brandon McCarthy. True?

A. True.

Q. And when you said that, even though you said you were a witness against -- strike that.

Even though you said you're a witness -- strike that.

What did you mean when you said you were a witness against the plaintiff, meaning Brandon McCarthy, in another matter? Or is that just a mistake that you made in the pleading that you signed?

A. Well, I don't know of any -- you know, I don't know of any -- what it potentially would be. But like I said, a lot of it comes down to all of the stuff going on with what I've been hearing about the IR -- I mean I don't know. I guess I -- I don't know. So --

Q. The IRS?

A. Well, I mean as far as what I've been hearing that he's been trying to do to me. But as in a -- as in another case or whatever, I don't know anything -- no, I don't know that I'm a witness in any case against him.

Q. Okay. So you don't have any facts that he's --

well, let -- let me ask you this question.

Are you aware of the IRS investigating Brandon McCarthy?

A. No.

Q. Okay. So are you aware of any case against Brandon McCarthy?

A. No.

Q. Are you aware of any investigation against Brandon McCarthy?

A. Directly?

Q. (Indicates.)

A. No.

Q. Do you have any indirect knowledge about any investigation against Brandon McCarthy, other than what you learned at Hillstone and from that other guy?

A. No. Basically what that guy told me.

Q. So --

A. I don't even know who the guy is. So it's just --

Q. Hearsay?

A. Yeah.

Q. So at -- as it stands right now -- you're not aware of being a witness against Brandon McCarthy any other matter, case, investigation. True?

A. True.

EXHIBIT 1

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy is trying to get you criminally prosecuted, correct?

A. Correct.

Q. Did you consider Brandon McCarthy your friend?

A. Yes.

Q. Do you think -- strike that.

Do you know whether or not Brandon McCarthy has been harmed?

A. I don't know --

MR. DAVID BELL: Calls for a legal conclusion. Objection; form.

THE WITNESS: I don't know because I don't know the facts of everything. Like I said, all I've -- the stuff I heard is all from, you know, Carl Fleming, the guy at Hillstone. Not directly.

Q. (BY MR. JAMES BELL) Well, he's no longer at K&L Gates, right?

A. Right.

Q. Okay.

A. From what I heard.

Q. Okay. And did you have any -- did you -- strike that.

Let me ask you this question.

EXHIBIT 1

Have you had any contact with K&L Gates?

A. Yes.

Q. Okay. And did you -- what did you tell K&L Gates about Brandon McCarthy?

A. What I heard from Nathan Halsey.

Q. And how many times have you met with K&L Gates?

A. I've never met with them. This was on the phone.

Q. Okay. How many times have you had a -- been on a telephone call with K&L Gates?

A. One time (indicating).

Q. Who did you speak to at K&L Gates?

A. I don't even remember.

Q. Who were you with on the phone call?

(Phone rang)

MR. DAVID BELL: I'm sorry.

(Pause in proceedings)

Q. (BY MR. JAMES BELL) Who was with you when you were on the phone call with K&L Gates or did they call you directly?

A. No, it was a set up call and two attorneys were with me.

Q. What are the names of those attorneys?

MR. DAVID BELL: Don't answer any questions about any attorneys that have represented you or given



EXHIBIT 1

you legal advice.

THE WITNESS: On the advice of counsel I'm going to --

Q. (BY MR. JAMES BELL) Are you going to refuse to answer the question about who you were on the call with to K&L Gates regarding K&L Gates' investigation of Brandon McCarthy?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes.

Q. (BY MR. JAMES BELL) What did Nathan Halsey -- strike that.

What did -- what did you tell K&L Gates about what Nathan Halsey told you?

MR. DAVID BELL: Objection; form.

THE WITNESS: Nathan told me that Brandon sent him -- that -- well, what was going on with Nathan was this, was that he had --

MR. DAVID BELL: Just answer his question.

THE WITNESS: Okay.

MR. JAMES BELL: That's all right. You can start wherever you want.

MR. DAVID BELL: Just answer his question.

THE WITNESS: Okay. Repeat that one more time.

Q. (BY MR. JAMES BELL) Sure. What did you tell

K&L Gates -- strike that.

You didn't have any personal knowledge of any wrongdoing to give to K&L Gates, correct?

A. Correct.

Q. And so you discussed what Nathan Halsey allegedly told you about Brandon McCarthy, right?

A. Correct.

Q. Okay. What did Nathan Halsey tell you about Brandon McCarthy?

A. That he sent him to the FBI to meet with an FBI agents -- or agent and that he had been sent out to get information on Schuster, Rall, et cetera. And he said that the third time that he went down there to get the wire -- because they wanted more information -- that the agent -- Nathan was real worried because he said the agent was like we don't need you anymore, we don't have any wires down there. And I said that's not true. They got plenty of wires down there, Nathan.

And he, man, it's just weird because I was giving them all this good information and then all of a sudden they told me to go home. And I said -- I just told him I wouldn't be messing with those people. I said I don't know -- you know, he was concerned about an SEC case that he had and he was concerned about it going criminal. And so, you know, I think he felt like he

needed to do something.

But he told me that -- that Brandon had directed him down there or maybe told him who to go to, I'm not sure. But that's basically what Nathan told me.

Q. It is possible that you could be confused about who Nathan Halsey was getting wired up for? Is that -- let me state it a different way.

Are you aware or not aware that Nathan Halsey was wired up, got a tape recording of Mr. Bob Miller from Trilogy Pharmacy? Are you aware of that?

A. Is he Asian? The -- an Asian guy?

MR. JAMES BELL: If I don't know if he's an Asian or not. Trilogy though.

THE WITNESS: Trilogy. I -- I don't remember exactly, you know, because -- like I said, those -- it all gets kind of convoluted to me. All -- there's so many different companies and people. So...

Q. (BY MR. JAMES BELL) I -- I get that there is and I'm -- here is the deal. I get a chance to take your depo, you're under oath, I just want to --

A. All right. Ask me one more time.

Q. If you don't know, it's cool.

A. Okay.

Q. I don't care and then I'm -- I'm moving on. All right.

Is it possible that Nathan Halsey, when he told you that he got wired up and was talking to the FBI and made a recording, it was for -- it was of a man named Mr. Bob Miller from Trilogy?  Is that possible?

A.  Absolutely.

MR. DAVID BELL:  Objection; form.

MR. JAMES BELL:  What's that?

THE WITNESS:  Absolutely.

MR. DAVID BELL:  Objection; form.

Q.  (BY MR. JAMES BELL)  Okay.  So if that's possible, it's also possible that Nathan didn't tell you that he was wired up for Schuster, RXpress, et cetera, correct?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  Correct.

Q.  (BY MR. JAMES BELL)  Okay.  And so you don't know whether or not Halsey was meeting with FBI regarding the Trilogy case, correct?

A.  Correct.

Q.  You don't have any direct evidence that Halsey was meeting with any law enforcement folks regarding Rall, Schuster, or any of those folks, correct?  You don't have direct knowledge of that, correct?

A.  Well, I didn't -- the DOD came to his house and took his phone, but I wasn't there.

Q. You don't have any direct knowledge that -- that Nathan Halsey was cooperating with law enforcement regarding Schuster, Rall, or any of those folks, correct?

A. Correct.

Q. Okay. And are you aware, sir, that the reason why the DOD came to his house and got his phone was for a recording that he had with Mr. Bob Miller from Trilogy Pharmacy? Were you aware of that?

A. No.

Q. Is that news to you?

A. Yes. He explained it differently to me. So that's news to me, yes, if that's true.

Q. Okay. And -- well, let me ask you this question.

Is it possible that you remembered it differently?

A. No, he -- I mean Nathan told me that the DOD called him. He called Reed Prospere and said they wanted his phone and Reed said, well, let me look at it and I'll call you back. And he said the next morning at 5:00 a.m. they showed up and got his phone.

Q. With a search warrant?

A. Yes.

Q. And so --

MR. JAMES BELL: I don't know -- I'm bleeding right there.

MR. DAVID BELL: It's self-inflicted, let the record reflect.

Q. (BY MR. JAMES BELL) Okay. So -- so you're not -- you don't have any direct evidence that Halsey and Brandon were shopping a Qui Tam against Schuster, Rall, or any of those folks, correct?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) And at some point in time Halsey -- are you aware of whether or not Halsey did file a Qui Tam case?

A. I'm not.

Q. Do you know whether or not Halsey filed a Qui Tam case against the Trilogy Pharmacy?

A. Not that I'm aware of.

Q. Is it possible that you mixed up Trilogy, Express, different pharmacies, just because there's a lot going on, like you said earlier?

A. It's possible. But Halsey's deal was not -- he was more worried about, you know, he showed me his complaint with the SEC and I told him that in my opinion this is a -- could possibly be referred to the

hg
EXHIBIT 1

Department of Justice. But he was more concerned with all of that, I mean, than -- so the answer to your question is it's possible, I don't know what he was looking at doing. But -- but from my perspective, he was more trying to get himself out of trouble than anything else that concerns any companies or any other individuals, including a Qui Tam case.

Q. So Halsey was more concerned about getting himself out of trouble with the SEC, right?

A. Well, and -- and not and -- and hoping that -- you know, not be referred to the Department of Justice. So both of those. I think -- so yes, correct, the SEC.

Q. And so -- and in terms of you repeating what Halsey says, you would agree with me that it gets fuzzy between different -- the different names of different fuzzies in terms of your recollection, given the fact that it was over -- it was two years ago or over two years ago. Would that be fair?

MR. DAVID BELL: Objection -- objection; form.

THE WITNESS: Yes.

Q. (BY MR. JAMES BELL) Do you have any direct evidence that Brandon McCarthy has anything to do with the Dallas Morning News article?

MR. DAVID BELL: Objection; form.

Objection.

THE WITNESS: Not direct, no.

Q. (BY MR. JAMES BELL) Do you have any -- so let me state it a different way. Strike that.

It would be a fair statement to say you don't have any evidence, knowledge, or facts to suggest that Brandon McCarthy had anything to do with any Dallas Morning News articles. True?

A. True.

Q. It would also be true to say that you don't have any direct evidence, knowledge, or facts to suggest that Brandon McCarthy has supplied Kevin Krause with any information about any clients, potential clients, or any other folks for that matter. True?

MR. DAVID BELL: Objection; form.

THE WITNESS: I don't have direct evidence, true.

MR. JAMES BELL: Did I throw that back in there. I can't remember.

(Pause in proceedings)

Q. (BY MR. JAMES BELL) So you -- were you -- you were convicted of -- just by way of background, so that I understand, conspiracy to commit securities fraud. And was it conspiracy to commit wire fraud and mail fraud or were -- did you get the actual charges?

MR. DAVID BELL: Mr. Reynolds is not going to testify about anything -- though those things are on -- .

MR. JAMES BELL: They're less than ten years old.

MR. DAVID BELL: Let me -- let me finish, please. Some of those things that you're inquiring about are part of the public record. He's just not going to testify about any matter regarding any of this line of questioning.

MR. JAMES BELL: Sure.

MR. DAVID BELL: He's not a party to this lawsuit and I'm not going to let him testify about anything. He answered your one question about he having previously been convicted. That's all he's going to talk about any of his prior criminal matters.

Q. (BY MR. JAMES BELL) You're going to refuse to answer my question about --

MR. DAVID BELL: And I'm advising him not to answer those questions.

Q. (BY MR. JAMES BELL) You're going to refuse to answer my question about being convicted of wire fraud, securities fraud and mail fraud, correct?

A. Correct.

Q. You've also been cited for contempt of court,

correct?

A. Correct.

Q. And tell Judge Tillery what was that for.

MR. DAVID BELL: I'm going to object to that. If it's public record, you can produce those documents for whomever.

Q. (BY MR. JAMES BELL) Are you going to refuse to answer my question about asking you to tell Judge Tillery why you were cited for contempt?

MR. DAVID BELL: He's going to testify in front of Judge Tillery. He's just not going to answer any questions as he is not a party to this lawsuit. And you may present the public record to whomever. But he's not going to answer any questions about any criminal matter.

Q. (BY MR. JAMES BELL) Are you going to refuse to answer my question why you were cited for criminal contempt -- strike that.

Are you going to refuse to answer my question about why you were cited for contempt?

MR. DAVID BELL: Objection; form. I don't think he can tell you why any of those things happened. If -- that's a matter that involves some -- court and some authority higher then him or you or I.

Q. (BY MR. JAMES BELL) Are you going to refuse to

EXHIBIT 1

answer my question about why you were cited for contempt?

MR. DAVID BELL: I'm advising him to refuse to answer -- respectfully refuse to answer your questions.

MR. JAMES BELL: I need to get a refusal --

MR. DAVID BELL: He's going to -- he's going to --

MR. JAMES BELL: So go ahead.

THE WITNESS: Correct.

MR. JAMES BELL: No. No. I need to get a clean record.

MR. DAVID BELL: Sure.

Q. (BY MR. JAMES BELL) Are you going to refuse to answer my question about why you were cited for contempt?

A. Yes.

Q. Okay. Do you know Braden Power?

A. Who? Can you repeat that question?

Q. Sure. Do you know Braden Power?

A. No.

Q. Do you know Craig Power?

A. No.

MR. DAVID BELL: P-O-W-E-R, Counsel? Oh, is this the related case that you filed with the Court,

said it was related? Is that the one? Oh, this is the case -- Braden Richard Power and Craig Patrick Power. Is that what you're asking about? Do you know those people?

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Are you aware -- strike that.

Do you have any direct evidence, knowledge, or facts to suggest that Brandon McCarthy breached or violated any of the Texas Disciplinary Rules of Professional Conduct?

MR. DAVID BELL: Objection; calls for a legal conclusion.

THE WITNESS: No.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge, or facts to suggest that Brian -- strike that.

Brandon McCarthy didn't provide competent and diligent representation to all of his clients?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: No.

MR. DAVID BELL: Are these all the same questions you are asking again. He will answer the same

EXHIBIT 1

way. And I would object the same way if you want to --

MR. JAMES BELL: Just have a running objection. Go ahead.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge, or facts to suggest that Brandon McCarthy violated any conflicts of interests as it relates to any of his clients?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge, or facts to suggest that Brandon McCarthy has been adversarial towards any of his clients?

MR. DAVID BELL: Calls for a legal conclusion. Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) All right. Are you taking any medications today that would affect your testimony?

A. No.

Q. Are you taking any medications?

A. Well, I have a prescription.

Q. For what?

A. Adderall.

Q. So you've taken Adderall today?

EXHIBIT 1

A. I haven't today.

Q. Are you under -- have you taken any pills today?

A. No.

Q. Any drugs or anything?

A. No.

Q. Just have to ask. Who is Cameron Smith?

A. She is a lawyer that represented me in my case with my ex when I got out. I guess child custody. She represented me in the child custody case.

Q. Has Cameron Smith represented you in any other matter?

MR. DAVID BELL: I'm not going to let him testify about any relationship he has or has had with any lawyer.

Q. (BY MR. JAMES BELL) Do you refuse to answer my question about whether or not Cameron Smith has represented you in any other matter besides a child custody case?

MR. DAVID BELL: I'm advising him not to --

THE WITNESS: On the advice of my counsel, I'm not going to answer that.

Q. (BY MR. JAMES BELL) Have you ever worked for Cameron Smith?

A. No.

EXHIBIT 1

Q. Have you ever worked for Jim Rolfe?

A. No.

Q. Have you ever been paid by Cameron Smith?

A. No.

Q. Have you ever been paid by Jim Rolfe?

A. No.

Q. What do you do for a living?

A. Right now I'm not doing much.

Q. What are you doing for a living?

A. Nothing.

Q. How are you earning a living?

A. I'm really not at this point, unfortunately.

Q. Have you accepted any money in connection with any pharmacies?

A. No.

Q. Have you received any money in connection with -- accepted any money that could be related to Brandon McCarthy?

A. No.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Have you ever received any type of payments regarding any -- anything to do with any potential Qui Tams?

A. No.

Q. So you've never been paid to be witness?

A. No.

Q. And at some point you offered to pay Nathan Halsey $2,000, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Not that I recall.

Q. (BY MR. JAMES BELL) And you don't recall offering Nathan Halsey $2,000 for some kind of book?

A. No.

Q. Is it possible that you offered Nathan Halsey $2,000 for a book?

A. I don't believe so.

Q. So you're denying that you offered Nathan Halsey $2,000 for any type of book, PowerPoint presentation, treaties, article, or otherwise?

MR. DAVID BELL: Objection; form.

THE WITNESS: Not that I recall.

Q. (BY MR. JAMES BELL) So you're denying that, true?

A. Yes.

Q. Did you ever tell Nathan Halsey that you needed an IRS guy, Rolfe wants to call him because he heard through the -- through a friend of his in the IRS that Brandon and Nathan were trying to get an investigation going on me so he wants to call him or, I guess, Gus Kepler?

MR. DAVID BELL: Objection; form.

THE WITNESS: Can you repeat that? I don't -- I don't understand that.

Q. (BY MR. JAMES BELL) Sure. Did you ever tell Gus Kepler or Nathan Halsey that you needed an IRS guy because Rolfe wants to call him?

A. About what?

MR. DAVID BELL: He just asked you.

THE WITNESS: No, I mean -- no.

Q. (BY MR. JAMES BELL) Are you still friends with Gus Kepler?

A. I think so.

Q. Have you traded any shares in the last couple of years?

MR. DAVID BELL: Objection; form.

THE WITNESS: Traded shares, what do you mean?

Q. (BY MR. JAMES BELL) Stock shares?

A. I'm going to plead the Fifth on that. I'm not going to talk about any of my business or anything of that nature.

Q. So you're taking the Fifth Amendment about whether or not you have sold, solicited, related to your stock shares?

MR. DAVID BELL: He's not going to testify

about any matter involving --

THE WITNESS: I am, yes.

Q. (BY MR. JAMES BELL) You're taking the Fifth Amendment?

A. Yes.

Q. (BY MR. JAMES BELL) Are you going to take the Fifth Amendment about whether or not you've attempted to sell shares to Brandon McCarthy?

A. I am. On the advice of counsel.

MR. DAVID BELL: Why don't you read that?

THE WITNESS: On advice of counsel, I respectfully decline to answer the question. I instead invoke my privilege against compelled self-incrimination secured by the Fifth and 14th Amendment to the U.S. Constitution and the Constitution of the State of Texas, even though invocation of the privilege is in no respect an admission or acknowledgement of criminal conduct as it is instead recognition that a response could simply supply a "link in the chain of evidence" which could be used against in criminal prosecution.

(Exhibit No. 1 was marked)

MR. DAVID BELL: Go ahead and state the authority that you're making that statement.

THE WITNESS: E.g. Hoffman v. United States, an individual may be (sic) compelled to provide

hglitigation.com

**EXHIBIT 1**

testimony --

MR. DAVID BELL: May not.

THE WITNESS: May not be compelled to provide testimony which could supply "a link in the chain of evidence" which could be use against him in criminal prosecution.

Q. (BY MR. JAMES BELL) Isn't it true --

MR. DAVID BELL: Let him finish, please.

THE COURT: Invocation of this privilege against compelled self-incrimination is not and should not be considered --

MR. DAVID BELL: Construed --

THE WITNESS: Construed as an admission of criminal conduct. One of the basic functions of the Fifth Amendment is to protect innocent men. Grunewald v. United States. Truthful responses of an innocent witness, as well those of a wrongdoer, may provide the government with incriminating evidence from the speaker's own mouth. Ohio v. Reiner.

Q. (BY MR. JAMES BELL) Isn't it true that you attempted and did, in fact, sell stock to Nathan Halsey and Gus Kepler?

MR. DAVID BELL: Objection. Go ahead and repeat -- can we have a --

If you'd mark that as an exhibit. Would

you like him to read it again or just say --

MR. JAMES BELL: I just want him to say I invoke the Fifth Amendment and -- and Exhibit 1.

MR. DAVID BELL: Just say --

MR. JAMES BELL: That's fine.

MR. DAVID BELL: And recite my invoking the Fifth Amendment and would repeat if you wish me to what I just read.

THE WITNESS: I invoke the Fifth Amendment and would repeat this if you would like me to.

Q. (BY MR. JAMES BELL) Just so I have a clean record. You're taking the -- did you sell or attempt to sell stock to Nathan Halsey and/or Gus Kepler?

MR. DAVID BELL: Go ahead.

THE WITNESS: I'm going to plead the Fifth Amendment.

Q. (BY MR. JAMES BELL) And did you ever attempt to sell stock to Ryan Myers or Barrett Howell at K&L Gates

MR. DAVID BELL: Same objection. Would you repeat --

Q. (BY MR. JAMES BELL) Do you plead the Fifth?

A. Yeah.

MR. DAVID BELL: And --

THE WITNESS: And --

EXHIBIT 1

MR. DAVID BELL: -- you'll gladly read this back into the record.

THE WITNESS: I will gladly read this back into the record.

MR. JAMES BELL: You can just say "I plead the Fifth Amendment plus Exhibit 1. Is that fair?

MR. DAVID BELL: Sure.

THE WITNESS: Yeah.

MR. DAVID BELL: And -- and let's say plus Exhibit 1 and I have asked if you prefer me to read it or just merely reference it.

MR. JAMES BELL: I'll just stipulate.

MR. DAVID BELL: Okay. That's fine. Thank you.

Q. (BY MR. JAMES BELL) Have you ever represented in the last year or two folks as a broker?

MR. DAVID BELL: Objection; form. Go ahead and recite the --

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Are you under a restriction from being involved in the trading or selling of stock?

MR. DAVID BELL: Objection.

THE WITNESS: I plead the Fifth. Exhibit

hg
**EXHIBIT 1**

1.

Q. (BY MR. JAMES BELL) Did you ever -- did you -- strike that.

Isn't it true, sir, that you told Brandon McCarthy that he should invest in some stocks and that those stocks would go up in value?

MR. DAVID BELL: Objection.

THE WITNESS: I plead Fifth, Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true that you wanted Brandon McCarthy to invest $50,000 spread among several stocks?

A. I plead the Fifth, Exhibit 1.

Q. Isn't it true, sir, that you told Brandon McCarthy that -- strike that.

Isn't it true, sir, that the reason why you have a vendetta against Brandon McCarthy is because he refused to buy any stocks that you wanted to sell him?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth, Exhibit 1.

Q. (BY MR. JAMES BELL) Did you ever -- strike that --

You've texted Nathan Halsey and you said, just to clarify, my friend Cameron Smith, who represents Rall, was hired by the SEC to prosecute a case against UDF. She doesn't represent UDF. Just wanted to make

EXHIBIT 1

that clear so there wasn't a misunderstanding between us. Have a great weekend.

Do you remember writing that text?

MR. DAVID BELL: Repeat your objection.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Did you say that Cameron Smith was hired by the SEC to prosecute a case?

A. I plead the Fifth, see Exhibit 1.

Q. Do you ever say that Jim Rall was hired to prosecute cases, including one against Brandon McCarthy?

A. I plead the Fifth, Exhibit 1.

Q. Isn't it true, sir, that you threatened Nathan Halsey by saying that Prosecutor Bowie was going to go after him?

A. I plead the Fifth, Exhibit 1.

Q. Isn't it true, sir, that you said that you had influence and that Prosecutor Bowie was a friend of yours and that you could control his decision making; isn't that true, sir?

A. I plead the Fifth. Exhibit 1.

Q. Isn't it true that you have threatened Nathan Halsey with criminal prosecution?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit

EXHIBIT 1

1.

Q.   (BY MR. JAMES BELL)   Isn't it true that you, along with Jim Rolfe and Cameron Smith, have threatened to prosecute Brandon McCarthy?

MR. JAMES BELL:  Objection; form.

THE WITNESS:  I plead the Fifth.  Exhibit 1.

Q.   (BY MR. JAMES BELL)   Isn't it true that you, Jim Rolfe and Cameron Smith have threatened to try and prosecute Nathan Halsey?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I plead the Fifth.  Exhibit 1.

Q.   (BY MR. JAMES BELL)   Isn't it true -- sir -- isn't it true, sir, that you, Jim Rolfe and Cameron Smith have made false statements about -- about Brandon McCarthy?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I plead the Fifth.  Exhibit 1.

Q.   (BY MR. JAMES BELL)   Isn't it true that you, Jim Rolfe and Cameron Smith have attempted to extort Brandon McCarthy?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I plead the Fifth.  Exhibit

1.

Q. (BY MR. JAMES BELL) Isn't it true that you, Jim Rolfe and Cameron Smith have conspired to extort and damage Brandon McCarthy?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy sent Nathan Halsey to become an informant, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Not besides what Nathan told me, no.

MR. JAMES BELL: Objection; nonresponsive.

Q. (BY MR. JAMES BELL) You don't have any direct evidence that Brandon McCarthy sent Nathan Halsey out to become an informant, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Correct?

A. Correct.

Q. Do you remember talking about a book?

MR. DAVID BELL: The same book you asked about before?

MR. JAMES BELL: Yeah.

MR. DAVID BELL: Asked and answered.

Do you remember him asking you about a book before?

THE WITNESS: Him?

MR. DAVID BELL: Yeah, Mr. Bell.

THE WITNESS: Yes.

MR. DAVID BELL: Would you answer the same way?

THE WITNESS: Yeah. I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Okay. So you're going to take the Fifth Amendment about -- strike that.

You're now taking the Fifth Amendment about whether or not you offered to purchase a book from Gus Kepler for $2,000?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) When you offered to purchase a book from Gus Kepler, what book were you attempting to purchase?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true, sir, that

you, Jim Rolfe and Cameron Smith already had this alleged book that you refer to in your text with Nathan Halsey?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true, sir, that the reason why you offered Nathan Halsey $2,000 for a book is because you, Cameron Smith and Jim Rolfe already possessed that book?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) How were you going to pay $2,000 to get a book from Nathan Halsey?

A. I plead the Fifth. Exhibit 1.

Q. Is it your sworn testimony, sir, under oath that Brandon McCarthy had that book that you reference in your text messages with Nathan Halsey?

A. Repeat that.

Q. Sure. Is it your sworn testimony that Brandon McCarthy had a copy of the book that you reference in your text messages with Nathan Halsey?

MR. DAVID BELL: Objection; form.

THE WITNESS: I have no idea.

Q. (BY MR. JAMES BELL) So, in other words, you have no direct evidence, knowledge, or facts to suggest that Brandon McCarthy had or seen any -- any book that you reference in the text messages with Nathan Halsey, true?

MR. DAVID BELL: Objection; form.

THE WITNESS: I don't know anything about a book -- I -- I have no direct evidence about any kind of book that has to do with Brandon.

Q. (BY MR. JAMES BELL) Okay. So it would be fair to say that you're not aware -- strike that.

It would be fair to say that you don't have any direct evidence, knowledge, or facts, to suggest that Brandon McCarthy has anything to do with any book that you discussed with Nathan Halsey, true?

MR. DAVID BELL: Objection; form.

THE WITNESS: That's true.

Q. (BY MR. JAMES BELL) So what book were you referring to when you were text messaging Nathan Halsey?

A. I have no -- I have no idea.

Q. Did you remember seeing any kind of PowerPoint presentation?

A. No.

Q. Have you ever seen a PowerPoint presentation? I'll remind you you're under oath.

hg

EXHIBIT 1

MR. DAVID BELL: Objection; form.

THE WITNESS: Well, in reference to what?

Q. (BY MR. JAMES BELL) Reference to anything that Brandon -- anything anybody says Brandon McCarthy had anything to do with?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) You haven't seen any PowerPoints?

A. Not that I recall.

Q. Did you see any bound -- did you ever see a bound book?

A. No.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) When you said to Nathan Halsey, would $2,000 help, cash, and he said for what, and you said copy of that.

When you said "copy of that," what were you referring to?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

(Mr. McCarthy left the proceedings)

Q. (BY MR. JAMES BELL) So you're going to plead the Fifth Amendment regarding asking Nathan -- strike

that.

You're going to plead the Fifth Amendment with respect to offering Nathan Halsey $2,000 cash for a copy of something that you reference in the text messages with him, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) So when you say you plead -- what did a "copy of that" refer to in your text messages with Nathan Halsey?

A. I plead the Fifth. See Exhibit 1.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) You're going to plead the Fifth as to what you meant -- strike that --

You're going to plead the Fifth Amendment or you are pleading the Fifth Amendment when you said you're willing to pay $2,000 for a copy of that?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) Can you tell Judge Tillery what, quote, a copy of that was?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Did you have a copy of a book, treatise, PowerPoint, prior to offering Nathan Halsey $2,000?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Were you instructed by anybody to offer Nathan Halsey $2,000 for a copy of a book or PowerPoint?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true, sir, that Cameron Smith and Jim Rolfe instructed you to offer Nathan Halsey $2,000 for a copy of a book?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Where did you, Jim Rolfe and Cameron Smith get a copy of that book?

MR. DAVID BELL: Objection; form.

THE WITNESS: I don't have a copy of the book, nor have I ever seen a copy of the book.

Q. (BY MR. JAMES BELL) You pled the Fifth Amendment with respect to a book. Do you know what book

I'm talking about? Or are you going to plead the Fifth Amendment to that?

A. I'm going to plead the Fifth on whatever book you're talking about.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Have you seen a presentation -- strike that.

Isn't it true, sir, that you've seen a copy of a PowerPoint or a book in presence of Cameron Smith and Jim Rolfe?

MR. DAVID BELL: Objection; form.

THE WITNESS: No, that's not true.

(Mr. McCarthy entered the proceedings)

Q. (BY MR. JAMES BELL) Are you aware -- who -- strike that.

Who told you to offer Nathan Halsey $2,000 for a copy of a book?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Who gave you the money to potentially pay Nathan Halsey for a copy of the book that you reference in your text messages with Nathan Halsey?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true that the book that you reference in your text messages with Nathan Halsey was what was going to be used to extort Brandon McCarthy?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true that --

MR. DAVID BELL: Excuse me. Also calls for a legal conclusion.

Q. (BY MR. JAMES BELL) Isn't it true, sir, that the reason why you, Rolfe, and Cameron Smith needed the book from Nathan Halsey is to fabricate and fraudulently make claims to extort Brandon McCarthy? Isn't that true?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't the reason why you, Jim Rolfe, and Cameron Smith tried to get a book from Nathan Halsey and offer him $2,000 is to frame Brandon McCarthy for something he didn't do?

MR. DAVID BELL: Objection; form.

hg
**EXHIBIT 1**

THE WITNESS: Of course not. Frame him for what? I don't even understand where you're going with this.

Q. (BY MR. JAMES BELL) You don't have any evidence that anybody's tried to frame Brandon McCarthy for anything?

A. Absolutely not.

Q. Do you have any evidence that -- that -- so then why are you refusing to talk about this book and pleading the Fifth?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) How -- does the -- the book fabricate and fraudulently attempt to -- to -- to implicate Brandon McCarthy in some kind of wrongful conduct?

A. I can't tell you about --

MR. DAVID BELL: Objection; form.

THE WITNESS: -- something I've never seen.

Q. (BY MR. JAMES BELL) Okay. Why were you offering money to Nathan Halsey for something -- $2,000 to Nathan Halsey for something you had never seen?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See

Exhibit 1.

Q. (BY MR. JAMES BELL) Why were you asking Nathan Halsey for a copy of a book that you had never seen?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) How did you know that Nathan Halsey had a book if you had never seen it?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) How did you first learn about the book that you reference in your text messages with Nathan Halsey?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

I would like to go on the record and state that I've never heard anybody try to get Brandon, try to obtain evidence against Brandon, or ask me, hey, let's go get him, let's go find this. Never has one person ever said that about -- to me about Brandon, ever.

Q. (BY MR. JAMES BELL) But you're including attorneys, correct?

A. No. I'm talking about I've never had anybody.

Q. Okay. Here -- here --

A. Tell me let's go get him, let's figure something out, let's conspire, let's find some stuff against him. Not -- no one has ever come to me and tried to get Brandon -- come up with some way to get Brandon messed up, screwed up, what have you.

MR. DAVID BELL: He's going to not talk to you about anything involving anything dealing with any attorney, period, end of report.

Is that correct?

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) Okay. So when you just answered that question, that excluded any comments from any attorneys, correct?

MR. DAVID BELL: He's not going to answer that question.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) You're going to refuse to answer my question about whether or not any attorney ever told you that they wanted to plant, fabricate, or fraudulently make up information in order to implicate Brandon McCarthy in some sort of unethical conduct?

A. I've never had --

MR. DAVID BELL: Objection; form.



EXHIBIT 1

THE WITNESS: -- I've never had anybody, including any attorneys that I know, ever ask or -- ask me to participate in -- nor would I -- getting Brandon in any sort of trouble.

Q. (BY MR. JAMES BELL) Why are you offering $2,000 for a book?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Who asked you to talk to K&L Gates?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) On the one hand, sir, you say to me that nobody has ever told you that they want any -- anything wrong to happen to Brandon McCarthy, correct?

A. That's absolutely correct.

Q. On the other hand, you're taking the Fifth Amendment as to who told you to contact K&L Gates, you're taking the Fifth Amendment, correct?

A. I plead the Fifth. See Exhibit 1.

Q. And the reason that you spoke -- strike that.

Your understanding of the reason why you

EXHIBIT 1

were speaking to K&L Gates is to talk alleged misconduct of Brandon McCarthy?

A. I plead the Fifth. See Exhibit 1.

Q. Can you tell Judge Tillery why you were tape -- telling Nathan Halsey that you were introducing Gus to the heads of IPOs for Stevens & Company?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Have you ever been in the health care business?

A. I haven't been as of right now. But I've been looking at different -- different businesses in there, but not -- I've never -- I guess you have to be more specific. Made -- have I ever made money off of health care?

MR. DAVID BELL: No. He just asked --

THE WITNESS: No, I haven't.

MR. DAVID BELL: -- if you've ever been in the health care business?

THE WITNESS: No, I haven't.

Q. (BY MR. JAMES BELL) Are you personally aware of any criminal conduct committed by anybody in the health care business?

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Direct evidence.

MR. DAVID BELL: Objection; form.

THE WITNESS: Direct evidence as in paperwork?

Q. (BY MR. JAMES BELL) Do you have any direct knowledge or direct evidence that anybody's committed any wrong -- criminal conduct in the health care business?

MR. DAVID BELL: Objection; form. In the whole wide world, Counsel?

MR. JAMES BELL: I'm going to start there and then I'm going to narrow it down.

MR. DAVID BELL: Okay. Why don't you start with narrow.

THE WITNESS: No direct evidence.

Q. (BY MR. JAMES BELL) So as you sit here right now, you don't have any -- I don't need to narrow it down now. So you don't --

MR. JAMES BELL: And I'll object to my side-bar.

MR. DAVID BELL: No problem.

MR. JAMES BELL: I appreciate that. Sorry.

Q. (BY MR. JAMES BELL) It would be fair to say that you don't have any direct evidence or knowledge or facts to suggest that anybody has committed any criminal

wrongdoing or criminal misconduct or unlawful conduct who is in the health care space, true?

MR. DAVID BELL: Objection; form.

THE WITNESS: I've had people come to me and --

Q. (BY MR. JAMES BELL) I'm talking about your direct knowledge.

A. Direct knowledge from the person that's being investigated?

Q. No. It's about what you've witnessed, seen, touched, right? Remember we talked about that earlier?

A. Yeah.

MR. DAVID BELL: Objection; form.

THE WITNESS: No direct evidence.

Q. (BY MR. JAMES BELL) So is it fair to say that you don't have direct knowledge, facts, or evidence to suggest that anybody's committed any criminal conduct in the health care space, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) Now, you've also said that you -- folks have come to you, correct?

A. Correct.

Q. Okay. About -- who -- who -- who came to you about who's committing alleged misconduct in the health

hg

**EXHIBIT 1**

care space?

MR. DAVID BELL: Objection; form.

THE WITNESS: I mean it's all the time. You know, people tell me things. You mean, Forest Park? Who are you talking about?

MR. DAVID BELL: Let him ask you a question so you can answer it.

Q. (BY MR. JAMES BELL) Sir, can you tell -- tell us what black box is?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Are you on Instagram as mystockbuy?

A. I plead the Fifth. See Exhibit 1.

Q. Do you put your brokerage account out on Instagram?

A. I plead the Fifth. See Exhibit 1.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Tell the folks about BioNovelus, Inc.

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Isn't it true that you

tried to get Brandon McCarthy to buy stock in BioNovelus, Inc.?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge, or facts of anybody that's presented a false, fictitious or fraudulent claim to the -- to any department of United States?

MR. DAVID BELL: Objection; form. Asks for a legal conclusion.

THE WITNESS: Can you repeat that?

Q. (BY MR. JAMES BELL) Sure. Do you have any direct evidence, knowledge, or facts to support the position that someone you know has presented a false, fictitious or fraudulent claim to a department of the United States?

MR. DAVID BELL: Objection; form. Asking for a legal conclusion.

THE WITNESS: Just anybody anywhere, no.

Q. (BY MR. JAMES BELL) Who told you that Brandon McCarthy helped shop a Qui Tam against any of his clients?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See

Exhibit 1.

Q. (BY MR. JAMES BELL) So you're going to plead the Fifth Amendment with respect to who told you that Brandon McCarthy allegedly was shopping Qui Tams against some of his clients, correct?

A. Correct.

Q. And so you're taking the Fifth Amendment with respect to that issue?

A. Correct.

Q. You -- you got to make sure you say "I take the Fifth Amendment?

A. I take the Fifth Amendment.

Q. Yeah. I'm sorry. I -- I -- it's my fault because I didn't ask a proper question.

Who told you that Brandon McCarthy was allegedly shopping a Qui Tam against any of his clients, former clients, potential clients?

MR. DAVID BELL: Objection; form.

THE WITNESS: Can you repeat that?

Q. (BY MR. JAMES BELL) Sure. Who told you that Brandon McCarthy was bringing a Qui Tam against any clients, existing clients, former clients, or potential clients or are you going to take the Fifth Amendment?

A. Yeah. I'm going to take the Fifth. See Exhibit 1.

EXHIBIT 1

Q. You're going to take the Fifth Amendment?

A. Please, yeah.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) When you refer to the book in the text messages with Nathan Halsey, how were you going to get the $2,000 to pay for that book?

MR. DAVID BELL: Objection; form. Asked and answered.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Who came up with the idea to pay $2,000 -- strike that.

Who came up with the idea to offer Nathan Halsey $2,000 for a book?

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Did you come up with the idea to pay or offer to pay Nathan Halsey $2,000 for a copy of a book?

A. I plead the Fifth. See Exhibit 1.

Q. Did Cameron Smith come up with the idea to pay Nathan Halsey $2,000 for a copy of a book?

A. I plead the Fifth. See Exhibit 1.

Q. Did Jim Rolfe come up with the idea to offer

Nathan Halsey -- have you offer Nathan Halsey $2,000 for a copy of a book?

A. I plead the Fifth. See Exhibit 1.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Has Jim Rolfe ever been your lawyer?

A. Yes.

Q. When?

A. Jim Rolfe and Joe Kendall were my attorneys when I was going through criminal matters.

Q. Okay. So --

A. So --

MR. DAVID BELL: That's a public record. He's not going to answer any other questions about Mr. Rolfe or Judge Kendall.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge, or facts to suggest that Brandon -- Brandon McCarthy was going to get some sort of kickback on a Qui Tam?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Did you ever get paid from any source or anybody for your communications or interactions with Nathan Halsey or Gus Kepler?

A. No.

EXHIBIT 1

MR. DAVID BELL: Objection; form. Objection; asked and answered. He answered no.

Q. (BY MR. JAMES BELL) Have you -- have you been paid as a consultant by anybody in the pharma -- strike that.

Have you been paid as a consultant by anybody in the health care space?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Have you been paid as a consultant by any lawyers?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

MR. DAVID BELL: Objection; asked and answered.

MR. JAMES BELL: Sorry about these books. Are you okay with space?

THE WITNESS: Yeah. Thanks.

Q. (BY MR. JAMES BELL) When's the last time you talked or interacted with Brandon McCarthy?

A. It's been a while. Gosh, maybe a couple of years.

Q. And you testified earlier that you are not aware of any cases or potential cases against Brandon McCarthy, correct?

EXHIBIT 1

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) You're not aware of any investigation personally against Brandon McCarthy, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) And you're not aware of any proceedings, investigations, cases, or potential cases whereby you have personal knowledge of or any evidence you could provide to anybody against Brandon McCarthy, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) And so you would agree with me since no cases, no investigations exist, that -- and you're not aware of any proceedings, that Brandon McCarthy hasn't attempted to intimidate you as a witness. Do you agree?

MR. DAVID BELL: Objection; form.

THE WITNESS: I don't know that no investigations exist.

Q. (BY MR. JAMES BELL) I understand you don't know that any investigations exist.

My question --

MR. JAMES BELL: Objection; nonresponsive.

Q. (BY MR. JAMES BELL) My question to you is: Since you don't know of any investigations or any proceedings or potential proceedings whereby you would be a witness, you don't have any direct evidence that Brandon McCarthy is trying to intimidate you in any way as a witness, correct?

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Correct?

A. I've heard from numerous people.

Q. You don't have any direct evidence that Brandon McCarthy is trying to intimidate you?

A. Directly no.

Q. Okay. So you don't have any direct evidence that Brandon McCarthy is trying to intimidate you in any way, correct?

A. That's correct.

Q. Do you have any direct evidence that Brandon McCarthy has falsified any information?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct evidence that Brandon McCarthy has covered up or engaged in any scheme, device, to defraud anybody or injure anybody?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  No.

Q.  (BY MR. JAMES BELL)  Are you aware -- strike that.

Do you have any direct evidence, knowledge, or facts to suggest that Brandon McCarthy has engaged in false, fictitious, or fraudulent statements or representations or made such?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  No.

(Pause in proceedings)

MR. JAMES BELL:  Let's take a quick break.

MR. DAVID BELL:  Yeah.

(Break taken)

(Matt Segedy not present after break)

Q.  (BY MR. JAMES BELL)  Sir, are you going to refuse to answer the question about the identity of any attorneys that you've met with in 2015 that can possibly have knowledge about the questions I've been asking you?

A.  I am, yes.

Q.  Are you going to refuse to identify the name of any attorneys in 2016 that possibly have any information regarding the questions I've been asking you?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  Yes I am.

Q.   (BY MR. JAMES BELL)   Are you going to refuse to answer the question about -- strike that.

Are you going to refuse to identify the names of any attorneys that you've consulted with, talked to, in 2017, regarding any of the questions I've asked?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  Yes.

Q.   (BY MR. JAMES BELL)   Are you going to refuse to answer the question of the dates of initial consultation or meetings with any attorneys you met with in 2015, '16 or 2017, regarding the subject matter of any of the questions I've been asking you about today?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  Yes.

Q.   (BY MR. JAMES BELL)   Are you going to refuse to answer the question regarding the existence of any fee agreements with any attorneys regarding the subject matter that we've been talking about today in either 2015, 2016, or 2017?

A.   What do you mean "fee agreements"?

Q.   Do you have any fee agreements with any attorneys?

A.   No.

MR. DAVID BELL:  Objection; form.

Q. (BY MR. JAMES BELL) Do you have a fee agreement Mr. David Bell?

A. Well, I'm going to plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Do you have a fee agreement with David Bell? Are you taking the Fifth Amendment?

A. I'm going to plead the Fifth Amendment.

Q. Who referred you to David Bell?

MR. DAVID BELL: I'm not going to let him answer any questions about any lawyers.

THE WITNESS: Yeah, I'm going to plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) Are you going to plead the Fifth Amendment with respect to the referral source was to David Bell?

MR. DAVID BELL: He's not going to answer any questions about any lawyers --

THE WITNESS: Yes, I am.

MR. DAVID BELL: -- he contacted or talked to or referred him to me.

Q. (BY MR. JAMES BELL) Are you going to refuse to answer the question and/or take the Fifth Amendment regarding any fees that have been charged by any attorneys regarding any of the subject matter we've discussed today in the years 2015, '16 and '17?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes.

Q. (BY MR. JAMES BELL) Are you going to refuse to answer the question regarding the terms of any fee agreements with any lawyers regarding -- that -- that you've talked to regarding the subject matter that we've talked to -- talked to you about today?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes. Correct, yes.

Q. (BY MR. JAMES BELL) Are you going to refuse to answer the question regarding the general purpose of any work performed by any attorneys that relate to the subject matter of your testimony today?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes.

MR. DAVID BELL: I'm not going to allow him to testify about any communication with any attorney.

MR. JAMES BELL: I'm not asking about the communication. I'm asking about the identify of the attorney. Are you going to refuse to allow him to answer that question?

MR. DAVID BELL: Yes. Thank you.

MR. JAMES BELL: Are you also going to refuse to allow your client to answer when the date of any initial consult or meeting was with any attorney?

hg
EXHIBIT 1

MR. DAVID BELL: Yes. And that's also based upon his Fifth Amendment rights that he's asserting today.

MR. JAMES BELL: Well, I just --

MR. DAVID BELL: And actually his First Amendment rights that he should be asserting today.

MR. JAMES BELL: Well, I need to -- I -- Just based on the case law, I need to -- to make sure I get a direct answer.

Q. (BY MR. JAMES BELL) Are you -- are you going to refuse to answer the date of any initial consultations or meetings with any attorneys, whether they acted as your attorney or you talked with them outside the scope of an attorney/client relationship?

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes.

Q. (BY MR. JAMES BELL) And you're going to refuse to identify the name of any attorneys that you've had a relationship with, whether attorney/client or otherwise, based on your Fifth Amendment privilege?

A. Yes.

Q. Are you going to take the Fifth Amendment with respect to your relationship with Cameron Smith?

A. Yes.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Are you going to take the Fifth Amendment -- strike that.

Are you taking the Fifth Amendment with respect to your relationship with Jim Rolfe?

A. Yes.

MR. DAVID BELL: Objection; form again.

Q. (BY MR. JAMES BELL) How much have you paid David Bell or are you taking the Fifth Amendment?

MR. DAVID BELL: He's not going to testify about his relationship with his attorney.

THE WITNESS: I'm not going to testify about any attorneys. I'm going to plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) And you're pleading the Fifth as to who your referral source was as to getting to David Bell?

MR. DAVID BELL: He's not going to testify about that any conversations with -- or communications with any attorney. Objection; form.

Q. (BY MR. JAMES BELL) Okay. I'm -- I'm not asking -- was -- did a nonattorney refer you to David Bell?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Okay. So you're going to

refuse to answer the question about who -- which attorney was the referral source to David Bell or are you taking the Fifth Amendment?

A. I am, yes.

Q. You're taking --

A. I'm -- I'm pleading the Fifth Amendment. See Exhibit 1.

Q. On the September 8th meeting that you had -- strike that.

On the -- do you remember on your August 13, 2015, meeting pitching Brandon McCarthy to use your Prisoner Entry Program that you had started?

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Is that possible?

A. It's possible.

Q. And did you -- do you remember talking about Forest Park and Dr. Rimlawi at that first meeting on August 2013, 2015?

A. At K&L Gates?

Q. Yes, sir.

A. I don't recall it, but I'm not saying it's not possible.

Q. Sure. Is it -- is it possible that you spent time talking about your Prisoner Entry Program at K&L Gates at your first meeting with Brandon McCarthy? Yes

EXHIBIT 1

or no?

A. Yes.

Q. Is it -- it's also possible that you spent time talking about Forest Park Medical Center with Brandon McCarthy at your first meeting at K&L Gates, correct?

A. Is the question is it possible?

Q. Yes.

MR. DAVID BELL: Objection; form.

THE WITNESS: Yes.

Q. (BY MR. JAMES BELL) And it's possible that you also spoke about Dr. Rimlawi with Brandon McCarthy at the first meeting at K&L Gates on or about August 13, 2015, correct?

A. It's possible. I don't recall.

Q. It's also possible that you talked about --

MR. JAMES BELL: I can move this over. I'm sorry.

Q. (BY MR. JAMES BELL) It's also possible that you spoke to Brandon McCarthy about a man -- a gentleman by the name of Joe Garza? Do you recall that on that August 2013, 2015, meeting?

A. It's possible.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) When you went to that September 13th meeting, did you understand how Qui Tams

worked, or no?

A. No. August.

Q. I'm sorry. When you showed up to the August 13, 2015, meeting did you understand how Qui Tams worked?

A. No. That's why we went there, to primarily see if we could gain Brandon's knowledge.

Q. On how -- on how a Qui Tam works?

A. Correct.

Q. You didn't have any information on any compounding pharmacies, doctors, hospitals, correct, at that August meeting?

A. Correct.

Q. You had some information regarding stock schemes and possibly Dr. Rimlawi, correct, at that first meeting?

A. Possibly.

Q. At that first meeting?

A. Possibly, yes.

Q. You would agree with me that nothing substantive was discussed at that first meeting with Brandon McCarthy in August of 2015, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Nothing substantive, but speaking on Rimlawi, now that I recollect, it -- it

EXHIBIT 1

strikes me as Brandon also thought he was a crook. I mean that all our -- talking about him. Because I did too and he -- he pretty much thought the same. But there was no specifics talked about as far as what exactly he's done or anything.

Q. (BY MR. JAMES BELL) Okay. So you-all -- you recall you remember talking about Dr. Rimlawi --

A. Yes.

Q. -- at that first meeting?

A. I -- I don't know when it actually was, but I know I've talked to Brandon about Rimlawi.

Q. And it probably would have been at the first meeting?

A. I guess, you know, I --

MR. DAVID BELL: Don't guess, please.

THE WITNESS: Okay. Possibly.

Q. (BY MR. JAMES BELL) Okay. And then you would agree with me that nothing substantive was discussed about any pharmacy, hospital, or doctor that you're aware of at that first meeting, correct?

A. Correct.

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) Do you remember the name of -- strike that.

Do you know whether or not Gus gave Brandon the name of -- the proper name of any compounding pharmacies or was he just listing them off? Do you remember?

A. I don't recall.

Q. So you don't recall which pharmacies Gus talked to Brandon about, correct?

A. Correct.

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) And whatever pharmacies were mentioned, you don't remember any criminal conduct or willful conduct that was discussed at that meeting, because you said nothing substantive was discussed, correct?

A. Correct.

Q. And Brandon McCarthy told you he needed to run a conflict checks, correct?

A. Correct.

Q. Before he could proceed, correct?

A. Correct.

Q. Because that was the standard procedure and he wanted to make sure that -- this is his third day at a big tall building law firm -- that he doesn't get in any trouble, right?

MR. DAVID BELL: Objection; form.

THE WITNESS: Absolutely.

Q. (BY MR. JAMES BELL) That was the impression that you got?

A. Absolutely.

Q. Did Brandon at that first meeting appear to be careful and cautious about what clients or Qui Tams he could or couldn't take and -- and the conflict procedures? Did he seem to be aware of those and cognizant and --

A. Yes.

MR. DAVID BELL: Objection; form, please.

Q. (BY MR. JAMES BELL) Go ahead. What's the answer?

A. Well, he -- he was -- he -- we just discussed the basics of how a Qui Tam worked. It wasn't -- there was no specifics. It was -- you know, and then he said he had to, you know, see if there's any conflicts. There wasn't any intimate details about any case or person or anything like that.

Q. So no intimate details were talked to about any case or person, correct, at the first meeting?

A. Correct.

Q. There was -- it was just basically an overview of how Qui Tam's work, correct?

A. Correct.

Q. And the names -- there were some names that were given to Brandon McCarthy, correct?

A. Correct.

Q. You don't remember the name of those pharmacies because they were all --

A. There's so many of them and it was names and companies and no, I don't -- I don't recall, you know, all the names and companies that were talked about.

Q. And Brandon McCarthy told you and Gus that he needed to run a conflict checks, correct?

A. Correct.

Q. And before he could even take a look at it or talk about any of these pharmacies because they could potentially be clients of K&L Gates, correct?

A. Correct. He made no comments whatsoever regarding any person or any company while we were there.

Q. Okay. So Brandon seemed completely professional in his dealings with you and Gus, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct. Correct.

Q. (BY MR. JAMES BELL) You've been around enough attorneys to know whether or not a lawyer is professional or not, right?

A. Yes.



EXHIBIT 1

Q. And Brandon seemed and -- seemed prepared and professional in terms of abiding by, based on your observations, abiding by his legal duties and ethical obligations to clients, and former clients, and/or existing clients of K&L Gates, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct. There was no -- like I said, there was -- he didn't make any substantive comments. He listened to us. And then at the end he said, well, you know, before I can advise you or do anything, I have to do a conflict check. And so yes, correct.

Q. (BY MR. JAMES BELL) Okay. So Brandon told you before he could do anything or advise, he had to run a conflicts check, correct?

A. Correct.

Q. And that seemed like the right thing to do, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Based on my, you know, limited knowledge of law, yes.

Q. (BY MR. JAMES BELL) And based on Brandon's professionalism that's why you continued to stay in contact with him? It's one of the reasons why, correct?

A. Correct.

Q. That he seemed to maintain confidentiality and he didn't seem like a shady lawyer to you, correct?

A. Correct.

Q. He seemed like he was honest, ethical in his dealings with the two of you, at least in your limited interaction with him, correct?

A. Correct.

Q. He didn't give you or Gus any legal advice, correct?

A. Correct.

Q. Brandon just -- in that first meeting, just listened to the two of you, correct?

A. Correct.

Q. And as you sit here right now, there's nothing you can say that Brandon did wrong in that first meeting with you in August of 2015, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct. Correct.

Q. (BY MR. JAMES BELL) And in terms of the second meeting that happened, I believe at the hotel, there's nothing Brandon said that was inappropriate or wrong or unethical in your opinion, correct?

A. Correct.

Q. The book that you reference in your text message with Nathan Halsey where you offer to pay him

$2,000, does that refer to a copy of a PowerPoint presentation?

MR. DAVID BELL: Objection; form.

THE WITNESS: On advice of my counsel, I plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Have you seen a PowerPoint presentation related to any alleged health care schemes?

MR. DAVID BELL: Objection; asked and answered. Objection; form.

THE WITNESS: Plead the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Do you remember a name called Trilogy coming up in the fall of 2015?

A. I mean I've heard the name.

Q. Do you know anything about the pharmacy called Trilogy?

A. No.

Q. Do you have any evidence that Brandon McCarthy brought or attempted to bring a Qui Tam lawsuit against a company called ProGen?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any evidence that Brandon put his personal well-being above any of his clients, former clients, or alleged clients?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any evidence that Brandon McCarthy has tried to drum up any federal criminal conviction in to any of his former clients, clients or existing clients?

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Or prospective clients.

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge, or facts to suggest that Brandon McCarthy helped published slanderous news articles against clients, former clients, existing clients or other folks?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct evidence that Brandon McCarthy's ever exploited a client -- a confidential relationship with any of his clients, former clients, or existing clients?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

MR. DAVID BELL: Okay. When you get to a stopping point.

MR. JAMES BELL: Okay. Give me five minutes. Is that all right?

MR. DAVID BELL: Yeah. I was just going to --

MR. JAMES BELL: If you want to bring pizza in here --

MR. DAVID BELL: No, just --

(Pause in proceedings)

Q. (BY MR. JAMES BELL) At -- based on your previous testimony that Brandon McCarthy didn't say much, he didn't -- at the first meeting Brandon McCarthy didn't tell you that he wanted to be in charge of bringing a Qui Tam against anybody at that point in time, correct?

A. Correct.

Q. It was more -- at the first meeting it was more Brandon McCarthy trying to give you information about what a Qui Tam was and the law behind a Qui Tam, correct?

A. Correct.

Q. Just a basic overview what a Qui Tam was?

A. We were just there -- I mean -- I like Brandon. I mean I would consider him my friend so I just said -- I told Gus, I said, let's go there and he can explain it. I don't know what it is and it's very confusing to

me. So I said he can explain it to us. And, you know, we can see if there's a possibility or not on whatever, you know, everybody was thinking about trying to make some money off a Qui Tam case. Because I was too. We were all, you know, trying to figure out how we can make some money off of this deal. So we just went there and -- and Brandon just kind of outlined the basics of how they worked. But not as far as any particular person or company or anything like that.

Q. Did you bring the concept of the Qui Tam against ProGen and its principals to Brandon McCarthy?

A. No.

Q. Was there ever a plan for you to be a plaintiff in a Qui Tam lawsuit against ProGen that you're aware of?

A. No.

Q. Did you discuss the name ProGen in the August 2015 meeting?

A. Not that I recall. I don't -- I mean they were rattling...

Q. As you sit here right now, can you remember the name --

A. No, I cannot.

Q. As you -- I just got to get a clean record.

A. Okay.

EXHIBIT 1

MCCARTHY: RYAN REYNOLDS

Page 129

Q. As you sit here right now, do you remember the name ProGen even coming up in your August 2015 meeting with Brandon McCarthy?

A. No.

Q. Was -- strike that.

Brandon McCarthy never solicited you to be a plaintiff in the Qui Tam action, correct?

A. Correct.

(Pause in proceedings)

Q. (BY MR. JAMES BELL) Since you didn't know the name ProGen, would you agree with me that you were never adverse to ProGen?

MR. DAVID BELL: Objection; form.

THE WITNESS: I would agree with that.

Q. (BY MR. JAMES BELL) Did Brandon McCarthy conspire with you to move forward with a Qui Tam?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Did Brandon McCarthy strategize and/or conspire with you to move forward regarding a Qui Tam?

A. No.

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Did Brandon McCarthy make

EXHIBIT 1

a deal with you regarding any Qui Tam?

A. No.

Q. Did Brandon McCarthy ever make any illegal deals with you?

A. No.

Q. Did Brandon McCarthy ever say that he would personally receive a portion of any recovery of a Qui Tam to you?

A. No.

Q. Did McCarthy say that he would take on a -- a Qui Tam without supporting evidence?

A. No.

Q. Did Brandon McCarthy ever talk to you about any referral fee or fee for him?

A. No.

Q. Did you see a PowerPoint presentation by Brandon McCarthy in or around Brandon McCarthy or that Brandon McCarthy had anything to do with?

A. No.

Q. Do you have any evidence, facts, or knowledge that Brandon McCarthy was looking in to ProGen to sue them?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct

EXHIBIT 1

evidence, knowledge, or facts that McCarthy was looking in to Schuster, Rall or any of those folks to sue them or harm them?

A. No.

Q. Do you have any evidence, facts, or knowledge to suggest that Brandon McCarthy tried to get any former clients, existing clients, or prospective clients criminally prosecuted?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

(Pause in proceedings)

Q. (BY MR. JAMES BELL) Did you ever hear Brandon McCarthy bring up the name ProGen to the best of your recollection?

A. No.

Q. Do you remember Brandon McCarthy in any -- you don't remember Brandon McCarthy bringing up the name Schuster, Rall or Xpress Pharmacy in your meetings, correct?

A. Correct. He didn't comment on anything. He just listened and then told us that he had to do a check. That's it.

Q. Do you have any direct evidence, knowledge, or facts that Brandon McCarthy -- that Brandon McCarthy helped Nathan Halsey obtain information or records about

ProGen and/or RXpress?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Or any of its principals?

A. No.

Q. Do you have any direct evidence, knowledge, or facts that suggest that Brandon McCarthy attempted to persuade the U.S. Department of Homeland Security to investigate ProGen or RXpress Rolfe or Schuster, any of those folks?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge, or facts that -- that Brandon McCarthy had something to do with presenting allegations regarding ProGen or any of the companies I've mentioned to the U.S. attorney's office?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) Do you have any direct evidence, knowledge, or facts that Brandon McCarthy worked with Halsey, Kepler, or you to publish defamatory news articles and television segments?

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

EXHIBIT 1

Q. (BY MR. JAMES BELL) Do you have any direct evidence that Brandon McCarthy had anything to do with a CBS news article?

A. No.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Do you have any direct evidence that Brandon McCarthy spurred the issuance of the warrant on Halsey's phone?

A. No.

Q. Based solely on your dealings with Brandon McCarthy, you would agree with me, he was honest in his dealings with you, true?

A. Yes.

Q. Based on your dealings with Brandon McCarthy, you would agree with me that he seemed ethical in his dealings with you, true?

A. Yes.

Q. You would agree with me that Brandon McCarthy in his dealings with you was upfront, honest, had integrity, correct?

A. I would.

Q. You'd say that Brandon McCarthy, in his dealings with you, presented himself as a loyal -- an attorney that acted with loyalty and integrity of the strictest kind? Would you agree with that?

A. Yes. I mean, like I said, we were friends. I was helping him with the Keep My ID thing. So I would -- yeah. The answer is yes. I mean...

Q. You're not aware of any false or inaccurate statements that Brandon McCarthy made, correct?

A. No.

MR. DAVID BELL: Objection; form.

THE WITNESS: No.

Q. (BY MR. JAMES BELL) I asked a double negative. I'm sorry.

A. Oh, okay.

Q. Would you agree with me that you're not aware of false or inaccurate statements that Brandon McCarthy has made about any clients, former clients, existing clients, future clients, or anybody to your knowledge? Do you --

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) -- agree with that statement?

A. Yes.

Q. Do you have the direct evidence, knowledge, or facts to suggest that Brandon McCarthy urged CBS to run any kind of story regarding any of his clients, former clients, or existing clients?

A. No.

MR. DAVID BELL: This is yours.

MR. JAMES BELL: Thank you.

(Pause in proceedings)

Q. (BY MR. JAMES BELL) When you told Brandon McCarthy that you've got a huge case out of Fort Worth in the hundreds of millions, health care, you didn't have any facts or evidence at that time, you just possible -- you were just searching for a potential Qui Tam case, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) How is your daughter, by the way?

A. Fine. Thank you.

Q. Good.

A. Fourteen. She's still sweet. Hopefully she stays that way.

MR. JAMES BELL: The name of the gal at the second meeting was Brooke Chavez Taylor.

THE WITNESS: Taylor. Brooke Taylor.

MR. DAVID BELL: Hey, can I have that?

MR. JAMES BELL: No.

MR. DAVID BELL: Let me see her again. Cute.

THE WITNESS: Yes, she's cute. What do you

EXHIBIT 1

think, Brandon?

MR. McCARTHY: She went to Harvard.

MR. DAVID BELL: Do what?

MR. McCARTHY: Harvard. Smart girl. Harvard. Harvard.

MR. DAVID BELL: Harvard, Massachusetts?

THE WITNESS: Yeah.

MR. JAMES BELL: Yes.

MR. DAVID BELL: Sure it wasn't Howard?

MR. JAMES BELL: Yeah. Positive.

(Pause in proceedings)

THE WITNESS: She's in law school, I think. I heard she maybe went to law school.

Q. (BY MR. JAMES BELL) Where are you currently living in case I have to subpoena you at another point in time?

A. 5608 Matalee, but I don't know how long. I'll update you if I change my address.

MR. JAMES BELL: Well, you've got to go through your attorney.

THE WITNESS: Or I'll update him to let you know.

That's another coincidence that came up, I guess, I can't -- I'm not allowed to live there because of my --

MR. DAVID BELL: Don't go into any of that stuff, please.

THE WITNESS: Okay. So...

Q. (BY MR. JAMES BELL) You would agree in your dealings with Brandon McCarthy it appeared that he adhered to his ethical legal duties, correct?

MR. DAVID BELL: Form; asked and answered.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) McCarthy seemed -- strike that.

Based on your observations, McCarthy seemed faithful to his clients, correct?

MR. DAVID BELL: Form; asked and answered.

MR. JAMES BELL: I didn't ask that before, by the way. I haven't asked any of these.

MR. DAVID BELL: Asked and answered.

THE WITNESS: I mean, yeah, correct.

Q. (BY MR. JAMES BELL) McCarthy appeared -- strike that.

McCarthy was forthright, correct?

A. Correct.

Q. McCarthy was frank with you guys?

A. Correct.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) McCarthy seemed like he

had a conscience, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) Honorable?

A. Correct.

Q. Just?

A. Correct.

Q. Moral?

A. Correct.

Q. Principled?

A. Correct.

Q. Conscientious?

A. Correct.

Q. Fair?

A. Correct.

Q. Equitable?

A. Correct.

Q. Upright?

A. Correct.

Q. Honorable?

A. Correct.

Q. Trustworthy?

A. Correct.

Q. Impartial?

A. Correct.

EXHIBIT 1

Q. Unbiased?

A. Correct.

Q. Unprejudiced?

A. Correct.

Q. Neutral?

A. Correct.

Q. Lawful?

A. Correct.

Q. Legal?

A. Correct.

Q. Legitimate?

A. Correct.

MR. DAVID BELL: Objection; form. I don't know what that means.

Q. (BY MR. JAMES BELL) Did McCarthy reveal, disclose, or divulge any information about any of his clients to you?

A. No.

Q. Did McCarthy leak, unmask, expose any information about any of his clients, prospective clients to you?

A. No.

MR. JAMES BELL: Let's take a quick pizza break and maybe I can shore this up.

MR. DAVID BELL: Yeah.

**EXHIBIT 1**

MR. JAMES BELL: Is that cool?

MR. DAVID BELL: Sure.

MR. JAMES BELL: Okay.

(Break taken)

Q. (BY MR. JAMES BELL) All right. Just -- is there anything I can say or do to change your mind about the questions I've asked regarding the Fifth Amendment? Change -- are you going to continue to maintain the Fifth Amendment with respect to the questions I asked you?

MR. DAVID BELL: I'm better suited to answer that question than he is. So we've talked about meeting. Let's meet and then we'll revisit all that.

MR. JAMES BELL: I know. I just need to get it on the record.

MR. DAVID BELL: Okay. That's fine.

MR. JAMES BELL: Okay.

THE WITNESS: Yeah. I would like to stick with my answers.

MR. JAMES BELL: I just -- let me ask it again, just so I have a clean record.

Q. (BY MR. JAMES BELL) Is there anything I can say or do to change your mind with regard to withdrawing your assertion of the Fifth Amendment privilege regarding any of the questions I've asked you thus far?

hg

EXHIBIT 1

A. No.

MR. JAMES BELL: Okay. Now, just -- I think it will take ten minutes in terms of a timeline. Well --

Q. (BY MR. JAMES BELL) You're going to assert the Fifth Amendment privilege with respect to any dealings with Cameron Smith, correct?

A. Well, any attorneys is what I'm going to assert the Fifth Amendment with.

Q. Okay.

MR. DAVID BELL: Any and all.

THE WITNESS: Yeah.

Q. (BY MR. JAMES BELL) You're going to assert the Fifth Amendment privilege with respect to Cameron Smith, correct?

A. Correct.

Q. Jim Rolfe, correct?

A. Correct.

Q. Joe Kendall, correct?

A. Correct.

Q. Okay. Now, you're aware of circumstances whereby folks were -- or have tried to implicate -- or her of implicating Brandon -- Brandon McCarthy in some kind of nefarious or wrongful conduct, correct?

MR. DAVID BELL: Objection; form.

EXHIBIT 1

THE WITNESS: Well, I mean -- hearsay. I've heard at lot of stuff, you know.

Q. (BY MR. JAMES BELL) Secondhand?

A. Yeah. About everybody and everything. I mean as far as this case is kind -- or this deal, whatever you want to call it, has kind of taken on a life of its own. So I've heard all kinds of stuff about all different people.

Q. So what have you heard about any alleged wrongdoing by Brandon McCarthy, even though it's secondhand? Now I'm asking for indirect knowledge or indirect facts.

A. I mean the thing -- I guess, you know, the whole thing with -- with Nathan and getting wired up by the FBI. That -- I -- I really get confused as far as the companies or whatever that maybe -- that as far as Kevin Krause is concerned that -- that for -- that Kevin Krause would not run Nathan's SEC complaint in the newspaper if -- if he was given the information on whomever, Scoot Schuster, Dustin, et cetera. But I don't -- I don't know who that deal was made with, if there ever was a deal. I just had heard that from Nathan.

Because Nathan had told me that if that article runs in Dallas -- all his investors are in

EXHIBIT 1

Dallas -- and he's basically screwed.

Q. My question is: What have you heard that Brandon McCarthy has done wrong? Or has everything you learned about Brandon McCarthy come from attorneys?

A. No, I mean a lot of it came from Halsey. But I don't -- you know, I mean I guess the -- that I heard that he sent Nathan to the FBI office to get wired up to go get information against whomever. I don't know exactly who they were, but...

That.

You know and, like I said, about me, I've heard, you know, numerous times that he had somebody at the IRS and that he was going to put on me.

Q. Who did you hear that from again?

A. Well, I heard it from the guy that Carl, who was a client of what's his name that I mentioned earlier. I don't know. It's some -- some attorney. Carl Fleming is his name. The guy at Hillstone. I know that there's a guy whose name is Hoi that has, you know, been calling people. And I had a girl -- an ex-girlfriend that said he called her and was asking about my investments and did I beat her up. And then she said eight months later he called and said, well, does Ryan sell drugs? And I'm going, what's going on here?

I've heard -- well, you're talking about Brandon. I'm trying to think. I mean, that -- that he was representing somebody and getting evidence against them when they were his client -- when they were his firm's client.

Q. Who did you hear that from, that allegation?

A. I don't know. It's like all so convoluted. I don't really remember. I'm just telling you things I remember that I've heard. You know...

Q. Did you hear that allegation from any attorneys?

A. I don't recall. But I mean I guess the main thing is the FBI thing. Because -- that -- that's -- you know, when Nathan told me that was -- that he was doing that, that -- that scared me. And I don't know who, what or -- had anything to do with that. But I didn't -- that's when I was -- that made me nervous. You know, especially in my situation. I just felt that was careless of him to be doing. But I know he wanted to get off that case, that SEC case.

I heard that -- that Brandon called the SEC attorney that was handling Nathan's case and maybe tried to trade -- you know, try to get Nathan -- help Nathan out. And I don't know if that's improper or not. I mean but I heard that. And that the SEC attorney told

Nathan that if Barack Obama calls me, I wouldn't drop this case. I'm not -- I'm not -- I don't know if that's wrong or not. I don't know if Brandon had anything to do with it. I'm just telling you things I've heard. I'm -- I'm not saying they're right, wrong, or indifferent. I don't know.

But mainly the FBI thing and, you know, from Nathan what said I -- I didn't -- you know, that he went to Krause. I don't know who all met with Kevin Krause. But, you know, it was told to me that there -- it was a trade where they would get Kevin the information on Schuster, Rall, et cetera, and all the companies if he wouldn't run that story.

Basically that's, you know, what I can remember.

Q. With regard to your assertion of the Fifth Amendment regarding the book that we were talking about earlier. Do you remember that?

A. Yes.

Q. Okay. When did you first hear of a book or a PowerPoint? Are you going to take the Fifth Amendment?

A. Well, I've never heard of a PowerPoint.

Q. Okay. You've heard of a book?

A. I've heard of a book, but I don't -- I've never seen a book. I don't -- it's my -- it's my belief that

hg
EXHIBIT 1

the book -- that the way that it was described by Gus and Nathan -- had nothing do to with Brandon.

Q. Your under --

A. I --

Q. Your understanding is the book had nothing to do with Brandon?

A. No. It wasn't -- it wasn't a --

Q. Well, I just -- I asked you a double negative.

It was your understanding -- would it be a fair statement to say that your understanding was the book that you were talking about earlier with Gus and Nathan had nothing to do with Brandon. That would be a true statement, correct?

A. Abso-- yes.

Q. Okay. Now, tell me what else do you --

A. Well, the -- the -- from my understanding was it was about Schuster and Rall. I don't even -- it was never -- I never have heard -- that's what struck me as funny when you said was there a book that was trying to -- that people were trying to get to hurt him. It was -- it had nothing to do with him. I think you're -- you're -- there's something that you're missing as far as that's concerned.

I think that whatever this book was had to do with the evidence that Nathan obtained on whoever he

was recording and text messaging and things of that nature.

Q. That's your guess?

A. That's what I was told.

Q. Who were you told that by?

A. Nathan and Gus.

Q. Okay. But as far as you know, you don't -- you don't think Brandon had anything to do with this book, correct?

A. No.

Q. Correct?

A. Correct.

Q. Okay. So yeah, I asked you a double negative. Just to be clear.

As far as you knew Brandon McCarthy had nothing to do with this book that Nathan and/or Gus -- Nathan Halsey, Gus Kepler had made, correct?

A. Correct.

Q. Now, at some point you were trying to obtain this book from either Gus or Nathan, right?

MR. DAVID BELL: Objection; form.

THE WITNESS: That, I'm going to plead the Fifth on -- on anything that has to do with me trying to obtain this book. I'm just telling you --

MR. DAVID BELL: Just let -- let him --

THE WITNESS: Yeah.

Q. (BY MR. JAMES BELL) What is the reasoning behind -- how would talking about the book incriminate you?

MR. DAVID BELL: You don't need to answer that. You're asking him for a legal conclusion. Just --

THE WITNESS: I'm just going to plead the Fifth.

Q. (BY MR. JAMES BELL) Okay. When -- well, why did you want to obtain a copy of the book?

MR. DAVID BELL: Objection; form.

THE WITNESS: I'm going to plead the Fifth on that.

MR. DAVID BELL: Tell him go back to Exhibit --

THE WITNESS: Yeah.

(Pause in proceeding)

THE WITNESS: I mean what I'm telling you is --

MR. DAVID BELL: Just leave it.

THE WITNESS: Okay.

Q. (BY MR. JAMES BELL) If you were me sitting here right now, what question should I ask you that wouldn't call for your invocation of the Fifth Amendment

privilege?

MR. DAVID BELL: Objection; form.

Why don't you and I talk, like we discussed earlier.

MR. JAMES BELL: I'm happy to talk to you afterwards. I'm -- I'm just -- I want --

MR. DAVID BELL: I'm not going to let him answer those questions. I'm not going to let him waive, knowingly or inadvertently, his First or Fifth Amendment or any other right he has.

Q. (BY MR. JAMES BELL) So are you pleading the Fifth Amendment with respect to why you wanted to obtain a copy of the, quote, unquote, book?

MR. DAVID BELL: He's doing what he's testified on the record.

MR. JAMES BELL: I know. I just got to get a record.

MR. DAVID BELL: That's all that he's -- just -- just --

THE WITNESS: I'm pleading the Fifth. See Exhibit 1.

Q. (BY MR. JAMES BELL) Okay. And was it your intent to purchase the book and then sell the book?

A. I plead the Fifth. See Exhibit 1.

Q. Who all was involved in -- strike that.

Page 150

Was it more than you involved in attempting to purchase the book?

A. I plead the Fifth. See Exhibit 1.

Q. Did you try and get the book from Gus Kepler?

A. I plead the Fifth. See Exhibit 1.

Q. Did you try and get the book from Nathan Halsey?

A. I plead the Fifth. See Exhibit 1.

Q. Why were you train -- trying to obtain a book that you had never seen?

A. I have to plead the Fifth again. See Exhibit 1.

Q. Did somebody instruct you to obtain the book?

A. I plead the Fifth. See Exhibit 1.

Q. Why did anybody else want to have a copy of the book?

A. I plead the Fifth. See Exhibit 1.

Q. How was the book going to help you?

A. I plead the Fifth. See Exhibit 1.

Q. Were you going to benefit -- benefit by obtaining the book?

A. I plead the Fifth. See Exhibit 1.

Q. Were you ever given the book?

A. I plead the Fifth. See Exhibit 1.

Q. Did you have a copy of the book and just not

look at it?

A. I plead the Fifth. See Exhibit 1.

Q. Have you ever held any type -- have you ever held this book in your hand?

A. Plead the Fifth. See Exhibit 1.

Q. And when I say "the book," this is the book that was allegedly created by Halsey and -- and Gus, correct?

A. I mean I don't know.

Q. Is that your understanding of the book that we're talking about?

A. No.

Q. What is your understanding of the book?

A. Because you're telling me there was a book that had something to do with McCarthy.

Q. I'm talking about the book regarding Halsey and -- and -- and -- and Kepler. That's the only book that's out there.

A. That I'm aware of.

Q. I'm talking about the -- the book --

MR. DAVID BELL: Excuse me. Objection; form.

MR. JAMES BELL: Sure.

Q. (BY MR. JAMES BELL) I'm talking about the book that you're referring to in the text messages between

you and Kepler and you and Halsey. Do you understand that?

MR. DAVID BELL: Objection; form.

THE WITNESS: I'm going to plead the Fifth. And see Exhibit 1 on that.

But you inferred earlier that it was some kind of book to use against McCarthy (indicating).

Q. (BY MR. JAMES BELL) The implication is if Brandon McCarthy had something to do with creating that book, he would have been creating it against some of his own clients. And that would be wrongful. Don't you agree?

MR. DAVID BELL: Objection; form. Asked for a legal -- asks -- asks for a legal conclusion.

THE WITNESS: I've -- I've never heard that. That -- that Brandon had anything do with that book, if we're talking about the same book.

Q. (BY MR. JAMES BELL) I'm talking about the book that you're talking about in your text messages to Halsey and Gus.

MR. DAVID BELL: Objection; form.

THE WITNESS: I plead the Fifth. See Exhibit 1.

I just didn't know -- you inferred earlier that there was some book out there that was trying to do

harm to McCarthy.

Q. (BY MR. JAMES BELL) It's the same book I'm talking about.

A. Okay. I've never thought that Brandon had anything to do with that book or produced it or went out -- from -- from my understanding that was Nathan. I don't -- I never -- so when you say that it's supposedly going to be used against him, I don't -- I have no knowledge of that.

Q. Well, do you understand the allegation against Brandon?

A. No, apparently not.

Q. The -- the allegation is that he somehow has -- had seen the book or produced the book, created the book, helped author the book with Nathan Halsey and -- and Gus to turn against former clients. Do you understand that that's one -- one of the allegations --

A. No.

Q. -- his firm is making against -- no?

A. No.

Q. Okay. Do you understand why I -- now I'm trying to ask about the -- the same book? Why -- why we're talking about the same book? Do you understand now? Does that give you a better kind of --

A. Yeah, I -- see, I didn't -- I didn't realize

hg

EXHIBIT 1

all that.

Q. Okay.

A. This is -- if -- if -- if this is the book that's out there that has information on whomever, the common knowledge out on the street is -- is that Nathan Halsey created this book. And so when you were saying that about using it against Brandon or something, I -- I thought you were talking about something different. Because I -- that doesn't make any sense to me.

Q. Well, it makes sense to you now, right?

A. I --

Q. If Nathan Halsey created a book against clients of Brandon McCarthy's and Brandon McCarthy knew about it to -- and -- and handed it over to pursue a Qui Tam lawsuit against his own clients, you could understand that -- if that allegation was made, you can understand why Brian -- why Brandon McCarthy wants to know who, what, when, where, how about this alleged book because he had nothing to do with it. You can understand that, right?

A. Yeah. I never -- that didn't even cross my mind that he would have. I'm telling you Nathan -- that Halsey -- if this is the so-called book, Halsey created this book, went out and got the information and it was -- and from my understanding, this book was created

because Halsey was trying to obtain evidence to get himself -- see, the Qui Tam was second nature. That -- that was down the line. I mean there's other -- there's -- Halsey thought he was in a pickle. I mean, Halsey's been through this before, you know. Reed Prospere got him off a prior -- he almost got indicted and Reed got him off a prior deal he was involved in. So Halsey was worried that this SEC case could be referred to the DOJ. And that -- if we're talking about this book, that's what I understood the book to be.

I didn't even -- never related McCarthy to this book whatsoever. It was for Halsey to get out of whatever deal he was in.

Q. Did Halsey ever say to you that Brandon McCarthy had anything to do with this book?

A. No.

Q. Did Gus Kepler ever tell you that Brandon McCarthy anything to do with this book?

A. No.

Q. Then why were you trying to obtain a copy of the book from Nathan Halsey?

MR. DAVID BELL: Objection; form.

THE WITNESS: I'm going to plead the Fifth. Exhibit 1.

Q. (BY MR. JAMES BELL) If it has nothing to do

with Brandon McCarthy, why are you pleading the Fifth Amendment as it relates to this book?

MR. DAVID BELL: Objection; form. I think the law is clear. He doesn't have to explain that to you, Counsel.

Q. (BY MR. JAMES BELL) Are you taking the Fifth Amendment?

A. Yeah. I'm pleading the Fifth. Exhibit 1.

Q. Did Nathan Halsey ever give you a copy of the book?

A. No.

Q. Are you aware of any copies that exist out there of the book?

A. No.

Q. Did Gus Kepler have a copy of the book?

A. Not that I'm aware of.

Q. Were you trying to get the book to pursue a Qui Tam?

A. Plead the Fifth. See Exhibit 1.

Q. When you were offering $2,000 to Nathan Halsey to get a copy of this book, is it because you wanted to pursue a Qui Tam case?

MR. DAVID BELL: Objection -- objection; form.

THE WITNESS: I plead the Fifth. Exhibit

**hg**

**EXHIBIT 1**

1.

Q. (BY MR. JAMES BELL) Did Jim Rolfe or Cameron Smith instruct you to offer $2,000 for the book so that they could surreptitiously help you prosecute a Qui Tam?

A. I plead the Fifth. Exhibit 1.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) So you're pleading the Fifth Amendment with respect to a book you've never seen, right?

A. Yes. Correct.

Q. You're pleading the Fifth Amendment with respect to a book you tried to obtain a copy -- how did you -- strike that.

How did you know that a book even existed?

A. I think Halsey kind of prided himself on making these presentations and, you know, I'm -- I'm friends with Reed Prospere and he, at one point, told me that --

MR. DAVID BELL: Don't tell him any conversations with any lawyer that's ever represented you.

THE WITNESS: Oh, okay.

Supposedly, Halsey was -- was good at presentations and he made this to help himself.

Q. (BY MR. JAMES BELL) Did Reed Prospere ever represent you?

EXHIBIT 1

A. Yes.

Q. And are you aware of any other presentations, other than the book that we're talking about, that Halsey made?

A. Not in relation to this case.

Q. Are -- are you aware of any other Qui Tam -- alleged Qui Tam presentations made by Halsey?

A. No.

Q. Are you aware of any other books or presentations made by Halsey?

A. No. Halsey told me that when -- when he was going to get indicted that he made some presentations to show the government that he didn't do this. He kind of pride -- like I said, he kind of prided himself on these presentations and, hey, this is how I got out of this deal, I went in there with these, you know, graphs and stuff and showed that I wasn't the one that did it. I was conned into doing this. And he -- he told me that that's how he got off this indictment.

Q. Okay. But with respect to presentations or books, other than about him and his case, are you only aware of one book or one presentation where he was attempting to pursue or throw other folks under the bus?

A. Yes. That's the only one I've heard about.

Q. And that's the book that we've been talking

about today, correct?

A. I assume.

Q. Okay. And how would somebody other than you benefit from having the book?

MR. DAVID BELL: Objection; form.

THE WITNESS: The only other people I think would benefit would be people that were representing the people that maybe were in the book that wanted to see what evidence was out there against them. I don't know.

Q. (BY MR. JAMES BELL) And then turn around and blame Brandon McCarthy?

A. That -- no, that doesn't -- that doesn't come into my mind whatsoever.

Q. Have -- have you ever heard of those attorneys saying that about Brandon McCarthy?

A. Never.

Q. Have you ever heard of Brandon McCarthy having anything to do with putting together, stapling, being involved with, touching this alleged book?

A. Never.

MR. JAMES BELL: Give me two minutes and then I -- I'm sorry. I know I've said it a couple of times and cried wolf, but...

Let me just talk to my client.

(Break taken)

EXHIBIT 1

Page 160

MR. JAMES BELL: I'm going to suspend the deposition at this time.

(Proceedings concluded at 2:51 p.m.)

hg

**EXHIBIT 1**

Page 161

CHANGES AND SIGNATURE

WITNESS: RYAN REYNOLDS          DATE:  NOVEMBER 10, 2017

PAGE       LINE      CHANGE                    REASON

hg

**EXHIBIT 1**

I, RYAN REYNOLDS, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
RYAN REYNOLDS

THE STATE OF _____ )

COUNTY OF _____ )

Before me, _____, on this day personally appeared RYAN REYNOLDS, known to me (or proved to me under oath or through_____ ) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ____ day of December, 2017.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS



**EXHIBIT 1**

NO. DC-17-13448

BRANDON MCCARTHY ) IN THE DISTRICT COURT
)
VS. ) 134TH JUDICIAL DISTRICT
)
)
JOHN/JANE DOES 1-10 ) DALLAS COUNTY, TEXAS

REPORTER'S CERTIFICATION

DEPOSITION OF RYAN REYNOLDS

NOVEMBER 10, 2017

I, Sherry Folchert, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, RYAN REYNOLDS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on the _____ day of November, 2017, to the witness or to the attorney for the witness for examination, signature and return to me by _____ day of December, 2017;

That the amount of time used by each party at the deposition is as follows:

James S. Bell - 3 hours, 21 minutes

hg
**EXHIBIT 1**

David Bell - 0 minutes

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

James S. Bell, Attorney for Plaintiff;

David Bell, Attorney for Ryan Reynolds;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 20th day of November, 2017.

*Sherry Folchert*

SHERRY FOLCHERT, CSR NO. 6259
Expiration Date: 12/31/19
HG Litigation
Firm Registration No. 69
2777 North Stemmons Freeway
Suite 1025
Dallas, Texas 75207
Phone: 1-888-656-3376



**EXHIBIT 1**

Page 165

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on or before the _____ day of December, 2017;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to James S. Bell, Custodial Attorney;

That $_____ is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on and filed with the Clerk.

Certified to by me this_____ day of December, 2017.

*Sherry Folchert*

SHERRY FOLCHERT, CSR NO. 6259
Expiration Date: 12/31/19
HG Litigation
Firm Registration No. 69
2777 North Stemmons Freeway
Suite 1025
Dallas, Texas 75207
Phone: 1-888-656-3376

EXHIBIT 1

## $

**$2,000** 77:3,7,10,13 87:15 88:8,15 90:16 91:3,18 92:3,8,15 93:16 94:23 95:22 98:6 105:6,12,14,19, 23 106:1 125:1 156:20 157:3

**$50,000** 83:10

## 0

**09** 13:16

## 1

**1** 79:21 81:3 82:6,10,20 83:1,8,12, 19 84:6,9,12,16,21 85:1,7,13,20 86:1,7 87:10,18,24 88:6,13,16 90:22 91:8,12,25 92:6,12,18 93:20 94:2,9,20 95:13 96:1,6,11,17 97:18 98:9,14,23 99:3,9 102:12,15,18,24 103:5 104:1,25 105:10,17,21,24 106:3 112:3,12 115:13 116:7 125:5,11 149:21,24 150:3,5,8,12, 14,17,19,22,24 151:2,5 152:5,23 155:24 156:8,19 157:1,5

**10** 13:16 51:17

**13** 116:11 117:12 118:4

**13th** 117:25

**14th** 79:14

**15** 51:17

**16** 111:11 112:25

**17** 112:25

## 2

**2009** 14:8

**2010** 14:8

**2013** 116:18 117:21

**2015** 15:13 46:7,13 110:18 111:11, 20 112:25 116:11,18 117:13,21 118:4,22 124:16 125:13 128:18 129:2

**2016** 110:22 111:20

**2017** 111:5,12,20

**2:51** 160:3

## 3

**33** 33:15

**34** 33:8

## 5

**5608** 136:17

**5:00** 66:22

## 7

**7-eleven** 34:1

## 8

**8th** 116:8

## A

**a.m.** 66:22

**abiding** 123:2,3

**Abso--** 146:14

**absolutely** 35:1 36:5 65:5,8 95:7 98:19 121:2,5

**accepted** 76:13,17

**account** 102:16

**acknowledge** 6:7

**acknowledgement** 79:17

**act** 20:14 21:3 26:10,17 27:5,17 28:7,14

**acted** 30:6,13,19 114:13 133:24

**action** 129:7

**activity** 20:8

**acts** 19:11,16 43:17 54:10

**actual** 69:25

**Adderall** 74:24,25

**additional** 52:16

**address** 136:18

**adhered** 137:6

**admission** 79:17 80:13

**adversarial** 74:13

**adverse** 129:12

**advice** 7:19,22 9:8,13,17 46:14 50:22,23 62:1,2 75:21 79:9,11 124:8 125:4

**advise** 9:4 123:10,14

**advising** 70:19 72:3 75:20

**Advisors** 18:11,17

**affect** 74:19

**affixed** 47:21

**agency** 20:15

**agent** 20:14 63:11,15,16

**agents** 41:6 63:11

**agree** 12:19 32:11 41:18 68:14 108:15,19 118:20 119:18 129:11, 14 133:11,15,18,25 134:12,18 137:4 152:12

**agreement** 32:18 112:2,5

**agreements** 20:14 111:18,21,22 113:5

**ahead** 8:21 50:13 72:9 74:3 79:22 80:23 81:14 82:17 121:13

**allegation** 144:6,10 153:10,13 154:16

**allegations** 132:15 153:17

**alleged** 19:10 55:24 88:2 99:1 101:25 125:7,25 142:9 154:18 158:7 159:19

**allegedly** 31:2 63:6 104:4,16 151:7

**allowed** 10:10 20:7,10,13 136:24

**Amendment** 78:22 79:4,7,14 80:15 81:3,7,9,16 82:6 87:12,13 90:25 91:2,16,17 92:25 93:2 98:21, 22 104:3,7,11,12,23 105:1 112:6,7, 14,22 114:2,6,20,22 115:2,3,8 116:3,6 140:7,9,24 141:6,9,14 145:17,21 148:25 149:9,12 156:2,7 157:8,11

**amount** 53:4



EXHIBIT 1

**and/or** 11:19 81:13 112:22 123:4 129:20 132:1 147:16

**answers** 140:19

**anticipate** 5:22

**anybody's** 95:5 100:6 101:17

**anymore** 39:16 63:16

**apologize** 43:23 56:23

**apparently** 153:12

**appeared** 137:5,18

**approached** 37:13

**approximately** 6:17 14:18 18:7

**article** 68:24 77:14 133:3 142:25

**articles** 69:8 126:13 132:23

**Asian** 64:11,13

**asks** 10:8,23 33:21 40:3 55:20 56:2,18 103:10 152:14

**assert** 141:5,8,13

**asserting** 114:3,6

**assertion** 140:24 145:16

**Assistant** 13:18

**associate** 20:7,10

**assume** 159:2

**attempt** 81:12,17 95:15

**attempted** 79:7 80:21 85:22 108:18 125:19 132:7

**attempting** 51:3 87:21 150:1 158:23

**attorney** 13:18 16:20 38:22 39:11, 16 47:16 48:4,20 49:11 50:16 51:3, 7 97:9,20 113:17,20,25 114:13 115:10,19 116:2 133:24 136:20 143:17 144:22,25

**attorney's** 51:13 132:17

**attorney/client** 7:16 21:7 47:2 114:14,19

**attorneys** 45:25 46:2,7,9,12 47:11,19 48:15,21 61:21,23,25 96:24 97:14 98:2 106:9 110:18,22 111:4,11,18,23 112:24 113:12 114:12,18 115:12 122:23 141:8 143:4 144:11 159:14

**attorneys'** 50:25 51:10,11

**August** 116:11,18 117:12,21 118:2,3,12,22 124:16 128:18 129:2

**author** 153:15

**authority** 71:24 79:23

**aware** 20:3 34:5 35:2,14,21,23 36:1,10 38:4 59:2,5,8,23 64:8,10 66:6,9 67:13,18 73:6 89:11 93:14 99:22 107:24 108:3,8,17 110:3 119:20 121:9 128:14 134:4,12 141:21 151:19 156:12,16 158:2,6, 9,22

---

**B**

**back** 37:25 51:21 57:17 66:21 69:18 82:2,3 148:15

**background** 52:5 69:22

**bad** 13:11 43:19

**Barack** 145:1

**Barrett** 81:18

**based** 9:13,17 33:6 40:15 41:19,20 43:12 44:8 46:14 50:22 114:2,8,20 123:2,20,22 127:9 133:10,14 137:11

**basic** 32:8 80:14 127:21

**basically** 59:16 64:4 121:24 143:1 145:14

**basics** 121:16 128:7

**basis** 10:11 19:9

**beat** 143:22

**beginning** 35:12

**belief** 145:25

**Bell** 5:5,8,11,14,15,16,18,20 6:2,6, 10 7:7,8,11,13,14,17,21,24,25 8:1, 2,4,7,9,10,13,15,16,18,19,22,24 9:1,2,4,6,10,18,22 10:1,6,8,10,12, 14,16,17,18,19,20,21,23,25 11:2 12:3,12,17,19,23,25 13:7,9,22 14:1 15:3,7,12,14,16 16:16,21 17:1,3, 15,19 18:12,16,21,25 19:19,21,22 20:2,18 21:1,2,5,9,12,14,16,19 22:7,12 23:4,7,12,14,19,21 24:4,6, 9,12,15,18,25 25:3,6,9,11,13,16, 19,22,25 26:5,8,12,15,19,22 27:1, 4,8,11,15,16,20,23 28:2,5,9,12,16, 19,23 29:1,9,12,15,18,21,24 30:2, 5,8,11,15,18,22,25 31:3,6,10,12, 16,19,24 32:2,5,8,23 33:1,3,5,10, 11,14,15,19,21,23 34:7,9,12,15,18, 21 35:4,6,8,9,10,14 36:17 38:6,9 40:2,5,7,9,11,13,15,19,22 41:9,12, 14,16,18,25 42:6 43:4,6 44:3,4,6, 10,14 46:1,6,8,11,17,18,20,23,24 47:1,4,9,11,14,17,21,23,25 48:2,5, 7,8,9,11,12,13,17,18,22,25 49:2,4, 8,14,16,21,23,24,25 50:1,2,3,5,7, 11,14,18,19,21,24 51:13,16,18,21, 24 52:8,13,15 54:4,7,17,20 55:4,8, 19,22 56:2,5,17,21 57:6,7,9,10,13 60:1,2,12,18 61:16,18,24 62:4,8, 10,14,18,20,22,25 64:12,18 65:6,7, 9,10,14,16 67:1,3,5,9,12 68:19,22, 25 69:3,15,18,21 70:1,4,6,11,12, 17,19,21 71:4,7,10,16,21,25 72:3, 6,7,9,11,13,14,24 73:6,12,15,16, 21,24 74:2,4,8,11,15,18 75:13,16, 20,23 76:20,21 77:4,6,15,17 78:1, 4,8,10,15,18,25 79:3,6,10,22 80:2, 7,8,12,20,23 81:2,4,5,6,11,14,17, 20,22,24 82:1,5,7,9,12,13,15,17, 21,24 83:2,7,9,18,20 84:4,7,24 85:2,5,8,11,14,18,21,24 86:2,5,8, 11,14,15,18,20,23,25 87:1,5,7,11, 16,19,22,25 88:4,7,11,14,24 89:1, 6,10,16,18 90:1,3,6,8,14,15,20,24 91:6,9,13,14,19,21,23 92:1,4,7,10, 13,16,19,21,24 93:5,6,11,14,18,21, 25 94:3,7,10,11,13,18,21,25 95:4, 11,14,19,21,24 96:2,4,7,9,12,15,23 97:7,12,15,19,25 98:5,7,10,12,15 99:7,10,17,19,22,25 100:1,2,5,9, 11,13,16,19,21,22,23 101:3,6,13, 15,19,21 102:2,6,8,10,13,19,20,22, 25 103:3,6,10,13,18,21,24 104:2, 18,20 105:3,4,7,11,15,18 106:4,5, 13,16,20,22 107:1,3,8,10,12,14,16, 19 108:1,3,6,8,13,15,20,23 109:1, 2,8,9,20,22 110:1,3,9,12,13,16,24 111:1,7,9,14,16,25 112:1,2,4,5,8,9, 13,15,16,19,21 113:1,3,8,10,14,16, 18,22,23 114:1,4,5,7,10,15,17,25 115:1,6,7,8,9,14,16,17,20,22,23,25 116:2,13,14 117:8,10,16,18,23,24 118:23 119:6,15,17,22,24 120:9,11 121:1,3,12,13 122:20,22 123:6,13, 19,22 124:17,19 125:3,6,8,12,21, 23 126:1,3,7,8,9,11,16,18,22,24 127:1,3,5,7,9 129:10,13,15,17,19, 23,25 130:23,25 131:9,12 132:2,4, 11,13,18,20,24 133:1,5,6 134:7,9,

EXHIBIT 1

17,18 135:1,2,4,10,12,18,21,22,23 136:3,6,8,9,10,14,19 137:1,4,7,9, 13,14,16,18,24,25 138:2,4 139:13, 15,23,25 140:1,2,3,5,11,14,16,17, 20,22 141:2,5,11,13,25 142:3 147:21,25 148:2,5,10,12,15,21,23 149:2,5,7,11,14,16,18,22 151:21, 23,24 152:3,8,13,18,21 153:2 155:22,25 156:3,6,23 157:2,6,7,18, 24 159:5,10,21 160:1

Bell's 51:6

benefit 150:20 159:4,7

betrayed 25:20

big 120:24

Bionovelus 102:21 103:2

bizarre 37:23

black 102:9

blame 159:11

bleeding 67:2

boat 49:15

Bob 64:9 65:4 66:8

book 77:7,10,13 86:22,23 87:2,14, 20 88:2,9,10,15,18,22 89:3,8,9,14, 18 90:12 92:2,9,15,20,23,25 93:3, 9,17,22 94:4,15,22 95:9,15 96:3,8, 13 98:6 105:4,6,14,20,23 106:2 124:24 145:17,20,23,24,25 146:1, 5,11,19,24 147:8,16,20,24 148:3, 11 149:13,23 150:2,4,6,9,13,16,18, 21,23,25 151:4,6,10,13,14,16,17, 20,24 152:7,10,17,18,25 153:2,5, 14,15,22,23 154:3,6,12,18,23,24, 25 155:10,12,15,18,21 156:2,10, 13,15,17,21 157:3,8,12,14 158:3, 22,25 159:4,8,19

books 107:16 158:9,21

bound 90:11,12

Bowie 84:14,18

box 102:9

Braden 72:18,20 73:2

Brando 53:13

Brandon 5:15 13:10,13,15,17,21 14:2,8,12,14 15:2,17 16:19 18:2 19:1,7 21:23 22:1,5 23:3,9,17,24 24:2,7,13,19,23 25:4,14,20 26:3,9,

16,23 27:5,12,17,24 28:6,13,20 29:6,13,19,25 30:6,12,19 31:1,7, 13,20 32:3 34:6,10,16,21,25 35:3, 15 36:3,6,8,12,15,16 37:2,14,16 38:4,12,16 39:24 40:6,10,16,18 41:4,21 42:8,13,18 43:8,10,16 44:1,8,18,20,24 45:10,17,20 51:22 52:4,8,20 53:16,19,21 54:3,8,21,25 55:23 56:5,14 57:1,18,22 58:2,5,12 59:3,6,9,14,23 60:3,6,9 61:4 62:7, 15 63:6,9 64:2 67:7 68:23 69:7,12 73:9,19 74:5,12 76:18 77:23 79:8 83:4,10,13,16 84:11 85:4,16,23 86:4,9,16 88:18,21 89:3,9,14 90:4 94:6,16,23 95:5,16 96:19,20,22 97:5,6,23 98:3,17 99:2 103:1,21 104:4,15,21 106:17,18 107:20,24 108:4,11,17 109:6,11,15,18,23 110:6 116:11,25 117:4,11,19 118:22 119:1,11 120:1,7,17 121:6 122:3,10,18 123:1,13 124:11,15,21 125:18,24 126:4,12,19 127:10,11, 17,22 128:7,11 129:3,6,15,19,25 130:3,6,13,17,18,21 131:6,12,16, 17,24 132:7,14,21 133:2,7,10,14, 18,22 134:5,13,22 135:4 136:1 137:5 141:23 142:10 143:3,4 144:2,21 145:3 146:2,6,12 147:8, 15 152:9,16 153:4,11 154:7,13,17 155:14,17 156:1 159:11,15,17

Brandon's 37:21 42:24 52:2 118:7 123:22

breached 24:2 29:19 34:16 73:9

break 43:7 51:17,20 110:12,14,15 139:24 140:4 159:25

Brian 73:17 154:17

bring 125:19 127:5 128:10 131:13

bringing 104:21 127:13 131:17

broker 82:16

brokerage 102:16

Brooke 16:6 135:19,20

Brooks 52:23

brought 5:9 16:2,5,14 55:25 56:14 125:19

building 120:24

bunch 22:23

bus 158:23

business 16:22 17:9,13,25 18:10 52:19 78:20 99:11,20,24 100:8

businesses 52:21 99:13

buy 83:17 103:1

C

call 39:17 61:10,14,19,21 62:5 66:21 77:21,24 78:6 142:6 148:25

called 22:14,16 38:20,23 52:7 66:19 125:13,15,20 143:21,23 144:21

calling 45:10 143:20

calls 13:5,6 21:16 22:7 23:4,12,19 24:9,15,25 25:6,16,23 26:5,12,19 27:1,9,20 28:3,10,17,24 29:10,16, 22 30:3,9,16,23 31:4,11,17,24 32:6 34:13,19 40:11,12 42:1 44:11 54:5, 18 55:4 60:12 67:9 73:12,21 74:8, 15 94:11 145:1

Cameron 75:7,11,17,24 76:3 83:23 84:7 85:3,9,15,22 86:3 88:1, 9 92:14,20 93:9 94:14,22 105:22 114:23 141:7,14 157:2

candor 26:17

care 28:14 64:24 99:11,16,20,24 100:7 101:2,18 102:1 107:7 125:7 135:6

careful 41:5 42:10 121:7

careless 144:19

Carl 38:20 39:1,3,9,12,21 60:16 143:15,18

Carl's 39:11

case 19:4,10 47:6,13,20 50:17 52:3 56:10 58:23,24 59:5,24 63:24 65:18 67:14,17 68:7 72:25 73:2 75:8,10,19 83:24 84:8 114:8 121:19,22 128:4 135:5,9 136:15 142:5 144:20,22 145:2 155:8 156:22 158:5,21

cases 84:11 107:24 108:9,10,16

cash 5:13 90:16 91:3

Castle 38:21 39:4,20 41:2

cautious 121:7

CBS 133:3 134:22

hg

EXHIBIT 1

Center 117:4

certify 8:24

cetera 52:4 63:12 65:12 142:20 145:12

chain 79:19 80:5

chance 64:19

change 136:18 140:6,8,23

charge 127:12

charged 112:23

charges 69:25

Chavez 135:19

cheated 25:4

check 52:9 56:6,9 123:11,15 131:22

checks 52:5 120:18 122:11

child 75:9,10,18

circumstances 9:21 141:21

cited 70:25 71:9,17,20 72:1,15

civil 10:16

claim 103:8,16

claims 94:16

clarify 83:23

clean 72:12 81:11 128:24 140:21

clear 9:12 12:11 15:18 43:7 49:17 53:20 56:22 84:1 147:14 156:4

client 5:12,14 8:5 9:4 12:5 113:24 126:20 143:16 144:4,5 159:24

clients 24:14,20,24 25:5,15,21 26:4,11,17,24 27:7,13,18,25 28:7, 15,22 29:7,20 30:1,7,13,20 31:8, 14,21 34:11,17 40:1 52:6 69:13 73:20 74:7,14 103:23 104:5,16,17, 22,23 121:7 122:15 123:4,5 125:25 126:5,6,8,14,21 131:7 134:14,15, 23,24 137:12 139:17,20,21 152:11 153:16 154:12,15

close 14:24 36:23

cognizant 121:10

coincidence 136:23

Collar 18:11,17

collect 51:4

comment 6:7,8 131:20

comments 20:23 97:13 122:16 123:9

commercial 17:5

commit 69:23,24

committed 22:1 31:2 32:3 43:16 54:10,22 99:23 100:6,25 101:17

committing 101:25

common 154:5

communication 12:7 113:17,19

communications 7:12 48:24 49:1,5 106:23 115:18

companies 19:6 64:17 68:6 122:8,9 132:16 142:16 145:13

company 99:6 122:17 125:20 128:9

compelled 79:13,25 80:3,10

competent 73:19

complaint 67:24 142:18

completely 122:18

compounding 118:11 120:2

concept 128:10

concerned 63:23,24 68:1,8 142:17 146:23

concerns 68:6

concluded 160:3

conclusion 8:5,11 10:9,13,24 21:17 22:8 23:5,13,20 24:10,16 25:1,7,17,23 26:6,13,20 27:2,9,21 28:3,10,17,24 29:10,16,22 30:3,9, 16,23 31:4,11,17,25 32:6 33:22 34:13,19 40:3,12 42:1 44:11 54:5, 18 55:5,20 56:3,18 60:13 67:10 73:13,22 74:9,16 94:12 103:11,19 148:6 152:14

conduct 22:2,6 23:3,10,17 32:4 40:10,17,18 41:22,24 44:2,8,12 54:15 55:2,3,16,24 73:11 79:17 80:14 95:17 97:23 99:23 100:7 101:1,17 120:12,13 141:24

confidential 126:20

confidentiality 124:1

conflict 120:18 121:8 122:11 123:11

conflicts 52:9 56:6,9 74:6 121:18 123:15

confused 64:5 142:15

confusing 127:25

connect 37:3

connect's 37:3

connection 76:13,16

conned 158:18

conscience 138:1

Conscientious 138:12

considered 80:11

conspiracy 69:23,24

conspire 97:3 129:16,20

conspired 86:3

conspiring 19:12

Constitution 79:15

Construed 80:12,13

consult 113:25

consultant 107:4,6,11

consultation 111:10

consultations 114:12

consulted 48:16 111:4

contact 61:1 98:21 123:24

contacted 112:19

contempt 70:25 71:9,18,20 72:2, 16

continue 32:23 140:8

continued 123:23

contract 34:17

contractual 31:21

contrary 49:20

control 84:19

conversation 37:24 46:4 48:3,14, 19 49:10

conversations 49:11 115:18

EXHIBIT 1

157:19

convicted 6:11 20:11 69:22 70:15, 22

conviction 20:23 126:5

convoluted 64:16 144:7

cool 22:24 64:22 140:1

cooperating 66:2

copies 156:12

copy 88:22 90:17,18 91:4,10,18,22 92:1,8,15,20,22,23 93:8,17,22 96:3 105:20,23 106:2 125:1 148:11 149:13 150:15,25 155:20 156:9,15, 21 157:12

correct 5:17 7:2,4 9:15,18,19,24 10:7,22 11:3,6,7,10,15,16 12:14,16 13:2,3 17:14,18 19:14 20:5,8,9,11, 12,15 23:11,14,15,18,21 24:3,8,11, 14,20,24 25:5,15,18,21,24 26:4,7, 11,14,18,21,25 27:3,7,10,13,14,19, 22 28:1,4,8,11,15,18,22,25 29:8, 11,14,17,20,23 30:1,4,7,10,14,17, 21,24 31:2,5,8,9,15,18,23 32:1,4,7, 14 34:11,14 43:13,17 44:4,5,9 45:8 46:19,21 51:1,2 53:8,15,17,18,24, 25 54:11,12,16,19,23,24 55:6,9,10, 12,13,18,21 56:1,4,6,7,11,12,16,19 57:4,5,8 60:4,5 63:3,4,7 65:13,15, 18,19,22,23 66:4,5 67:8,11 68:12 70:23,24 71:1,2 72:10 77:3 86:10, 17,20,21 91:5,20 96:24 97:10,11, 14 98:18,19,22 101:18,20,22,23 104:5,6,9 107:25 108:2,5,7,12,14 109:7,9,16,17 113:9 117:5,13 118:9,11,13,15,22 119:20,21,23 120:7,8,10,15,16,18,19,20,21 121:22,23,25 122:1,3,4,11,12,15, 16,19,21 123:5,7,12,15,16,18,24, 25 124:2,3,6,7,9,10,12,13,16,18, 22,23 127:14,15,19,20 129:7,8 131:19,20 133:20 134:5 135:9,11 137:6,8,12,17,20,21,23 138:1,3,5, 7,9,11,13,15,17,19,21,23,25 139:2, 4,6,8,10,12 141:7,15,16,17,18,19, 20,24 146:13 147:9,11,12,17,18 151:8 157:10 159:1

counsel 5:8 7:19,23 8:4 9:9 10:3 19:19 46:14 50:23 62:2 72:24 75:21 79:9,11 100:10 125:4 156:5

couple 78:13 107:21 159:22

court 5:7 6:5 11:12 70:25 71:23 72:25 80:9

covered 109:23

Craig 72:22 73:2

crazier 42:22

created 151:7 153:14 154:6,12,23, 25

creating 152:9,10

cried 159:23

crimes 31:1

criminal 19:11,16 20:8,23 42:25 43:17 44:2 54:10,15 55:2 63:25 70:16 71:14,17 79:17,20 80:6,14 84:23 99:23 100:7,25 101:1,17 106:10 120:12 126:5

criminally 60:4 131:8

crook 42:24 45:1 119:1

cross 154:21

custody 75:9,10,19

cute 135:24,25

---

**D**

---

Dallas 68:24 69:7 142:25 143:1

damage 32:10 86:4

damaged 29:25

date 13:14 14:23 113:24 114:11

dates 13:12 111:10

daughter 135:12

David 5:8,14,16,20 6:6 7:7,8,14 8:4,10,15,19 9:4 10:1,4,8,12,16,18, 20,23 12:3,17,23 13:7,22 15:3,7,14 16:16 17:15 18:12,21 19:19,22 20:18 21:5,12,16 22:7 23:4,12,19 24:4,9,15,25 25:6,11,16,22 26:5, 12,19 27:1,8,15,20 28:2,9,16,23 29:9,15,21 30:2,8,15,22 31:3,10, 16,24 32:5,23 33:3,10,14,21 34:7, 12,18 35:4,8,10 36:17 38:6 40:2,7, 11,19 41:14,25 44:3,10 46:1,8,20 47:1,14,21,23 48:2,8,11,13,22 49:2,8,16,23,25 50:2,5,11,18,21 51:16,24 52:13 54:4,17 55:4,19 56:2,17 57:6,10 60:1,12 61:16,24 62:8,14,18,22 65:6,9,14 67:3,9

68:19,25 69:15 70:1,6,12,19 71:4, 10,21 72:3,7,13,24 73:12,15,21,24 74:8,15 75:13,20 76:20 77:4,15 78:1,8,15,25 79:10,22 80:2,8,12,23 81:4,6,14,20,24 82:1,7,9,13,17,24 83:7,18 84:4,24 85:11,18,24 86:5, 11,18,23 87:1,5,7,16,22 88:4,11,24 89:6,16 90:1,6,14,20 91:6,13,19,23 92:4,10,16,21 93:5,11,18,25 94:7, 11,18,25 95:11,19,24 96:4,9,15 97:7,15,25 98:7,12 99:7,17,19,25 100:2,9,13,21 101:3,13,19 102:2,6, 10,19,22 103:3,10,18,24 104:18 105:3,7,15 106:4,13,20 107:1,8,12, 14 108:1,6,13,20 109:8,20 110:1,9, 13,24 111:7,14,25 112:2,5,8,9,15, 16,19 113:1,8,14,16,22 114:1,5,15, 25 115:6,8,9,16,17,21,23 116:2,13 117:8,23 118:23 119:15,22 120:9 121:1,12 122:20 123:6,19 124:17 125:3,8,21 126:1,7,9,16,22,24 127:3,7 129:13,17,23 130:23 131:9 132:2,11,18,24 133:5 134:7,17 135:1,10,21,23 136:3,6,9 137:1,7, 13,16,24 138:2 139:13,25 140:2, 11,16 141:11,25 147:21,25 148:5, 12,15,21 149:2,7,14,18 151:21 152:3,13,21 155:22 156:3,23 157:6,18 159:5

day 38:23 52:12 120:23

deal 48:15 64:19 67:22 128:6 130:1 142:5,21,22 155:7,13 158:16

dealing 27:18 48:14 49:9 97:8

dealings 28:21 43:12 122:19 124:5 133:10,12,14,16,19,23 137:5 141:6

deals 130:4

dealt 28:14

December 15:13

deceptive 24:23

decision 84:19

decline 79:12

defamation 21:15,18,20 32:9,19, 21 33:6 34:3

defamatory 34:5 132:22

defamed 24:8

defendants 55:18



EXHIBIT 1

definition 33:17

defraud 109:24

defrauded 25:14

delay 57:11

denying 77:12,17

department 68:1,11 103:9,16 132:8

depo 64:20

deposed 6:24

deposition 5:25 6:1,13 7:2,6 10:7, 22 11:15,17 22:23 41:10 160:2

details 121:19,21

device 109:24

difference 12:13,20 13:4

differently 66:12,17

diligent 73:20

direct 12:13,14,20,21 21:25 22:4, 12,17,19 23:2,9,16,23 24:1,6,12, 18,22 25:3,13,19 26:2,8,15,16,22 27:4,11,16,23 28:5,12,19 29:1,3,5, 12,18,24 30:5,11,18,25 31:6,12,19 32:2 34:9,15 39:23 54:1,9 56:13,25 60:2 65:20,23 66:1 67:6 68:22 69:2,11,16 73:8,16 74:4,11 86:8,15 89:2,8,13 100:1,3,5,6,15,24 101:7, 8,14,16 103:6,14 106:16 109:5,11, 14,18,22 110:5 114:9 126:11,18 130:25 131:23 132:6,13,20 133:1,6 134:21

directed 64:3

directly 59:10 60:17 61:20 109:13

dirt 39:8

Disciplinary 73:10

disclose 27:24 39:24 139:16

discuss 16:22 17:13 18:16 53:5 55:14,15 128:17

discussed 17:7,20 19:7 51:23 53:9,18,21 55:23 63:5 89:15 112:25 118:21 119:18 120:13,14 121:15 149:4

discussing 52:20 53:8,13,16

discussion 20:1

discussions 33:6

divulge 139:16

doctor 119:19

doctors 118:11

documents 71:6

DOD 65:24 66:7,18

DOJ 155:9

dollar 53:3

dollars 53:2

Donson 52:23 53:1

door 37:7 38:2

double 23:8 43:22 56:22 134:9 146:8 147:13

downtown 15:4,18 18:3

draft 47:19 50:16

drafted 46:15 47:5

drink 17:23

drop 145:1

drugs 75:5 143:24

drum 126:4

duly 5:3

Dustin 19:5,17 142:20

duties 24:2 29:20 123:3 137:6

---

**E**

E.g. 79:24

earlier 20:19 67:21 101:11 107:23 143:17 145:18 146:11 149:4 152:6, 24

earning 76:11

easier 10:4

eating 36:20

end 97:9 123:9

enforcement 20:15 65:21 66:2

engaged 20:8 22:6 23:3,10,17,24 26:23 29:13 40:10,16,18 41:22,23 44:1,8 109:23 110:6

engaging 54:15

enter 20:13

entered 93:13

entities 31:22 55:25

entity 34:17

Entry 116:12,24

equitable 28:21 138:16

ethical 123:3 124:4 133:15 137:6

evidence 21:25 22:4 23:2,16 24:2, 7,22 25:14 26:3,9,16,23 27:12,17, 24 28:6,13,20 29:2,3,5,13,19,25 30:6,12,19 31:1,7,13,20 32:3 34:10,16 39:23 41:21 54:1,9,16,21 55:1,12,16 56:13,25 60:3 65:20 67:6 68:23 69:6,11,16 73:8,17 74:5,12 79:19 80:5,18 86:9,16 89:2,8,13 95:5,8 96:20 100:1,3,6, 15,24 101:14,16 103:7,14 106:17 108:11 109:5,11,14,18,23 110:5 125:18,23 126:3,12,19 130:11,20 131:1,5,23 132:6,14,21 133:2,7 134:21 135:7 144:3 146:25 155:1 159:9

evil 30:13

ex-girlfriend 143:21

exact 13:14

EXAMINATION 5:4

exclude 5:21

excluded 5:21 97:13

Excuse 5:8 94:11 151:21

exhibit 79:21 80:25 81:3 82:6,10, 19,25 83:8,12,19 84:5,9,12,16,21, 25 85:6,12,19,25 86:6 87:10,17,23 88:5,12,16 90:22 91:8,12,25 92:6, 12,18 93:20 94:2,9,20 95:13 96:1, 6,11,17 97:18 98:9,14,23 99:3,9 102:12,15,18,24 103:5 104:1,25 105:10,17,21,24 106:3 112:3,12 115:13 116:7 125:5,10 148:16 149:21,24 150:3,5,8,11,14,17,19, 22,24 151:2,5 152:5,23 155:24 156:8,19,25 157:5

exist 108:16,22,24 156:12

existed 157:14

existence 111:17

existing 104:22 123:5 126:6,14,21

131:7 134:14,24

explain 127:24 128:1 156:4

explained 66:12

exploited 126:19

expose 139:19

Express 67:20

extort 85:22 86:3 94:5,16

**F**

fabricate 94:15 95:15 97:21

fact 40:15 41:19,20 52:15 68:16 80:21

facts 22:1,5 23:23 26:3 27:25 28:6, 13,20 37:13 54:9 55:15 57:1 58:25 60:15 69:6,11 73:9,17 74:5,12 89:2,13 100:25 101:16 103:7,14 106:17 110:6 126:12 130:20 131:1, 5,24 132:7,14,21 134:22 135:7 142:12

failed 39:24

fair 22:23 27:12 28:21 32:16,17 36:2 41:24 58:4 68:18 69:5 82:6 89:10,12 100:23 101:15 138:14 146:10

faith 26:10

faithful 24:13 137:12

fall 125:13

false 21:22 85:16 103:8,15 110:7 134:4,13

falsified 109:19

fault 43:23 104:13

FBI 42:9 63:10 65:2,17 142:15 143:7 144:13 145:7

federal 126:4

fee 50:25 51:11,13 111:17,21,22 112:1,4 113:4 130:14

feel 45:14

fees 51:3,10 112:23

felon 6:11

felony 11:8 20:11

felt 45:11,12,13 63:25 144:18

fictitious 103:8,16 110:7

fidelity 28:7

fiduciary 29:19

figure 38:1 97:2 128:5

file 67:14

filed 12:10 46:18,19 47:6,13,20 50:17 51:4,9,12 67:16 72:25

filibuster 50:8

final 15:1

find 53:23 96:21 97:3

fine 48:11 81:5 82:13 135:14 140:16

finish 50:5,6 70:6 80:8

fired 39:16

firm 56:9 120:24 153:19

firm's 144:5

firsthand 45:2

Fleming 38:20 60:16 143:18

folks 5:6,12 6:4 20:10 43:12 54:14 56:15 65:21,22 66:3 67:8 69:14 82:16 101:22 102:20 126:15 131:2 132:10 141:22 158:23

follow 10:15 36:3

Forest 102:4 116:17 117:4

forget 15:6

form 8:12,14 10:8,11,14,15,24 11:19,21 12:17,23 13:7,22 15:3,14 16:16 17:15 18:12 21:17 22:8 23:5, 13,20 24:4,9,16 25:1,7,16,22 26:6, 12,20 27:1,8,15,21 28:2,9,16,23 29:9,15,21 30:2,8,15,22 31:3,10, 16,24 32:5 33:4,10,21 34:7,12,18 35:4,13 36:17 38:6 40:2,7,11,19 41:25 44:3,10 46:20 51:24 52:13 54:4,17 55:4,19 56:17 57:6 60:1,13 62:8,14 65:6,9,14 67:10 68:20,25 69:15 71:21 73:15,22 74:9,16 76:20 77:4,15 78:1,15 82:17 83:18 84:24 85:5,11,18,24 86:5,11,18 87:16,22 88:4,11,24 89:6,16 90:1, 6,14,20 91:6,13,19,23 92:4,10,16, 21 93:5,11,18,25 94:7,18,25 95:11, 19,24 96:4,9,15 97:25 98:7,12 99:7,25 100:2,9 101:3,13,19 102:2, 10,19,22 103:3,10,18,24 104:18

105:3,7,15 106:4,20 107:1,8,12 108:1,6,13,20 109:8,20 110:1,9,24 111:7,14,25 113:1,8,14 114:15,25 115:6,19,23 116:13 117:8,23 118:23 119:22 120:9 121:1,12 122:20 123:6,19 124:17 125:3,9,21 126:1,7,9,16,22 129:13,17,23 130:23 131:9 132:2,11,18,24 133:5 134:7,17 135:10 137:7,13,24 138:2 139:13 141:25 147:21 148:12 149:2 151:22 152:3,13,21 155:22 156:3,24 157:6 159:5

Fort 135:5

forthright 137:20

Forty-six 33:12

forward 129:16,20

found 37:22

Fourteen 135:16

frame 94:23 95:1,5

frank 137:22

fraud 29:14 69:23,24,25 70:22,23

fraudulent 103:8,16 110:7

fraudulently 94:15 95:15 97:22

freaking 38:23

friend 15:5 16:2,4,9,14 37:17 38:20 60:6 77:22 83:23 84:18 127:23

friends 16:19 45:20 78:10 134:1 157:16

front 71:11

fucked 37:20

fully 27:24

functions 80:14

funny 146:19

future 134:15

fuzzies 68:16

fuzzy 68:14

**G**

gain 118:7

gal 135:18

EXHIBIT 1

Garza 117:20

Gates 14:16,21 15:18 18:7 19:1 60:19 61:1,4,6,10,12,19 62:6,12 63:1,3 81:19 98:11,21 99:1 116:19, 25 117:5,12 122:15 123:5

Gates' 62:6

gave 52:11 93:21 120:1

general 113:11

gentleman 15:6 117:19

girl 136:4 143:20

give 23:22 32:24 39:8 52:16 54:13, 21,25 57:9,10 63:3 124:8 127:1,17 153:24 156:9 159:21

giving 33:1 63:20

glad 49:25 50:6

gladly 82:1,3

good 26:10 43:2 63:20 135:15 157:22

Gosh 107:21

government 21:4 80:18 158:13

graphs 158:16

great 84:2

grossly 31:14

Grunewald 80:15

guess 19:12 39:10,13 58:19 75:9 77:24 99:14 119:14,15 136:24 142:13 143:6 144:12 147:3

Gus 19:3 54:14 55:12,23 77:24 78:5,11 80:22 81:13 87:14,20 99:5 106:24 120:1,6 122:10,19 124:8 127:24 146:1,11 147:6,16,17,20 150:4 151:7 152:20 153:16 155:17 156:15

guy 16:19 36:21,25 37:3,7 38:2 42:19 43:11 46:5 53:1 59:15,16,18 60:17 64:11 77:21 78:5 143:15,18, 19

guys 36:19 137:22

**H**

half 15:25

Halsey 42:5,7,8 61:5 62:10,13

63:5,8 64:6,9 65:1,17,20 66:2 67:6, 13,16 68:8,14 77:3,7,9,13,20 78:5 80:21 81:13 83:22 84:14,23 85:10 86:9,16 88:3,8,15,19,23 89:4,15,19 90:16 91:3,11 92:3,8,15 93:16,22, 24 94:5,15,23 95:22,23 96:3,8,14 99:5 105:5,14,19,23 106:1,24 124:25 131:25 132:22 143:5 147:17 150:7 151:7,16 152:1,20 153:15 154:6,12,23 155:1,4,8,12, 14,21 156:9,20 157:15,22 158:4,7, 10,11

Halsey's 67:22 133:8 155:5

hand 36:21 98:15,20 151:4

handed 154:14

handling 144:22

happen 39:19 98:17

happened 35:12 71:22 124:20

happy 149:5

harm 32:20 131:3 153:1

harmed 24:19 60:10

harms 33:19

Harvard 136:2,4,5,6

heads 99:6

health 99:11,15,20,24 100:7 101:2,18,25 107:7 125:7 135:6

hear 12:22 45:24 131:12 143:14 144:6,10 145:20

heard 11:18 38:7,15 40:20 41:5 42:14 43:11 45:22,25 46:2 60:16, 22 61:5 77:21 96:19 109:10 125:14 136:13 142:2,7,9,22 143:2,6,12,15 144:1,9,21,25 145:4,22,23,24 146:18 152:15 158:24 159:14,17

hearing 58:18,21

hearsay 59:20 142:1

held 151:3,4

helped 47:19 50:16 56:14 103:22 126:13 131:25 153:15

helping 134:2

hey 38:21 39:5 41:4 96:20 135:21 158:15

higher 71:24

Hillstone 36:20 37:13 46:5 59:15 60:17 143:18

hired 35:18 36:3,6,10 83:24 84:8, 10

Hoffman 79:24

Hoi 143:19

home 63:21

Homeland 132:8

honest 42:17 124:4 133:11,19

honesty 27:18

Honorable 138:4,20

hookup 41:4

hoping 68:10

hospital 119:19

hospitals 118:11

hotel 15:4,6,18 16:15 18:3 124:20

hour 14:18 15:25 18:7 51:17

house 65:24 66:7

Howard 136:9

Howell 81:18

huge 135:5

Huh-uh 51:8

hundreds 135:6

hurt 146:20

**I**

ID 16:23 17:2 134:2

idea 39:9 88:25 89:20 105:11,13, 19,22,25

identify 5:9 110:21 111:3 113:19 114:18

identity 110:17

ill 30:6 36:8

illegal 22:2 41:22,23 55:2 130:3

Impartial 138:24

impedes 21:6

implicate 95:16 97:22 141:22

hg

**EXHIBIT 1**

implicating 141:23

implication 152:8

important 39:2

impression 121:3

improper 144:24

in-person 13:21

inaccurate 134:4,13

inadvertently 149:9

inappropriate 124:21

incident 36:18

including 25:15 57:2 68:7 84:11 96:23 98:2

incriminate 148:3

incriminating 80:18

indicating 36:24 37:8 46:17 61:11 152:7

indicted 41:7 44:21 155:6 158:12

indictment 158:19

indifferent 145:6

indirect 12:13,21,25 22:18 59:13 142:11,12

individual 79:25

individuals 68:7

inferred 152:6,24

influence 84:18

informant 86:10,17

information 39:25 63:12,14,20 69:13 97:22 109:19 110:22 118:10, 14 127:17 131:25 139:16,20 142:19 143:8 145:12 154:4,24

informer 20:14 21:3

initial 111:10 113:25 114:11

injure 109:24

innocent 80:15,16

inquiring 70:7

insist 5:23

Instagram 102:13,17

instruct 35:7 49:6 150:13 157:3

instructed 12:4 92:7,14

instructing 49:8

instructions 11:20

instructs 11:24

integrity 27:6 133:20,24

intent 149:23

interacted 107:20

interaction 124:6

interactions 106:24

interested 52:1

interests 74:6

interfered 31:20

interject 20:19

interrupting 47:24 48:10

intimate 121:19,21

intimidate 37:23 108:18 109:6,12, 15

intimidating 36:22

introduce 5:6 6:4

introducing 99:5

invade 7:15

invest 83:5,10

investigate 36:12 37:4 38:5,16 132:9

investigated 35:15 37:15 101:9

investigating 36:15,16 38:13,17 59:2

investigation 37:18 59:8,14,24 62:6 77:23 108:4

investigations 108:9,16,22,24 109:3

investigator 34:24 35:3 36:3,11

investigators 35:15,17,22

investments 143:22

investors 142:25

invocation 79:16 80:9 148:25

invoke 79:13 81:3,9

invoking 81:6

involved 82:22 149:25 150:1 155:7 159:19

involves 71:23

involving 16:22 79:1 97:8

IPOS 99:6

IR 58:18

irrespective 43:11

IRS 37:3,17 41:4,6 44:21 45:20 58:20 59:2 77:21,22 78:5 143:13

issuance 133:7

issue 104:8

## J

James 5:11,15,18 6:2,10 7:11,17, 24,25 8:1,7,13,16,22,24 9:1,6,10 10:4,6,10,14,17,19,21,25 11:2 12:12,19,25 13:9 14:1 15:12,16 16:21 17:1,3,19 18:16,25 19:21 20:2 21:1,2,9,14,19 22:12 23:7,14, 21 24:6,12,18 25:3,9,13,19,25 26:8,15,22 27:4,11,16,23 28:5,12, 19 29:1,12,18,24 30:5,11,18,25 31:6,12,19 32:2,8 33:1,5,11,15,19, 23 34:9,15,21 35:6,9,14 38:9 40:5, 9,13,15,22 41:9,12,16,18 42:6 43:4,6 44:4,6,14 46:6,11,23 47:4, 17,25 48:5,7,8,9,12,17,18,25 49:4, 14,21,24 50:1,3,7,14,19,24 51:18, 21 52:8,15 54:7,20 55:8,22 56:5,21 57:7,9,13 60:2,18 61:18 62:4,10, 20,25 64:12,18 65:7,10,16 67:1,5, 12 68:22 69:3,18,21 70:4,11,17,21 71:7,16,25 72:6,9,11,14 73:6,16 74:2,4,11,18 75:16,23 76:21 77:6, 17 78:4,10,18 79:3,6 80:7,20 81:2, 5,11,17,22 82:5,12,15,21 83:2,9,20 84:7 85:2,5,8,14,21 86:2,8,14,15, 20,25 87:11,19,25 88:7,14 89:1,10, 18 90:3,8,15,24 91:9,14,21 92:1,7, 13,19,24 93:6,14,21 94:3,10,13,21 95:4,14,21 96:2,7,12,23 97:12,19 98:5,10,15 99:10,22 100:1,5,11,16, 19,22,23 101:6,15,21 102:8,13,20, 25 103:6,13,21 104:2,20 105:4,11, 18 106:5,16,22 107:3,10,16,19 108:3,8,15,23 109:1,2,9,22 110:3, 12,16 111:1,9,16 112:1,4,13,21 113:3,10,18,23 114:4,7,10,17 115:1,7,14,20,25 116:14 117:10,

16,18,24 119:6,17,24 120:11 121:3,13 122:22 123:13,22 124:19 125:6,12,23 126:3,8,11,18 127:1,5, 9 129:10,15,19,25 130:25 131:12 132:4,13,20 133:1,6 134:9,18 135:2,4,12,18,22 136:8,10,14,19 137:4,9,14,18,25 138:4 139:15,23 140:1,3,5,14,17,20,22 141:2,5,13 142:3 148:2,10,23 149:5,11,16,22 151:23,24 152:8,18 153:2 155:25 156:6 157:2,7,24 159:10,21 160:1

**Jim** 76:1,5 84:10 85:3,9,15,22 86:3 88:1,9 92:14,19 93:10 94:22 105:25 106:5,9 115:4 141:17 157:2

**Joe** 34:1 106:9 117:20 141:19

**Judge** 71:3,8,11 91:21 99:4 106:15

**jury** 5:7 6:5

**Justice** 68:1,11

### K

**K&I** 14:16,21 15:18 18:7 19:1 60:19 61:1,3,6,10,12,19 62:6,12 63:1,3 81:18 98:11,21 99:1 116:19, 24 117:5,12 122:15 123:5

**keepmyid.com** 17:4,5

**keepmyid.org** 17:14

**keepmyid.org.** 17:7

**Kelley** 5:13

**Kendall** 106:9,15 141:19

**Kepler** 19:3 52:1 57:13 77:25 78:5, 11 80:22 81:13 87:15,20 106:24 132:22 147:17 150:4 151:17 152:1 155:17 156:15

**Kevin** 69:12 142:17 145:9,11

**kickback** 106:18

**kind** 13:11 17:9,25 26:24 27:6 30:19 35:21 36:21,22 39:25 45:12 55:3 64:16 77:7 89:8,21 95:16 128:7 133:25 134:23 141:24 142:5, 6 152:7 153:24 157:15 158:13,14

**kinds** 142:7

**knew** 147:15 154:13

**knowingly** 149:9

**knowledge** 12:13,14,20,21 13:1 19:13 22:1,4,13,17,19,21 23:9,16, 23 24:1,7,13,19,22 25:4,14,20 26:1,2,9,16 27:5 28:6 29:6 30:12 31:1,13 34:16 36:14 38:12 40:16 41:21 44:9,14,15,18 45:2,22 52:2 54:9 56:20 57:1,21 59:13 63:2 65:23 66:1 69:6,11 73:8,17 74:5,12 89:2,13 100:6,24 101:7,8,16 103:7, 14 106:17 108:10 110:5,19 118:7 123:21 126:12 130:20 131:1,5,23 132:6,14,21 134:15,21 142:11 153:9 154:5

**Krause** 69:12 142:17,18 145:9,10

### L

**lasted** 18:7

**law** 20:15 49:13,18,19,20 65:21 66:2 114:8 120:24 123:21 127:18 136:12,13 156:4

**Lawful** 139:7

**lawsuit** 12:10 70:13 71:12 125:19 128:14 154:15

**lawyer** 7:7,12,21 8:3,9 9:3,13,17, 18,22 11:19 21:8 23:1 75:8,15 106:6 122:23 124:2 157:19

**lawyers** 12:7,9 107:11 112:10,17 113:5

**leak** 139:19

**learn** 96:12

**learned** 59:15 143:4

**leave** 148:21

**led** 9:21

**left** 90:23

**legal** 8:5,11 10:9,13,23 21:17 22:7 23:5,12,19 24:10,16 25:1,6,17,23 26:6,13,20 27:2,9,21 28:3,10,17,24 29:10,16,22 30:3,9,16,23 31:4,11, 17,25 32:6,24 33:1,22 34:13,19 40:3,12 42:1 44:11 54:5,18 55:5,20 56:3,18 60:12 62:1 67:10 73:13,22 74:9,15 94:12 103:11,19 123:3 124:8 137:6 139:9 148:6 152:14

**Legitimate** 139:11

**liar** 40:6

**lie** 11:9 32:13 33:23 34:3

**life** 10:4 142:6

**Lifelock** 17:10

**limited** 57:3 123:21 124:5

**link** 79:19 80:4

**List** 46:6

**listened** 123:9 124:12 131:21

**listing** 120:3

**live** 136:24

**living** 33:7 76:7,9,11 136:15

**local** 53:1

**long** 14:17 15:24 136:17

**longer** 60:18

**looked** 36:21,23 37:25

**lot** 41:10 53:10 58:17 67:21 142:2 143:5

**loyal** 26:4 133:23

**loyalty** 133:24

### M

**mad** 45:15

**made** 21:22 29:6 32:19 34:6,10 45:17 58:14 65:3 85:16 99:15 110:8 122:16 134:5,14 142:21 144:17 147:17 154:16 157:23 158:4,7,10,12

**mail** 69:24 70:23

**main** 144:12

**maintain** 124:1 140:8

**make** 8:24 10:2,4 32:25 56:21 83:25 94:16 97:22 104:10 114:8 120:23 123:8 128:3,5 129:25 130:3 154:9

**makes** 154:10

**making** 79:23 84:19 153:19 157:15

**malice** 30:20

**man** 38:21,24 39:1,5,15,17,19 41:4 42:9 63:19 65:3 117:19

EXHIBIT 1

mark 80:25

marked 79:21

market 17:8,13

marketing 17:8,10,13

Massachusetts 136:6

Matalee 136:17

material 39:24

matt 5:13,16 110:15

matter 21:6 39:12 55:1 57:19 58:13 59:24 69:14 70:9 71:15,23 75:12,18 79:1 111:12,19 112:24 113:6,13

matters 12:10 20:21,22 70:16 106:10

Mccarthy 5:15 13:10,13,15,21 14:3,8,12,15 15:2,17 17:2 18:2 21:23 22:1,5 23:3,10,17,24 24:2,7, 13,19,23 25:4,14,20 26:3,9,16,23 27:5,12,17,24 28:7,14,20 29:6,13, 19,25 30:6,12,19 31:1,7,13,20 32:3 34:6,10,16,22,25 35:3,16 36:4,12, 15,16 37:2,14,17 38:5,13,16 39:24 40:6,10,16,18 41:21 43:8,10 51:22 52:20 53:14,17,19,21 54:3,8,21,25 55:23 56:14 57:1,14,19,22 58:2,5, 12 59:3,6,9,14,23 60:3,6,9 61:4 62:7 63:6,9 68:23 69:7,12 73:9,19 74:6,13 76:18 79:8 83:5,10,14,16 84:11 85:4,17,23 86:4,9,16 88:18, 22 89:3,14 90:4,23 93:13 94:6,16, 24 95:5,16 97:23 98:17 99:2 103:1, 22 104:4,15,21 106:18 107:20,25 108:4,12,18 109:6,12,15,19,23 110:6 116:11,25 117:5,11,19 118:22 120:17 122:3,10 125:18 126:4,13 127:10,11,17 128:11 129:3,6,15,19,25 130:3,6,10,13,17, 18,21 131:1,6,13,16,17,24 132:7, 15,21 133:2,7,11,14,18,22 134:5, 13,22 135:5 136:2,4 137:5,9,11,18, 20,22,25 139:15,19 141:23 142:10 143:3,4 147:15 151:15 152:7,9 153:1 154:13,17 155:11,15,18 156:1 159:11,15,17

Mccarthy's 126:19 154:13

meaning 22:9 58:12

means 139:14

meant 91:15

media 17:5

Medical 117:4

medications 74:19,21

meet 8:18 13:9,17 38:24 63:10 140:13

meeting 14:7,9,14,17,19,21 15:1, 10,24 16:1,5,14,22 17:3,12,18,20, 21 18:3,6,15 19:1,2 47:15 48:4,15, 19 51:22 53:5,8,13,17,23 54:3,8, 13,20,23 55:1,14,15 56:1 57:14 65:17,21 113:25 116:8,11,17,25 117:5,12,21,25 118:4,12,16,18,21 119:9,13,20 120:13 121:6,22 124:11,15,20 127:11,16 128:18 129:2 135:19 140:13

meetings 13:21,24 14:11 15:17,21 21:8 48:6 111:11 114:12 131:18

memory 52:24 53:4

men 80:15

mentioned 52:23 53:1,3 120:12 132:16 143:16

message 124:25

messages 88:19,23 89:4 91:5,11 93:23 94:4 96:13 105:5 151:25 152:19

messaging 89:19 147:1

messed 45:5 97:6

messing 63:22

met 13:11,13,15 14:10 16:18 39:3 47:9 48:21 61:6,7 110:18 111:11 145:9

Miller 64:10 65:4 66:8

millions 53:2 135:6

mind 10:3 140:6,23 154:22 159:13

mine 15:5 38:20

minutes 51:17,19 127:2 141:3 159:21

misconduct 99:1 101:1,25

misrepresentations 29:7 34:10

missing 49:14 146:22

mistake 58:13

misunderstanding 84:1

mixed 67:19

moment 15:23

money 76:13,16,17 93:21 95:22 99:15 128:4,6

months 15:10 143:23

Moral 138:8

morning 66:21 68:24 69:8

motion 46:15,24 47:5,12,19,20 50:16,24 51:4,9,12 57:17

motions 46:18

motive 30:13

mouth 80:19

move 5:25 117:16 129:16,20

moving 64:24

murdered 34:1

Myers 81:18

mystockbuy 102:14

## N

named 38:20 65:4

names 48:20 52:11,16,21 53:10 54:14 61:23 68:15 111:4 122:2,7,9

naming 49:10

narrative 13:6

narrow 100:12,14,17

Nathan 42:5,7,8 61:5 62:10,13,15, 16 63:5,8,15,18 64:4,6,8 65:1,11 66:2,18 77:2,7,9,12,20,23 78:5 80:21 81:13 83:22 84:13,22 85:10 86:9,12,16 88:2,8,15,19,23 89:4, 15,19 90:15,25 91:3,11 92:2,8,15 93:16,22,23 94:5,15,23 95:22,23 96:2,8,14 99:5 105:5,13,19,23 106:1,24 124:25 131:25 142:14,23, 24 143:7 144:14,23 145:1,8 146:2, 12,25 147:6,16,17,20 150:6 153:6, 15 154:5,12,22 155:21 156:9,20

Nathan's 142:18 144:22

nature 78:21 147:2 155:2

needed 64:1 77:20 78:5 94:14 120:17 122:11

nefarious 141:24

negative 23:8 43:22 134:9 146:8 147:13

negatives 56:22

negligent 31:7,14

nervous 39:4 144:17

Neutral 139:5

news 66:11,13 68:24 69:8 126:13 132:23 133:3

newspaper 142:19

nice 42:19 43:11

night 34:1

nonattorney 115:21

nonresponsive 7:25 43:5 86:14 109:1

notice 5:24

numerous 38:8 109:10 143:12

## O

oath 11:3,9 64:20 88:17 89:25

Obama 145:1

object 7:8,22 8:11 9:8,11 10:11,15 32:24 35:6,13 41:12,17 43:4 71:4 74:1 100:19

objecting 33:3

objection 5:24 7:25 8:12,13 10:8, 14,24 12:17,23 13:7,22 15:3,14 16:16 17:15 18:12 20:19 21:5,16, 17 22:8 23:4,5,13,20 24:4,9,15,25 25:1,7,10,16,22,23 26:5,6,12,13, 19,20 27:1,8,9,15,20,21 28:2,3,9, 10,16,17,23,24 29:9,10,15,16,21, 22 30:2,3,8,9,15,16,22,23 31:3,4, 10,11,16,17,24,25 32:5,6 33:10,21 34:7,12,13,18,19 35:4 36:17 38:6 40:2,3,7,11,19 41:25 42:1 44:3,10, 11 46:8,20 51:24 52:13 54:4,5,17, 18 55:4,19,20 56:2,17,18 57:6 60:1,13 62:8,14 65:6,9,14 67:9,10 68:19,25 69:1,15 71:21 73:12,15, 21,22 74:3,8,9,16 76:20 77:4,15 78:1,15 80:23 81:20 82:17,24 83:7, 18 84:4,24 85:5,11,18,24 86:5,11, 14,18 87:16,22 88:4,11,24 89:6,16 90:1,6,14,20 91:6,13,19,23 92:4,

10,16,21 93:5,11,18,25 94:7,18,25 95:11,19,24 96:4,9,15 97:25 98:7, 12 99:7,25 100:2,9 101:3,13,19 102:2,10,19,22 103:3,10,18,24 104:18 105:3,7,15 106:4,20 107:1, 2,8,12,14 108:1,6,13,20 109:1,8,20 110:1,9,24 111:7,14,25 113:1,8,14 114:15,25 115:6,19,23 116:13 117:8,23 118:23 119:22 120:9 121:1,12 122:20 123:6,19 124:17 125:3,8,9,21 126:1,7,9,16,22 129:13,17,23 130:23 131:9 132:2, 11,18,24 133:5 134:7,17 135:10 137:24 138:2 139:13 141:25 147:21 148:12 149:2 151:21 152:3, 13,21 155:22 156:3,23 157:6 159:5

objections 11:18 57:17

objects 11:20

obligations 123:4

observations 123:3 137:11

obtain 96:20 131:25 147:19,24 148:11 149:12 150:9,13 155:1,20 157:12

obtained 146:25

obtaining 150:21

offer 92:8,14 93:16 94:23 105:13, 19,25 106:1 124:25 157:3

offered 77:2,9,12 87:14,19 88:8

offering 77:7 91:3 92:2 95:22 98:5 156:20

office 132:17 143:7

Ohio 80:19

one's 32:20

opinion 32:24 33:2 67:24 124:22

opportunity 11:15

oral 32:10

order 46:16,25 47:6,12,20 50:17, 25 51:5,13 57:18 97:22

original 15:10

outlined 128:7

overtalk 10:2

overview 121:24 127:21

## P

P-O-W-E-R 72:24

p.m. 160:3

paid 76:3,5,25 106:22 107:4,6,10 115:7

paper 34:2

paperwork 100:4

Pardon 57:7

Park 102:4 116:17 117:4

part 10:18 17:16 20:6 70:8

participate 98:3

parties 55:16

party 41:5 70:12 71:12

pass 37:18

Patrick 73:2

pause 61:17 69:20 110:11 127:8 129:9 131:11 135:3 136:11 148:18

pay 77:2 88:14 91:18 93:22 105:6, 12,19,22 124:25

payments 76:22

pending 39:14

people 16:11 17:23 22:10 37:5,21 38:8 40:25 42:3 44:19 45:4 63:22 64:17 73:4 101:4 102:4 109:10 142:8 143:20 146:20 159:6,7,8

perceived 45:16

performed 113:12

peril 6:8

period 97:9

permission 20:16 21:3

perplexed 19:23

person 22:14,16 37:19 42:18 44:21 45:20 96:21 101:8 121:20,22 122:17 128:9

person's 37:10

personal 19:13 22:21 38:12 40:16 41:21 43:12 44:9,12,14,18 45:20 57:20 63:2 108:10 125:24

**personally** 22:10,20 35:23 44:23 99:22 108:4 130:7

**persons** 20:8

**perspective** 68:4

**persuade** 132:8

**pharma** 107:4

**pharmacies** 67:20 76:14 118:11 120:3,6,11 122:5,14

**pharmacy** 64:10 66:9 67:17 119:19 125:15 131:18

**phone** 22:10 45:9 61:8,14,15,19 65:25 66:7,20,22 133:8

**physical** 14:2

**physically** 13:24

**picking** 45:9

**pickle** 155:4

**pills** 75:2

**pitching** 116:11

**pizza** 127:5 139:23

**place** 14:22

**placing** 5:24

**plaintiff** 58:12 128:13 129:7

**plan** 128:13

**plant** 97:21

**plead** 78:19 81:15,22 82:5,19,25 83:8,12,19 84:5,9,12,16,21,25 85:6,12,19,25 86:6 87:9,17,23 88:5,12,16 90:21,24 91:2,7,10,12, 14,16,24 92:5,11,17 93:1,3,19 94:1,8,19 95:12,25 96:5,10,16 97:17 98:8,13,23 99:3,8 102:11,15, 18,23 103:4,25 104:2 105:9,16,21, 24 106:3 112:3,7,11,13 115:12 125:5,10 147:22 148:8,13 149:24 150:3,5,8,11,14,17,19,22,24 151:2, 5 152:4,22 155:23 156:19,25 157:5

**pleading** 58:14 91:17 95:10 115:14 116:6 149:11,20 156:1,8 157:7,11

**pleadings** 20:21,25

**pled** 92:24

**plenty** 63:18

**point** 18:14 45:11 51:10 67:12 76:12 77:2 126:25 127:13 136:15 147:19 157:17

**portion** 130:7

**position** 22:5 103:15

**Positive** 136:10

**possessed** 88:10

**possibility** 128:2

**possibly** 19:4 41:8 52:2 67:25 110:18,22 118:15,17,19 119:16

**potential** 52:12 69:13 76:23 104:17,22 107:24 108:9 109:4 135:8

**potentially** 17:4 52:22 54:14 55:17 56:9,10 58:16 93:22 122:15

**power** 41:14 72:18,20,22 73:2

**Powerpoint** 77:13 89:21,24 92:2, 9 93:9 125:1,6 130:16 145:21,22

**Powerpoints** 90:9

**predicate** 40:12

**prefer** 25:11 82:10

**prepared** 123:1

**prescription** 74:22

**presence** 14:2 93:9

**present** 13:24 71:13 110:15

**presentation** 77:14 89:22,24 93:7 125:2,7 130:16 158:22

**presentations** 57:14 157:16,23 158:2,7,10,12,15,20

**presented** 103:8,15 133:23

**presenting** 132:15

**pretty** 14:24 17:10 119:3

**previous** 127:10

**previously** 70:15

**pride** 158:14

**prided** 157:15 158:14

**primarily** 118:6

**principals** 128:11 132:4

**Principled** 138:10

**print** 34:2

**prior** 47:20 70:16 92:2 155:6,7

**Prisoner** 116:12,24

**private** 34:24 35:2,15,17 36:3,11

**privately** 35:18 36:15

**privilege** 7:16 12:8 21:7 79:13,16 80:9 114:20 140:24 141:6,14 149:1

**privileged** 48:24 49:12

**pro** 46:19,25 50:16 51:9,12

**problem** 50:2 100:21

**procedure** 120:22

**procedures** 121:9

**proceed** 6:8 10:20 120:20

**proceeding** 148:18

**proceedings** 5:23 61:17 69:20 90:23 93:13 108:9,17 109:4 110:11 127:8 129:9 131:11 135:3 136:11 160:3

**produce** 71:5

**produced** 153:5,14

**professional** 73:11 122:19,24 123:2

**professionalism** 123:23

**Progen** 53:5,8,11,13,16,18,21 57:3 125:20 128:11,14,17 129:2, 11,12 130:21 131:13 132:1,9,16

**Program** 116:12,24

**proper** 104:14 120:2

**prosecute** 83:24 84:8,11 85:4,10 157:4

**prosecuted** 60:4 131:8

**prosecution** 79:20 80:6 84:23

**Prosecutor** 84:14,18

**prospective** 126:8 131:7 139:20

**Prospere** 66:19 155:6 157:17,24

**protect** 16:23 80:15

**protective** 46:15,24 47:6,12,19 50:17,25 51:4,12 57:17

**protectmyid.org.** 16:24

provide 73:19 79:25 80:4,17 108:11

public 35:18 70:8 71:5,13 106:13

publicly 36:16

publish 132:22

published 126:13

purchase 87:14,20,21 149:23 150:2

purpose 17:12 54:13 113:11

pursue 52:22 154:14 156:17,22 158:23

put 36:21 102:16 125:24 143:13

putting 159:18

## Q

qualified 32:25

question 7:15,20 8:2,6,8,17,21 9:2,12,17,23 11:19,21,22 13:5 14:1 21:10,12 33:4 35:11 40:22 43:20 46:12 47:5,9,18 48:3,7,14,23 49:7,9 50:15,20 59:1 60:25 62:5,18,22 66:15 68:3 70:14,18,22 71:8,17,20 72:1,15,19 75:17 79:12 97:13,16,20 102:6 104:14 108:25 109:2 110:17 111:2,10,17 112:22 113:4,11,21 116:1 117:6 140:12 143:2 148:24

questioning 70:10

questions 5:19 7:9 8:20 9:5,21 12:6 19:24 35:12 46:9 47:2,15 61:24 70:20 71:12,14 72:5 73:25 106:14 110:19,23 111:5,13 112:10,17 140:7,9,25 149:8

Qui 19:4,10 52:3,12,22 53:24 55:17 56:14 57:2 67:7,14,16 68:7 76:23 103:22 104:4,16,21 106:19 117:25 118:4,8 121:7,16,25 125:19 127:13,18,21 128:4,10,14 129:7,16,21 130:1,7,11 135:8 154:14 155:2 156:17,22 157:4 158:6,7

quick 110:12 139:23

quote 91:22 149:13

## R

Rall 19:5,17 54:22 55:24 56:15 57:3 63:12 65:22 66:3 67:8 83:24 84:10 131:2,18 145:12 146:17

rang 61:15

rattling 128:20

read 79:10 81:1,8 82:1,3,10

real 36:23 63:15

realize 153:25

reason 17:17 66:6 83:15 88:8 94:14,21 98:24,25

reasoning 148:2

reasons 48:23 123:24

recall 6:22,23 15:23 16:8,10,12,13,20 18:2 41:23 42:23 43:3,15 44:1,7 52:20 53:7,10,12,16 77:5,6,16 90:10 116:21 117:14,20 119:7 120:5,6 122:8 128:19 144:12

receive 130:7

received 76:16,21

recite 81:6 82:18

recognition 79:18

recollect 118:25

recollection 68:16 131:14

record 6:6 9:11 15:17 19:20,22 20:1 49:17 53:20 56:22 67:4 70:8 71:5,13 72:12 81:12 82:2,4 96:18 106:13 128:24 140:15,21 149:15,17

recording 64:9 65:3 66:8 147:1

records 131:25

recovery 130:7

Reed 66:19,20 155:5,7 157:17,24

refer 88:2 91:10 105:4 115:21 125:1

reference 82:11 88:18,22 89:4 90:2,3 91:4 93:23 94:4 96:13 124:24

referral 112:14 115:15 116:2 130:14

referred 10:3 67:25 68:11 112:8,20 155:9

referring 57:20 89:19 90:19 151:25

reflect 67:4

refresh 52:24 53:4

refusal 9:6 48:1 72:6

refuse 6:7 7:17,20,24 8:1,8,16,23 9:1,12,16,20,22 21:9 46:11 47:4,8,18 50:15,19 62:4 70:17,21 71:7,16,19,25 72:3,4,14 75:16 97:19 110:17,21 111:1,3,9,16 112:21 113:3,10,20,24 114:11,17 116:1

refused 83:17

refusing 95:9

regard 140:23 145:16

Reiner 80:19

relate 113:12

related 72:25 73:1 76:17 78:23 125:7 155:11

relates 48:3 74:7 156:2

relating 49:9

relation 158:5

relationship 47:3,15 75:14 114:14,19,23 115:4,10 126:20

relationships 31:21

release 20:4,6

relevant 17:22

remember 6:16,18 13:16 14:23 17:20 18:19,22 22:17 40:25 41:8 52:4,11,15,25 61:13 64:15 69:19 84:3 86:22 87:2 89:21 101:11 116:10,16 119:7,24 120:4,12 122:5 125:12 128:21 129:1 131:16,17 144:8,9 145:15,18

remembered 18:22 66:16

remind 89:25

repeat 12:18 18:24 62:23 72:19 78:2 80:24 81:7,10,21 84:4 88:20 103:12 104:19

repeating 68:13

report 97:9

reporter 10:5 11:12 50:9

represent 19:23,25 83:25 157:25

representation 7:10 8:20 9:5 73:20

representations 110:8

represented 61:25 75:8,10,11,18 82:15 157:19

representing 144:3 159:7

represents 83:23

reputation 32:11,20 33:20

respect 18:6 79:16 91:3 92:25 104:3,8 112:14 114:23 115:4 140:9 141:6,14 149:12 157:8,12 158:20

respectfully 72:4 79:12

respond 6:7

response 79:18

responses 80:16

restaurant 13:11 36:19 37:13 38:25

restriction 82:22

retain 7:13

retained 7:21 8:2,8

reveal 139:15

review 11:15

revisit 140:13

Reynolds 5:2 6:9,10 39:1 70:1

Richard 73:2

rights 114:2,6

Rimlawi 116:17 117:11 118:15,25 119:7,11

ripped 53:2

risk 6:8

Rob 38:21 39:4,10,11,13,15,20

Rolfe 76:1,5 77:21 78:6 85:3,9,15, 22 86:3 88:1,9 92:14,19 93:10 94:14,22 105:25 106:5,9,15 115:4 132:9 141:17 157:2

rolling 42:20

Ronald 52:3

rude 37:1

Rule 10:18

rules 10:15 73:10

run 52:6,8 56:6,8 120:17 122:11 123:14 134:22 142:18 145:13

running 25:9 74:2

runs 142:25

RXPRESS 57:3 65:12 132:1,9

Ryan 5:2 6:9 36:24 38:25 39:6 81:18 143:24

**S**

Sanchez 16:2

scared 144:15

scenario 45:7

scheme 109:24

schemes 118:15 125:7

school 136:12,13

Schuster 19:5,16,23,25 52:3 54:22 55:24 56:15 57:3 63:12 65:12,22 66:3 67:7 131:2,18 132:9 142:20 145:12 146:17

Scoot 142:20

scope 114:14

Scott 19:5,16

screwed 97:6 143:1

search 66:23

searching 135:8

SEC 63:24 67:24 68:9,12 83:24 84:8 142:18 144:20,21,25 155:8

secondary 38:15

secondhand 36:14 42:14 44:15, 24 45:22 142:3,11

secured 79:14

securities 69:23 70:23

Security 132:8

Segedy 5:13,16 110:15

segments 132:23

self-dealing 26:24

self-incrimination 79:13 80:10

self-inflicted 67:3

sell 79:8 80:21 81:12,13,18 83:17 143:24 149:23

selling 82:23

sense 32:13 154:9,10

September 116:8 117:25

served 7:1

services 7:13

set 12:10 20:21 61:21

shady 124:2

shared 12:8

shares 78:13,16,18,24 79:8

shit 39:6

shop 56:14 103:22

shopped 57:2

shopping 67:7 104:4,16

shore 139:24

short 51:17

shorten 22:23

shorter 41:11

shoulder 36:21

show 6:6 49:13 57:13 158:13

showed 54:7 66:22 67:23 118:3 158:17

sic 8:12 79:25

side-bar 41:13,17 100:20

signature 47:21

signed 46:25 58:14

similar 21:13

simply 79:18

sir 5:6 6:2 7:11 8:7 22:13 41:19 47:17 66:6 83:4,13,15 84:13,17,20 85:14,15 87:25 88:7,17 92:13 93:8 94:13 98:15 102:8 110:16 116:20

sit 15:22 18:1 43:15,25 44:6 53:7, 12 100:16 124:14 128:21 129:1

sitting 36:20 148:23

situation 144:18

slanderous 126:13

smart 45:14 136:4

smell 12:15,22

Smith 75:7,11,17,24 76:3 83:23 84:8 85:3,9,16,22 86:3 88:1,9 92:14,20 93:9 94:14,22 105:22 114:23 141:7,14 157:3

so-called 154:23

social 17:5

sold 78:23

solely 133:10

solicited 78:23 129:6

somebody's 32:11

sort 97:23 98:4 106:18

source 106:23 112:14 115:15 116:2

sources 38:15

Southwest 52:17,19

space 101:2,18 102:1 107:7,17

speak 61:12

speaker's 80:19

speaking 48:9 99:1 118:25

special 20:14 21:3

specific 99:15

specifically 37:16

specifics 55:23 119:4 121:17

spent 116:23 117:3

spoke 98:24 117:11,19

spoken 22:10

spread 83:10

spurred 133:7

standard 120:22

standards 20:7

standing 37:7 38:2

stands 59:22

stapling 159:18

start 18:10 62:21 100:11,13

started 12:4 14:24 18:11 116:12

state 6:2 11:8 64:7 69:4 79:15,22 96:18

statement 9:3,14 15:19 20:4 23:8, 11 31:23 32:10,19 41:24 51:14 69:5 79:23 134:19 146:10,13

statements 21:22 34:6 85:16 110:7 134:5,13

States 13:18 79:25 80:16 103:9,17

stay 123:23

staying 5:23

stays 6:1 135:17

Stevens 99:6

stick 140:18

stipulate 41:16 82:12

stock 78:18,24 80:21 81:13,18 82:23 103:1 118:14

stocks 83:5,6,11,17

stopping 126:25

stories 42:4

story 41:1 134:23 145:13

strange 37:9 46:4

strategize 129:20

street 154:5

strictest 27:6 133:25

strike 5:25 6:3 8:17 14:19 23:24 26:1 29:2,4 39:22 41:19 58:8,10 60:8,24 62:11 63:1 69:4 71:18 73:6,18 83:3,14,20 87:12 89:11 90:25 91:15 93:7,15 98:24 105:12 107:4 110:3 111:2 115:2 116:9 119:25 129:5 137:9,19 149:25 157:13

strikes 119:1

struck 146:18

stuff 17:11 58:17 60:16 97:3 137:2 142:2,7 158:17

subject 111:12,18 112:24 113:6, 13

subpoena 7:1 136:15

substance 48:6,19

substantive 118:21,24 119:18 120:14 123:8

sudden 63:21

sue 130:21 131:2

suggest 23:24 24:7 26:3 28:6,13, 20 29:6 30:12 31:13 54:9 57:1 69:6,11 73:9,17 74:5,12 89:2,13 100:25 101:17 106:17 110:6 126:12 131:6 132:7 134:22

suggestion 10:3

suggests 49:19

suited 140:11

sum 48:6,19

supervised 20:3,6

supplied 69:12

supply 79:19 80:4

support 22:5 103:14

supported 20:24

supporting 130:11

supposed 45:19

supposedly 45:21 153:7 157:22

Surely 51:18

surreptitiously 157:4

surrounding 9:21

suspend 160:1

sustain 41:13

sweet 135:16

sworn 5:3 46:23 51:11 88:17,21

**T**

taking 74:18,21 78:22 79:3 81:12 87:13 98:20,22 104:7 112:5 115:3, 8 116:3,5 156:6

talk 17:23 38:25 39:13,14 50:9,11 52:17 70:16 78:20 95:9 97:7 98:10 99:1 122:14 130:13 149:3,5 159:24

talked 17:4 18:2,10,13 19:4 22:17 101:11 107:20 111:5 112:19 113:6, 7 114:13 117:15 119:4,11 120:6

hg
EXHIBIT 1

121:21 122:9 140:12

**talking** 22:12,21 65:2 86:22 93:1,4 96:25 101:6 102:5 111:19 116:16, 24 117:4 119:2,7 144:1 145:17 146:11 148:3 151:11,16,20,24 152:17,18,19 153:3,23 154:8 155:9 158:3,25

**tall** 120:24

**Tam** 19:4,10 52:3 55:17 56:14,15 67:7,14,17 68:7 103:22 104:16,21 106:19 118:8 121:16 125:19 127:13,18,21 128:4,10,14 129:7, 16,21 130:1,8,11 135:9 154:14 155:2 156:18,22 157:4 158:6,7

**Tam's** 121:25

**Tams** 52:12,22 53:24 57:2 76:23 104:4 117:25 118:4 121:7

**tape** 64:9 99:4

**Taylor** 135:19,20

**telephone** 61:10

**television** 132:23

**telling** 5:19 42:4,14 44:7 99:5 144:8 145:4 147:24 148:19 151:14 154:22

**ten** 70:4 141:3

**terms** 52:12 68:13,16 113:4 123:2 124:19 141:3

**testified** 5:3 18:8 107:23 149:15

**testify** 12:8,9 20:20 21:6,8 47:24 49:3 70:2,9,13 71:10 75:14 78:25 113:17 115:9,11,17

**testimony** 11:11 46:24 51:11 74:19 80:1,4 88:17,21 113:13 127:10

**Texas** 73:10 79:15

**text** 84:3 88:2,19,23 89:4,19 91:4, 10 93:23 94:4 96:13 105:5 124:24 147:1 151:25 152:19

**texted** 83:22

**thing** 12:4 37:8 39:14 42:20,21 123:17 134:2 142:13,14 144:13 145:7

**things** 18:14 39:18 51:22 70:2,7 71:22 102:4 144:8 145:4 147:1

**thinking** 128:3

**thirdhand** 45:4

**Thirty-three** 33:8

**thought** 33:15 37:1 41:11 43:10 54:14 119:1,3 153:4 154:8 155:4

**threatened** 84:13,22 85:3,9

**throw** 69:18 158:23

**Tillery** 71:3,9,11 91:21 99:4

**time** 35:11,13 37:25 39:2 43:24 50:10,12 51:10 55:22 57:10 61:11 62:24 63:13 64:21 67:12 102:3 107:19 116:24 117:3 127:14 135:7 136:16 160:2

**timeline** 141:3

**times** 6:15,17,21,24 13:20 14:2,4 61:6,9 143:12 159:23

**today** 5:10,17 74:19,25 75:1,3 111:13,19 112:25 113:7,13 114:3,6 159:1

**told** 20:19 22:15,17 36:19 38:19 39:21 41:1 42:8 44:19 56:5,8 59:16 62:13,15 63:6,21,22 64:2,3,4 65:2 66:18 67:24 83:4,13 86:12 93:16 97:21 98:16,21 103:21 104:3,15,20 120:17 122:10 123:13 127:24 131:21 135:4 142:24 144:14,25 145:10 147:4,5 157:17 158:11,18

**total** 16:11

**touch** 12:15,22

**touched** 101:11

**touching** 159:19

**trade** 144:23 145:11

**traded** 78:13,16

**trading** 82:22

**train** 150:9

**treaties** 77:14

**treatise** 92:2

**Trilogy** 64:10,13,14 65:4,18 66:8 67:17,19 125:13,16

**trouble** 39:7 68:5,9 98:4 120:25

**true** 6:11 9:3,13,23 15:19 16:2,15 17:6 18:11 19:17 20:4 23:3,8,11 31:22 33:18 36:4,5 43:2,8 44:16

45:4,7 51:14 53:21,22 58:2,5,6 59:24,25 63:17 66:13 69:8,9,10,14, 17 77:18 80:7,20 83:4,9,13,15 84:13,17,20,22 85:2,8,14,15,21 86:2 87:25 88:7 89:5,15,17 92:13 93:8,12 94:3,10,13,17 101:2 102:25 133:12,16 146:13

**Trustworthy** 138:22

**truth** 11:5,6 32:21

**Truthful** 80:16

**turn** 153:16 159:10

**type** 17:11 29:13 76:22 77:13 151:3

## U

**U.S.** 79:14 132:8,17

**UDF** 83:25

**Unbiased** 139:1

**understand** 10:6,21 11:2,8,11,14, 22 12:12 13:4 19:23 21:15 37:12 41:10 69:23 78:3 95:2 108:23 117:25 118:4 152:1 153:10,17,21, 23 154:15,16,19

**understanding** 21:19,21 32:9,22 33:2,5 49:19 98:25 146:5,9,10,16 151:10,13 153:6 154:25

**understood** 39:11 155:10

**unethical** 22:6 23:17 40:10,17,18 41:22,24 44:8 55:2 97:23 124:22

**United** 13:18 79:24 80:16 103:9,17

**unlawful** 23:10 101:1

**unmask** 139:19

**Unprejudiced** 139:3

**unquote** 149:13

**update** 136:18,21

**upfront** 133:19

**Upright** 138:18

**urged** 134:22

**utmost** 26:10 27:18

## V

vendetta 83:16

versus 13:6 22:17

violated 73:10 74:6

## W

waive 149:8

waiving 5:24

walked 36:19 37:6,7,21 38:2

wanted 39:13,14,17 63:14 66:20 83:10,17,25 97:21 120:23 127:12 144:19 149:12 156:21 159:8

warrant 66:23 133:8

Wednesday 7:2

weekend 84:2

weird 63:19

weirdest 39:18

well-being 125:24

whatsoever 36:7 55:9 122:16 155:12 159:13

When's 107:19

White 18:11,16

whomever 71:6,13 142:20 143:8 154:4

wide 100:10

willful 120:13

willfully 32:3

wire 63:14 69:24 70:22

wired 42:9 64:6,9 65:2,12 142:14 143:7

wires 63:17,18

withdrawing 140:23

witnessed 101:10

wolf 159:23

word 11:12 32:9,18

words 89:1

work 5:12 53:24 113:12 121:25

worked 39:10 75:23 76:1 118:1,5 121:16 128:8 132:22

works 5:17,19 118:8

world 33:7 100:10

worried 63:15 67:23 155:8

worry 37:5,6,20

Worth 135:5

Wow 33:13

writing 84:3

written 32:10

wrong 43:19 57:21 98:17 100:7 124:15,21 143:3 145:3,5

wrongdoer 80:17

wrongdoing 54:2,22 63:3 101:1 142:10

wrongful 23:3 32:4 54:10 55:3,16, 24 95:16 141:24 152:11

wrote 46:22,24

## X

Xpress 57:3 131:18

## Y

y'all 54:15

year 13:15 82:16

years 13:12 33:7,8 68:17,18 70:5 78:14 107:22 112:25

yes-or-no 13:5

you-all 119:6




STATE OF TEXAS }
COUNTY OF DALLAS }

I, FELICIA PITRE, Clerk of the District of Dallas County,
Texas, do hereby certify that I have compared this instrument
to be a true and correct copy of the original as appears on
record in my office.

GIVEN UNDER MY HAND AND SEAL of said Court, at office
in Dallas, Texas, this 13th day of December A.D., 2017

FELICIA PITRE, DISTRICT CLERK
DALLAS COUNTY, TEXAS

By Benny John                    Deputy

TAB E

NO. DC-17-13448

| BRANDON MCCARTHY | ) | IN THE DISTRICT COURT |
| | ) | |
| VS. | ) | 134TH JUDICIAL DISTRICT |
| | ) | |
| JOHN/JANE DOES 1-10 | ) | DALLAS COUNTY, TEXAS |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF

RYAN REYNOLDS

NOVEMBER 10, 2017

Volume No. 1

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION of RYAN REYNOLDS, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 10th of November, 2017, from 10:12 a.m. to 2:51 p.m., before Sherry Folchert, CSR, in and for the State of Texas, reported by machine shorthand, at the offices of David Bell, 8350 Meadow Road, Suite 186, Dallas, Texas, pursuant to the Texas Rules of Civil Procedure.

**CERTIFIED TRANSCRIPT**

hg

**EXHIBIT 1**

A P P E A R A N C E S

FOR THE PLAINTIFF:

James S. Bell
JAMES S. BELL, P.C.
2808 Cole Avenue
Dallas, Texas   75204
214-668-9000

FOR THE WITNESS:

David Bell
DAVID BELL, P.C.
8350 Meadow Road, Suite 186
Dallas, Texas   75231
214-368-3191

ALSO PRESENT:

Brandon McCarthy
Kelley Cash
Matt Segedy

hg
**EXHIBIT 1**

INDEX

PAGE

Appearances . . . . . . . . . . . . . . . . . . . .    2

Stipulations. . . . . . . . . . . . . . . . . . . .    4

RYAN REYNOLDS
    Examination by Mr. James S. Bell . . . . . . . .    5

Signature and Changes . . . . . . . . . . . . . .  161

Reporter's Certificate. . . . . . . . . . . . . .  163

EXHIBITS

NO.  DESCRIPTION                                    PAGE

 1   Fifth Amendment Invocation                       79

CERTIFIED QUESTIONS

 1   When did David Bell become your lawyer?        7/7

 2   When did you retain Mr. Bell for services?     7/12

 3   So you're going to refuse to answer my         7/20
     question about when you retained Mr. Bell to
     become your lawyer?

 4   Are you going to refuse to answer my question  8/1
     about when you retained Mr. Bell as your
     lawyer?

 5   Sir, are you going to refuse to answer my      8/7
     question about when you retained Mr. Bell
     to become your lawyer?

 6   You're going to refuse to answer my question   9/1
     about when Mr. Bell became your lawyer.

hg

**EXHIBIT 1**

Is it possible that Nathan Halsey, when he told you that he got wired up and was talking to the FBI and made a recording, it was for -- it was of a man named Mr. Bob Miller from Trilogy? Is that possible?

A. Absolutely.

MR. DAVID BELL: Objection; form.

MR. JAMES BELL: What's that?

THE WITNESS: Absolutely.

MR. DAVID BELL: Objection; form.

Q. (BY MR. JAMES BELL) Okay. So if that's possible, it's also possible that Nathan didn't tell you that he was wired up for Schuster, RXpress, et cetera, correct?

MR. DAVID BELL: Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) Okay. And so you don't know whether or not Halsey was meeting with FBI regarding the Trilogy case, correct?

A. Correct.

Q. You don't have any direct evidence that Halsey was meeting with any law enforcement folks regarding Rall, Schuster, or any of those folks, correct? You don't have direct knowledge of that, correct?

A. Well, I didn't -- the DOD came to his house and took his phone, but I wasn't there.

Q. You don't have any direct knowledge that -- that Nathan Halsey was cooperating with law enforcement regarding Schuster, Rall, or any of those folks, correct?

A. Correct.

Q. Okay. And are you aware, sir, that the reason why the DOD came to his house and got his phone was for a recording that he had with Mr. Bob Miller from Trilogy Pharmacy? Were you aware of that?

A. No.

Q. Is that news to you?

A. Yes. He explained it differently to me. So that's news to me, yes, if that's true.

Q. Okay. And -- well, let me ask you this question.

Is it possible that you remembered it differently?

A. No, he -- I mean Nathan told me that the DOD called him. He called Reed Prospere and said they wanted his phone and Reed said, well, let me look at it and I'll call you back. And he said the next morning at 5:00 a.m. they showed up and got his phone.

Q. With a search warrant?

A. Yes.

Q. And so --

MR. JAMES BELL: I don't know -- I'm bleeding right there.

MR. DAVID BELL: It's self-inflicted, let the record reflect.

Q. (BY MR. JAMES BELL) Okay. So -- so you're not -- you don't have any direct evidence that Halsey and Brandon were shopping a Qui Tam against Schuster, Rall, or any of those folks, correct?

MR. DAVID BELL: Objection; calls for a legal conclusion. Objection; form.

THE WITNESS: Correct.

Q. (BY MR. JAMES BELL) And at some point in time Halsey -- are you aware of whether or not Halsey did file a Qui Tam case?

A. I'm not.

Q. Do you know whether or not Halsey filed a Qui Tam case against the Trilogy Pharmacy?

A. Not that I'm aware of.

Q. Is it possible that you mixed up Trilogy, Express, different pharmacies, just because there's a lot going on, like you said earlier?

A. It's possible. But Halsey's deal was not -- he was more worried about, you know, he showed me his complaint with the SEC and I told him that in my opinion this is a -- could possibly be referred to the

Department of Justice. But he was more concerned with all of that, I mean, than -- so the answer to your question is it's possible, I don't know what he was looking at doing. But -- but from my perspective, he was more trying to get himself out of trouble than anything else that concerns any companies or any other individuals, including a Qui Tam case.

Q. So Halsey was more concerned about getting himself out of trouble with the SEC, right?

A. Well, and -- and not and -- and hoping that -- you know, not be referred to the Department of Justice. So both of those. I think -- so yes, correct, the SEC.

Q. And so -- and in terms of you repeating what Halsey says, you would agree with me that it gets fuzzy between different -- the different names of different fuzzies in terms of your recollection, given the fact that it was over -- it was two years ago or over two years ago. Would that be fair?

MR. DAVID BELL: Objection -- objection; form.

THE WITNESS: Yes.

Q. (BY MR. JAMES BELL) Do you have any direct evidence that Brandon McCarthy has anything to do with the Dallas Morning News article?

MR. DAVID BELL: Objection; form.

EXHIBIT 1

Objection.

THE WITNESS:  Not direct, no.

Q.  (BY MR. JAMES BELL)  Do you have any -- so let me state it a different way.  Strike that.

It would be a fair statement to say you don't have any evidence, knowledge, or facts to suggest that Brandon McCarthy had anything to do with any Dallas Morning News articles.  True?

A.  True.

Q.  It would also be true to say that you don't have any direct evidence, knowledge, or facts to suggest that Brandon McCarthy has supplied Kevin Krause with any information about any clients, potential clients, or any other folks for that matter.  True?

MR. DAVID BELL:  Objection; form.

THE WITNESS:  I don't have direct evidence, true.

MR. JAMES BELL:  Did I throw that back in there.  I can't remember.

(Pause in proceedings)

Q.  (BY MR. JAMES BELL)  So you -- were you -- you were convicted of -- just by way of background, so that I understand, conspiracy to commit securities fraud.  And was it conspiracy to commit wire fraud and mail fraud or were -- did you get the actual charges?

MR. DAVID BELL: Mr. Reynolds is not going to testify about anything -- though those things are on -- .

MR. JAMES BELL: They're less than ten years old.

MR. DAVID BELL: Let me -- let me finish, please. Some of those things that you're inquiring about are part of the public record. He's just not going to testify about any matter regarding any of this line of questioning.

MR. JAMES BELL: Sure.

MR. DAVID BELL: He's not a party to this lawsuit and I'm not going to let him testify about anything. He answered your one question about he having previously been convicted. That's all he's going to talk about any of his prior criminal matters.

Q. (BY MR. JAMES BELL) You're going to refuse to answer my question about --

MR. DAVID BELL: And I'm advising him not to answer those questions.

Q. (BY MR. JAMES BELL) You're going to refuse to answer my question about being convicted of wire fraud, securities fraud and mail fraud, correct?

A. Correct.

Q. You've also been cited for contempt of court,

hg
EXHIBIT 1

MR. JAMES BELL: Is that cool?

MR. DAVID BELL: Sure.

MR. JAMES BELL: Okay.

(Break taken)

Q. (BY MR. JAMES BELL) All right. Just -- is there anything I can say or do to change your mind about the questions I've asked regarding the Fifth Amendment? Change -- are you going to continue to maintain the Fifth Amendment with respect to the questions I asked you?

MR. DAVID BELL: I'm better suited to answer that question than he is. So we've talked about meeting. Let's meet and then we'll revisit all that.

MR. JAMES BELL: I know. I just need to get it on the record.

MR. DAVID BELL: Okay. That's fine.

MR. JAMES BELL: Okay.

THE WITNESS: Yeah. I would like to stick with my answers.

MR. JAMES BELL: I just -- let me ask it again, just so I have a clean record.

Q. (BY MR. JAMES BELL) Is there anything I can say or do to change your mind with regard to withdrawing your assertion of the Fifth Amendment privilege regarding any of the questions I've asked you thus far?

A.   No.

MR. JAMES BELL:  Okay.  Now, just -- I think it will take ten minutes in terms of a timeline.  Well --

Q.   (BY MR. JAMES BELL)  You're going to assert the Fifth Amendment privilege with respect to any dealings with Cameron Smith, correct?

A.   Well, any attorneys is what I'm going to assert the Fifth Amendment with.

Q.   Okay.

MR. DAVID BELL:  Any and all.

THE WITNESS:  Yeah.

Q.   (BY MR. JAMES BELL)  You're going to assert the Fifth Amendment privilege with respect to Cameron Smith, correct?

A.   Correct.

Q.   Jim Rolfe, correct?

A.   Correct.

Q.   Joe Kendall, correct?

A.   Correct.

Q.   Okay.  Now, you're aware of circumstances whereby folks were -- or have tried to implicate -- or her of implicating Brandon -- Brandon McCarthy in some kind of nefarious or wrongful conduct, correct?

MR. DAVID BELL:  Objection; form.

THE WITNESS: Well, I mean -- hearsay. I've heard at lot of stuff, you know.

Q. (BY MR. JAMES BELL) Secondhand?

A. Yeah. About everybody and everything. I mean as far as this case is kind -- or this deal, whatever you want to call it, has kind of taken on a life of its own. So I've heard all kinds of stuff about all different people.

Q. So what have you heard about any alleged wrongdoing by Brandon McCarthy, even though it's secondhand? Now I'm asking for indirect knowledge or indirect facts.

A. I mean the thing -- I guess, you know, the whole thing with -- with Nathan and getting wired up by the FBI. That -- I -- I really get confused as far as the companies or whatever that maybe -- that as far as Kevin Krause is concerned that -- that for -- that Kevin Krause would not run Nathan's SEC complaint in the newspaper if -- if he was given the information on whomever, Scoot Schuster, Dustin, et cetera. But I don't -- I don't know who that deal was made with, if there ever was a deal. I just had heard that from Nathan.

Because Nathan had told me that if that article runs in Dallas -- all his investors are in

EXHIBIT 1

Dallas -- and he's basically screwed.

Q. My question is: What have you heard that Brandon McCarthy has done wrong? Or has everything you learned about Brandon McCarthy come from attorneys?

A. No, I mean a lot of it came from Halsey. But I don't -- you know, I mean I guess the -- that I heard that he sent Nathan to the FBI office to get wired up to go get information against whomever. I don't know exactly who they were, but...

That.

You know and, like I said, about me, I've heard, you know, numerous times that he had somebody at the IRS and that he was going to put on me.

Q. Who did you hear that from again?

A. Well, I heard it from the guy that Carl, who was a client of what's his name that I mentioned earlier. I don't know. It's some -- some attorney. Carl Fleming is his name. The guy at Hillstone. I know that there's a guy whose name is Hoi that has, you know, been calling people. And I had a girl -- an ex-girlfriend that said he called her and was asking about my investments and did I beat her up. And then she said eight months later he called and said, well, does Ryan sell drugs? And I'm going, what's going on here?

EXHIBIT 1

I've heard -- well, you're talking about Brandon. I'm trying to think. I mean, that -- that he was representing somebody and getting evidence against them when they were his client -- when they were his firm's client.

Q. Who did you hear that from, that allegation?

A. I don't know. It's like all so convoluted. I don't really remember. I'm just telling you things I remember that I've heard. You know...

Q. Did you hear that allegation from any attorneys?

A. I don't recall. But I mean I guess the main thing is the FBI thing. Because -- that -- that's -- you know, when Nathan told me that was -- that he was doing that, that -- that scared me. And I don't know who, what or -- had anything to do with that. But I didn't -- that's when I was -- that made me nervous. You know, especially in my situation. I just felt that was careless of him to be doing. But I know he wanted to get off that case, that SEC case.

I heard that -- that Brandon called the SEC attorney that was handling Nathan's case and maybe tried to trade -- you know, try to get Nathan -- help Nathan out. And I don't know if that's improper or not. I mean but I heard that. And that the SEC attorney told

EXHIBIT 1

Nathan that if Barack Obama calls me, I wouldn't drop this case. I'm not -- I'm not -- I don't know if that's wrong or not. I don't know if Brandon had anything to do with it. I'm just telling you things I've heard. I'm -- I'm not saying they're right, wrong, or indifferent. I don't know.

But mainly the FBI thing and, you know, from Nathan what said I -- I didn't -- you know, that he went to Krause. I don't know who all met with Kevin Krause. But, you know, it was told to me that there -- it was a trade where they would get Kevin the information on Schuster, Rall, et cetera, and all the companies if he wouldn't run that story.

Basically that's, you know, what I can remember.

Q. With regard to your assertion of the Fifth Amendment regarding the book that we were talking about earlier. Do you remember that?

A. Yes.

Q. Okay. When did you first hear of a book or a PowerPoint? Are you going to take the Fifth Amendment?

A. Well, I've never heard of a PowerPoint.

Q. Okay. You've heard of a book?

A. I've heard of a book, but I don't -- I've never seen a book. I don't -- it's my -- it's my belief that

hg

EXHIBIT 1

the book -- that the way that it was described by Gus and Nathan -- had nothing do to with Brandon.

Q. Your under --

A. I --

Q. Your understanding is the book had nothing to do with Brandon?

A. No. It wasn't -- it wasn't a --

Q. Well, I just -- I asked you a double negative.

It was your understanding -- would it be a fair statement to say that your understanding was the book that you were talking about earlier with Gus and Nathan had nothing to do with Brandon. That would be a true statement, correct?

A. Abso-- yes.

Q. Okay. Now, tell me what else do you --

A. Well, the -- the -- from my understanding was it was about Schuster and Rall. I don't even -- it was never -- I never have heard -- that's what struck me as funny when you said was there a book that was trying to -- that people were trying to get to hurt him. It was -- it had nothing to do with him. I think you're -- you're -- there's something that you're missing as far as that's concerned.

I think that whatever this book was had to do with the evidence that Nathan obtained on whoever he

EXHIBIT 1

was recording and text messaging and things of that nature.

Q. That's your guess?

A. That's what I was told.

Q. Who were you told that by?

A. Nathan and Gus.

Q. Okay. But as far as you know, you don't -- you don't think Brandon had anything to do with this book, correct?

A. No.

Q. Correct?

A. Correct.

Q. Okay. So yeah, I asked you a double negative. Just to be clear.

As far as you knew Brandon McCarthy had nothing to do with this book that Nathan and/or Gus -- Nathan Halsey, Gus Kepler had made, correct?

A. Correct.

Q. Now, at some point you were trying to obtain this book from either Gus or Nathan, right?

MR. DAVID BELL: Objection; form.

THE WITNESS: That, I'm going to plead the Fifth on -- on anything that has to do with me trying to obtain this book. I'm just telling you --

MR. DAVID BELL: Just let -- let him --